IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

Docket No.

_____

ANDREA RIDGELL, on behalf of herself and all others similarly situated,

Petitioner,

v.

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA,

Respondent,

FRONTIER AIRLINES, INC.,

Real Parties in Interest.

_____

From the United States District Court, Northern District of California
Case No. 2:18-cv-04916-PA-AFM

APPENDIX (Vol. 2 of 2)

_____

Marcus J. Bradley CBN 174156
Kiley L. Grombacher CBN 245960
Bradley/Grombacher LLP
2815 Townsgate Road Suite 130
Westlake Village, CA 91361
Phone: (805) 270-7100
Fax: (805) 270-7589

Kristi D. Rothschild CBN 222727
Rothschild and Alwill APC
27 West Anapamu Street Suite 289
Santa Barbara, CA 93101
Phone: (805) 845-1190
Fax: (805) 456-0132

Attorneys for Petitioner

## TABLE OF CONTENTS

| Record Tab | Volume | District Court Docket Number | Date | Description | Bates Number |
|---|---|---|---|---|---|
| 1 | 1 | 42 | 11/9/2018 | Order Denying Plaintiff's Motion for Class Certification | ER000001-ER000008 |
| 2 | 1 | 30 | 10/01/2018 | Civil Minutes Denying Plaintiff's Motion for Relief from Deadline Imposed by Local Rule 23-3 | ER000009-ER0000010 |
| 3 | 1 | 20 | 8/28/2018 | Minutes (In Chambers) - Court Order Denying Motion for Ex Parte Relief | ER0000011-ER0000012 |
| 4 | 2 | 41 | 11/5/18 | Reply in Support of Motion for Class Certification | ER0000013-ER0000017 |
| 5 | 2 | 40 | 10/29/18 | Frontier Airlines Inc.'s Opposition to Plaintiff's Motion for Class Certification | ER0000018-ER0000044 |
| 6 | 2 | 40-1 | 10/29/18 | Declaration Valerie W. Tyler in Support of Opposition re: Notice of Motion and Motion to Certify Class | ER0000045-ER0000075 |
| 7 | 2 | 40-3 | 10/29/18 | Declaration Jeffrey J. Ellis in Support of Opposition re: Notice of Motion and Motion to Certify Class | ER0000076-ER0000079 |
| 8 | 2 | 39 | 10/23/18 | Declaration of Andrea Ridgell in Support of Motion to Certify Class | ER0000080-ER0000084 |
| 9 | 2 | 38 | 10/22/18 | Notice of Motion and Motion for Class Certification | ER0000085-ER000096 |
| 10 | 2 | 38-1 | 10/22/18 | Declaration of Marcus J. Bradley in Support of Motion to Certify Class | ER000097-ER000104 |

| 11 | 2 | 38-2 | 10/22/18 | Declaration of Kiley L. Grombacher in Support of Motion to Certify Class | ER000105-ER000107 |
| 12 | 2 | 38-3 | 10/22/18 | Declaration of Andrea Ridgell in Support of Motion to Certify Class | ER000108-ER000112 |
| 13 | 2 | 33 | 10/5/18 | First Amended Class Action Complaint | ER000113-ER000138 |
| 14 | 2 | 24 | 9/20/18 | Frontier Airlines Inc.'s Notice of Non-Opposition to Plaintiff's Motion for Relief from Deadline Imposed by Local Rule 23-3 | ER000139-ER000142 |
| 15 | 2 | 23 | 9/17/18 | Joint Report Pursuant to Federal Rule of Civil Procedure 26(F), Local Rule 26-1, And the Court's Scheduling Order | ER000143-ER000154 |
| 16 | 2 | 21 | 9/6/18 | Plaintiff's Notice Of Motion And Motion For Relief From Deadline Imposed By Local Rule 23-3; Memorandum Of Points And Authorities In Support Thereof | ER000155-ER000164 |
| 17 | 2 | 21-1 | | Declaration Of Kiley Lynn Grombacher In Support Of Motion For Relief From Deadlines Imposed By Local Rule 23-3 | ER000165-ER000168 |
| 18 | 2 | 22 | 9/6/18 | Plaintiff's Request for Judicial Notice re: Notice of Motion and Motion for Relief from Deadline Imposed by Local Rule 23-3 | ER000169-ER000237 |
| 19 | 2 | 19 | 8/29/18 | Notice of Non-Opposition to Ex Parte Application for Relief from Deadline Imposed | ER0002389-ER000241 |

3

| | | | | | |
|---|---|---|---|---|---|
| 20 | 2 | 18 | 8/28/18 | by Local Rule 23-3 Ex Parte Application for Relief from Deadline Imposed by Local Rule 23-3 filed | ER000242-ER000252 |
| 21 | 2 | 18-1 | 8/28/18 | Request for Judicial Notice. | ER000253-ER000321 |
| 22 | 2 | 18-2 | 8/28/18 | Declaration of Kiley Grombacher In Support of Motion for Relief. | ER000322-ER000325 |
| 23 | 2 | | | District Court Docket For Case #: 2:18-cv-04916-PA-AFM | ER000326-ER000332 |

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile: (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com

**ROTHSCHILD & ASSOCIATES, APC**
Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
27 W. Anapamu Street, Suite 289
Santa Barbara, California 93101
Telephone: (805) 845-1190
Facsimile: (805) 456-0132
krothschild@kdrlawgroup.com
jalwill@kdrlawgroup.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA RIDGELL, on behalf of herself and others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California<br><br>Defendants. | **CASE NO. CV 18-4916 PA (AFMx)**<br><br>**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>**DATE: November 19, 2018**<br>**TIME: 1:30 P.M.**<br>**DEPT: 9A** |

ER000013

Plaintiff Andrea Ridgell ("Plaintiff") hereby submits her reply memorandum in support of her motion for class certification.

## I.   INTRODUCTION

Defendant Frontier Airlines, Inc.'s[1] opposition to Plaintiff's Motion for Class Certification reads more like a hybrid motion for summary judgment/motion to dismiss/opposition to motion for class certification.   Defendant's arguments can be grouped into three categories: (1) preemption arguments; (2) jurisdiction arguments; and (3) certification arguments. The preemption arguments raised therein are largely inappropriate for disposition at this stage of the litigation and, if anything, serve only to underscore the propriety of certification.   The remaining arguments further bolster the arguments in favor of Plaintiff's need for discovery to adequately prepare her motion for class certification.  For the reasons discussed below and in Plaintiff's moving papers Plaintiff requests that this Court grant her Motion for Class Certification.

## II.   ANALYSIS

### A. Frontier's Merits-Based Attacks Are Not Suitable for Certification

Frontier seems to equate a "rigorous analysis" with an in-depth examination of the underlying merits—i.e., whether Plaintiff's claims are subject to federal preemption[2].  Such analysis has been flatly rejected by the United States Supreme Court and the Ninth Circuit Court of Appeals.  It is well settled that any examination of the

---

[1] Hereafter "Frontier".

[2] While Plaintiff maintains that the preemption issue should not be determined in the context of this motion, she submits that her design defect and failure to warn claims are not subject to preemption. The case of *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680 (3d Cir. 2016) is particularly instructive.  Therein, the U.S. Court of Appeals for the Third Circuit held that the Federal Aviation Act of 1958, the General Aviation Revitalization Act of 1994 (GARA), and regulations promulgated by the Federal Aviation Administration (FAA) do not categorically pre-empt state products liability claims including claims of defective design and failure to warn. *Id*. at 686. Given the complex nature of this issue, should the Court be inclined to adjudicate this issue at this stage of the proceedings, Plaintiff would request the opportunity to provide supplemental briefing not to exceed twenty-five (25) pages (as she would be afforded if the issue was properly raised in a summary judgment or pleadings motion).

ER000014

merits of a claim is inappropriate in the context of a motion for class certification. *Eisen v. Carlisle & Jacquelin*, 411 U.S. 156, 177-78, 94 S.Ct. 2140 (1974). In *Eisen*, the United States Supreme Court explained that "nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." (*Eisen*, supra, 417 U.S. at p. 177.) Defendant cannot argue the merits of the claims in order to challenge the appropriateness of the class. *Baldwin & Flynn* 149 F.R.D. 598, 601 (1993); *Steiner v. Equimark Corp.* 96 F.R.D. 603, 606 (1983); *Stockwell v. City and County of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014) (stating that while some evaluation of the merits frequently "cannot be helped" in evaluating a motion for class certification, that likelihood of overlap with the merits is "no license to engage in free-ranging merits inquiries at the certification stage");

Instead, the primary question in deciding a plaintiff's motion for class certification is "not whether the plaintiff has stated a cause of action that will prevail on the merits, but whether he/she has met the requirements of Rule 23." *Daniel F. v. Blue Shield of California*, 305 F.R.D. 115, 120 (N.D. Cal. 2014) citing *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL–CIO v. ConocoPhillips Co.,* 593 F.3d 802, 808 (9th Cir.2010)

On a motion for class certification, the Court is required to "examine the merits of the underlying claim ... only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 981 n. 8 (9th Cir.2011) (citations omitted). As the Ninth Circuit aptly noted, "[t]o hold otherwise would turn class certification into a mini-trial." *Id.*

///

///

///

**B. The Merits-Based Issued Framed by Defendant's Motion Actually Underscore the Propriety of Class Certification.**

Frontier's opposition frames a number of potentially dispositive preemption issues, each of which actually bolsters a finding that the Rule 23 certification factors are indeed satisfied in this litigation. Frontier argues against certification on raising several bases for federal preemption including:

(1) That the economic damage/refund claim contradicts the terms of the Frontier contract of carriage and relates directly to Frontier's ticket prices, routes and services[3];

(2) Plaintiff's failure to warn claim is preemption under *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir. 2007)[4];

(3) Frontier cannot be held liable for having operated aircraft that have been certified to be safe and airworthy by the FAA[5]

While such issues are clearly not properly raised at the certification stage of the litigation, Frontier will be free to raise these issues in the contact of a motion for summary judgment. The disposition of these issues as framed, will not vary from class member to class member thereby satisfying the commonality and predominance prerequisites for class certification.

**C. Frontier's Motion Underscores Plaintiff's Need for Discovery**

Predictably, Frontier seeks denial of Plaintiff's Motion for Class Certification on the grounds that she has not sufficiently met her burden of establishing the requirements of Federal Rule of Civil Procedure Rule 23 because she cannot proffer sufficient evidentiary proof to establish numerosity, commonality, typicality, adequacy, predominance and superiority. Although relying on out of Circuit authority, should the

---

[3] Frontier Airlines Inc.'s Opposition to Plaintiff's Motion for Class Certification [ECF Dkt. No. 40] ("Opp.") at 6:5-7.
[4] Opp. at 6:27-7:6.
[5] Opp. at 7:16-17.

Court be inclined to deny certification on the grounds that Plaintiff cannot establish the Rule 23 factors including, *inter alia,* numerosity, typicality and superiority—all of which require discovery (from Frontier, Airbus and class members). Plaintiff requests the opportunity to conduct discovery and leave to file an amended motion for class certification. At such time, Plaintiff will be in a position to provide the Court with a trial plan[6].

## III. CONCLUSION

For the foregoing reasons, as well as those set forth in Plaintiff's Opening Brief, the Court should certify the Class and Subclass, appoint Plaintiff as a class representative, and appoint Bradley/Grombacher LLP and Rothschild & Associates, APC as class counsel.

DATED: November 5, 2018         **BRADLEY/GROMBACHER, LLP**

By**:** /s/ Kiley Lynn Grombacher
       Marcus J. Bradley, Esq.
       Kiley Lynn Grombacher, Esq.
       Attorneys for Plaintiff

---

[6] Plaintiff needs discovery to adequately address Defendant's jurisdiction argument. Courts have recognized that limited discovery is appropriate. See generally *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 713 (9th Cir.1992) (finding that since Plaintiff bears the burden of proving jurisdiction, and it is an abuse of discretion to dismiss for lack of subject matter jurisdiction without permitting Plaintiff limited discovery where facts are disputed). Nevertheless, if it is Frontier's preference, Plaintiff does not oppose dismissal of the action in this Court so that she can file the action in state court.

1  Kevin R. Sutherland (State Bar No. 163746)
   Natasha N. Mikha (State Bar No. 270731)
2  CLYDE & CO US LLP
   633 West 5th Street, 26th Floor
3  Los Angeles, California 90071
   Telephone: (213) 358-7600
4  Facsimile: (213) 358-7699
   Email:     kevin.sutherland@clydeco.us
5             natasha.mikha@clydeco.us

6  Jeffrey J. Ellis (admitted *pro hac vice*)
   CLYDE & CO US LLP
7  405 Lexington Avenue, 16th Floor
   New York, New York 10174
8  Telephone: (212) 710-3900
   Facsimile: (212) 710-3950
9  Email:     jeff.ellis@clydeco.us

10 Attorneys for Defendant
   FRONTIER AIRLINES, INC.

11

12              UNITED STATES DISTRICT COURT

13            CENTRAL DISTRICT OF CALIFORNIA

14 ANDREA RIDGELL, on behalf of)  Case No.: 2:18-CV-04916 PA (AFMx)
   herself and others similarly situated, )
15                              )  FRONTIER AIRLINES INC.'S
   Plaintiff,                   )  OPPOSITION TO PLAINTIFF'S
16                              )  MOTION FOR CLASS
   v.                           )  CERTIFICATION
17                              )
   FRONTIER   AIRLINES,   INC.  a)  Date:  November 19, 2018
18 Colorado corporation; AIRBUS S.A.S.,)  Time:  1:30 p.m.
   a foreign corporation doing business in)  Place: Courtroom of the Honorable Percy
19 the  State  of  California;  AIRBUS)         Anderson
   GROUP HQ, INC., a corporation doing)
20 business in the State of California, )
                                )
21           Defendants.        )
                                )
22 _____)

23

24      Frontier Airlines, Inc. (hereinafter "Frontier "), by and through its counsel of

25 record, Clyde & Co US LLP, hereby opposes plaintiff's motion for class certification

26 as follows:

27 / /

28 / /

---

FRONTIER AIRLINES INC.'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

ER000018

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS .................................................................................. 1

ARGUMENT ....................................................................................................... 3

I     PLAINTIFF'S MOTION FOR CLASS CERTIFICATION SHOULD BE DENIED BECAUSE THE CLAIMS ASSERTED BY PLAINTIFF AND THE PROPOSED CLASSES CANNOT BE MAINTAINED AGAINST FRONTIER ............................................................................................. 3

     A.    The Claims Asserted By Plaintiff Are Insufficient To Establish Subject Matter Jurisdiction ..................................................... 4

     B.    Frontier Cannot Be Held Liable For Operating Airworthy Aircraft Or For Not Warning About A Condition That The FAA Has Not Deemed Unsafe ....................................................................... 6

II    PLAINTIFF'S MOTION FOR CLASS CERTIFICATION SHOULD BE DENIED BECAUSE THIS ACTION DOES NOT SATISFY THE REQUIREMENTS OF RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE ................................................................... 12

     A.    Plaintiff Fails to Satisfy the Numerosity Requirement .................... 12

     B.    Plaintiff Fails to Satisfy the Commonality Requirement .................. 14

     C.    Plaintiff Fails to Satisfy the Typicality Requirement ....................... 18

     D.    Plaintiff Fails to Satisfy the Adequacy Requirement ....................... 18

     E.    Plaintiff Fails to Satisfy the Rule 23(b) Requirements ..................... 19

          1.    Plaintiff Fails to Satisfy the Predominance Requirement ........ 19

          2.    Plaintiff Fails to Satisfy the Superiority Requirement ............. 20

CONCLUSION ................................................................................................. 21

ER000019

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abdullah v. American Airlines, Inc.*
181 F.3d 363 (3d Cir. 1999) ................................................... 6

*Air Evac EMS, Inc. v. Robinson*
486 F. Supp. 2d 713 (M.D. Tenn. 2007) ............................... 8

*American Airlines v. Wolens*
513 U.S. 219 (1995) ................................................................. 5

*Bockrath v. Aldrich Chemical Co.*
21 Cal. 4th 71(1999) ............................................................. 17

*Briseno v. ConAgra Foods, In*c.
844 F.3d 1121 (9th Cir. 2017) ............................................. 13

*City of Burbank v. Lockheed Air Terminal Inc.,*
411 U.S. 624 (1973) ................................................................ 6

*General Tel. Co. of Southwest v. Falcon*
457 U.S. 147 (1982) ........................................................ 18, 19

*Kamm v. California City Development Co.*
509 F.2d 205 (9th Cir. 1975) ................................................. 3

*M.D. ex rel. Stukenberg v. Perry*
675 F.3d 832 (5th Cir. 2012) ............................................... 15

*Marcus v. BMW of N. Am., LLC*
687 F.3d 583 (3d Cir. 2012) ................................................ 13

*Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.*
555 F.3d 806 (9th Cir. 2009) ................................................. 7

*Molien v. Kaiser Foundation Hospitals*
27 Cal. 3d 916 (1980) ........................................................... 17

*Montalvo v. Spirit Airlines*
508 F.3d 464 (9th Cir. 2007) ...................................... 6, 7, 11

*Naffe v. Frey*
789 F.3d 1030 (9th Cir. 2015) ............................................... 4

*Northwest Airlines, Inc. v. Minnesota*
322 U.S. 292 (1944) ................................................................ 6

*Scofield v. Critical Air Medicine*
45 Cal. App. 4th 990 (1996) ................................................ 17

*United States v. Christensen*
419 F.2d 1401 (9th Cir. 1969) ............................................... 6

*Vega v. T-Mobile USA, Inc.*
564 F.3d 1256 (11th Cir. 2009) ...................................... 12, 13

*Wal-Mart Stores, Inc. v. Dukes*
564 U.S. 338 (2011) ......................................................... 14, 15

ER000020

*Zinser v. Accufix Research Inst., Inc.*
   253 F.3d 1180 (9th Cir.) ................................................................. 12, 21

**Statutes**

49 U.S.C. § 41713(b)(1) ...................................................................... 5

Fed. R. Civ. Proc. 23(a) ............................................................... 12, 19

Fed. R. Civ. Proc. 23(b) ......................................................... 12, 19, 20

**Secondary Sources**

Department of Transportation (D.O.T.) Federal Aviation Administration
   Interpretation 1975-29 1975 WL 342731 (May 6, 1975) ................................ 9, 10

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

ER000021

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff's motion for class certification should be denied because plaintiff has failed to meet her burden of establishing that the certification requirements of Rule 23 of the Federal Rules of Civil Procedure have been satisfied or that discovery would enable her to do so. Subject matter jurisdiction requires a plaintiff to not only establish viable claims on behalf of herself and the proposed classes but also to establish that class damages will meet the five million dollar threshold of the Class Action Fairness Act. Plaintiff, however, has presented no evidence concerning the alleged damages incurred by the proposed classes, has failed to establish that common issues of fact or law would predominate over individual inquiries and has failed to show that a class action would be superior to alternative procedures for resolution of any individual claims that might be asserted against Frontier. When it is further considered that the claims asserted by plaintiff are not only conclusory, factually suspect and preempted by federal law, it becomes readily apparent that plaintiff's motion should be denied and plaintiff's complaint dismissed.

## STATEMENT OF FACTS

Plaintiff asserts this proposed class action on the basis of alleged "bleed air events."[1] First Amended Complaint, [Dkt No. 38], ¶¶ 16-88. Plaintiff alleges causes of action for strict liability, breach of warranties, negligence, negligent infliction of emotional distress and false imprisonment. However, plaintiff's claims are replete with conclusory and unsupported allegations. In that regard, plaintiff alleges in paragraphs 7 and 8 of her complaint that the Airbus defendants "design, manufacture and sell" aircraft, while alleging in paragraph 9 that Frontier operates aircraft. First

---

[1] Although plaintiff also references the alleged events in her complaint as "fume events," the term "bleed air event" is used in plaintiff's definition of the proposed nationwide class and, thus, Frontier references the alleged events accordingly. First Amended Complaint, [Dkt No. 38], p. 16, l. 14.

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

ER000022

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

Amended Complaint [Dkt No. 33], ¶ ¶ 7, 8 and 9. Nonetheless, the causes of action for strict liability on the basis of design defect, breach of warranties and negligence are alleged against "All Defendants" on the basis that all defendants bore some responsibility for, among other allegations, "designing, manufacturing, assembling, testing, maintaining, servicing, selling, marketing, promoting and providing warnings or instructions about the subject aircraft." First Amended Complaint [Dkt No. 33], ¶ 104 (emphasis added); see also ¶ ¶ 89-110.

Plaintiff cannot reasonably dispute that these causes of action do not apply to Frontier. Moreover, even if the negligence cause of action was construed to include an alleged duty to warn about a bleed air system which plaintiff concedes to be "common," and which is used on every Airbus aircraft and absent only from the Boeing 787, none of these claims or those for negligent infliction of emotional distress and false imprisonment are supported by any facts or legal basis for holding Frontier liable. First Amended Complaint [Dkt No. 33], ¶ ¶ 35, 70, 75, 103-125. Indeed it strains credulity to allege without any supporting facts that passengers waiting to board a flight "in the terminal area of the (Phoenix) airport" were "imprisoned" by Frontier. First Amended Complaint [Dkt No. 33], p. ¶ ¶ 104 and 123.

In relation to the foregoing, it is also relevant to note that at the case management conference held on October 1, 2018, counsel for plaintiff conceded that the proposed nationwide class of passengers would be seeking only economic damages for the cost of their airfare for flights onboard the allegedly defective Airbus aircraft. Declaration of Jeffrey J. Ellis ("Ellis Decl."), ¶ 4. Consistent with this assertion at the case management conference, plaintiff's complaint alleges that the proposed nationwide class has "paid a premium for the service, over similar alternatives . . . (and) all overpaid for the service." First Amended Complaint [Dkt No. 33], ¶ 85 (emphasis added). These claims, however, relate directly to air carrier prices, routes and services and in so doing, implicate the broad body of established case law interpreting the express preemption provision of the Airline Deregulation Act

ER000023

as well as the terms governing refunds contained in Frontier's contract of carriage. Declaration of Valerie W. Tyler ("Tyler Decl."), ¶ 4, Exhibit A.

Frontier's contract of carriage provides terms and conditions of transportation for passengers and their baggage on all flights operated by Frontier. Tyler Decl., ¶ 4, Exhibit A. The contract of carriage governs the rights and liabilities of Frontier's passengers and Frontier with respect to any claims arising out of transportation on domestic flights operated by Frontier. Tyler Decl., ¶ 4. Frontier's contract of carriage provides that a ticket entitles a passenger to transportation between the point of origin and the destination. Tyler Decl., ¶ 5, Exhibit A. Accordingly, the contract of carriage provides no basis for a refund in the event that a ticket has been fully used and the passenger has been transported from the point of origin to the destination. Tyler Decl., ¶ 7, Exhibit A.

Lastly, it is relevant to note that plaintiff makes no attempt to establish that even her individual claim meets the court's jurisdictional threshold as her attorney conceded at the case management conference that plaintiff's alleged "injuries" were transient in nature. Ellis Decl., ¶ 4.

**ARGUMENT**

**I**

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION SHOULD BE DENIED BECAUSE THE CLAIMS ASSERTED BY PLAINTIFF AND THE PROPOSED CLASSES CANNOT BE MAINTAINED AGAINST FRONTIER**

Plaintiff's motion begins by asserting that plaintiff should be afforded the opportunity to conduct discovery prior to seeking class certification. However, plaintiff's argument cites to *Kamm v. California City Development Co*., a Ninth Circuit opinion which provides that the "propriety of a class action cannot be determined *in some cases* without discovery." 509 F.2d 205, 210 (9th Cir. 1975) (*emphasis added*). This action, however, is not one in which pre-certification

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

ER000024

discovery is warranted. Discovery will not assist plaintiff in certifying a class action against Frontier because this Court lacks subject matter jurisdiction over the proposed class action pursuant to the Class Action Fairness Act ("CAFA"), and the claims against Frontier are both factually unsupported and clearly preempted by federal law.

### A. The Claims Asserted By Plaintiff Are Insufficient To Establish Subject Matter Jurisdiction

Pursuant to CAFA, federal courts have subject matter jurisdiction over class actions filed pursuant to Rule 23 of the Federal Rules of Civil Procedure if two conditions are met: (1) the amount in controversy exceeds the sum or value of $5 Million, exclusive of interest and costs; and (2) the matter is a class action in which any member of the class of plaintiffs is a citizen of a different state from any defendant, any member of the class of plaintiffs is a foreign citizen and any defendant is a citizen of a state, or any member of the class of plaintiffs is a citizen of a state and any defendant is a foreign citizen. *See* 28 U.S.C. § 1332(d).

While the amount in controversy alleged by a plaintiff asserting federal jurisdiction will generally be respected, if it appears to a "legal certainty" that the claim is actually for less than the jurisdictional amount, dismissal is warranted. *Naffe v. Frey*, 789 F.3d 1030, 1040 (9th Cir. 2015). Pertinent instances which meet the "legal certainty" standard include instances where "a specific rule of law or measure of damages" would limit recoverable damages, or where "independent facts show that the amount of damages was claimed merely to obtain federal court jurisdiction." *Naffe*, 789 F.3d at 1040.

The admissions of plaintiff's counsel at the case management conference on October 1, 2018, as well as the case law governing these claims, establish that the amount in controversy requirement is not met here. When counsel for plaintiff was questioned by the Court regarding the types of damages purportedly suffered by the proposed class plaintiffs, she conceded that the proposed nationwide class of passengers would be seeking only economic damages for refunds of the cost of their

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

ER000025

1   airfare on flights that utilized the allegedly defective Airbus aircraft. Ellis Decl., ¶ 4.

2   Not only does this representation to the Court establish that the proposed classes

3   cannot meet the jurisdictional requirements of CAFA, it also relates directly to air

4   carrier prices, routes and services and ignores the refund provisions of Frontier's

5   contract of carriage. Tyler Decl., ¶ 4, Exhibit A.

6       The Airline Deregulation Act of 1978 (hereinafter "1978 ADA") expressly

7   states that "no State . . . shall enact or enforce any law . . . relating to rates, routes, or

8   services of any air carrier." S*ee*, P.L. 95-504, 49 U.S.C. § 41713(b)(1). As the

9   Supreme Court stated in *Morales v. Trans World Airlines, Inc*., 504 U.S. 374 (1992),

10  Congress included this provision in the 1978 ADA in order to "ensure that the States

11  would not undo federal deregulation with regulation of their own." *Morales*, 504 U.S.

12  at 378. The Supreme Court further stated that Congress' use of the term "relate to"

13  was identical to the language used in other statutes and was intended to convey "a

14  broad pre-emptive purpose" and an "expansive sweep." *Id*. at 383-84. The Court then

15  stated that "State enforcement actions having a connection with, or reference to,

16  airline rates, routes, or services are pre-empted." *Id*.

17      The Supreme Court next considered the scope of the 1978 ADA's preemption

18  clause in *American Airlines v. Wolens*, 513 U.S. 219 (1995). That case involved an

19  attempt to use State consumer protection laws to enforce what was alleged to be a

20  breach of an air carrier's contractual obligations. The Court held that any "remedy"

21  sought by a party to an airline contract must be "confined to a contract's terms" since

22  that contract clearly relates to the airline's "rates and services." 513 U.S. at 229.

23      Plaintiff's complaint makes no reference to Frontier's contract of carriage

24  despite the fact that it forms the basis for all of the transportation at issue and is

25  integral to any preemption analysis. In this regard, it is relevant to note that like most

26  airlines, Frontier's contract of carriage provides that "the ticket entitles the passenger

27  to transportation between the point of origin and the destination." Tyler Decl., ¶ 5,

28  Exhibit A. Accordingly, the contract of carriage provides no basis for a refund in the

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

-5-
FRONTIER AIRLINES INC.'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

event that a ticket has been fully used and the passenger has been transported from the point of origin to the destination. Tyler Decl., ¶ 7, Exhibit A. The contract of carriage further precludes a class action from being brought pursuant to the contract of carriage. Tyler Decl., ¶ 8, Exhibit A.

Thus, plaintiff's economic damage/refund claim contradicts the terms of the Frontier contract of carriage and relates directly to Frontier's ticket prices, routes and services. In accordance with the specific language of the ADA, the contract of carriage and the aforesaid holdings of the Supreme Court, plaintiff's broad-based class action is clearly preempted.

### B. Frontier Cannot Be Held Liable For Operating Airworthy Aircraft Or For Not Warning About A Condition That The FAA Has Not Deemed Unsafe

For nearly a century, Congress has recognized that federal control over aviation must be "intensive and exclusive." *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 303 (1944) (J. Jackson, concurring). To that end, Congress enacted the Federal Aviation Act (the "Act") in 1958, the "whole tenor [of which was] to create and enforce one unified system of flight rules." *United States v. Christensen*, 419 F.2d 1401, 1404 (9th Cir. 1969). Congress found the "creation of a single, uniform system of regulation vital to increasing air safety." *Abdullah v. American Airlines, Inc.*, 181 F.3d 363, 368 (3d Cir. 1999). The Act, together with the broad authority given to the Federal Aviation Administration (hereinafter "FAA"), thus establishes a "uniform and exclusive system of federal [aviation] regulation." *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 639 (1973). Consistent with this understanding, the Ninth Circuit has held that the Act and its corresponding regulations "demonstrate an intent to occupy exclusively the entire field of aviation safety and carry out Congress' intent to preempt all state law in this field." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir. 2007).

The issue in *Montalvo* was whether air carriers had a duty to warn passengers of the risks of deep vein thrombosis ("DVT"). *Montalvo*, 508 F.3d at 468. After

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

-6-

ER000027

analyzing the Act and the federal regulations, the Court found that, through implied field preemption, the Act "preempts the entire field of aviation safety from state and territorial regulation." *Id.* at 468, 473-74. Applying this principle, the Court concluded that the air carriers were under no duty to warn about the potential risks of DVT "absent a federal mandate to do so." *Id.* Because no such mandate existed, the Court upheld the dismissal of plaintiffs' failure to warn claims. *Id.* at 474.

The Ninth Circuit reaffirmed in *Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.,* that when the FAA "issues 'pervasive regulations' in an area…the [agency] preempts all state law claims in *that* area." 555 F.3d 806, 811 (9th Cir. 2009) (*emphasis in original*). The question in *Martin* was whether a federal rule governing airstairs preempted a tort claim by a passenger who was injured when she fell off such stairs. *Martin*, 555 F.3d at 808. The Court held that, because there was only one federal regulation on airstairs, the airstairs were not "pervasively regulated" and the Act did not preempt a state law claim that the airstairs were defective. *Martin*, 555 F.3d at 812.

In the case at bar, Frontier cannot be held liable for having operated aircraft that have been certified to be safe and airworthy by the FAA. As noted in *Martin,* in order for aircraft to be certified as airworthy, it must be shown that the aircraft "meets the agency's regulations, and 'that no feature or characteristic makes it unsafe. *Martin*, 555 F.3d at 8; s*ee also* Tyler Decl., ¶ 9. Plaintiff does not allege, and could not in good faith allege, that the Airbus aircraft operated by Frontier are not certified as airworthy by the FAA. In fact, the evidence provides the opposite. *See* Tyler Decl., ¶ 9.

Plaintiff also cannot dispute that cabin air systems are pervasively regulated by the FAA. Paragraph 94 of plaintiff's first amended complaint specifically alleges that:

> [t]he Federal Aviation Administration (FAA) has issued a number of federal aviation regulations (FARs), airworthiness directives (ADs), and advisory circulars (ACs) regarding cabin air ventilation requirements and contaminant concentration limits.

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

ER000028

First Amended Complaint [Dkt No. 33], ¶ 94.  Moreover, paragraphs 95-98 of the complaint allege specific federal regulations governing cabin air systems.  First Amended Complaint [Dkt No. 33], ¶¶ 95-98.  What plaintiff does not and cannot in good faith allege is that the FAA has either deemed the Airbus cabin air system unsafe or has required a warning with respect to same.  Plaintiff obviously recognizes the foregoing in that she only alleges in paragraphs 59-61 that the FAA is studying this issue.  First Amended Complaint [Dkt No. 33], ¶¶ 59-61.

The Seventh Circuit's holding in *Bieneman v. City of Chicago*, 864 F.2d 463, 471 (7th Cir. 1988) is instructive.  There, the court specifically addressed federal preemption in the context of considering whether a lower court properly dismissed an action an action similar to the one at bar.  Like here, plaintiff claimed aircraft that were deemed airworthy by the FAA to be defective because they were not equipped with equipment that plaintiff claimed to be required.  In that regard, the Court framed the issue and its resolution as follows:

> Bieneman's complaint suggests that damages should be awarded because there are too many flights per hour, or *because the aircraft are older models not fitted with high-bypass turbofan engines*, or because the planes do not climb at a sufficiently steep rate after takeoff. These subjects are governed by federal law, *and a state may not use common law procedures to question federal decisions or extract money from those who abide by them*.

864 F.2d at 473 (*emphasis added*).

Consistent with the foregoing, the court in *Air Evac EMS, Inc. v. Robinson*, 486 F. Supp. 2d 713 (M.D. Tenn. 2007) held that the State of Tennessee was also preempted from regulating the type of equipment used in air ambulance helicopters. The district court cited to the preemption case law noted herein, enjoined the proposed regulation of the State of Tennessee and held that "only the FAA" has "responsibility for matters concerning aviation safety, *including the certification* and operation of

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

aircraft." 486 F. Supp. 2d at 715 (*emphasis added*).

The FAA -- the Agency charged with the duty to promulgate the regulations and standards governing flight operations and safety -- has also rejected State attempts to require additional safety equipment on aircraft. In Interpretation 1975-29, Federal Aviation Decisions, I-48, the Chief Counsel of the FAA responded to a letter inquiring whether a State had the right to promulgate a rule requiring installation of an additional safety feature on aircraft using that State's airspace. *See* Department of Transportation (D.O.T.) Federal Aviation Administration, Interpretation 1975-29, 1975 WL 342731 (May 6, 1975). The Chief Counsel to the FAA unequivocally rejected this proposal with language and reasoning which echoes the Supreme Court's holding in *Burbank*:

> The expansive authority of the Administrator to prescribe safety standards applicable to civil aircraft in air commerce under Title VI of the [Federal Aviation Act of 1958] is indicative of *Congress' intent to preempt any state or local regulation* on the same subject matter. This preemptive intent is all the more forceful when the *nature* of air commerce is considered and the *necessity for uniformity* of regulation is reflected upon.
>
> Pursuant to its broad statutory mandate, the FAA has issued a detailed and comprehensive scheme of rules and regulations requiring the installation of safety hardware under both its certification and operating rules. Your attention is particularly directed toward the certification and operating rules for air carriers found in Federal Aviation Regulation (FAR) Part 121 of Title 14. The breadth and scope of these regulations, *coupled with what we consider to be Congress' desire to make Federal superintendency of safety in air commerce an exclusive enterprise, requires a finding of Federal preemption with respect to any state or local regulation requiring*

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

-9-

FRONTIER AIRLINES INC.'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

ER000030

*installation of "Smoke Hoods" as described in your correspondence.* Department of Transportation (D.O.T.) Federal Aviation Administration, Interpretation 1975-29, 1975 WL 342731, at *1 (May 6, 1975) (*emphasis added*).

Additionally, it is worth noting that, as plaintiff alleges in her complaint, Airbus is a "European multinational corporation that designs, manufactures, and sells civil and military aeronautical products worldwide." First Amended Complaint [Dkt No. 33], ¶ 7. As such its products are subject to initial regulation by the European Aviation Safety Agency (EASA). Similar to the FAA, EASA describes its mission as ensuring "the highest common level of safety protection for [European Union] citizens" and "the highest common level of environmental protection." It further states that one of the ways that it achieves this mission is to "certify & approve products and organisations, in fields where EASA has exclusive competence (e.g. airworthiness)."[2]

In conjunction with its regulatory role, EASA has specifically studied the "bleed air issue"[3] which plaintiff cites as the crux of all of her claims. In that regard, EASA has made the following findings in a 2014 report. First, EASA has noted that "airborne contaminations [similar to those found in aircraft] are also observed in typically indoor environments like offices, schools, kinder gardens or dwellings."[4] EASA also found that "[t]aking indoor air guidelines into consideration the cabin air is no object of any concerns."[5] EASA then explicitly noted that:

[t]o state the obvious, there is no contaminant-free indoor

---

[2] *See* https://www.easa.europa.eu/the-agency/the-agency.

[3] *See* EASA – Final Report on Preliminary Cabin Air Quality Measurement Campaign, available at https://www.easa.europa.eu/sites/default/files/dfu/EASA%20CAQ%20Study%20Final%20Report_21.03.2017.pdf.

[4] *Id*. at p.105.

[5] *Id*. at p. 105-06.

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

ER000031

environment. The aircraft cabin is no exception. However, due to the exceptional high air exchange rates in aircraft, the cabin air has been proven to be less polluted compared to normal indoor environments (e.g., offices, dwellings, etc.). Volatile contaminations in the cabin are thus depleted quickly.[6]

In summarizing the "current data situation," EASA noted that "[t]he still ongoing discussion about the so-called 'aerotoxic syndrome' remains completely incomprehensible."[7]

The foregoing statements are obviously contrary to what plaintiff alleges in her complaint. This is not surprising, since plaintiff's complaint asserts that the FAA has been aware of allegations about "bleed air" for 24 years but has never deemed the bleed air system to render an aircraft not airworthy nor required any airline to warn about the bleed air system. In light of EASA's findings, the foregoing case law and the specific holding by the Ninth Circuit in *Montalvo* that air carriers are under no duty to warn about the alleged potential health risks "absent a federal mandate to do so," plaintiff's claims in the case at bar against Frontier should be dismissed just as the claims against the air carrier defendants were dismissed in *Montalvo*. 508 F.3d at 473, 474. Moreover, since the plaintiff's false imprisonment claim is based only on conclusory allegations and is patently devoid of any credibility, that claim should be dismissed as well. Although the latter may not be preempted by federal law, plaintiff fails to establish that this claim, or any of the others she asserts against Frontier, satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure, as provided in further detail below.

/ /

/ /

---

[6] *Id.* at p. 106.

[7] *Id.* at p. 109.

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

ER000032

## II

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION SHOULD BE DENIED BECAUSE THIS ACTION DOES NOT SATISFY THE REQUIREMENTS OF RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Plaintiffs seeking to certify a class must satisfy all requirements of Rule 23(a) of the Federal Rules of Civil Procedure, in addition to satisfying the requirements of one of the three subparts of Rule 23(b). Plaintiff asserts that this action qualifies pursuant to Rule 23(a) and (b)(3). However, it is plaintiff's burden to prove by a preponderance of the evidence that all requirements of Rule 23 are satisfied. *Zinser v. Accufix Research Inst., Inc*., 253 F.3d 1180, 1186 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) (noting that, "as the party seeking class certification, [plaintiff] bears the burden of demonstrating that she has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)."). As explained in further detail below, plaintiff has failed to meet her burden of establishing that the proposed classes satisfy any of the requirements of Rule 23.

### A. *Plaintiff Fails to Satisfy the Numerosity Requirement*

While a plaintiff need not establish the precise number of members in a purported class, there must be some showing, absent a mere allegation, that the class satisfies the numerosity requirement. *Vega v. T-Mobile USA, Inc*., 564 F.3d 1256, 1267 (11th Cir. 2009). In *Vega*, the Eleventh Circuit noted that the plaintiff submitted no evidence concerning the number of defendant's retail stores or sales representatives in Florida, relying instead upon the fact that the defendant employed "thousands" of associates nationwide. *Vega*, 564 F.3d at 1267. However, the class that plaintiff sought to certify was for sales representatives employed during the class period in Florida. *Vega*, 564 F.3d at 1267. The Court found that the "district court's inference of numerosity for a Florida-only class without the aid of a shred of Florida-only evidence was an exercise in sheer speculation." *Vega*, 564 F.3d at 1267. The Court

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

ER000033

1  noted that the record was "utterly devoid" of any showing that the proposed class of

2  sales representatives in Florida was "so numerous that joinder of all members is

3  impracticable." *Vega*, 564 F.3d at 1267–68.

4  Similarly, the Third Circuit has declined to find that the numerosity requirement

5  was met where there was a "complete lack of evidence specific to BMWs purchased

6  or leased in New Jersey with Bridgestone [run-flat tires] that have gone flat and been

7  replaced." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 597 (3d Cir. 2012)

8  (distinguished by Ninth Circuit in *Briseno v. ConAgra Foods, I*nc., 844 F.3d 1121,

9  1130 (9th Cir. 2017) on other grounds). In that case, plaintiff sought to certify a class

10  of purchasers and lessees of BMW cars who had a specific type of tire replaced.

11  *Marcus*, 687 F.3d at 597. The Third Circuit found that the district court had "crossed

12  the line separating inference and speculation" because, although BMW "is a large

13  company that sells and leases many cars throughout the country," the court had

14  certified a "New Jersey class of owners and lessees with Bridgestone [tires] that have

15  gone flat and been replaced." *Marcus*, 687 F.3d at 597. The Third Circuit noted that,

16  while it may be "tempting to assume that the New Jersey class meets the numerosity

17  requirement based on the defendant companies' nationwide presence," the district

18  court had abused its discretion in certifying the class without any evidence supporting

19  numerosity. *Marcus*, 687 F.3d at 597.

20  In support of her assertion that the numerosity requirement for her proposed

21  nationwide class is met, plaintiff merely alleges that "Frontier operates hundreds of

22  flights each day and thus it is clear that the number of class members can easily extend

23  into the thousands." Motion for Class Certification, [Dkt No. 38], p. 7, ll. 3-4.

24  Similar to the plaintiffs above who relied upon the defendant's nationwide presence

25  without submitting any evidence of the specific class they sought to certify, it appears

26  that plaintiff intends to rely merely upon the number of flights conducted by Frontier

27  per day, rather than offering any evidence concerning the number of flights which

28  may have experienced alleged bleed air events. While plaintiff may assert in her reply

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

-13-

FRONTIER AIRLINES INC.'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

ER000034

that she requires discovery in order to provide such evidence, this argument would be unavailing. Plaintiff does not need information or documents from Frontier in order to make the showing required at the certification stage, as plaintiff could have presented evidence in her motion for class certification concerning the estimated frequency of alleged bleed air events in a given period of time. Any assertion that plaintiff lacks access to studies, reports, or experts on the topic would be belied by the technical allegations of her complaint. First Amended Complaint, [Dkt No. 33], ¶¶ 34-52 and 75-81.

In light of the foregoing, plaintiff has not satisfied the numerosity requirement with respect to her proposed nationwide class of all passengers who have traveled with Frontier and "experienced a bleed air event." With respect to the proposed sub-class of plaintiff's fellow passengers on flight no. 1630, the numerosity requirement is likely met. However, both proposed classes fail to meet the other Rule 23 requirements, as provided in further detail below.

### B. Plaintiff Fails to Satisfy the Commonality Requirement

Commonality requires that plaintiffs "demonstrate that the class members 'have suffered the same injury.' This does not mean merely that they have all suffered a violation of the same provision of law." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011) (*internal citation omitted*). In order to satisfy the commonality requirement, it must be established that the claims of the proposed class depend on at least one common issue of law or fact whose resolution "will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke." *Dukes*, 546 U.S. at 350. Courts are required to conduct a "rigorous analysis" to ensure that the requirements of Rule 23(a) are met. *Dukes*, 564 U.S. at 350–51. The requisite "rigorous analysis" may require courts "to probe behind the pleadings" and will "[f]requently entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 564 U.S. at 350–51.

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

FRONTIER AIRLINES INC.'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

ER000035

In *Dukes*, the Supreme Court found that commonality was not met because one plaintiff's experience of workplace discrimination was "insufficient to infer that 'discriminatory treatment is typical of the employer's employment practices.'" *Dukes*, 564 U.S. at 356 (*internal citation omitted*). The Court noted that the members of the proposed class held different jobs for variable lengths of time in different stores across the country and appeared to have little in common apart from their sex and the class action lawsuit. *Dukes*, 564 U.S. at 360. In the instant case, the proposed class members similarly have very little in common apart from the fact that they have flown on aircraft operated by Frontier.

In another action where commonality was not established, the Fifth Circuit found that the district court had abused its discretion in certifying a class of children in the Texas state foster care system. *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 843 (5th Cir. 2012). The Fifth Circuit noted that the district court had not conducted the rigorous analysis required, as it had accepted plaintiffs' contention that "systemic deficiencies" in the foster care system created common questions of fact, but failed to consider the defendant's arguments that "dissimilarities within the proposed class precluded commonality with specific reference to the elements or defenses for establishing the class claims." *Perry*, 675 F.3d at 843. Specifically, the Court noted that defendant had raised the argument that "the individual class member's substantive due process claims are not capable of classwide resolution because deciding each plaintiff's claim requires an individualized inquiry regarding whether the State's conduct 'shocks the conscience.'" *Perry*, 675 F.3d at 843. Accordingly, the Fifth Circuit remanded for the district court to look beyond the pleadings and sufficiently analyze whether the class claims contained individualized issues that would prevent certification. *Perry*, 675 F.3d at 843.

Similar to the analysis in *Dukes*, one passenger's experience with a single alleged bleed air event is insufficient to infer that the alleged event was typical of all other alleged events. In this case, the Court need not even go beyond the pleadings to

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

ER000036

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

1  determine that commonality is not satisfied, as the dissimilarities in the proposed

2  classes are apparent from the complaint. Plaintiff alleges that, during her flight with

3  Frontier, the aircraft "experienced a problem with the air quality" and that she and

4  other passengers experienced symptoms including coughing and eye irritation. First

5  Amended Complaint, [Dkt No. 33], p. 5, ll. 10-14. Plaintiff's complaint alleges that a

6  handful of Frontier flights other than plaintiff's have been diverted due to "smoke," "a

7  suspicious odor," "an odor" and "smoke." First Amended Complaint, [Dkt No. 33], p.

8  11, ll. 7, 9, 11 and 14. The descriptions provided for these alleged events indicate that

9  the events are not similar to the event alleged by plaintiff, which references neither

10 smoke nor an odor, nor are they similar to one another, as an event involving smoke is

11 not necessarily the same as an event involving odor.

12      However, a probe beyond the pleadings further establishes that plaintiff cannot

13 satisfy the commonality requirement with respect to either proposed class. This is

14 clear in plaintiff's assertion of the perceived common issues, which she describes as

15 including: "(1) whether the design is defective, (2) what information Frontier knew or

16 had access to regarding the likelihood of fume events, and (3) whether members of the

17 class were subject to forced and nonconsensual confinement." Motion for Class

18 Certification, [Dkt No.38], p. 7, ll. 21-23. These alleged common issues do not satisfy

19 the commonality requirement as to Frontier. Plaintiff concedes in her complaint that

20 Frontier did not design the aircraft, so whether the aircraft design is defective is not a

21 common question which is vital to plaintiff's resolution of her claims against Frontier.

22 With respect to what information Frontier knew or had access to, this is also not a

23 question which is vital to resolution of plaintiff's claims against Frontier, because the

24 operations of an air carrier are exclusively governed by federal law, as explained in

25 further detail above. No amount of knowledge changes the fact that Frontier is under

26 no duty to warn absent a federal mandate to do so. Further, plaintiff's final alleged

27 common question is not a question that is common to all proposed class members.

28 / /

-16-

FRONTIER AIRLINES INC.'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

ER000037

In order to prove false imprisonment, plaintiff would have to establish that the alleged confinement was intentional.  *Scofield v. Critical Air Medicine*, 45 Cal. App. 4h 990, 1001 (1996).  As plaintiff appears to be alleging that the broader nationwide class of passengers may also have experienced confinement, plaintiff would have to establish Frontier's intent with respect to every alleged instance of false imprisonment. Individualized inquiries would also be necessary on plaintiff's two other causes of action against Frontier.  With respect to negligence,[8] plaintiff must establish that each class member was harmed and that the harm was substantially caused by the alleged event.  *Bockrath v. Aldrich Chemical Co.*, 21 Cal. 4th 71, 79 (1999).  A negligible or theoretical cause is insufficient to establish liability.  *Bockrath*, 21 Cal. 4th at 79. Similarly, to prove negligent infliction of emotional distress, plaintiff must establish that each class member suffered "serious emotional distress" which was substantially caused by the alleged event.  *Molien v. Kaiser Foundation Hospitals*, 27 Cal. 3d 916, 928 (1980).  Both of these showings fail to satisfy the commonality requirement, as they would require individualized inquiries.  Whether an alleged event could be deemed a "substantial cause" of any alleged harm will depend upon the type, duration and pervasiveness of the alleged event, as well as the type of harm alleged to have been sustained by each of the class members.

In light of the necessity of conducting individualized inquiries in order to arrive at a verdict or judgment on all of plaintiff's three causes of action against Frontier, plaintiff's claims do not contain common issues of fact or law for purposes of the

---

[8] While Frontier disputes that the negligence cause of action is properly alleged against Frontier, as it includes reference to the design and manufacture of aircraft for which Frontier is not responsible, Frontier presumes for purposes of this motion that some of plaintiff's allegations in this cause of action could be alleged against Frontier. Accordingly, for purposes of this class certification discussion, Frontier addresses only the three causes of action from plaintiff's first amended complaint which can conceivably be asserted against Frontier on the basis of the allegations therein: negligence, negligent infliction of emotional distress and false imprisonment.

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

ER000038

commonality requirement.

### C. Plaintiff Fails to Satisfy the Typicality Requirement

While this is a separate requirement under Rule 23, it tends in practice "to merge" with commonality. *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157, fn. 13 (1982). The purpose of this requirement is to ensure that the class representative possesses the same interest and suffered the same injury as the proposed class members such that her claims and defenses are typical of those of the proposed class. *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982). Together, both requirements serve as "guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157, fn. 13 (1982).

For the reasons provided above in the discussion on commonality, it is not clear that plaintiff suffered the same injury as the proposed class members. Further, statements made at the case management conference on October 1, 2018 appear to indicate that plaintiff does not necessarily possess the same interest as the proposed class members. Ellis Decl., ¶ 4. Plaintiff's counsel appeared to concede that the proposed nationwide class of passengers would be seeking only economic damages for the cost of their airfare on flights that allegedly experienced fume events and that the recovery of the proposed sub-class of passengers on plaintiff's flight would be focused on the false imprisonment claim as opposed to any physical injuries. Ellis Decl., ¶ 4. As counsel effectively conceded that plaintiff and the members of the proposed sub-class of passengers on plaintiff's flight would be focused on the false imprisonment claim, plaintiff's claim is not typical of the broader nationwide class.

### D. Plaintiff Fails to Satisfy the Adequacy Requirement

The final prerequisite of Rule 23(a) is adequacy, which requires that the proposed class representative "fairly and adequately protect the interests" of all

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

ER000039

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

members of the proposed classes.  Fed. R. Civ. Proc. 23(a)(4).  The Supreme Court has noted that, in practice, the commonality and typicality requirements also tend to "merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest."  *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157, fn. 13 (1982).

Based on the representations in the declarations submitted in support of the motion for class certification, Frontier does not presently have any concerns regarding competency of counsel or conflicts of interest.  However, plaintiff fails to satisfy the adequacy requirements for all of the reasons cited in the discussions above concerning commonality and typicality, including that she appears to have limited the recovery of proposed class members to only the costs of their airfare before the class has been certified, which may not be representative of the types of damages that other proposed class members would have sought if plaintiff were not their proposed representative.

### E. Plaintiff Fails to Satisfy the Rule 23(b) Requirements

As explained above, Rule 23(a) has not been satisfied.  But if the Court were to determine that it has been satisfied, the Court would next consider whether one of the requirements of Rule 23(b) have been satisfied.  Plaintiff alleges that this action meets the requirements of Rule 23(b)(3) in that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. Proc. 23(b)(3).

#### 1. Plaintiff Fails to Satisfy the Predominance Requirement

As explained above, plaintiff cannot establish a single common question for purposes of Rule 23(a)(2), but even if plaintiff had established a common question, her request for class certification fails to satisfy the requirement that  questions of law or fact common to class members "predominate over any questions affecting only individual members."  Fed. R. Civ. Proc. 23(b)(3).  The Supreme Court has noted that,

-19-
FRONTIER AIRLINES INC.'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

ER000040

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

1  "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than

2  23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

3     However, despite this requirement being more demanding than those of 23(a),

4  plaintiff spends the least time on it, likely in acknowledgment of the weakness of her

5  potential arguments.  With respect to this requirement, plaintiff merely alleges that

6  "each of the claims can be demonstrated or refuted with common evidence" and all the

7  claims "arise from common facts."  Motion for Class Certification, [Dkt No. 38], p. 9,

8  ll.20-23.  This is clearly insufficient to meet plaintiff's burden of establishing that the

9  alleged common issues of fact or law predominate over questions affecting individual

10  members.  As explained in more detail above, none of plaintiff's alleged common

11  questions are vital to resolution of her claims against Frontier and each of her causes

12  of action against Frontier would require numerous individualized inquiries.

13  Accordingly, plaintiff has not satisfied the requirement of predominance.

14          **2.  *Plaintiff Fails to Satisfy the Superiority Requirement***

15     In order to determine whether a class action is "superior" to other methods of

16  adjudicating the controversy, Rule 23(b)(3) lists four factors for consideration:  (A)

17  the class members' interests in individually controlling the prosecution or defense of

18  separate actions; (B) the extent and nature of any litigation concerning the controversy

19  already begun by or against class members; (C) the desirability or undesirability of

20  concentrating the litigation of the claims in the  particular forum; and (D) the likely

21  difficulties in managing a class action.

22  Fed. R. Civ. Proc. 23(b)(3).

23     In her motion, plaintiff asserts that adjudicating the claims as class claims "will

24  be significantly less burdensome than if the matter were prosecuted individually" and

25  that "there are no manageability issues."  Motion for Class Certification, [Dkt No. 38],

26  p. 10, ll. 9-10 and 16.  These two assertions are insufficient to establish that

27  superiority is satisfied in this case.  As provided in further detail above, resolution of

28  the claims in this action would require numerous individualized inquiries and, thus,

ER000041

the proposed class action would actually be more burdensome than actions brought by individual passengers. Additionally, where numerous individualized issues will arise, the burden is on plaintiff to present a manageable trial plan adequate to deal with such issues. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001). Plaintiff has not presented any trial plan but merely asserts, without support, that there are no manageability issues. Accordingly, plaintiff has not met her burden of establishing that the superiority requirement is met.

As plaintiff cannot establish that any of the requirements of Rule 23 of the Federal Rules of Civil Procedure have been satisfied, she has failed to meet her burden and the motion for class certification should be denied.

## CONCLUSION

In light of the foregoing, Frontier Airlines, Inc. respectfully requests that the Court deny plaintiff's motion for class certification and, should the Court deem it appropriate to do so, dismiss plaintiff's entire action against Frontier since there is no basis in law or fact to render Frontier liable for the claims asserted herein.

Dated: October 29, 2018                    CLYDE & CO US LLP


                                           By: */s/ Natasha N. Mikha*
                                                KEVIN R. SUTHERLAND
                                                NATASHA N. MIKHA
                                                Attorneys for Defendant
                                                FRONTIER AIRLINES, INC.

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

ER000042

**PROOF OF SERVICE**

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California, I am over the age of eighteen years, and not a party to the within action. My business address is 633 West 5th Street, 26th Floor, Los Angeles, California 90071.

On October 29, 2018, I served the document(s) described as:

FRONTIER AIRLINES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

on the parties in this action addressed as follows:

SEE ATTACHED SERVICE LIST

in the following manner:

☐ **(BY FAX):** by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below, or as stated on the attached service list, on this date before 5:00 p.m.

☐ **(BY MAIL):** as follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

☐ **(BY OVERNIGHT DELIVERY):** I caused such envelope(s) to be delivered to an overnight delivery carrier with delivery fees provided for, addressed to the person(s) on whom it is to be served.

☐ **(BY PERSONAL SERVICE):** I caused such envelope(s) to be delivered by hand this date to the offices of the addressee(s).

☒ **(BY CM/ECF):** by electronic filing system with the clerk of the Court which will send a Notice of Electronic Filing to all parties with an e-mail address of record. who have filed a Notice of Consent to Electronic Service in this action:

I declare I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **October 29, 2018**, at Los Angeles, California.

_____
Kathy Rollins

CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

4510937

-22-

FRONTIER AIRLINES INC.'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

SERVICE LIST

Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
BRADLEY/GROMBACHER LLP
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Tel:  (805) 270-7100
Fax: (805) 270-7100
E-Mail:  mbradley@bradleygrombacher.com
         kgrombacher@bradleygrombacher.com

Attorneys for Plaintiff

Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
ROTHSCHILD & ASSOCIATES, APC
27 W. Anapamu Street, Suite 289
Santa Barbara, California  93101
Tel:  (805) 845-1190
Fax: (805) 456-0132
E-Mail: krothschild@kdrlawgroup.com
        jalwill@kdrlawgroup.com

Attorneys for Plaintiff

CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

4510937

-23-

FRONTIER AIRLINES INC.'S OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

ER000044

Kevin R. Sutherland (State Bar No. 163746)
Natasha N. Mikha (State Bar No. 270731)
CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600
Facsimile: (213) 358-7699
Email:     kevin.sutherland@clydeco.us
           natasha.mikha@clydeco.us

Jeffrey J. Ellis (admitted *pro hac vice*)
CLYDE & CO US LLP
405 Lexington Avenue, 16th Floor
New York, New York 10174
Telephone: (212) 710-3900
Facsimile: (212) 710-3950
Email:     jeff.ellis@clydeco.us

Attorneys for Defendant
FRONTIER AIRLINES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA RIDGELL, on behalf of herself and others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ, INC., a corporation doing business in the State of California, <br><br> Defendants. | Case No.: 2:18-CV-04916 PA (AFMx) <br><br> DECLARATION OF VALERIE W. TYLER IN SUPPORT OF FRONTIER AIRLINES INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION <br><br> Date:  November 19, 2018 <br> Time:  1:30 p.m. <br> Place:  Courtroom of the Honorable Percy Anderson |

I, Valerie W. Tyler, declare and state as follows:

1.     Frontier Airlines, Inc. (hereinafter "Frontier") is an air carrier certified by the United States Department of Transportation to engage in interstate air transportation. I am employed by Frontier in the position of Senior Counsel. I have held this position at Frontier since January, 2015. As Senior Counsel at Frontier, my job duties include: negotiating, writing and reviewing agreements on

-1-
DECLARATION OF VALERIE W. TYLER IN SUPPORT OF FRONTIER AIRLINES, INC.'S
OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

1 behalf of Frontier; advising executives and departments within Frontier on a wide

2 variety of legal issues; researching unique legal issues impacting Frontier; and

3 advising and providing training to Frontier employees with respect to legal risks

4 and liabilities, legal requirements and contract obligations.

5     2.    I have personal knowledge of the facts contained in this declaration. I

6 can competently testify to these facts if called as a witness in these proceedings.

7     3.    This declaration is submitted in support of Frontier's opposition to

8 plaintiff's motion for class certification, filed concurrently herewith.

9     4.    Attached hereto as Exhibit A is a true and correct copy of Frontier's

10 Contract of Carriage. The Contract of Carriage provides terms and conditions of

11 transportation for passengers and their baggage on all flights operated by Frontier.

12 The Contract of Carriage, in addition to such additional terms and conditions

13 presented on Frontier Airlines' website, fare rules, published schedules or printed

14 on or in any ticket or ticket-less travel authorization, govern the rights and

15 liabilities of Frontier's passengers and Frontier with respect to any claims arising

16 out of transportation on domestic flights operated by Frontier.

17     5.    Section 8A of the Contract of Carriage provides that a ticket entitles a

18 passenger to transportation between the point of origin and the destination.

19     6.    Section 16A of the Contract of Carriage provides a limitation of

20 liability for indirect, special or consequential damages which may result from the

21 performance of transportation, delay in performance, or failure to provide

22 transportation. Section 16A provides that the "absolute limit of Frontier's liability

23 for failing to provide transportation will be a refund of the amount paid for the

24 corresponding ticket."

25     7.    Section 20A of the Contract of Carriage provides the basis for refunds

26 of tickets. In the event that no portion of a ticket is used, the refund amount is

27 "equal to the fare and charges paid for the ticket issued to the passenger." If a

28 portion of the ticket has been used, the refund amount is limited to the unused

-2-

DECLARATION OF VALERIE W. TYLER IN SUPPORT OF FRONTIER AIRLINES, INC.'S
OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

ER000046

portion of the ticket. The Contract of Carriage provides no basis for a refund in the event that a ticket has been fully used and the passenger has been transported from the point of origin to the destination.

8. Section 22H of the Contract of Carriage provides that any "case brought pursuant to this Contract of Carriage, Frontier's Tarmac Delay Plan, or Frontier's Customer Service Plan may be brought in a party's individual capacity and not as a plaintiff or class member in any purported class or representative proceeding."

9. In my job duties as Senior Counsel, I am familiar with the laws and regulations to which Frontier's operations must adhere. All of the Airbus aircraft operated by Frontier have been certified as airworthy by the United States Federal Aviation Administration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 29, 2018, at Denver, Colorado.

_____
VALERIE W. TYLER

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

-3-
DECLARATION OF VALERIE W. TYLER IN SUPPORT OF FRONTIER AIRLINES, INC.'S
OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

# PROOF OF SERVICE

## STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California, I am over the age of eighteen years, and not a party to the within action. My business address is 633 West 5th Street, 26th Floor, Los Angeles, California 90071.

On October 29, 2018, I served the document(s) described as:

**DECLARATION OF VALERIE W. TYLER IN SUPPORT OF FRONTIER AIRLINES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

on the parties in this action addressed as follows:

SEE ATTACHED SERVICE LIST

in the following manner:

☐ **(BY FAX):** by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below, or as stated on the attached service list, on this date before 5:00 p.m.

☐ **(BY MAIL):** as follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

☐ **(BY OVERNIGHT DELIVERY):** I caused such envelope(s) to be delivered to an overnight delivery carrier with delivery fees provided for, addressed to the person(s) on whom it is to be served.

☐ **(BY PERSONAL SERVICE):** I caused such envelope(s) to be delivered by hand this date to the offices of the addressee(s).

☒ **(BY CM/ECF):** by electronic filing system with the clerk of the Court which will send a Notice of Electronic Filing to all parties with an e-mail address of record, who have filed a Notice of Consent to Electronic Service in this action:

I declare I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on October 29, 2018, at Los Angeles, California.

Kathy Rollins

CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

4510609

-4-

DECLARATION OF VALERIE TYLER IN SUPPORT OF FRONTIER AIRLINES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

ER000048

**SERVICE LIST**

Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
BRADLEY/GROMBACHER LLP
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Tel: (805) 270-7100
Fax: (805) 270-7100
E-Mail: mbradley@bradleygrombacher.com
    kgrombacher@bradleygrombacher.com

Attorneys for Plaintiff

Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
ROTHSCHILD & ASSOCIATES, APC
27 W. Anapamu Street, Suite 289
Santa Barbara, California 93101
Tel: (805) 845-1190
Fax: (805) 456-0132
E-Mail: krothschild@kdrlawgroup.com
    jalwill@kdrlawgroup.com

Attorneys for Plaintiff

CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

4510609

-5-

DECLARATION OF VALERIE TYLER IN SUPPORT OF FRONTIER AIRLINES, INC.'S
OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

ER000049

EXHIBIT A

ER000050

Case: 18-80170, 11/28/2018, ID: 11098983, DktEntry: 1-4, Page 42 of 324

# **FRONTIER** AIRLINES  Contract of Carriage

**Effective Date:** 08/22/18

ER000051

**FRONTIER**

CONTRACT OF CARRIAGE                                         Rev67 06/14/18

## Table Of Contents

| Section | Subject | Page |
|---------|---------|------|

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
2. Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
3. Refusal to Transport and Special Conditions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
4. International Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
5. Child Passengers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
6. Service Animals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
7. Smoking. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
8. Tickets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
9. Ticket Validity and Itinerary Changes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
10. Check-in Times. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
11. Fares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
12. Checked Baggage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12
13. Carry-On Baggage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
14. Cabin-Seat Baggage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14
15. Conditions and Charges for Special Items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15
16. Limitations of Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
17. Claim Limits and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18
18. Failure to Operate on Schedule or Failure to Carry . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
19. Denied Boarding Compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
20. Refunds. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22
21. Currency and Mode of Payment and Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
22. Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

ER000052

**FRONTIER**

## 1.   Introduction

The following terms and conditions as well as such additional terms and conditions presented on Frontier Airlines' website, fare rules, published schedules or printed on or in any ticket or ticket-less travel authorization apply to all tickets issued for travel on flights operated by or for Frontier Airlines, Inc. ("Frontier") as well as that transportation regardless of whether such ticket was sold by Frontier or its authorized agents or whether such ticket is used ("Contract of Carriage").

This document is available for public inspection at all Frontier locations. Copies may be obtained by visiting the Frontier's web site at www.FlyFrontier.com or by writing to: Frontier Airlines, Inc., Customer Relations, 4545 Airport Way, Denver, CO 80239.

## 2.   Definitions

A. **Codeshare** – A marketing and business arrangement in which two airlines "share" the same flight (which might include connecting legs). One airline places its designator code and flight number on a flight operated by the other airline, and markets and sells tickets for that shared flight as part of its published schedule.

B. **DOT** – U.S. Department of Transportation.

C. **FAA** – U.S. Federal Aviation Administration.

D. **Fare Rules** – The rules and requirements associated with a ticket.

E. **IATA** – International Air Transport Association.

F. **Qualified Individual with a Disability** – An individual with a disability who: (i) has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities; (ii) has a record of such an impairment; or, (iii) is regarded as having such an impairment, as further defined in 14 CFR 382.5.

G. **Standby Passenger** – A passenger boarded subject to availability of seat space at departure time and only after all passengers having confirmed reservations for the flight have been boarded.

H. **Stopover** – An intentional interruption in a passenger's trip in excess of 4 hours at a point between the place of departure and the final destination.

I. **STRETCH Seat** - A seat located in the front rows and exit rows of certain Frontier aircraft that have additional legroom. These seats are made available to passengers for a fee.

J. **Ticket** -The record of agreement, including electronic tickets, for passenger air transportation provided by the airline under certain terms and conditions to the passenger as described on the ticket, in the fare rules, and in this Contract of Carriage.

K. **TSA** – U.S. Transportation Security Administration.

## 3.   Refusal to Transport and Special Conditions

A. Frontier may refuse to provide transportation to any person and may require that a passenger leave an aircraft or be removed from an aircraft for the following reasons, in which case Frontier will provide a refund of the amount paid for their ticket, which will be the limit of Frontier's liability.

ER000053

![FRONTIER logo]

**C O N T R A C T   O F   C A R R I A G E**                                      Rev 68 08/22/18

1) Government Request -- To comply with a government requisition of space or request for emergency transportation, e.g., in connection with national defense or natural disaster (actual, threatened or reported).

2) No Seat for Safety Assistant - If a passenger requires a safety assistant (see Section 3.B.6) and there is not a seat available on the applicable flight and, thus, both the passenger and the safety assistant are denied transportation. For purposes of determining whether a seat is available for a safety assistant, the safety assistant is deemed to have checked in at the same time as the individual with the disability.

B. Frontier may refuse to provide transportation to any person and may require that a passenger leave an aircraft or be removed from an aircraft for the following reasons, in which case no refund will be due and Frontier will have no further liability.

1) Government Direction - To comply with a direction of a government official acting in their official capacity to remove or not provide transportation to a specific individual.

2) Identification -- The passenger refuses to produce a government-issued identification as required by Frontier's representatives or as required by law.

3) Passports/Visas -- The passenger intending to travel across any international border fails to possess and present all valid documents (passports, visas, certificates, etc.) required by the laws of the countries from, over or into which the passenger will fly, which will in all cases be the passenger's exclusive responsibility.

4) Failure to Appear - The passenger fails to check-in for their flight within the required times or appear for boarding of that flight within the required times.

5) Special Medical Requirements -- The passenger will be refused transport if he or she requires medical equipment be used in flight or services (i) not provided by Frontier, (ii) that may not be used in flight, or (iii) does not have sufficient supplies therefor. The foregoing includes any medical equipment that would require use of power from the aircraft, medical equipment for which the passenger does not have sufficient batteries for the duration of the flight plus unexpected delays. Passengers must be able to sit in a single seat with the seat in the full and upright position, which precludes passengers that must lie flat or that must be transported on a stretcher. Frontier does not provide medical oxygen.

EXCEPTION:   A respiratory device (e.g., ventilator, respirator, CPAP machine or Portable Oxygen Concentrator) is considered an assistive device and is permitted as carry-on or checked baggage at no charge provided that all batteries must be transported in carry-on baggage and must be packaged in a manner that protects them from physical damage and short circuits, and provided that if the device is to be used in flight: (i) the passenger must carry enough fully-charged batteries to power the device throughout the entire journey including all ground time (between connections), the duration of the flight and for unexpected delays, (ii) the device must be approved by the FAA with stickers indicating such, and (iii) prior to traveling, the passenger must complete the Portable Oxygen Concentrator Medical Authorization form (30881) available on Frontier's website or obtain a medical statement from his/her physician addressing the points on the POC Medical Authorization form.

*NOTE:        Passengers are referred to 14 CFR Part 121, SFAR No. 106 for regulations regarding and a list of Portable Oxygen Concentrators that are approved for use on aircraft.*

ER000054

**FRONTIER**

CONTRACT OF CARRIAGE                                                      Rev 68 08/22/18

6) Qualified Individual with a Disability -- If transportation is refused because the passenger fails to comply with the following: Qualified individuals with a disability will be transported in accordance with the conditions and requirements of 14 C.F.R. § 382 unless the carriage of such individuals may impair the safety of the flight or violate Federal Aviation Regulations. Pursuant to 14 C.F.R. § 382.113, Frontier does not provide certain extensive in flight special services such as assistance in actual eating, assistance within the lavatory or at the individual's seat with elimination functions, or provision of medical services. Moreover, pursuant to 14 C.F.R. § 382.29, a qualified individual with a disability may be required to be accompanied by a safety assistant as a condition of being provided air transportation in any of the following circumstances: (i) when the individual, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from employees, including the required safety briefing, (ii) when the individual has a mobility impairment so severe that the individual is unable to assist in his/her own evacuation of the aircraft, (iii) when the individual has both severe hearing and severe vision impairments, if the individual cannot establish some means of communication with employees adequate to permit transmission of the required safety briefing, (iv) on the day of departure, if it is determined that an individual meeting the criteria of (i), (ii) or (iii) must travel with a safety assistant, contrary to the individual's self-assessment that he/she is capable of traveling independently, the safety assistant will not be charged to accompany the individual with a disability.

7) Prisoners - If transportation is refused because of a failure to comply with the following: Frontier accepts up to two "low risk" prisoners with hand restraints per flight. If the flight is 4 hours or less, at least one armed or unarmed law enforcement officer must accompany the prisoner(s). If the flight is more than 4 hours, at least two armed or unarmed law enforcement officers must accompany the prisoner(s). At no time may any prisoner be left unattended. No prisoners are accepted on codeshare itineraries.

8) Resistant Prisoners - Any prisoner who has resisted or is reasonably believed to be capable of resisting his/her escort.

9) Proper Attire - Any passenger who is barefoot and over 5 years of age, unless required to be barefoot for medical reasons, or who is not otherwise fully clothed.

10) Intoxication - Any passenger who appears to be intoxicated or under the influence of drugs.

11) Communicable Disease or Infection - A passenger who has a communicable disease or infection that is known or reasonably believed to pose a direct threat to the health or safety of others in the course of flight. If such a passenger presents a medical certificate dated within 10 days of the date of the flight for which it is being presented with specific conditions under which the individual can travel and not pose a direct threat to the health and safety of other persons, transportation will be provided to such individual unless it is not reasonable or feasible to implement the conditions set forth in the medical certificate as necessary to prevent the transmission of the disease or infection to other persons in the normal course of flight. Unacceptable measures will include, but not be limited to, a required separation between the passenger and others persons, use of medical equipment not permitted to be used on the aircraft, a requirement that any person wear protective gear including gloves.

12) Refusal or Inability to Sit - Any passenger who is unwilling or unable to sit in an upright position during takeoff and landing with the seat belt fastened.

13) Failure to Follow Instructions - Any passenger who refuses to obey instructions from an employee or crewmember.

14) Use of Ticket Issued to Other Person - Any passenger who attempts to use a ticket not issued to that person.

---

**Refusal to Transport and Special Conditions**                              **Pg. 4 of 24**

**FRONTIER**

**CONTRACT OF CARRIAGE**                                      Rev 68 08/22/18

15) Interference - Any passenger who interferes with any member of the flight crew in pursuit of their duties or attempts to do so.

16) Smoking - Any passenger who smokes or attempts to smoke on an aircraft.

17) Weapon - Any passenger who, except as permitted by law (see 49 C.F.R. § 1544.219), wears or has on or about their persons concealed or unconcealed, deadly or dangerous weapons.

18) Purchase in Violation of Contract of Carriage - Any passenger that purchases a ticket in violation of this Contract of Carriage or any fare rule. In addition, Frontier may (i) invalidate the tickets or any other that may have been purchased in the same manner, (ii) cancel any remaining portion of the passenger's itinerary, or (iii) confiscate any unused portions of the ticket.

19) General Refusal - Any person whom Frontier has informed is not permitted to purchase transportation from Frontier.

C. Refusal to Sell Transportation - Frontier may refuse to sell transportation to any person, including the following, and may inform such persons that they are not permitted to purchase transportation from Frontier:

1) Refusal to Comply - A person who refuses to comply with instruction given by employees or representatives prohibiting the solicitation of items for sale or purchase, including airline tickets, passes, or travel award certificates.

2) Prior Conduct - A person who has disrupted airline operations, mistreated employees, or has not complied with Frontier's policies or otherwise violates this Contract of Carriage.

3) Misconduct - A person who has committed a fraudulent act against Frontier.

D. Customer of Size - If, in Frontier's sole judgment, a passenger is unable to sit in an aircraft seat without lifting either or both armrests and occupying all or a portion of the adjacent seat(s), or encroaching into the aisle or adjacent seat(s), the passenger will be required to purchase a ticket for an additional seat (or more, if required to accommodate the passenger) at the price then applicable. If sufficient, contiguous seats are not available, the passenger will be given the option to switch to flights on which such seats are available (for which applicable fees will apply) or be given a refund.

E. Allergies (Peanut, Pet, or Chemical) - Items are not removed from the aircraft to accommodate a passenger's allergy to a particular food, substance, or chemical. A variety of snacks are served on board many flights, including products that may contain peanuts or other nuts. A "peanut-free" or "chemical-free" environment cannot be provided to passengers onboard the aircraft. Passengers are advised to consult a healthcare professional regarding the risks of onboard exposure to any allergen.

F. Pregnancy - Passengers who are pregnant are urged to consult with their doctor on whether it is safe to travel by air, including with due consideration to the possibility of turbulence, cabin pressurization, significantly increased risk of deep vein thrombosis associated with pregnancy, and lack of ready access to medical care. This is particularly important for women in their ninth month of pregnancy, who are urged to obtain an examination from their physician shortly before flying to confirm air travel will be safe. Women with a history of complications or premature delivery should not fly if pregnant. By traveling with Frontier, pregnant women acknowledge and accept these risks. Different policies for passengers who are pregnant may apply on any leg of a codeshare flight that is operated by the codeshare airline.

G. Electronic Surveillance of Passengers and Baggage - Passengers and their baggage are subject to inspection, including via electronic means, with or without the passenger's consent or knowledge.

ER000056

**F R O N T I E R**

**C O N T R A C T   O F   C A R R I A G E**                    Rev 68 08/22/18

H. Diversion - In the event that Frontier is required to divert an aircraft because a passenger requires medical attention or due to the passenger's conduct, the passenger may be required to reimburse Frontier for the costs that Frontier incurs, including the cost to accommodate other passengers. The amount due will be as determined by Frontier.

# 4.  International Transportation

A. Compliance with Regulations - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements of countries to be flown from, into, or over. Frontier is not liable for any aid or information given by any agent or employee to any passenger in connection with obtaining necessary documents or complying therewith (including as may be provided in this Contract of Carriage) or the consequences to any passenger resulting from his/her failure to obtain such documents or to comply with such laws, regulations, orders, demands, requirements, or instructions.

B. Compliance with Foreign Country Regulations regarding Importation of Goods - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements of countries to be flown from, into, or over. Frontier is not liable for the consequences to any passenger resulting from his/her failure to comply with such laws, regulations, orders, demands, requirements, or instructions.

C. Customs Inspection - If required, a passenger must attend the inspection of his/her baggage, checked or unchecked, by customs or other government officials. Frontier accepts no responsibility to the passenger if they fail to observe this condition.

D. Government Regulation - No liability shall attach to Frontier if, based on what it understands to be applicable law, government regulation, demand, order or requirement, it refuses to carry passenger. If, however, it is ultimately determined that Frontier was incorrect, the limit of its liability will be to refund the amount paid for the ticket on which transportation was refused.

E. International Operations - Frontier is required to make an attempt to obtain emergency contact information from a passenger traveling into or out of a foreign country. If a passenger refuses to provide emergency contact information, Frontier will document the attempt and may require the passenger to sign the document.

F. Indemnification - A passenger shall indemnify Frontier for any loss, damage, or expense suffered or incurred by Frontier by reason of the passenger's failure to possess any required travel documents or other failure to comply with the provisions of this section, including the applicable fare if Frontier is required to transport the passenger home from a country. Frontier is not liable to the passenger for loss or expense due to the passenger's failure to comply with this provision.

G. Baggage Limitation - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements regarding baggage size and weight limitations of countries to be flown from, into, or over. Frontier is not liable for the consequences to any passenger resulting from his/her failure to comply with such laws, regulations, orders, demands, requirements, or instructions.

# 5.  Child Passengers

A. Accompanied Children -- Children from 7 days through 14 years of age may travel with another passenger who is at least 15 years old.

B. Unaccompanied Children

1)  Children under 5 years old may not travel unaccompanied.

---

ER000057

**FRONTIER**

**CONTRACT OF CARRIAGE**                                    Rev 68 08/22/18

2)  Unaccompanied children ages 5 - 14 will be accepted for travel subject to the following:

   a)  Travel will only be permitted on non-stop flights operated by Frontier (unaccompanied children will not be accepted on connecting flights).

      *NOTE:*  *The child will not be accepted for travel if a flight is expected to terminate short of, or bypass, the child's destination, or if there are anticipated lengthy delays at the origin or destination city due to air traffic control, weather or other factors that may impact Frontier's ability to operate its scheduled service.*

   b)  Escort service must be purchased for the child and applicable fees paid.

   c)  The child must be capable of communicating with the flight crew, following instructions, and be able to use the lavatory without supervision.

   d)  Frontier will not administer medication to a child.

   e)  The child must hold confirmed reservations from the originating airport to the destination airport. Travel as a standby passenger is not allowed.

   f)  The child must be brought to the originating airport by a parent or responsible adult who remains: (i) with the child until the child is aboard the aircraft and (ii) at the gate until the aircraft departs the airfield.

   g)  The adult listed on the Unaccompanied Minor Travel (form 30440) must arrive at the gate 30 minutes prior to the flight arrival. If the child/children are not met, Frontier will take appropriate action to ensure the safety of the child. This includes returning the child/children to the airport of departure, if appropriate, and all costs associated will be reimbursed to Frontier by the authorized guardian.

   h)  Children must be in possession of all required travel documents required by law (passport, visa, etc.).

   i)  If necessary, emergency medical assistance will be provided. Authorizing guardian will be responsible for all costs related to the treatment.

   j)  All forms required by Frontier must be completed.

   k)  A snack may be provided to the unaccompanied child if available. These snacks may contain nuts, soy, wheat, dairy, or eggs and may be packaged in a facility that processes the same.

C.  Escort service may be purchased for passengers aged 15 to 17 years subject to the same terms and conditions.

   *NOTE:*  *Passengers under age 18 traveling without both parents may need additional documentation to travel across international borders, depending on the country's requirements.*

D.  Fee for Escort Service for Unaccompanied Children - A separate service charge will apply per direction for each unaccompanied child, whether or not traveling together. No fee applies to unaccompanied children who are *EarlyReturns®* Elite members.

E.  Infant and Child Fares (except as otherwise provided in a specific fare rule) are as follows:

1)  Infants under 2 years of age are accepted, without charge, when the infant does not occupy a separate seat and is accompanied by a full fare-paying passenger over the age of 15.

   *NOTE:*  *Due to supplemental equipment considerations, the number of infants accepted per flight may be limited based on aircraft type.*

2)  One adult may accompany up to two infants under the age of 2.

ER000058

**FRONTIER**

**CONTRACT OF CARRIAGE**                                      Rev 68 08/22/18

   a)  When an adult passenger is traveling with two infants under 2 years of age, a seat must be purchased for at least one infant. The fare is the same as an adult fare.

3)  Children 7 days - 14 years of age occupying a seat, accompanied or unaccompanied, are charged the same fare as an adult passenger.

   NOTE:  *Passengers under age 2 traveling as lap children (not purchasing a seat) are subject to international taxes. These taxes must be paid prior to boarding the originating departure flight.*

F.  Child Restraint Systems - Frontier accepts infant and child restraint systems (car seat or harness) approved for air travel that fit in the applicable aircraft seat with the arm rest down that meet the following requirements:

1)  Approved seats manufactured to U.S. standards between January 1, 1981, and February 25, 1985, must bear the label: "This child restraint system conforms to all applicable Federal motor vehicle safety standards."

2)  Seats manufactured to U.S. standards on or after February 26, 1985, must bear two labels: (i) "This child restraint system conforms to all applicable Federal motor vehicle safety standards" and (ii) "THIS RESTRAINT IS CERTIFIED FOR USE IN MOTOR VEHICLES AND AIRCRAFT" in red lettering.

3)  Seats not meeting the above criteria must bear a label or markings showing: (i) the seat was approved by a foreign government, (ii) the seat was manufactured under the standards of the United Nations, (iii) the seat or child restraint device furnished by the certificate holder was approved by the FAA through Type Certificate or Supplemental Type Certificate, or (iv) the seat or child restraint device was approved by the FAA in accordance with 14 C.F.R § 21.8(d), or FAA Technical Standard Order C-100b, or a later version.

   NOTE 1:  *A child under the age of 2 must be held in the passenger's lap or be seated in an approved car seat for taxi, takeoff, and landing.*

   NOTE 2:  *Frontier encourages all adults traveling with infants under 2 years of age to secure the infant in an approved car seat or harness in the infant's own purchased seat.*

4)  Child Harness - The FAA-approved AMSafe Aviation C.A.R.E.S. child harness device may be used on-board the aircraft. It is designed for children weighing between 22 and 44 pounds (between 10 and 20 kilograms) and must bear the label "FAA Approved in accordance with 14 CFR 21.305(d) approved for aircraft use only."

5)  Car Seats - A car seat may be used by a child between the ages of 7 days and 2 years if seat space is available after boarding, even if a seat has not been purchased for the child. A car seat may be used by any child when a separate seat has been purchased. To use a car seat onboard the aircraft:

   a)  It must bear manufacturer labels identifying approval for aircraft use, as described in subsection (1) and (2) above.

   b)  It must have a solid seat and solid back.

   c)  It must have restraint straps installed to hold the child in the car seat.

   d)  The child may not exceed the weight limitation of the car seat.

   e)  It may not be placed in the emergency exit rows, in the seats immediately in front of or behind the exit rows, or in any seat that has an airbag seatbelt installed.

ER000059

**FRONTIER**

   f) Window seats are the preferred location for a car seat so it does not impede a passenger's movement or egress into the aisle. Other seat assignments are permitted provided the car seat is not obstructing the egress of any passenger.

   g) It must be secured by a seat belt at all times.

6) Booster Seats - Booster seats may be carried on-board aircraft but must be stowed in an overhead compartment or underneath the seat for take-off and landing. Once the aircraft has reached cruising altitude, the passenger may use the seat during the flight. The booster seat must be stowed when the aircraft begins its descent.

# 6. Service Animals

A. General - The following categories of service animals are allowed in the cabin without charge.

1) Service animals trained to assist passengers with disabilities. As evidence that an animal is a service animal, the passenger must present an identification card, other written documentation, the animal must have a harness, tag, or the passenger must give credible verbal assurances that he/she is a qualified individual with a disability using the animal. Service animals in training must be accompanied by certified trainer.

2) Service animals used for emotional support or psychiatric service. As evidence that the animal is required for that purpose, the passenger must present a hard copy of a written statement, one per animal, current within one year, on letterhead from a mental health professional (e.g., psychiatrist, psychologist, licensed clinical social worker, including a medical doctor specifically treating the passenger's mental or emotional disability) stating the following: (i) the passenger has a mental or emotional disability recognized in the Diagnostic and Statistical Manual of Mental Disorders — Fourth Edition (DSM IV), (ii) the passenger needs the emotional support or psychiatric service animal as an accommodation for air travel or for activity at the passenger's destination, (iii) the individual providing the assessment is a licensed mental health professional, and the passenger is under his or her professional care, and (iv) The date and type of the mental health professional's license and the state or other jurisdiction in which it was issued.

3) Service animals trained in explosive detection, contraband search, or search and rescue on active duty and traveling for that purpose. The passenger must present credible documentation thereof.

B. Exclusions - Notwithstanding anything to the contrary above, the following types of animals are not accepted as service animals: unusual or exotic animals including but not limited to rodents, reptiles, insects, hedgehogs, rabbits, sugar gliders, non-household birds or animals that have been improperly cleaned and/ or have a foul odor.

C. Seating - The passenger may sit anywhere, except in an emergency exit row, provided the animal does not obstruct an aisle or egress of passengers in an emergency evacuation. The animal must fit under the seat or on the passenger's lap, one animal per lap. The animal may not occupy a seat. An animal that cannot or does not comply with the foregoing will not be accepted.

D. International - Restrictions for travel with an animal to international destinations vary by country. Frontier recommends contacting the appropriate embassy or consulate before purchasing a ticket for travel. Different policies may apply on any leg of a codeshare flight that is operated by the codeshare airline.

E. Oxygen - No oxygen will be administered to a service animal in the event of an emergency.

ER000060

**FRONTIER**

CONTRACT OF CARRIAGE                                                      Rev 68 08/22/18

## 7.  Smoking

A.  Smoking is prohibited on all flights.

B.  Federal law prohibits tampering with, disabling, or destroying any smoke detector installed in an aircraft lavatory.

C.  The use of electronic smoking devices is prohibited at all times on all aircraft.

## 8.  Tickets

A.  A passenger is entitled transportation only upon presentation of a valid ticket or electronic ticket (e-ticket). The ticket entitles the passenger to transportation between the point of origin and the destination.

NOTE:       *Paper tickets are not issued on Frontier ticket stock. Only electronic tickets are issued for travel on Frontier. However, paper tickets from other airlines may be accepted for travel at Frontier's discretion.*

B.  Tickets are honored only in the order in which they are issued.

C.  The following practices are prohibited:

1)  Back to Back Ticketing -- The purchase or use of portions of tickets from two or more tickets issued as round-trip fares or other scheme for circumventing minimum stay requirements.

2)  Throwaway Ticketing -- The purchase or use of round-trip tickets for one way travel.

3)  Hidden City/Point Beyond Ticketing -- The purchase or use of a ticket from a point before the passenger's actual origin or to a point beyond the passenger's actual destination.

D.  A ticket which has not been properly issued or paid for, or which has been altered, mutilated, or improperly issued by an unauthorized party is not valid for travel or refund.

E.  The purchaser of a ticket and the passenger intending to use it are responsible for ensuring that the ticket accurately states the name of the passenger.

F.  A ticket may only be used by the person named on the ticket. Frontier is not liable to the purchaser of a ticket if the ticket is used by someone other than the person named on the ticket.

G.  Presentation of a ticket by someone other than the named passenger renders the ticket void. The ticket is subject to confiscation and is ineligible for refund.

H.  An additional processing fee will apply to each ticket purchased or changed via Frontier's reservation center or at its airport counters, except (i) tickets purchased by an Elite member for themselves (a fee does apply to purchases by such members for others), and (ii) issuing an international ticket for infant taxes for an infant not occupying a seat.

ER000061

# FRONTIER

**CONTRACT OF CARRIAGE**                                       Rev 68 08/22/18

## 9.   Ticket Validity and Itinerary Changes

A.  Period of Validity

   1)  Tickets issued by Frontier are valid for transportation only on the flights and dates shown on the ticket and have no value and are not valid for transportation thereafter, provided, however, if a passenger cancels a ticket before the scheduled flight departure time, the value of the ticket less a service fee will be retained for 90 days from the date of cancellation of the ticket in the form of an electronic credit. The credit has no cash or refund value and may only be applied to a single subsequent ticket on a Frontier flight for the same passenger as the original ticket.

   2)  Except as required by law or as provided in this Contract of Carriage, Frontier shall have no obligation of any kind to reschedule such passengers or to provide them with any refund or other credit for unused tickets.

B.  Except for tickets purchased for travel within 7 days (168 hours) of purchase, all tickets may be cancelled within twenty-four (24) hours of the purchase and a full refund will be given.

## 10.  Check-in Times

A.  Airport Check-In - It is the passenger's responsibility to arrive at the airport, taking into consideration travel time both to and within the applicable airport, including processing through the security check point with enough time to complete check-in and security screening processes.

B.  Passengers can check in beginning 2 hours before departure at Frontier's airport check-in counters or 24 hours before departure at FlyFrontier.com or on the Frontier mobile app, if the reservation is eligible for online or mobile app check-in.

C.  Check-In Times

   1)  For domestic flights (originating and to a destination within the United States), the passenger must be checked in with a printed boarding pass or a Frontier mobile app boarding pass in-hand at least 45 minutes prior to scheduled departure whether or not checking bags.

   2)  For international flights, the passenger must be checked in with a printed boarding pass or a Frontier mobile app boarding pass in-hand at least 60 minutes prior to scheduled departure.

D.  Time Limit for Checking Bags - Baggage to be checked must be presented at the airport within the minimum check-in time. Passengers who present baggage after the minimum check-in time may be refused transport. At some airports, the counter may close at the check-in cut-off time, in such cases, passenger and baggage check-in are not permitted after the check-in deadline. In the event that baggage is accepted after the minimum check-in time, the passenger will be liable for any costs and fees for the bag to be delivered in the event that it is not carried on the same flight.

E.  Availability for Boarding - Tickets and seat assignments are subject to cancellation for passengers who fail to make themselves available for boarding at the departure gate at least 20 minutes prior to scheduled departure.

F.  Failure to Appear - If a passenger fails to travel on a flight on their itinerary without the reservation for that flight having been cancelled, all subsequent flights, including return flights, on the itinerary will be cancelled.

ER000062

Case 2:18-cv-04916-PA-AFM   Document 40-2   Filed 10/25/18   Page 14 of 26   Page ID #:490

**FRONTIER**

**CONTRACT OF CARRIAGE**                                Rev 68 08/22/18

G. Misconnected Passengers - The ticket of any passenger who does not meet the minimum check-in time due to the late arrival of an inbound connecting flight operating by Frontier will be accommodated on the next available flight operated by Frontier to the same destination. Frontier will not provide transportation on another airline or reimburse the cost of transportation purchased from another airline. The ticket of any passenger who does not meet the minimum check-in time due to the late arrival of an inbound connecting flight operating by any other airline will be cancelled and no refund or accommodation on another flight will be due unless available and purchased at the applicable price by the passenger.

## 11. Fares

A. Fares apply for transportation only between the airports for which they are published.

B. When a passenger requires connecting service with arrival at one airport and departure from another airport, transportation between those airports must be arranged by and at the expense of the passenger.

C. Fares are subject to change without notice until a ticket is issued.

## 12. Checked Baggage

A. Fees applicable to checked baggage:

   1) Baggage fees apply to each checked bag.

   2) Active duty military personnel, reservists traveling with orders, and military personnel traveling in uniform may check bags at no charge for all types of tickets. This policy is for active duty military personnel only and does not extend to family members or traveling companions.

B. Baggage Allowance Exceptions - The following may be checked or carried on at no charge and do not count toward the passenger's baggage allowance.

   1) Medical Assistive Devices - Canes, crutches, braces, wheelchairs, etc. for the use of the passenger. There is no limit to the number of mobility aids a passenger may check. Medical assistive devices must be packed separately, in protective packaging, for baggage fees to be waived.

   2) Wheelchairs - In compliance with federal law, wheelchairs or other types of mobility devices for the passenger are accepted as checked baggage in addition to the passenger's baggage allowance at no additional charge. Certain Frontier aircraft can accommodate up to two wheelchairs up to 40 inches (101 cm) high, 50 inches (127 cm) long, 13 inches (33 cm) wide and weighing no more than 70 pounds (31 kilograms) in the cabin of the aircraft on a first-come, first-served basis. Wheelchairs carried in the cabin of the aircraft will be brought to the front of the aircraft after all other passengers have deplaned.

   3) Essential Infant or Child Items - Child restraint devices, car seats, strollers, diaper bags, and other essential baby items when the infant is traveling. These items must be packed separately, in protective packaging, for baggage fees to be waived.

C. Acceptable Baggage - Frontier will accept for transportation as baggage such personal property necessary or appropriate for the wear, use, comfort, or convenience of the passenger for the purpose of the trip, subject to the following:

ER000063

Case 2:18-cv-04916-PA-AFM   Document 11-2   Filed 11/23/2018   Page 56 of 324

**FRONTIER**

**CONTRACT OF CARRIAGE**                                        Rev 68 08/22/18

1) Checked baggage may not exceed 62 inches (157 cm) in linear dimension (height plus length plus width), nor more than 180 inches (457 cm) in any of those dimensions or weigh more than 50 pounds (22.6 kilograms). Additional fees apply to items that exceed those size and weight limitations. No baggage weighing more than 100 pounds (45 kilograms) will be accepted.

*NOTE 1:*   *For baggage checked to or from Canada, no baggage weighing more than 70 pounds (31.75 kilograms) will be accepted.*

2) The TSA website maintains a list of items that passengers are not permitted to check in baggage. See www.tsa.gov for a complete list. Baggage containing any items on that list will not be accepted.

3) An item for transportation not suitably packaged to withstand ordinary handling and turbulence, or of a size, weight or character that renders it unsuitable for transportation will not be accepted.

4) The passenger is responsible for ensuring that all items packed in checked baggage are properly packaged and padded to resist handling and turbulence. (Refer to Section 17)

5) All baggage is subject to inspection by Frontier. Frontier is not, however, obligated to perform an inspection. Frontier will refuse to transport or will remove baggage if the passenger refuses to submit the baggage for inspection.

6) Frontier will not accept baggage or other personal property for storage.

7) Frontier will check baggage only when the passenger presents a valid ticket for transportation on the applicable flight.

8) The passenger's name, address and telephone number must appear on the baggage.

9) Frontier has the right to refuse to transport baggage on any flight other than the one carrying the passenger.

10) Baggage will not be checked:

   a) To a point that is not reflected on the passenger's ticket.

   b) Other than the passenger's destination on the applicable flight, but if the flight is a connecting flight, to the final destination, but if that connecting flight is scheduled to depart from an airport different from the one at which the passenger is scheduled to arrive then only to the destination of the first leg.

11) Live animals are not accepted as checked baggage.

12) Agricultural items, perishable items, or products that do not conform with customs or agricultural government law at the flight's destination will not be accepted.

13) Frontier will not accept for carriage any restricted/hazardous materials as defined in the DOT Hazardous Materials Regulations (49 C.F.R. §§ 171-177) and IATA Dangerous Goods Regulations. Examples of such goods are (i) liquor products over 140 proof, (ii) gasoline-powered tools, (iii) compressed gases, (iv) corrosives (such as acids and wet batteries), (v) explosives (such as dynamite and fireworks), (vi) flammables (such as matches and lighter fuels), (vii) poisons, and (viii) magnetic and radioactive materials. Electronic smoking devices (commonly referred to as e-cigarettes or personal vaporizers) pose a safety risk and are not permitted in checked baggage. These items are permitted in carry-on baggage. Spare lithium batteries are not allowed in checked baggage.

14) Perishable items must be packaged properly such that they cannot leak through their packaging. (Refer to Section 17)

D. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

ER000064

Case 2:18-cv-04916-PA-AFM   Document 40-2   Filed 10/25/18   Page 16 of 26   Page ID #:492

**FRONTIER**

**CONTRACT OF CARRIAGE**

## 13. Carry-On Baggage

A. Passengers are permitted up to two carry-on items:

1) One free personal item not larger than 8" x 14" x 18" (20 cm x 35 cm x 45 cm) that must fit under the seat.

2) One carry-on item not larger than 10"H x 16"W x 24"L (25 cm x 40 cm x 114 cm) and weighing not more than 35 pounds (15 kilograms) that may be placed in the overhead compartment or under the seat. A fee for the carry-on item may apply based on the ticket type purchased.

3) Items that exceed these dimensions or are in excess of the allowance will be gate checked to which a fee will apply.

B. The TSA website maintains a list of items that passengers are not permitted to carry onboard an aircraft. See www.tsa.gov for a complete list. Carry-on items containing any items on that list will not be accepted.

C. The passenger is responsible for all items brought on board the aircraft. Items must be stored under a seat or in the overhead compartment.

D. Use of Portable Electronic Devices (PEDs)

1) Small authorized PEDs are devices under 2 pounds and are of a size that can easily be placed in a seat pocket along with the other materials that are normally found in the seat pocket (Passenger Safety Information Card, Menu or airsickness bag). They include devices like tablets, readers and mobile phones and may be used during all phases of flight when in airplane mode including taxi, take-off and landing. However, if using them during taxi, take-off and landing, you must secure these devices by holding them, putting them in your pocket or holster, or placing them in a seatback pocket.

2) Large authorized PEDs are devices 2 pounds or more such as full-size laptops. They must be turned off and stowed during taxi, takeoff and landing. You may stow them under the seat in front of you or in an overhead compartment. These devices may be used above 10,000 feet when authorized by a Flight Attendant announcement.

3) On all flights operating outside U.S. airspace, PEDs cannot be used during taxi, takeoff and landing, but may be used in airplane mode above 10,000 feet when authorized by a Flight Attendant announcement.

E. Sound Emitting Devices - Portable electronic devices that emit sound, e.g., music or video players or games, may be used only with headphones and provided the sound, even via the headphones, cannot be heard by others.

F. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 14. Cabin-Seat Baggage

A. Cargo stowed inside the main cabin of the aircraft and occupying a passenger seat is referred to as "Cabin-Seat Baggage." Cabin-Seat Baggage may be transported on flights operated by Frontier subject to the following conditions:

1) The full fare for the ticket for the applicable seat is paid. There is no carry-on baggage allowance or baggage allowance for that ticket. If the Cabin-Seat Baggage must be accommodated into a STRETCH seat due to its size or at the passenger's request, the STRETCH seat fee applies.

ER000065

**FRONTIER**

**CONTRACT OF CARRIAGE**                                    Rev 68 08/22/18

2) The Cabin-Seat Baggage must be packaged or covered in a manner to avoid possible injury to passengers and crew.

3) The Cabin-Seat Baggage must be carried aboard the aircraft by the passenger.

4) The Cabin-Seat Baggage may not weigh more than 100 pounds (45 kilograms).

5) The Cabin-Seat Baggage cannot exceed size dimensions of 57" height x 17.84" width x 9.3" depth (144.78 cm x 45.31 cm x 23.62 cm).

6) The Cabin-Seat Baggage must fit in the seat without blocking aircraft signage or extending into the aisle and be secured with a seatbelt or other approved method.

7) Certain seats may not accommodate Cabin-Seat Baggage. Frontier will assign seats as appropriate.

8) Except as provided herein, Frontier is not responsible for damage to Cabin-Seat Baggage.

9) Cabin-Seat Baggage does not count toward the passenger's baggage allowance.

## 15. Conditions and Charges for Special Items

The following items are accepted as checked or carry-on baggage, subject to the conditions specified and payment of applicable fees.

NOTE:   Refer to the Sports Equipment and Special/Fragile Items chart hosted at www.FlyFrontier.com for other items which have specific packaging or other requirements which need to be met in order to be transported by air. All items listed on the Sports Equipment and Special/Fragile Items chart are subject to baggage fees. Baggage fees for excess, oversize, and overweight are cumulative and all may be assessed on one item.

A. Firearms -- Firearms are accepted as checked baggage on flights within the United States, but not international flights. Carriage of any firearm is subject to the following conditions:

1) In accordance with federal law, a passenger who presents baggage that contains a firearm must (i) ensure the firearm is unloaded, (ii) pack the firearm in a lockable, hard-sided container, (iii) declare the firearm unloaded at the time of check-in, and (iv) sign a "Firearms Unloaded" declaration.

2) If the firearm is in a locked, hard-sided container INSIDE a piece of checked baggage, the declaration must be placed inside the checked baggage and proximate to, but not inside of, that container.

3) If the firearm is in a locked, hard-sided container, but NOT INSIDE a piece of checked baggage, the declaration must be placed inside the container.

4) After screening, the passenger must lock the firearm container and retain the key or combination.

5) The passenger must make arrangements for and assume full responsibility for complying with any applicable laws, customs and government regulations, or restrictions of the state or territory to which the firearm is being transported.

B. Ammunition - Ammunition for firearms (whether or not the firearm is also being carried) is accepted as checked baggage on flights within the United States, but not international flights, subject to the following conditions:

1) The ammunition must be securely packed in the original manufacturer's packaging, fiber (such as cardboard), wood or metal boxes or other sturdy and durable packaging providing sufficient cartridge separation.

ER000066

**CONTRACT OF CARRIAGE**                                    Rev 68 08/22/18

2) Each passenger is allowed up to 11 pounds (4.9 kilograms) of ammunition.

3) Loaded ammunition clips and magazines must also be securely boxed.

4) Ammunition may be packed with the firearm.

C. Live Animals -- Frontier accepts live animals only in the cabin of the aircraft, not as checked baggage. The transportation of live animals is subject to fees for carriage and the terms and conditions below.

   EXCEPTION:  See separate rules with respect to service animals referred to in *6. Service Animals*.

1) Only the following animals are permitted:

   a) Domestic Flights -- Domesticated dogs, cats, rabbits, guinea pigs, hamsters, or small household birds.

   b) International Flights -- Domesticated dogs and cats.

2) The passengers carrying the animal are responsible for making arrangements and assuming full responsibility for complying with any applicable laws, customs and other governmental regulations, requirements or restrictions of the country, state or territory to which the animal is being transported.

3) The passengers carrying the animal are responsible for paying any import/export fees, duties or taxes that may apply as well as any fines for failing to comply with applicable law.

4) International - Restrictions for travel with an animal to international destinations vary by country. Frontier recommends contacting the appropriate embassy or consulate before purchasing a ticket for travel.

5) The passengers carrying the animal are responsible for making advance reservations because no more than ten pet containers will be accepted per flight.

6) No passenger may carry more than one pet container.

7) The animal must remain in a pet container at all times and may not be fed while onboard the aircraft.

8) The pet container must be large enough for the pet to stand, turn around, and lie down in a natural position and fit underneath the seat in front of the passenger.

9) The animal may not disrupt other passengers and the passenger must be able to quiet the animal without removing it from the container.

10) The container counts toward the carry-on baggage allowance.

11) No oxygen will be administered to an animal in the event of an emergency.

D. Human Remains:

1) Crematory remains (human or animal) may be transported as carry-on or checked baggage subject to the following conditions:

   a) The container must be made of a material such as wood or plastic that can be successfully screened by the TSA. If the container cannot be screened, it will not be allowed.

   b) If the container is checked, it must be sufficiently packaged in a well-insulated and sturdy container.

   c) If the container is carried onboard the flight, it counts toward the passenger's carry-on allowance and it must meet carry-on baggage dimensions.

2) Human remains in caskets are not accepted.

E. Dry Ice (frozen carbon dioxide) -- Dry ice may be carried under the following conditions:

1) A maximum of 5.5 pounds (2.5 kilograms) of dry ice per passenger is accepted in checked or carry-on baggage.

---

**Conditions and Charges for Special Items**                    **Pg. 16 of 24**

**FRONTIER**

CONTRACT OF CARRIAGE                                    Rev 68 08/22/18

2) The cooler or package must permit the release of carbon dioxide gas. Styrofoam containers are not accepted.

F. Bicycle - Bicycles may be carried under the following conditions:

1) The handlebars must be fixed sideways and the pedals removed or wrapped in plastic foam or similar material and the entire bicycle is encased in a hard-sided case.

2) Bicycles may only be carried as checked baggage.

3) A fee applies for each bicycle checked as baggage.

4) Bicycles are excluded from baggage liability unless packaged in a hard-sided case.

G. Special Items - The following items may exceed carry-on baggage dimensions, but may be taken as a carry-on item (and count toward the carry-on bag allowance) as long as they fit in the overhead bin: fishing rods, tennis rackets, wedding attire, poster tubes and musical instruments. If any such items are comprised of more than one piece, they must be packaged together to be considered one item. The carry-on bag fee applies.

H. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 16. Limitations of Liability

A. Consequential Damages – The purchase of a ticket does not guarantee transportation. Frontier is not liable for any indirect, special or consequential damages resulting from the performance of transportation, delay in performance or failure to provide transportation of passengers and other incidental services whether or not there was prior knowledge that such damages might be incurred. The absolute limit of Frontier's liability for failing to provide transportation will be a refund of the amount paid for the corresponding ticket.

B. International Transportation – With respect to international transportation, as defined in the following referenced conventions, as applicable, Frontier's liability will be limited as specified in, as and if applicable, (i) the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw, October 12, 1929, as amended ("Warsaw Convention"), but subject to the Agreement entered into by Frontier pursuant to 14 C.F.R. Part 203 or (ii) the Convention for the Unification of Certain Rules for International Carriage by Air, signed at Montreal, May 28, 1999 ("Montreal Convention").

ER000068

**FRONTIER**

**CONTRACT OF CARRIAGE**                                          Rev 68 08/22/18

## 17. Claim Limits and Procedures

A. Limitations of Liability

1) Domestic Flights – With respect to domestic flights, i.e., those flights originating and ending within the United States without any scheduled stops outside of the United States, or international flights to which neither the Warsaw Convention or the Montreal Convention apply, Frontier's limit of liability, if any, for the loss, damage or delay in the carriage of checked baggage shall be limited to $3,500 for all bags checked under a single ticketed passenger's name. Frontier will not be liable for:

i) the following items included in checked baggage, with or without the knowledge of Frontier:

- alcohol
- antiques
- art, paintings
- art supplies
- artifacts
- bags made from lightweight material not designed for shipping
- blueprints
- books
- business documents
- CDs
- cell phones
- Cigars, cigarettes, electronic cigarettes, vape pens
- collectibles
- computer equipment (including hardware, software and all accessories)

- dentures
- drugs prohibited by federal or state law
- DVDs
- eyeglasses
- files
- food/perishables
- fragile articles or other similar valuable items and commercial effects
- hand and power tools
- heirlooms
- irreplaceable items
- jewelry
- keys
- machinery and its parts
- manuscripts
- medication
- money

- natural fur products
- negotiable papers/ instruments
- optics
- orthodontics
- orthotics
- photographic/video/ electronic equipment and accessories
- precious metals or stones
- publications
- samples
- securities
- silverware
- sound reproduction equipment
- sunglasses
- surgical supports
- toys

ii) articles strapped, taped, or tied to other pieces of baggage, which may become separated as a result of normal handling during transportation

iii) damage to the following items when not packed in a hard-sided case or other packing that is suitable for the item.

- Prosthetic devices
- Medical equipment
- Musical instruments
- Recreational or sporting equipment
- Baby items including car seats and strollers

iv) damage to handles, straps, wheels and zippers arising from normal wear and tear caused by ordinary handling of baggage.

v) damage arising from ordinary wear and tear, such as cuts, scratches, scuffs, stains, dents, punctures, marks, and dirt

**Claim Limits and Procedures**                                          **Pg. 18 of 24**

ER000069

**FRONTIER**

**CONTRACT OF CARRIAGE**                                   Rev 68 08/22/18

    vi)  damage resulting from over- packing or misuse

    vii)  damage arising from liquids on or in baggage; including weather (e.g. rain, snow)

2) International Flights/Montreal Convention – With respect to international flights to which the Montreal Convention applies, Frontier's limit of liability, if any, for the loss, damage or delay in the carriage of baggage (whether checked or carry-on) shall be limited to 1,131 Special Drawing Rights per ticketed passenger. The conversion rate, available at www.imf.org, in effect on the date of loss will be used for determining maximum liability amount.

3) International Flights/Warsaw Convention – With respect to international flights to which the Warsaw Convention applies, Frontier's limit of liability, if any, for the loss, damage or delay of (i) checked baggage shall be limited to 17 Special Drawing Rights per pound, or actual value, whichever is less, (ii) carry-on baggage shall be limited to 332 Special Drawing Rights or actual value, whichever is less. The conversion rate, available at www.imf.org, in effect on the date of loss will be used for determining maximum liability amount. Absent evidence to the contrary, bags will be presumed to weigh 20 pounds.

4) Frontier does not accept declarations of higher value or accept fees based on such declarations.

5) Subject to the above specified limits of liability, Frontier will compensate a passenger whose baggage has been lost, damaged or delayed for reasonable, documented direct damages up to the specified limit of liability, provided the passenger has made reasonable effort to minimize the amount of damage and provided documentation of the loss. The compensation due for lost or damaged property will be determined by the lesser of the original purchase price less applicable depreciation or the cost to make repairs.

6) Frontier's liability for wheelchairs, mobility aids, and assistive devices used by a passenger with a disability if lost or damaged by Frontier shall be up to the original purchase price of the device without regard to the above limitations of liability.

7) Passengers who incur incidental expenses as a result of delayed baggage delivery will be reimbursed per established DOT guidelines, subject to the above limitations of liability (as applicable). Any amounts paid to the passenger for incidental expenses will be deducted from the total loss amount prior to check issuance.

8) Frontier will not be liable for loss or damage to carry-on baggage unless such damage is caused by Frontier's or its agent's negligence, which does not include damage resulting from turbulence, shifting of items during flight, or ordinary handling, including placing the baggage in overhead compartments or under seats.

9) Frontier's employees and agents are not liable to passengers.

B. Time Limit to Make Claims and Procedures

1) With respect to domestic flights and those international flights to which the Montreal Convention does not apply, any claim based on damage, delay or loss of baggage must be reported to Frontier within 12 hours of the arrival of the flight on which the loss or damage is claimed to have occurred. Claims for pilferage may be made up to 24 hours after flight arrival. Any documentation required to support the claim must be submitted within 30 days from the date the requesting passenger receives the claim form packet from Frontier; Frontier will not be liable if the completed claims are not submitted, with documentation, within that time period.

![FRONTIER]

**CONTRACT OF CARRIAGE**                                    Rev 68 08/22/18

2) With respect to international flights to which the Montreal Convention applies, in the case of baggage damage, the person entitled to delivery must submit in writing to Frontier as soon as possible after discovery of the damage, and at the latest in writing 7 days from receipt of checked baggage and in the case of delay or loss, complaints must be made at the latest within 21 days from the date on which the baggage has been placed at the passenger's disposal or should have been placed at his/her disposal in the case of loss. All claims must be made in writing and must be accompanied by supporting documentation. Any subsequent request for documentation from Frontier must be provided to Frontier within 21 days of the request.

## 18. Failure to Operate on Schedule or Failure to Carry

A. Liability Limited - Except to the extent provided in this rule, Frontier is not liable for failure to operate any flight, failure to operate a flight according to its schedule, or for changing the schedule or type of equipment used on any flight, with or without notice to the passenger.

B. Force Majeure - In the occurrence of a force majeure event, Frontier may cancel, divert, or delay any flight without liability except to provide a refund for the unused portion of the ticket.

C. Delay, Misconnection, or Cancellation - In the event (i) a passenger's flight is cancelled, (ii) a passenger is denied boarding because an aircraft with lesser capacity is substituted, (iii) a passenger misses a connecting Frontier flight due to a delay or cancellation of a Frontier flight (but not flights of other carriers), (iv) a passenger is delivered to a different destination because of the omission of a scheduled stop to which the passenger held a ticket, to the extent possible, Frontier will provide transportation on its own flights at no additional charge to the passenger's original destination or equivalent destination as provided herein. Frontier will have no obligation to provide transportation on another carrier. If Frontier cannot provide the foregoing transportation, Frontier shall, if requested, provide a refund for the unused portion of the passenger's ticket in lieu of the transportation under the foregoing. The foregoing shall be the limit of Frontier's liability for the matters covered by this provision.

D. For purposes of involuntary reroute, the following groups of cities are considered to be the same point. If Frontier is able to provide transportation to one of the specified alternative cities, Frontier has met its obligation for transport to the final destination.

- Chicago-O'Hare (ORD) /Milwaukee (MKE)
- Ft. Lauderdale (FLL) /West Palm Beach (PBI) / Miami (MIA)
- Los Angeles (LAX) /Orange County (SNA)
- Madison (MSN)/Milwaukee (MKE)
- New York La Guardia (LGA) /Trenton (TTN) /Philadelphia (PHL)
- Orange County (SNA) /San Diego (SAN)
- Orlando (MCO) /St. Augustine (UST)
- Orlando (MCO) /Tampa (TPA)
- Washington Dulles (IAD) /Washington National (DCA)

E. Schedule Change Prior to Day of Travel -- When a passenger's itinerary is changed because of a modification in Frontier's schedule, arrangements will be made to:

1) Transport the passenger over its own route system to the destination; or

2) In the event the schedule modification is significant, at Frontier's discretion, it may refund the cost of the unused portion of the ticket.

ER000071

**FRONTIER**

F.  Extended Onboard Ground Delays -- In accordance with FAA regulations, Frontier maintains and complies with a separate Contingency Plan for Lengthy Tarmac Delays. Frontier's Contingency Plan for Lengthy Tarmac Delays may be found on Frontier's website at https://az832049.vo.msecnd.net/media/1567/f9-contingency-plan-for-extended-tarmac-delays-2015.pdf. Frontier's Contingency Plan for Lengthy Tarmac Delays is subject to change without notice and is not part of this Contract of Carriage.

## 19. Denied Boarding Compensation

When a seat cannot be provided due to an inadequate number of seats for the number of passengers holding confirmed reservations (overbooking), the actions described in this section will be taken.

A.  Voluntary -- Passengers on a flight with an overbooking will be encouraged to voluntarily relinquish their seats in exchange for alternate travel and for compensation in the form of an Electronic Travel Certificate for future transportation within 90 days on Frontier. The request and selection of volunteers will be in a manner determined solely by Frontier.

B.  Involuntary -- If insufficient passengers volunteer, passengers who check in after all seats have been assigned will be denied boarding and Frontier will provide transportation on Frontier's flights to the same destination.

C.  Amount of Compensation -- Frontier will compensate a passenger for involuntary-denied boarding based on the new arrival time after the originally scheduled arrival time as follows:

| Domestic | International | Compensation |
|---|---|---|
| New arrival time within :59 | New arrival time within :59 | No Compensation |
| New arrival time within 1 - 1:59 | New arrival time within 1 - 3:59 | 200% (2x) of the one-way fare, not to exceed $675 |
| New arrival time 2 hours or more | New arrival time 4 hours or more | 400% (4x) of the one-way fare, not to exceed $1350 |

> NOTE 1:   Frontier will not provide compensation for denied boarding when an aircraft of lesser capacity is substituted due to operational or safety reasons.

> NOTE 2:   No compensation will be due if boarding is denied for reasons other than overbooking, e.g., pursuant to applicable law or other provisions of this Contract of Carriage.

D.  Onward Transportation for Passengers Denied Boarding

1)  A passenger denied boarding, voluntarily or involuntarily, pursuant to this section, will be transported on Frontier's next available flight on which space is available and at no additional charge.

2)  If a passenger who has been denied boarding, voluntarily or involuntarily, pursuant to this section, wishes to modify the travel date, if space is available, a ticket will be provided for travel within 72 hours at no additional charge.

ER000072

**FRONTIER**

**CONTRACT OF CARRIAGE**                                Rev 68 08/22/18

---

E. Electronic Travel Certificates - Frontier may offer passengers denied boarding involuntarily an Electronic Travel Voucher good for transportation on Frontier in lieu of cash compensation otherwise due under this section. Passengers may decline such offer in favor of the applicable cash compensation. The Electronic Travel Certificate has no refund value, will expire 90 days from date of issuance, is not transferable and may only be used to purchase tickets for the passenger to whom it is issued. Only one Electronic Travel Certificate may be used per ticket at the time of purchase. Electronic Travel Certificates may not be applied to ancillary fees and charges, e.g., seat fees, baggage fees, etc., applied to group travel, or combined with other offers. If a ticket purchased with an Electronic Travel Certificate costs less than the amount of the certificate, no residual value remains. Changes to a ticket purchased with an Electronic Travel Certificate may result in a change fee and any additional fare difference based on the rules of the issued ticket.

F. Time of Offer and Payment of Compensation

1) The offer of compensation for overbooking will be made by Frontier on the day and at the place where the failure to provide confirmed space occurred. If accepted, compensation will be given to the passenger. If the alternative transportation arranged for the passenger's convenience departs before the payment can be made, payment will be made by mail or other means within 24 hours after the denied boarding occurs.

2) Acceptance of any Denied Boarding Compensation constitutes full compensation for damages incurred by the passenger as a result of Frontier's failure to provide the passenger with a confirmed seat.

## 20. Refunds

---

A. The following applies with respect to refunds for tickets under this Contract of Carriage:

1) If no portion of the ticket has been used, the refund amount will be equal to the fare and charges paid for the ticket issued to the passenger.

2) If a portion of the ticket has been used:

a) One-way ticket:

i. If travel was terminated at origination, the refund will be equal to the fare paid.

ii. If travel was terminated at an intermediate or stopover point, the refund will be equal to the fare paid from the point of termination to the destination or to the point at which transportation is to resume and will be the lowest one-way fare for the class of service paid for minus any discount.

b) Round-trip or excursion ticket purchased: the refund will be equal to the unused portion of the ticket.

B. All refunds will be subject to government laws, rules, regulations, or orders of the country in which the ticket was originally purchased and of the country in which the refund is being made.

C. As applicable, processing fees may be assessed and deducted from the refund.

D. To obtain a refund, the passenger must submit all required documentation and information including:

1) Brief written explanation

2) Name, address, and at least one telephone number

3) Form of payment used to purchase the ticket

E. Payment - A refund will be provided only to the original purchaser's form of payment. However, if, at the time of the application for refund, evidence is submitted that a company purchased the ticket on behalf of its employee or a travel agency has made a refund to its client, the refund will be made directly to the employee's company or the travel agency.

---

ER000073

**FRONTIER**

**CONTRACT OF CARRIAGE**                                    Rev 68 08/22/18

F. Where To File - Requests for refunds may be mailed to: Frontier Airlines, Inc., Attn: Refunds, P.O. Box 492085, Denver, CO 80249. The application may also be submitted at a Frontier ticket counter or an IATA Travel Agency. Processing ordinarily takes at least 60 days.

G. Refunds will be paid as follows:

| Payment Type | Refunded To |
|---|---|
| Universal Air Travel Plan | The subscriber against whose account the ticket was charged |
| Transportation Request issued by a government agency other than a U.S. government agency | The government agency that issued the transportation request |
| U.S. Government Transportation Request | The U.S. government agency that issued the U.S. Government Transportation Request with a check payable to the "Treasurer of the United States" |
| Credit Card | The account of the person to whom the credit card was issued |
| Electronic Travel Certificate | Refunded to a new electronic certificate |

H. Identity - Frontier does not assume responsibility to confirm that the person using or presenting a ticket for refund is the true owner of the ticket.

## 21. Currency and Mode of Payment and Fees

A. All fares, fees, charges and taxes charged or collected by Frontier are due in United States dollars. Those due in other currencies will be converted to United States dollars as determined by Frontier.

B. All amounts due to Frontier must be paid with a credit card. Frontier does not accept cash for any transactions, including those on Frontier's aircraft.

C. Frontier does not accept personal checks, traveler's checks, certified (cashier's) checks or money orders.

D. A service charge will apply to any improper chargeback on a credit card and may be charged to the same credit card via which the chargeback is made.

## 22. Miscellaneous

A. Subordination to Law - In all cases, this Contract of Carriage will be subordinate to any applicable law.

B. Metric References - Conversion of British units to metric units are approximate and for reference only. The British unit will apply.

C. Change Without Notice - Except as may be required by applicable laws, government regulations, orders and requirements, Frontier reserves the right to amend this Contract of Carriage without notice, provided that no such change shall apply to carriage that has commenced.

ER000074

Case 2:18-cv-04916-PA-AFM   Document 40-2   Filed 10/25/18   Page 26 of 26   Page ID #:502

**FRONTIER**

**C O N T R A C T   O F   C A R R I A G E**                                      Rev 68 08/22/18

D.  No Waiver/Modification of Terms - No employee or agent of Frontier has the authority to waive, modify, or alter any provisions of the Contract of Carriage unless authorized by a corporate officer of Frontier. Accommodations provided beyond what is required by the Contract of Carriage do not alter the Contract of Carriage. Frontier's employees and agents, including third party travel agents and online travel sites, are only authorized to sell tickets for air transportation on Frontier subject to the Contract of Carriage.

E.  Changes in Rules, Fares, and Charges - Unless otherwise provided within specific fare rules, transportation is subject to the rules, fares and charges in effect on the date a ticket is issued, determined by the validation stamped or imprinted on the ticket, or valid electronic ticket.

F.  Taxes and Charges - When the ticket is issued for the effective date, all government, airport, vendor, or other charges that apply to passenger travel into foreign countries are the responsibility of the passenger to whom the ticket was originally issued and are in addition to the published fare and charges.

G.  Fares/Charges - Specific fares and charges information is available through Frontier reservations offices and at www.FlyFrontier.com.

H.  No Class Action - Any case brought pursuant to this Contract of Carriage, Frontier's Tarmac Delay Plan, or Frontier's Customer Service Plan may be brought in a party's individual capacity and not as a plaintiff or class member in any purported class or representative proceeding.

I.  Time Limit for Action - No legal action may be brought by a passenger against Frontier unless commenced within 6 months from the date of the alleged incident.

J.  Choice of Law - This Contract of Carriage will be governed by and construed in accordance with the laws of the United States of America and the State of Colorado without regard to conflict of law principles or law. All right to trial by jury in any action, proceeding or counterclaim arising out of or in connection with this Contract of Carriage is irrevocably waived.

K.  Codeshare Flights – Except for baggage policies (see Sections 12, 13 and 15), the policies, rules and procedures of the operating airline will apply on any codeshare flight.

ER000075

Kevin R. Sutherland (State Bar No. 163746)
Natasha N. Mikha (State Bar No. 270731)
CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600
Facsimile: (213) 358-7699
Email:      kevin.sutherland@clydeco.us
            natasha.mikha@clydeco.us

Jeffrey J. Ellis (admitted *pro hac vice*)
CLYDE & CO US LLP
405 Lexington Avenue, 16th Floor
New York, New York 10174
Telephone: (212) 710-3900
Facsimile: (212) 710-3950
Email:      jeff.ellis@clydeco.us

Attorneys for Defendant
FRONTIER AIRLINES, INC.

CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA RIDGELL, on behalf of herself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ, INC., a corporation doing business in the State of California,<br><br>Defendants. | Case No.: 2:18-CV-04916 PA (AFMx)<br><br>DECLARATION OF JEFFREY J. ELLIS IN SUPPORT OF FRONTIER AIRLINES INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION<br><br>Date: November 19, 2018<br>Time: 1:30 p.m.<br>Place: Courtroom of the Honorable Percy Anderson |

I, Jeffrey J. Ellis, declare and state as follows:

1.      I am an attorney at law duly licensed to practice in all courts of the State of New York and am admitted *pro hac vice* before this Court in the above-captioned matter.  I am a partner in the law firm of Clyde & Co US LLP, counsel for defendant Frontier Airlines, Inc. (hereinafter "Frontier") in the above-captioned matter.  I have personal knowledge of the facts contained in this declaration.  I can competently testify

ER000076

1   to these facts if called as a witness in these proceedings

2        2.     This declaration is submitted in support of Frontier's opposition to

3   plaintiff's motion for class certification, filed concurrently herewith.

4        3.     Along with my colleague, Kevin Sutherland, I attended the Court's case

5   management conference in the above-captioned matter on behalf of Frontier on October

6   1, 2018. Counsel for plaintiff, Kiley Grombacher, was also in attendance.

7        4.     It is my recollection that, during the conference, the Court inquired with

8   respect to the damages that plaintiff and the proposed classes would be seeking. After

9   some discussion, plaintiff's counsel ultimately conceded that the proposed nationwide

10   class of passengers would be claiming only economic damages in the form of the cost

11   of their tickets for flights on allegedly defective aircraft. With respect to the proposed

12   sub-class of passengers on plaintiff's flight, plaintiff's counsel ultimately conceded that

13   their proposed claim would be focused on the alleged false imprisonment, as opposed

14   to any physical injuries. It is my recollection that plaintiff's counsel also conceded that

15   plaintiff's alleged physical injury claim was transient in nature.

16        5.     On October 8, 2018, my colleague Kevin Sutherland caused to be filed a

17   transcript order form for the transcript from the October 1, 2018 case management

18   conference. We anticipate receiving the transcript by November 8, 2018 and, to the

19   extent that a review of the transcript requires me to clarify or revise any of my

20   statements above with respect to the conference, I shall cause to be filed a supplemental

21   declaration in advance of the November 19, 2018 hearing on plaintiff's motion for class

22   certification.

23        I declare under penalty of perjury under the laws of the United States of America

24   that the foregoing is true and correct. Executed on October 29, 2018, at New York,

25   New York.

26

27                             JEFFREY J. ELLIS

28

CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

DECLARATION OF JEFFREY J. ELLIS IN SUPPORT OF FRONTIER AIRLINES, INC.'S
OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

ER000077

CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

# PROOF OF SERVICE

## STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California, I am over the age of eighteen years, and not a party to the within action. My business address is 633 West 5th Street, 26th Floor, Los Angeles, California 90071.

On October 29, 2018, I served the document(s) described as:

**DECLARATION OF JEFFREY J. ELLIS IN SUPPORT OF FRONTIER AIRLINES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

on the parties in this action addressed as follows:

SEE ATTACHED SERVICE LIST

in the following manner:

☐ **(BY FAX):** by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below, or as stated on the attached service list, on this date before 5:00 p.m.

☐ **(BY MAIL):** as follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

☐ **(BY OVERNIGHT DELIVERY):** I caused such envelope(s) to be delivered to an overnight delivery carrier with delivery fees provided for, addressed to the person(s) on whom it is to be served.

☐ **(BY PERSONAL SERVICE):** I caused such envelope(s) to be delivered by hand this date to the offices of the addressee(s).

☒ **(BY CM/ECF):** by electronic filing system with the clerk of the Court which will send a Notice of Electronic Filing to all parties with an e-mail address of record, who have filed a Notice of Consent to Electronic Service in this action:

I declare I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on October 29, 2018, at Los Angeles, California.

_____
Kathy Rollins

4509327

-3-

DECLARATION OF JEFFREY J. ELLIS IN SUPPORT OF FRONTIER AIRLINES, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

ER000078

# SERVICE LIST

Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
BRADLEY/GROMBACHER LLP
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Tel:  (805) 270-7100
Fax: (805) 270-7100
E-Mail: mbradley@bradleygrombacher.com
        kgrombacher@bradleygrombacher.com

Attorneys for Plaintiff

Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
ROTHSCHILD & ASSOCIATES, APC
27 W. Anapamu Street, Suite 289
Santa Barbara, California  93101
Tel:  (805) 845-1190
Fax: (805) 456-0132
E-Mail: krothschild@kdrlawgroup.com
        jalwill@kdrlawgroup.com

Attorneys for Plaintiff

CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

4509327

-4-

DECLARATION OF JEFFREY J. ELLIS IN SUPPORT OF FRONTIER AIRLINES, INC.'S
OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

ER000079

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Taylor L. Emerson, Esq. (SBN 225303)
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@ bradleygrombacher.com
temerson@bradleygrombacher.com

**ROTHSCHILD & ALWILL, APC**
Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
27 W. Anapamu Street, Suite 289
Santa Barbara, California   93101
Telephone:  (805) 845-1190
Facsimile:   (805) 456-0132
krothschild@kdrlawgroup.com
jalwill@kdrlawgroup.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA RIDGELL, on behalf of herself and others similarly situated<br>Plaintiff,<br><br>v.<br><br>FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California<br><br>Defendants. | **Case No.: 2:18-CV-04916 PA (AFMx)**<br><br>**EXECUTED DECLARATION OF PLAINTIFF ANDREA RIDGELL IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>**DATE: 11/19/18**<br>**TIME: 1:30 p.m.**<br>**DEPT: 9A** |

ER000080

# DECLARATION OF ANDREA RIDGELL

I, Andrea Ridgell, declare as follows:

1. I am an adult, over the age of 18 years old. I am a resident of the State of California. I am a named Plaintiff and a prospective class member in *ANDREA RIDGELL, on behalf of herself and others similarly situated v. FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California* (Case No. 2:18-CV-04916 PA (AFMx), currently pending in the United States District Court for the Central District of California.

2. I have personal knowledge of the matters stated herein, and if called to testify about these facts, I could and would do so in a competent and truthful manner. I make this declaration in support of Plaintiff's Motion for Class Certification against Defendants AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California (collectively, "AIRBUS").

## Background

3. On June 2, 2017, I boarded Frontier Airlines flight number F91630 with a scheduled departure time of 10:19 PM and an arrival time of 6:04 AM on June 3, 2017. The flight was direct from Los Angeles to Phoenix with no scheduled stops.

4. I believe the aircraft to have been an airbus A320.

5. Approximately two hours into the flight the plane experienced a problem with the air quality in the cabin.

6. I, and many of my fellow passengers, experienced physical distress including one or more of the following non-exhaustive symptoms: passing out, choking, coughing and eye irritation.

Page 1

ER0p0081

7.  Upon information and belief, while onboard the subject aircraft, I and the members of the classes, were exposed to toxic fumes that entered the passenger cabin through the aircraft's ventilation system as a result of what is commonly referred to as a "fume" event.

8.  As a result of the aforementioned problems, the aircraft was forced to make an emergency landing in Phoenix, Arizona, and the subject aircraft was grounded.  The all of the passengers were immediately de-boarded from the plane.

9.  Some of the passengers were analyzed by paramedics, others were taken to the hospital.

10. Although we each requested to leave, the passengers were confined in the terminal.  We were not permitted to board other flights or to leave the terminal area.

11. After three (3) hours the passengers were released from the forced confinement.

12. I contacted Frontier about the incident on or about June 7, 2017 via email submitted through Frontier's website.  Defendant Frontier in a response email received June 7, 2017, stated that there was "nothing wrong with [the plane]" and did not provide me with any additional details or redress other than a $200 travel voucher (provided to all passengers) which expired on September 7, 2017.

13. To date, Frontier has not informed me of the name and type of chemicals to which I was exposed.

**Class Representative Status**

14. I seek to be a Class Representative for this lawsuit.  I understand that a Class Representative:

    (a)  represents the interests of all members of the class in litigation

Page 2

to recover money damages or obtain injunctive relief for the class;

(b)   has claims that are typical of those of the class, thus involving common issues of law or fact;

(c)   always consider the interests of the class just as he would consider his own interests and, in some cases, must put the interests of the class before his own interests. This means that the Class Representative is a fiduciary to the Class;

(d)   always actively participate in the lawsuit, as necessary, by, among other things, answering interrogatories, producing documents to the requesting party and giving deposition and trial testimony if required;

(e)   may be required to travel to give such testimony;

(f)   recognizes and accepts that any resolution of the lawsuit, by dismissal or settlement, is subject to court approval, and must be designed in the best interest of the class as a whole;

(g)   is not required to be particularly sophisticated or knowledgeable about the subject of the lawsuit;

(h)   should follow the progress of the lawsuit and should provide all relevant facts to the lawyers for the class;

(i)   volunteers to represent or champion many other people with similar claims and injuries because of the importance of the case and the necessity that all class members benefit from the lawsuit equally; the savings of time, money and effort should benefit all parties and the court.

15. To date, I have performed a number of tasks in my role as a Class Representative. This includes the following:

a.   Being in regular contact with my counsel regarding the status of my lawsuit, and providing my counsel with any

EXECUTED DECLARATION OF PLAINTIFF ANDREA RIDGELL
CASE NO. 2:18-CV-04916 PA (AFMx)

ER0 00083

1    information or documents upon request.

2    16. I understand that the members of the proposed classes are similarly-situated

3    with respect to a common course of conduct or practice.

4    17. I understand that class actions are an important tool to assure compliance

5    with the law even where an individual's losses may be relatively small.

6    18. I have no interests which are inconsistent with the interests of Class

7    Members and will adequately represent Class Members. I brought this

8    lawsuit on behalf of myself and fellow passengers similarly situated to

9    rectify legal wrongs being committed by Defendants. The legal and factual

10   issues for which I seek to have this case certified as a class action are

11   typical of my own legal and factual issues.

12   (a)    As a Class Representative I will always consider the interests

13   of Class Members just as I would consider my own interests

14   and, in some cases, must put the interests of Class Members

15   before my own interests. I have and will continue to actively

16   participate in the lawsuit, as necessary, including answering

17   interrogatories, producing documents as requested, giving

18   deposition and trial testimony, and helping in any other way I

19   can. I recognize and accept that any resolution of this lawsuit,

20   by dismissal or settlement, is subject to court approval, and

21   must be designed in the best interest of the class as a whole.

22   I declare under penalty of perjury under the laws of the State of California
and the United States of America that the foregoing is true and correct. Executed
this 22nd day of October 2018, at Santa Barbara, California.



Andrea Ridgell

---

Page 4

ER000084

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Taylor L. Emerson, Esq. (SBN 225303)
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Telephone:   (805) 270-7100
Facsimile:    (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@ bradleygrombacher.com
temerson@bradleygrombacher.com

**ROTHSCHILD & ALWILL, APC**
Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
27 W. Anapamu Street, Suite 289
Santa Barbara, California   93101
Telephone:   (805) 845-1190
Facsimile:    (805) 456-0132
krothschild@kdrlawgroup.com
jalwill@kdrlawgroup.com

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANDREA RIDGELL, on behalf of herself and others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California<br><br>Defendants. | Case No.: 2:18-CV-04916 PA (AFMx)<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**<br><br>**DATE:** 11/19/18<br>**TIME:** 1:30 p.m.<br>**DEPT:** 9A |

1

ER000085

**TO THE HONORABLE COURT, ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on November 19, 2018 at 1:30 p.m. before the Honorable Percy Anderson, in Courtroom 9A of the United States District Court located at 350 West 1st Street, Los Angeles, California, 90012, plaintiff, Andrea Ridgell ("Plaintiff") shall and does move this Court for entry of an Order pursuant to Federal Rule of Civil Procedure 23 (b)(3) certifying proposed classes; appointing Plaintiff's attorneys to serve as class counsel under Rule 23(g); and directing notice to class members under Rule 23(c).

The Motion is made on the accompanying Memorandum of Points and Authorities, the Proposed Order, all other pleadings and papers on file in this action, and all further evidence and argument that may be adduced in connection herewith.

DATED: October 22, 2018                BRADLEY/GROMBACHER, LLP


By: /s/ Marcus J. Bradley
    Marcus J. Bradley, Esq.
    Attorneys for Plaintiff

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

ER000086

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiff Andrea Ridgell ("Plaintiff") respectfully submits this Memorandum of Points and Authorities in support of her Motion for Class Certification.

This case arises from "fume" events which occur as the result of the defective design and manufacture of Frontier Airline's fleet of Airbus aircrafts. Fume events occur when the air inside the passenger cabin of an aircraft becomes contaminated with pyrolised compounds such as engine oil, de-icing or hydraulic fluid. Such events are caused by the "bleed" air system used in Defendants' aircrafts which draws pre-heated compressed air from the engine and pumps this air straight into the cabin after being cooled. Defendants have repeatedly experienced fume events yet have failed to eliminate the traditional pneumatic system and bleed manifold and instead adopt a no-bleed system whereby electrically driven compressors provide the cabin pressurization function, with fresh air brought onboard via dedicated cabin air inlets. Moreover, Defendants have failed to warn consumers about the dangers of the "bleed" air system.

Such system has caused damage to Plaintiff and other passengers in the form of personal injury and lost money.

Plaintiff alleges the following causes of action on behalf of some or all of the members of the classes outlined above: (1) strict products liability; (2) breach of warranties; (3) negligence; (4) false imprisonment; (5) negligent infliction of emotional distress.

Plaintiff seeks to represent in her own capacity and on behalf of two classes of other Frontier passengers defined as:

**Nationwide Class**
All persons in the United States who have flown in one of Defendants' aircraft that have experienced a bleed air event. Specifically excluded from this Class are Defendants, the officers, directors, or employees of Defendants, any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir, or assign of Defendants. Also excluded any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

1

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

**Flight 1630 Class**
All passengers in the United States who were on Frontier Airlines Flight 1630 on June 2, 2017.

## II.    STATEMENT OF RELEVANT FACTS

### 1.    Status of Filing and Service

At present, the pleadings are not settled as to all defendants.  Plaintiff filed this action on June 1, 2018. (ECF Dkt . No. 1) Plaintiff served defendant Frontier on or about June 15, 2018. (Id. at ¶ 7.) As a professional courtesy to Frontier, Plaintiff stipulated to provide Frontier an additional thirty-nine (39) days in which to file an answer to the complaint. (Grombacher Decl. at ¶ 8 ECF Dkt No. 11.) Defendant Frontier timely filed an answer to the complaint on August 14, 2018. (Grombacher Decl. at ¶ 8; ECF Dkt No. 15).

Pursuant to Court Order, Plaintiff filed a first amended complaint on October 5, 2018 to clarify jurisdiction.  (ECF Dkt No. 33.)  Frontier filed an answer to the complaint on October 19, 2018. (ECF Dkt No. 37.)

Plaintiff promptly caused the initiating complaint and supporting documents to be translated into French and, promptly began the process of effectuating service on Defendant Airbus through the processes required by Hague Convention. (Grombacher Decl. at ¶ 12.) The process request has been confirmed received by the Ministry de la Justice in Paris on July 16, 2018 (Grombacher Decl. ¶ 13.) Unfortunately, at present, service upon Airbus has not been fully effectuated. (Id. at ¶ 14.)

### 2.    LR 23-3 Deadline

Pursuant to Local Rule 23-3, the deadline for the filing of Plaintiff's motion for class certification was set to fall on September 13, 2018.  On August 28, 2018, after meeting and conferring with counsel for Defendant, Plaintiff filed an unopposed ex parte application to vacate this date.  [ECF Dkt. No. 18.)  Pursuant to Order of this Court, the ex parte application was denied; however, the certification deadline was briefly continued to permit Plaintiff to seek relief by fully noticed motion [ECF Dkt No.; 20].

2

ER000088

1  Plaintiff filed a formal motion to continue the class certification filing deadline
2  on September 6, 2018. Frontier filed a Notice of Non-Opposition on September 20,
3  2018. ECF Dkt. No.24.) The motion was on for hearing before the Court on October 1,
4  2018 and was denied (ECF Dkt No. 30.) thereby requiring the filing of the present
5  motion.

6  ## III.  Legal Standard

7  "Class actions have two primary purposes: (1) to accomplish judicial economy
8  by avoiding multiple suits, and (2) to protect rights of persons who might not be able to
9  present claims on an individual basis." *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 647
10 (C.D.Cal.1996) (citing *Crown, Cork & Seal Co. v. Parking*, 462 U.S. 345 (1983)).
11 Federal Rule of Civil Procedure 23 governs class actions. A class action "may be
12 certified if the trial court is satisfied after a rigorous analysis, that the prerequisites of
13 Rule 23(a) have been satisfied." *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147,
14 161 (1982).

15 To certify a class action, plaintiffs must set forth facts that provide prima facie
16 support for the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3)
17 typicality; and (4) adequacy of representation. *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S.
18 ——, ——, 131 S.Ct. 2541, 2548 (2011); *Dunleavy v. Nadler (In re Mego Fir. Corp.*
19 *Sec. Litig.)*, 213 F.3d 454, 462 (9th Cir.2000). These requirements effectively "limit
20 the class claims to those fairly encompassed by the named plaintiff's claims." *Falcon*,
21 457 U.S. at 155 (quoting *Califano v. Yamasaki*, 442, U.S. 682, 701 (1979)).

22 If the Court finds that the action meets the prerequisites of Rule 23(a), the Court
23 must then consider whether the class is maintainable under Rule 23(b). *Dukes*, 131 S.Ct.
24 at 2548. Rule 23(b)(3) governs cases where monetary relief is the predominant form of
25 relief sought, as is the case here. A class is maintainable under Rule 23(b)(3) where
26 "questions of law or fact common to the members of the class predominate over any
27 questions affecting only individual members," and where "a class action is superior to
28 other available methods for fair and efficient adjudication of the controversy."

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

ER000089

Fed.R.Civ.P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir.1998) (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)). The predominance inquiry measures the relative weight of the common to individualized claims. Id. "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir.2001) (citing *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.1996)). In determining superiority, the court must consider the four factors of Rule 23(b)(3): (1) the interests members in the class have in individually controlling the prosecution or defense of the separate actions; (2) the extent and nature of any litigations concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely encountered in the management of a class action. Id. at 1190–1993. "If the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." Id. (citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1778 at 535–39 (2d.3d.1986)).

More than a pleading standard, Rule 23 requires the party seeking class certification to "affirmatively demonstrate ... compliance with the rule—that is he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 131 S.Ct. at 2551. This requires a district court to conduct "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." Id. Nevertheless, "neither the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class." *Blackie v. Barrack*, 542 F.2d 891, 901 (9th Cir. 1975).

---

4

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

ER000090

## IV. ANALYSIS

### A. Plaintiff Should be Afforded the Opportunity to Conduct Discovery Prior to Certification

Prior to a Rule 23 Motion seeking class certification, the parties are entitled to conduct discovery in order to provide the court with evidence to either support or refute the requested certification. See *Vinole*, 571 F.3d 935 at 942. However, based on the information above, the court concludes that plaintiffs have not been given the opportunity to engage in the necessary class discovery. See *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir. 1975) ("The propriety of a class action cannot be determined in some cases without discovery.")

Indeed, the Ninth Circuit recently concluded that the bright-line of Local Rule 23-3 is incompatible with Federal Rule of Civil Procedure 23." *ABS Entm't, Inc. v. CBS Corp.*, 900 F.3d 1113, 1140 (9th Cir. 2018). As the ABS Court explained, "Local Rules cannot be incompatible with Federal Rules. Fed. R. Civ. P. 83(a)(1)":

> Central District of California Local Rule 23-3 sets a strict 90-day time frame from the filing of a complaint to the motion for class action certification. This bright line rule is in direct contrast to the flexibility of the Federal Rule, which calls for a determination on class certification "[a]t an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1)(A). That flexible approach makes sense. The class action determination can only be decided after the district court undertakes a "rigorous analysis" of the prerequisites for certification. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) (quoting *Gen. Tele. Co. of SW v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ). To undertake that analysis may require discovery. *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir.1975) ("The propriety of a class action cannot be determined in some cases without discovery;" "To deny discovery in [such cases] would be an abuse of discretion."). See Barbara J. Rothstein & Thomas E. Willging, Federal Judicial Center, Managing Class Action Litigation: A Pocket Guide for Judges 9 (3d ed. 2010) ("Considering [Fed. R. Civ. P. 23(c)(1) ], you should feel free to ignore local rules calling for specific time limits; such local rules appear to be inconsistent with the federal rules and, as such, obsolete."); Federal Judicial Center, Manual for Complex Litigation, Fourth § 21.133 ("Some local rules specify a short period within which the plaintiff must file a motion to certify a class action. Such rules, however, may be inconsistent with Rule 23(c)(1)(A)'s emphasis on the parties' obligation to present the court with sufficient information to

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

ER000091

support an informed decision on certification. Parties need sufficient time to develop an adequate record.")

Given Plaintiff's burden at certification, she should be entitled to discovery. Yet the Court has denied such opportunity even as to the most basic Rule 23 requirements (i.e. numerosity). Plaintiff anticipates that she will require the following discovery to prepare her motion:

| General Category of Discovery | Relevancy to Claim in Litigation | Relevancy to Rule 23 Factor |
|---|---|---|
| Flight Manifest | False Imprisonment; Strict Liability, Failure to Warn | Numerosity; typicality, commonality predominance[1] |
| Aircrafts in Frontier's Fleet (including any modifications or maintenance issues) | Strict Liability; Failure to Warn | Commonality, typicality, predominance |
| Internal Reports regarding the subject flight | Strict Liability; Failure to Warn | Commonality, typicality, predominance |
| Aircraft design specs | Strict Liability; Failure to Warn | Commonality, typicality, predominance |
| Policies and procedures regarding fume events and terminal confinements | False Imprisonment; Failure to Warn | Commonality, typicality, predominance |
| Facts surrounding the "quarantining" of passengers of the subject flight and reparations made by the airline to passengers as a result of the incident | False Imprisonment | Numerosity, Commonality, typicality, predominance |

## B.   The Requirements for Certification Under Federal Rule of Civil Procedure 23 Are Satisfied

### a.   Numerosity

Rule 23(a)(1) requires the class to be so numerous that joinder of individual class members is impracticable. See Fed.R.Civ.P. 23(a)(1). Here, the proposed classes are

---

[1] See e.g. *Wallman v. Tower Air, Inc.,* 189 F.R.D. 566, 568–69 (N.D. Cal. 1999) where plaintiff sought the passenger list in a putative class action so he could contact the passengers as potential witnesses or plaintiffs and "possibly enhance the odds in favor of class certification by proving typicality and numerosity, for example. Plaintiff wishes to investigate whether other passengers had similar experiences to Plaintiff and observed the same actions by Defendant's employees. This information would tend to show the degree of typicality of Plaintiff as compared with other passengers, which would also be relevant to certification of a plaintiff class."

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

ER000092

sufficiently numerous.   Here, the members of the class can be ascertained from Frontier's business records.   While the plaintiff does not have formal discovery, Frontier operates hundreds of flights each day and thus it is clear that the number of class members can easily extend into the thousands.   As to the sub-class, Plaintiff estimates that there were at least 200 individuals on her flight.

### b.   Commonality

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury ... [and][t]heir claims must depend upon a common contention ... of such nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S.Ct. at 2551 (internal quotation marks and citations omitted). "What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." Id.

Plaintiff anticipates that discovery will show that Defendant's aircrafts all run on a "bleed-air" system.   Thus, because the design and manufacture are uniform, the questions underlying the litigation can be resolved "in one stroke." Moreover, answers to these questions are "central to the validity" of each class member's claims because, as discussed in more detail in the Court's predominance analysis below, each class member's claim hinges on (1) whether the design is defective, (2) what information Frontier knew or had access to regarding the likelihood of fume events, and (3) whether members of the class were subject to forced and nonconsensual confinement. *Dukes*, 131 S.Ct. at 2551; see section IV.B.1, infra.

### c.   Typicality

Typicality measures whether there is a sufficient nexus between the claims of unnamed representatives and those of the class at large. *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010). A plaintiff need only possess the same interest and have

ER000093

suffered the same injury as the other class members. *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 984 (9th Cir. 2011). Under these "permissive standards," representative claims are typical if they are "reasonably co-extensive with those of absent class members." *Franco v. Ruiz Food Prods., Inc.,* 2012 WL 5941801, at *6 (E.D. Cal. Nov. 27, 2012) (citing *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir. 1998)). Claims need not be identical to be typical. *Id.* Typicality can be satisfied even if factual differences exist between the plaintiff and the other class members. *Rivera v. Bio Engineered Supplements & Nutrition, Inc.,* 2008 WL 4906433, at *7 (C.D. Cal. Nov. 13, 2008) (holding, "the typicality requirement is not particularly strict").

Typicality is easily satisfied in this case. Plaintiff's claim arises from the same practice or course of conduct as other putative class members' claims—namely, those passengers of Frontier Airlines who experienced "fume" events in the United States (the "Class"). Plaintiff's claims are also typical on behalf of a subclass of all passengers on Frontier Flight 1630 which departed Los Angeles International Airport on June 2, 2017 (the "California Class").

### d. Adequacy

To establish adequacy of representation, the issue is whether "the named plaintiffs and their counsel have any conflicts of interest with other class members" and whether "the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class." *Hanlon,* 150 F.3d at 1020. Here, the interests of Plaintiff and the members of the proposed classes are fully aligned in determining whether Frontier's aircrafts are defective in design. See Ridgell Decl. Plaintiff has demonstrated an understanding of the case and has worked with her counsel to prosecute the action, responded to numerous discovery requests and sat for their depositions. Further, Plaintiff retained counsel with significant experience in class action. Bradley Decl. Therefore, the adequacy requirement is met here.

### 2. Rule 23(b) Requirements

Under Rule 23(b)(3), class certification is appropriate "if Rule 23(a) is satisfied" and if

ER000094

"the court finds that [1] the questions of law or fact common to class members predominate over any questions affecting only individual members, and that [2] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b) (3); *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162–63 (9th Cir.2001).

### a. Predominance

The predominance inquiry "trains on legal or factual questions that qualify each class member's case as a genuine controversy." *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "When one or more of the central issues in the action are common to the class and can be said to predominate," a class action will be considered proper "even though other matters will have to be tried separately." *Gartin v. S & M NuTec LLC*, 245 F.R.D. 429, 435 (C.D.Cal.2007). "Because no precise test can determine whether common issues predominate, the Court must pragmatically assess the entire action and the issues involved." *Romero v. Producers Dairy Foods, Inc.,* 235 F.R.D. 474, 489 (E.D.Cal.2006). "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." See *Valentino v. Carter–Wallace, Inc.*, 97 F .3d 1227, 1234 (9th Cir.1996). "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625.

Here, each of the claims can be demonstrated or refuted with common evidence. The claims all arise from common facts (i.e. all Frontier aircrafts all operate with the same bleed air system; all passengers of Plaintiff's flight were subject to the same confinement.)

### 3. Class Litigation is Superior to Other Methods of Adjudication

Rule 23(b)(3) sets forth four relevant factors for determining whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." These factors include: (i) the class members' interest in individually controlling separate actions; (ii) the extent and nature of any litigation concerning the

ER000095

controversy already begun by or against class members; (iii) the desirability of concentrating the litigation in the particular forum; and (iv) the likely difficulties in managing a class action. "[C]onsideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (internal quotation marks and citation omitted), amended by 273 F.3d 1266 (9th Cir. 2011).

Here, adjudicating class claims will be significantly less burdensome than if the matter were prosecuted individually." *Menagerie Prods. v. Citysearch*, 2009 WL 3770668, at *19 (C.D. Cal. Nov. 9, 2009) (concluding that "it does not appear that any members of the class have commenced any other litigation concerning the controversy alleged herein" and "concentrating the litigation in this Court will allow it to proceed in an efficient manner without risking inconsistent outcomes, and there is no reason to think that this is an undesirable forum to litigate these claims").

Further, there are no manageability issues. There is no reason to believe that the prosecution of the claims of the putative Class Members in a single class action will create more management problems than the alternative (i.e., the prosecution of hundreds or thousands of separate lawsuits by each class member).

## I.  CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that this Court grant class certification, appoint Plaintiff as class representative and appoint Plaintiff's counsel as class counsel.


DATED:  October 22, 2018          **BRADLEY/GROMBACHER, LLP**


By:   /s/   Marcus J. Bradley
Marcus J. Bradley, Esq.
Attorneys for Plaintiff

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

ER000096

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile: (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@ bradleygrombacher.com

**ROTHSCHILD & ALWIL, APC**
Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
27 W. Anapamu Street, Suite 289
Santa Barbara, California 93101
Telephone: (805) 845-1190
Facsimile: (805) 456-0132
krothschild@kdrlawgroup.com
jalwill@kdrlawgroup.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA RIDGELL, on behalf of herself and others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California<br>Defendants. | Case No.: 2:18-CV-04916 PA (AFMx)<br><br>**DECLARATION OF MARCUS J. BRADLEY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>**DATE:** 11/19/18<br>**TIME:** 1:30 p.m.<br>**DEPT:** 9A |

1

ER000097

# DECLARATION OF MARCUS J. BRADLEY

I, Marcus J. Bradley, declare as follows:

1.      I am an attorney at law duly licensed to practice law before all of the courts of the State of California, and most of the district courts within the Ninth Circuit. I am a partner in the law firm of Bradley/Grombacher LLP and counsel for plaintiff, Andrea Ridgell, now filing this Motion for Class Certification.  In my capacity as counsel, I have been actively involved with all aspects of this litigation and have reviewed the discovery produced. Accordingly, I have personal knowledge of all the matters set forth herein, and if called, I could and would competently testify to the following:

2.      This Declaration is submitted in support of the Motion for Class Certification, and specifically to address the adequacy of Bradley/Grombacher LLP, to be appointed class counsel by this Court.

3.      My firm, Bradley/Grombacher, and I have extensive experience litigating wage and hour class and representative actions as well as complex consumer class actions. I have been personally involved in all of the cases listed below. In connection with these cases, I have acted as either lead counsel with my various firms, or have worked in conjunction with other members of my various firms or co-counsel from other firms.

4.      I have practiced law since 1994.  In 2000, I joined Mazursky, Schwartz & Angelo as an associate and became a partner in January 2005 at which time the firm was renamed Schwartz, Daniels & Bradley.  I remained as a partner handling primarily wage and hour class actions until the dissolution of the firm effective December 31, 2008.  In January 2009, I moved my existing practice transferring a number of wage and hour cases to become a partner with the law firm of Marlin & Saltzman, a long-established firm with whom I had been co-counsel on dozens of wage and hour class actions during my tenure at Schwartz, Daniels & Bradley. On September 1, 2016, I formed Bradley/Grombacher LLP along with a former associate at Marlin & Saltzman,

2

ER000098

and current partner, Kiley Grombacher.

5.     I have been responsible for all facets of class action employment and other complex litigation, from pre-filing investigation through trial and appeal. Since approximately May 2000, I have spent most of my time representing workers in wage and hour matters. I, along with my current and former partners, have litigated these issues in class actions to favorable settlements that have recouped over $700,000,000.00 in unpaid wages, including the following more notable cases:

a.     *Gutierrez v. State Farm Mutual*, Los Angeles Superior Court (BC236552). Class action mis-classification case seeking overtime compensation for approximately 2,600 insurance claims adjusters employed by State Farm.  The class was certified and summary adjudication was granted as to liability in favor of the class. The case settled for $135 million just prior to trial, with final approval granted with no objections filed.

b.     *Bednar v. Allstate Insurance Company*, Los Angeles Superior Court (BC240813).  Class action mis-classification case seeking overtime compensation for approximately 1,200 insurance claims adjusters employed by Allstate.  The class was certified and summary adjudication was granted as to liability in favor of the class. The case settled for $120 million just prior to trial, with final approval granted with no objections filed.

c.     *Roberts v. Coast National Insurance*, Orange County Superior Court (01CC08478).  Class action mis-classification case seeking overtime compensation for insurance claims adjusters employed by Coast National Insurance.  Certification granted, and then the matter was tried before a binding arbitrator.  The case settled during the arbitration for in excess of $18 million.

d.     *CNA Class Action Litigation*, Los Angeles Superior Court Class (JCCP 4230).  Class action mis-classification case seeking overtime compensation for insurance claims adjusters employed by Defendant.  Case settled for $33 million, with final approval granted with no objections filed.

DECLARATION OF MARCUS J. BRADLEY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

ER000099

e. *Dotson v. Royal SunAlliance*, Orange County Superior Court (02CC01787). Class action mis-classification case seeking overtime compensation for insurance claims adjusters employed by Royal SunAlliance. Case settled for $12.3 million, with final approval granted with no objections filed.

f. *Parris v. Lowe's Home Improvement*, Los Angeles County Superior Court (BC260702). Class action seeking payment of "off-the-clock" hours worked by all hourly employees of Lowe's Home Improvement stores in the State of California. The class was certified by the Court of Appeal and remanded to the trial court for further proceedings. Shortly thereafter, a $29.5 million settlement was reached and approved without objection.

g. *Pardo v. Toyota Motor Sales, et al*. Los Angeles County Superior Court (BC372781). Class action mis-classification of workers with claims for overtime and missed meal and rest breaks. The case settled for $7.75 million and was approved with no objections.

h. *Smith/Ballard v. Wal-Mart Stores, Inc*. United States District Court for the Northern District of California (Case No. 4:06-cv-05411-SBA). Wage and hour class action seeking unpaid vacation and personal time, unpaid wages, and related penalties on behalf of over 245,000 employees. The action was certified and settled for $86 million while Defendants' appeal of the certification was pending in the Ninth Circuit Court of Appeals.

i. *Hoyng v. AON*, Los Angeles County Superior Court (BC377184). Wage and hour class action seeking overtime and related compensation for mis-classification on behalf of Relationship and Account Specialists. The case settled for $10.5 million which was approved with no objections filed.

j. *In RE Bank of America Wage and Hour Employment Practices Litigation*, MDL 2138, United States District Court for the District of Kansas. California state and FLSA wage and hour litigation for various violations including unpaid overtime and "off-the-clock" work. Settled for $73 million.

4

ER000100

k. *Lemus v. H & R Block Litigation*, United States District Court for the Northern District of California (Case No. 3:09-cv-03179-SI) Class certified, and settlement reached prior to trial. Total settlement of $35 million.

l. *Harris v. Vector Marketing Corporation,* United States District Court for the Northern District of California (Case No. 3:08-cv-05198-EMC). Independent contractor mis-classification class action case on behalf of approximately 70,000 employees.

m. *Bickley v. Schneider National Trucking,* United States District Court for the Northern District of California (Case No. 4:08-cv-05806-JSW). Wage and hour class action on behalf of approximately 6,000 truck drivers. Settled for $29.5million.

n. *Roberts v TJX,* United States District Court for the Northern District of California (Case No. 13-CV-04731-MEJ). Wage and hour violations on behalf of approximately 82,000 employees. Settled for $8.5 million.

o. *Oprychal v. New Your Life Insurance,* United States District Court for the Central District of California (Case No. 2:07-cv-00518-VBF). Class action for the failure to pay commissions pursuant to a compensation plan. Settled for $10 million.

p. *Neuvenheim v. Gamestop Corp.,* United States District Court for the Central District of California (Case No. 2:09-cv-06799-ODW). Class action on behalf of nonexempt employees for wage and hour violations.

q. *Hightower v. JP Morgan Chase,* United States District Court for the Central District of California (Case No. 2:11-cv-01802-PSG). Class action on behalf of nonexempt employees for wage and hour violations. Settled for $12 million.

6. On many of the above cases I was either lead or co-lead counsel including cases in multi-district litigation or coordinated proceedings where I worked collaboratively and cooperatively with co-counsel to bring about an efficient and beneficial resolution for all class members as the above results demonstrate.

7. For example, Bradley/Grombacher LLP was recently appointed as interim co-lead counsel in the *In Re: Volkswagon "Clean Diesel" Marketing, Sales Practices,*

5

DECLARATION OF MARCUS J. BRADLEY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

*and Products Liability Litigation* currently pending before the Hon. Charles Breyer in the United States District Court for the Northern District of California, Case No. 3:15-md-02672-CRB

8.    I have argued cases in trial courts as well as before courts of appeal. My writings on legal topics pertaining to litigating wage and hour class and representative actions have appeared in professional publications and I have been called upon to speak at conferences and seminars for professional organizations including a recent presentation titled "Planning for and Executing Trial in Class and Collective Wage & Hour Cases."

9.    I have also been honored as a Super Lawyer in the area of class actions by Los Angeles Magazine for multiple years including 2018. I am also a member of a number of professional organizations including the Consumer Attorneys of Los Angeles, the Consumer Attorneys of California, the California Employment Lawyers Association, and the America Association of Justice.

10.    Ms. Grombacher specializes her practice in complex litigation including consumer and employment class actions. She has litigated hundreds of employment and consumer class actions throughout her career which began at Arias, Ozzello & Gignac where she gained extensive experience litigating consumer cases.

11.    Thereafter, Ms. Grombacher joined Marlin & Saltzman in 2010 where she focused her practice almost exclusively on wage and hour, collective and representative actions including the reported case, *Faulkinbury v. Boyd & Associates,* which clarified the holding in seminal case, *Brinker Restaurant Corp. v. Superior Court* to establish that legality of certain company policies could be determined on a class-wide basis even if the application of the polices varies by individual.

12.    She has been selected by Super Lawyers Magazine as a "Rising Star" in the field of complex litigation since 2015 and has published articles on the field of class action litigation including "A Class-Action Primer" which appeared in *The Advocate,* which is the Journal of Consumer Attorneys of Southern California.

6

**DECLARATION OF MARCUS J. BRADLEY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

ER000102

13.     Ms. Grombacher has also lectured on various topics involving complex case management and recently spoke at the Beverly Hills Bar Association's Class Action and Complex Case Management Conference.

14.     She is also a member of a number of professional organizations including the Consumer Attorneys of Los Angeles and the America Association of Justice.

15.     In addition, Ms. Grombacher and I will be assisted by Bradley/Grombacher senior associate, Taylor Emerson, who is in her sixteenth year of practice. Ms. Emerson brings significant wage and hour class action experience and has ably assisted me and Ms. Grombacher on dozens of class action cases since joining the firm in 2016.

16.     Moreover, Bradley/Grombacher will be able to draw on the resources of our co-counsel, Rothchild & Alwill. In addition to utilizing the experience and expertise of attorney, Kristi Rothschild, we will also have numerous other attorneys and support staff from that firm at our disposal when the need arises.

17.     In connection with this matter, we have devoted substantial time and resources to developing the case over the past year. Once certified, we are committed to continue handling the matter in a n effective and well-staffed manner.

18.     Our firms are working with the representative plaintiff to protect the interests of the putative proposed class. We are familiar with the law as it applies to the legal and factual issues relevant to this matter. Our firms are prepared to dedicate the necessary personnel and resources, and have the capability of doing the same, to prepare for and try this matter to judgment.

19.     The proposed representative plaintiff has been informed of her duties and obligations as a class representative. She has been informed of his duty to select adequate and skilled counsel, to cooperate with counsel and to place the interests of the class on a level equal with his owns interests. She has agreed to meet these obligations.

20.     I am personally aware of the nature of the claims being raised by the proposed class representative. I do not know of any claim which she has which is

7

DECLARATION OF MARCUS J. BRADLEY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

ER000103

different from or in conflict with the claims of the proposed class or sub class.

21.    I have investigated and do not know of any other litigation concerning the claims which are the subject of the current complaint.

**Plaintiff has Met and Conferred in Advance of Filing this Motion**

22.    On October 22, 2018, I spoke with counsel for defendant Frontier telephonically regarding the filing of this motion. Counsel advised they could not consent and would oppose the motion.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my personal knowledge.  This declaration is executed this 22nd day of October, 2018, at Westlake Village, California.

     /s/Marcus J. Bradley
Marcus J. Bradley

DECLARATION OF MARCUS J. BRADLEY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

ER000104

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Telephone:    (805) 270-7100
Facsimile:    (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@ bradleygrombacher.com

**ROTHSCHILD & ALWIL, APC**
Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
27 W. Anapamu Street, Suite 289
Santa Barbara, California   93101
Telephone:    (805) 845-1190
Facsimile:    (805) 456-0132
krothschild@kdrlawgroup.com
jalwill@kdrlawgroup.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA RIDGELL, on behalf of herself and others similarly situated<br><br>        Plaintiff,<br><br>v.<br><br>FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California<br>        Defendants. | **Case No.: 2:18-CV-04916 PA (AFMx)**<br><br>**DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>**DATE:  11/19/18**<br>**TIME:  1:30 p.m.**<br>**DEPT: 9A** |

**DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

ER000105

# DECLARATION OF KILEY L. GROMBACHER

I, Kiley Lynn Grombacher, declare as follows:

1.     I am an attorney duly admitted to practice law before this Court and I am a member in good standing of the State Bar of California, the State Bar of Tennessee, and in the Third and Ninth Circuits.

2.     I am a named partner at Bradley/Grombacher, LLP counsel for Andrea Ridgell ("Plaintiff").

3.     In my capacity as counsel, I have been actively involved with all aspects of this litigation. Accordingly, I have personal knowledge of all the matters set forth herein, and if called, I could and would competently testify to the following:

4.     This Declaration is submitted in support of the Motion for Class Certification, and specifically to address the adequacy of Bradley/Grombacher LLP, to be appointed class counsel by this Court.

## RELEVANT PROCEDURAL HISTORY

5.     Plaintiff filed this action on June 1, 2018.

6.     Pursuant to Local Rule 23-3, the deadline for the filing of Plaintiff's motion for class certification was September 13, 2018.  Currently, by Order of the Court the current deadline is October 22, 2018.

7.     Plaintiff served defendant Frontier on or about June 15, 2018.

8.     As a professional courtesy to Frontier, Plaintiff stipulated to provide Frontier an additional thirty-nine (39) days in which to file an answer to the complaint. Frontier filed an answer to the complaint on August 14, 2018.

9.     Plaintiff voluntarily dismissed defendant Airbus Group HQ, Inc., pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) on July 16, 2018.

10.     Given that defendant Airbus S.A.S. ("Airbus") is a foreign corporation, service must be effectuated through protocols established by the Hauge Convention.

11.     Shortly after filing, Plaintiff caused the complaint and all initiating documents to be translated into French.

2

ER000106

12.     Promptly upon translation, Plaintiff began the process of effectuating service under the Hague Convention with the assistance of ABC Legal, a process serving company.

13.     In accordance with required procedures, the service request was sent to the Ministry de la Justice in Paris with confirmed receipt on July 16, 2018.

14.     At present, service has not yet been confirmed and may take several more weeks or months to be effectuated.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my personal knowledge.  This declaration is executed this 22nd day of October, 2018, at Westlake Village, California.

/s/   Kiley Lynn Grombacher
Kiley Lynn Grombacher, Esq.

**DECLARATION OF KILEY L. GROMBACHER IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

ER000107

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Taylor L. Emerson, Esq. (SBN 225303)
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile: (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@ bradleygrombacher.com
temerson@bradleygrombacher.com

**ROTHSCHILD & ALWILL, APC**
Kristi D. Rothschild (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
27 W. Anapamu Street, Suite 289
Santa Barbara, California 93101
Telephone: (805) 845-1190
Facsimile: (805) 456-0132
krothschild@kdrlawgroup.com
jalwill@kdrlawgroup.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA RIDGELL, on behalf of herself and others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California<br><br>Defendants. | **Case No.: 2:18-CV-04916 PA (AFMx)**<br><br>**DECLARATION OF PLAINTIFF ANDREA RIDGELL IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>**DATE: 11/19/18**<br>**TIME: 1:30 p.m.**<br>**DEPT: 9A** |

## <u>DECLARATION OF ANDREA RIDGELL</u>

I, Andrea Ridgell, declare as follows:

1. I am an adult, over the age of 18 years old. I am a resident of the State of California. I am a named Plaintiff and a prospective class member in *ANDREA RIDGELL, on behalf of herself and others similarly situated v. FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California* (Case No. 2:18-CV-04916 PA (AFMx), currently pending in the United States District Court for the Central District of California.

2. I have personal knowledge of the matters stated herein, and if called to testify about these facts, I could and would do so in a competent and truthful manner. I make this declaration in support of Plaintiff's Motion for Class Certification against Defendants AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California (collectively, "AIRBUS").

### <u>Background</u>

3. On June 2, 2017, I boarded Frontier Airlines flight number F91630 with a scheduled departure time of 10:19 PM and an arrival time of 6:04 AM on June 3, 2017. The flight was direct from Los Angeles to Phoenix with no scheduled stops.

4. I believe the aircraft to have been an airbus A320.

5. Approximately two hours into the flight the plane experienced a problem with the air quality in the cabin.

6. I, and many of my fellow passengers, experienced physical distress including one or more of the following non-exhaustive symptoms: passing out, choking, coughing and eye irritation.

DECLARATION OF PLAINTIFF ANDREA RIDGELL
CASE NO. 2:18-CV-04916 PA (AFMx)

ER000109

7. Upon information and belief, while onboard the subject aircraft, I and the members of the classes, were exposed to toxic fumes that entered the passenger cabin through the aircraft's ventilation system as a result of what is commonly referred to as a "fume" event.

8. As a result of the aforementioned problems, the aircraft was forced to make an emergency landing in Phoenix, Arizona, and the subject aircraft was grounded. The all of the passengers were immediately de-boarded from the plane.

9. Some of the passengers were analyzed by paramedics, others were taken to the hospital.

10. Although we each requested to leave, the passengers were confined in the terminal. We were not permitted to board other flights or to leave the terminal area.

11. After three (3) hours the passengers were released from the forced confinement.

12. I contacted Frontier about the incident on or about June 7, 2017 via email submitted through Frontier's website. Defendant Frontier in a response email received June 7, 2017, stated that there was "nothing wrong with [the plane]" and did not provide me with any additional details or redress other than a $200 travel voucher (provided to all passengers) which expired on September 7, 2017.

13. To date, Frontier has not informed me of the name and type of chemicals to which I was exposed.

**Class Representative Status**

14. I seek to be a Class Representative for this lawsuit. I understand that a Class Representative:

      (a)    represents the interests of all members of the class in litigation

Page 2

DECLARATION OF PLAINTIFF ANDREA RIDGELL
CASE NO. 2:18-CV-04916 PA (AFMx)

| 1  | | to recover money damages or obtain injunctive relief for the |
| 2  | | class; |
| 3  | (b) | has claims that are typical of those of the class, thus involving |
| 4  | | common issues of law or fact; |
| 5  | (c) | always consider the interests of the class just as he would |
| 6  | | consider his own interests and, in some cases, must put the |
| 7  | | interests of the class before his own interests.  This means that |
| 8  | | the Class Representative is a fiduciary to the Class; |

1  to recover money damages or obtain injunctive relief for the
class;

(b)  has claims that are typical of those of the class, thus involving common issues of law or fact;

(c)  always consider the interests of the class just as he would consider his own interests and, in some cases, must put the interests of the class before his own interests.  This means that the Class Representative is a fiduciary to the Class;

(d)  always actively participate in the lawsuit, as necessary, by, among other things, answering interrogatories, producing documents to the requesting party and giving deposition and trial testimony if required;

(e)  may be required to travel to give such testimony;

(f)  recognizes and accepts that any resolution of the lawsuit, by dismissal or settlement, is subject to court approval, and must be designed in the best interest of the class as a whole;

(g)  is not required to be particularly sophisticated or knowledgeable about the subject of the lawsuit;

(h)  should follow the progress of the lawsuit and should provide all relevant facts to the lawyers for the class;

(i)  volunteers to represent or champion many other people with similar claims and injuries because of the importance of the case and the necessity that all class members benefit from the lawsuit equally; the savings of time, money and effort should benefit all parties and the court.

15. To date, I have performed a number of tasks in my role as a Class Representative.  This includes the following:

a.  Being in regular contact with my counsel regarding the status of my lawsuit, and providing my counsel with any

Page 3

information or documents upon request.

16. I understand that the members of the proposed classes are similarly-situated with respect to a common course of conduct or practice.

17. I understand that class actions are an important tool to assure compliance with the law even where an individual's losses may be relatively small.

18. I have no interests which are inconsistent with the interests of Class Members and will adequately represent Class Members. I brought this lawsuit on behalf of myself and all other non-exempt or hourly employees similarly situated to rectify legal wrongs being committed by Defendants. The legal and factual issues for which I seek to have this case certified as a class action are typical of my own legal and factual issues.

    (a)    As a Class Representative I will always consider the interests of Class Members just as I would consider my own interests and, in some cases, must put the interests of Class Members before my own interests. I have and will continue to actively participate in the lawsuit, as necessary, including answering interrogatories, producing documents as requested, giving deposition and trial testimony, and helping in any other way I can. I recognize and accept that any resolution of this lawsuit, by dismissal or settlement, is subject to court approval, and must be designed in the best interest of the class as a whole.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed this 22nd day of October 2018, at Santa Barbara, California.

_____

Andrea Ridgell

DECLARATION OF PLAINTIFF ANDREA RIDGELL
CASE NO. 2:18-CV-04916 PA (AFMx)

ER000112

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:  (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@ bradleygrombacher.com


**ROTHSCHILD & ASSOCIATES, APC**
Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
27 W. Anapamu Street, Suite 289
Santa Barbara, California  93101
Telephone:  (805) 845-1190
Facsimile:   (805) 456-0132
krothschild@kdrlawgroup.com
jalwill@kdrlawgroup.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA RIDGELL, on behalf of herself and others similarly situated <br><br> Plaintiff, <br><br> v. <br><br> FRONTIER AIRLINES, INC. a Colorado corporation; and AIRBUS S.A.S., a foreign corporation doing business in the State of California <br> Defendants. | **CASE NO. 2:18-CV-04916 PA (AFMx)** <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> 1. Strict Products Liability <br><br> 2. Breach of Warranties <br><br> 3. Negligence <br><br> 4. False Imprisonment <br><br> 5. Negligent Infliction of Emotional Distress <br><br> **DEMAND FOR JURY TRIAL** |

ER000113

Plaintiff Andrea Ridgell ("Plaintiff"), by and through her attorneys of record, files this Complaint against the above-named Defendants Frontier Airlines Holdings, Inc. (hereinafter referred to as "Frontier"), Airbus S.A.S. ("Airbus") (hereafter defendants Frontier and Airbus are collectively referred to as "Defendants") and states as follows:

## INTRODUCTION

1.      This case arises from "fume" events which occur as the result of the defective design and manufacture of Frontier Airline's fleet of Airbus aircrafts.  Fume events occur when the air inside the passenger cabin of an aircraft becomes contaminated with pyrolised compounds such as engine oil, de-icing or hydraulic fluid.

2.      Such events are caused by the "bleed" air system used in Defendants' aircrafts which draws pre-heated compressed air from the engine and pumps this air straight into the cabin after being cooled.

3.      Defendants have repeatedly experienced fume events yet have failed to eliminate the traditional pneumatic system and bleed manifold and instead adopt a no-bleed system whereby electrically driven compressors provide the cabin pressurization function, with fresh air brought onboard via dedicated cabin air inlets.   Moreover, Defendants have failed to warn consumers about the dangers of the "bleed" air system.

4.      Such system has caused damage to Plaintiff and other passengers in the form of personal injury and lost money.

5.      As such, Plaintiff seeks relief in this action individually and as a class action on behalf of all passengers of Frontier Airlines who experienced "fume" events in the United States (the "Class").  Plaintiff also seeks relief in this action individually and as a class action on behalf of a subclass of all passengers on Frontier Flight 1630 which departed Los Angeles International Airport on June 2, 2017 (the "California Class").

/ / /

/ / /

ER000114

## PARTIES

6.     Plaintiff is a citizen of the United States of America, domiciled in Santa Barbara County, California.

7.     Defendant Airbus S.A.S. is a European multinational corporation that designs, manufactures, and sells civil and military aeronautical products worldwide. Defendant Airbus S.A.S. has in the past and continues to engage in substantial and non-isolated business activity on a continuous and systemic basis in the United States and California.

8.   Defendants have in the past and continue to engage in substantial and non-isolated business activity on a continuous and systematic basis in the United States and California. For example, and without limitation:

a. Airbus S.A.S. maintains a North American headquarters in Herndon, Virginia; and numerous offices throughout the United States including engineering centers in Mobile, Alabama and Wichita, Kansas.

b. In the State of California, Airbus S.A.S. owns and operates Airbus Group HQ Inc., which holds a principal address in San Jose, California. The purpose of Airbus Group HQ Inc. is to sell Airbus S.A.S. aircraft in the State of California (hereafter, defendant Airbus S.A.S. and Airbus Group HQ Inc. shall be referred to as "Airbus".)

c. In the State of California, Airbus S.A.S. owns and operates Airbus Defense and Space, Inc., a Delaware corporation that is registered with the California Secretary of State; and, qualified for the transaction of intrastate business to sell AIRBUS S.A.S. aircraft in the State of California.

d. Additionally, Airbus S.A.S. by and through Airbus Group HQ Inc., doing business as $A^3$ ("A-Cubed") that operates a Customer Support Center in Los Angeles, California, where it provides on-site technical assistance, and helps solve in-service problems.

9.     Frontier is a Delaware corporation with a principal place of business and corporate headquarters in Denver, Colorado.  Frontier operates passenger service

ER000115

throughout the United States including between California and Florida.

## JURISDICTION AND VENUE

10.    Jurisdiction and venue is proper in this Court because California is the location of the subject flight origination.

11.    This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, in that the estimated damages involved in the claims will exceed $5,000,000 and Plaintiff and class members are residents of different states than Defendants.

12.    At all times relevant, Defendants were engaged in substantial and not isolated activity within the State of California including, but not limited to, transacting business, contracting to supply goods or services and providing goods or services to California.

13.    At all times relevant, Defendants purposefully directed their activities to residents of the State of California and purposefully conducted activities within the State of California thereby invoking the benefits and protections of California law.

14.    The injuries and causes of action of Plaintiff and the members of the Class arise from Defendants' activities within the State of California.

15.    Defendants have marketed, advertised, sold tickets, and operated in this District.  Thus, under 28 U.S.C. §§1391(c)(2) and (d), Defendants are deemed to reside in this District.  As such, venue is proper in this judicial district under 28 U.S.C. §1391(b)(1) because Defendants are deemed to reside in this District and under 28 U.S.C. §1391(b)(2), because Defendants conduct business in this District and a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in this District.

## FACTS

### Facts About Frontier Flight F91630

16.    On or about May 16, 2017, Plaintiff purchased a one-way ticket on Frontier airlines for travel from Los Angeles, California to Orlando.  Plaintiff paid a purchase

ER000116

price of $163.99.

17.     On or about June 2, 2017, Plaintiff boarded Frontier airlines flight number F91630 with a scheduled departure time of 10:19 PM and an arrival time of 6:04 AM on June 3, 2017.  The flight was direct from Los Angeles to Phoenix with no scheduled stops.

18.     Plaintiff believes the aircraft to have been an airbus A320 (320) V1.  The aircraft was designed and manufactured by Airbus.

19.     At the times mentioned, and at all times relevant to this complaint, Frontier is a common carrier engaged in the business of transporting passengers for hire by air.

20.     Approximately two hours into the flight, the subject aircraft experienced a problem with the air quality in the cabin.

21.     Many of the passengers including Plaintiff experienced physical distress including one or more of the following non-exhaustive symptoms: passing out, choking, coughing and eye irritation.

22.     Upon information and belief, while onboard the subject aircraft Plaintiff and the members of the classes (as defined below) were exposed to toxic fumes that entered the passenger cabin through the aircraft's ventilation system as a result of what is commonly referred to as a "fume" event.

23.     The toxic fumes entered the passenger cabin through the air delivery system as a result of the product defect as alleged herein. The "product" for purposes of this Complaint is the Airbus aircraft and its component parts.

24.     Bleed air is the outside air fraction of the cabin supply air that is first compressed in the aircraft engines or Auxiliary Power Unit and which, as a result of the product defect alleged herein, is prone to contamination with high-temperature engine oil and hydraulic fluid, and their byproducts, under normal operating conditions.

25.     These airborne toxins were not removed from the bleed air before the air was supplied to the passenger cabin for the flight attendants and passengers to breathe.

26.     As a result of the aforementioned problems, the subject aircraft was forced

to make an emergency landing in Phoenix, Arizona, and the subject aircraft was grounded. The passengers were immediately de-boarded from the plane.

27. Some of the passengers were analyzed by paramedics, others were taken to the hospital.

28. Although they each requested to leave, the passengers were confined in the terminal. They were not permitted to board other flights or to leave the terminal area. The passengers were never informed as to what chemicals they had been exposed to.

29. After three (3) hours the passengers were released from the forced confinement.

30. Frontier has refused to acknowledge the event. Indeed, publicly accessible records maintained by Frontier reported the flight as having landed on time in Orlando without incident.

31. Plaintiff contacted Frontier about the incident on or about June 7, 2017 via email submitted through Frontier's website. Defendant Frontier in a response email received June 7, 2017, stated that there was "nothing wrong with [the plane]" and did not provide Plaintiff with any additional details or redress other than a $200 travel voucher (provided to all passengers) which expired on September 7, 2017.

32. To date, Defendant Frontier has not informed Plaintiff or any of the passengers on the subject plane of the name and type of chemicals to which they were exposed.

33. Due to her exposure to contaminated cabin air, Plaintiff suffered personal injuries including nausea, blurred vision, headaches, emotional distress and lost monies.

**General Facts about Defendants' Bleed Air System**

34. Life is unsustainable at the altitudes at which airliners cruise. This is due to extremely low atmospheric pressure, density, temperature and humidity. The industry-referred solution has been a system of drawing or "bleeding" high-pressure air into the aircraft through the aircraft's jet engines.

35.    Defendants use a bleed air system on every aircraft in the Frontier fleet including, but not limited to, the Airbus A318, Airbus A319, Airbus A320, and the Airbus A321.

36.    A bleed air system uses a network of ducts, valves and regulators to conduct medium to high pressure air, "bled" from the compressor section of the engine(s) and auxiliary power unit (APU), to various locations within the aircraft. There the air is utilized for a number of functions including:

- pressurization;

- air conditioning;

- engine start;

- wing and engine anti-ice systems;

- water system pressurization;

- hydraulic system reservoir pressurization; and

- boundary layer separation enhancement.

37.    The use of the air for pressurization and air-conditioning is of particular importance.   After leaving the engine and passing through the air-conditioning pack, where it is cooled, this bleed air is combined with recirculated cabin air before it enters the cabin. The airliner cabin is a hermetically sealed pressure vessel, with an inflow of bleed air and a computer-controlled outflow, which exhausts back to the atmosphere. Jet engines operate at extremely high temperatures. The only air that enters the interior of the aircraft during operation is the bleed air from the engines.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /



**Cabin air**

The cabin air system in today's jetliners is designed to provide a safe, comfortable cabin environment at cruising altitudes that can reach upward of 40,000 feet.

Briefly, here's how the system works:

1. Air enters the compressor stage of the aircraft's jet engine, where it becomes very hot as it is pressurized.

2. The hot, compressed air then passes to air conditioning units where it is cooled.

3. The outside air is passed to the mixing manifold, where it's mixed 50/50 with recirculated cabin air that has been cleaned with high-efficiency filters.

4. Air from the mixing manifold is supplied to the cabin on a continuous basis from overhead outlets.

5. As outside air enters the aircraft, an equal amount of air is discharged. The air in the entire cabin is replaced every two to three minutes.

SOURCE: Boeing, Airbus, flightglobal.com

38. It is important to note that this bleed air is cooled but not cleaned (i.e., filtered) before being mixed with recirculated cabin air. Recirculated air, however, is leaned using high-energy particulate air (HEPA) filtration. HEPA filters, by definition, are designed to capture particles but not gases and vapors, which pass directly through, and collection efficiency is established on the basis of particles that pass through the filter (i.e., penetration efficiency).

39. HEPA filters capture particles measuring 0.3 micrometers (μm) in diameter and, as such, certain particles, molecules, and microorganisms can nevertheless pass through. For example, viruses are among the smallest of microorganisms, ranging in size from 0.02 to 0.3 μm in diameter and are thus too small to be captured by HEPA filters. Likewise, fumes are generally less than 0.05 μm in diameter which are also too small to be captured via filtration.

**Facts About "Fume" Events**

40. The term "fume" is used commonly to describe any noxious gas, smoke, or vapor in the atmosphere. In the case of contaminated air inside an aircraft cockpit/cabin, the term "fume event" has been used to refer to a potentially toxic environment created by contaminated bleed air.

41. The hydraulic systems discussed above vent to atmosphere, which, in this case, is the interior of the aircraft. In addition, the hydraulic pumps, and some actuators, are mounted in the engines, and the bleed air is also used to pre-pressurize the hydraulic

ER000120

systems. The very high pressure of aircraft hydraulic systems (>10 MPa) creates "sweats", leaks and ruptures. The overall result is that the interior air of aircraft is routinely contaminated by hydraulic fluid in addition to the engine lubricating oil and other substances.

42.     One of the fundamental problems of such systems lies in the fact that all the constituents of jet engine lubricating oil and aircraft hydraulic fluid are harmful to humans with various degrees of toxicity.  Air contamination can occur during normal operation of the airplane but is particularly high during "fume events" or events where additional toxins enter the air system.

43.     Gases contained in contaminated cockpit/cabin air as constituents of "bleed" air include carbon monoxide ("CO") from engine exhaust and carbon dioxide ("CO2") as a product of incomplete combustion. Trioxygen ("O3"), originating in the stratosphere, may enter the cockpit/cabin from outside the aircraft via the environmental control system.

44.     Exposure to high CO2 concentrations can lead to symptoms such as headache, dizziness, and restlessness and ultimately lead to asphyxia.

45.     Exposure to O3 may be associated with symptoms ranging from irritation to eyes and mucous membranes to chronic respiratory disease.  Additionally, O3 reacts with materials in the cabin, including seat fabric, carpet, plastic, and clothing to emit VOC byproducts.   In controlled experiments, the most common VOC emissions detected were aldehydes, 6-methyl-5-hepten-2-one, and acetone.

46.     Vapors contained in contaminated cockpit/cabin air may also include both volatile ("VOCs") and semi-volatile organic compounds ("SVOCs"), both of which are chemical compounds based on carbon chains or rings that also contain hydrogen with or without oxygen, nitrogen, and other elements that represent constituents of jet engine oils, hydraulic fluids, and deicing fluids.

47.     Among the many possible VOCs and SVOCs representing constituents of contaminated bleed air, particular concern has been attributed to tricresyl phosphate

ER000121

(Tricresyl phosphates are anti-wearing agents that are added to all jet engine oils used on all jet propelled commercial airliners in the United States.)

48.    Tricresyl phosphates are known neurotoxins, i.e. nerve agents. A neurotoxin or nerve agent is a toxin that acts specifically on nerve cells of the central and peripheral nervous systems. Inhalation exposure to tricresylortho phosphate ("TOCP") (one of the isomeric forms of Tricresyl phosphate) at higher concentrations is associated with a delayed neurotoxic toxic effect (i.e., several days following exposure) manifested by peripheral nervous system abnormalities. Additionally, TOCP can affect the body if it comes in contact with the eyes or skin.

49.    Tricresyl phosphates are organophosphates. Organophosphates are chemical compounds used in insecticides, herbicides, pesticides, nerve agents and nerve gases, all sharing a similar chemical structure. Organophosphates, as a family of chemicals, are considered toxic to human health. Indeed, in 2001 the Environmental Protection Agency banned most residential uses of organophosphates in part because of their risk to human health.

50.    De-icing fluids and exhaust from jet engines may also enter the bleed air supply during ground operations.

51.    Thus, inhaling toxic cabin air can cause short-term or transient symptoms as well as permanent and serious personal injury.

52.    A typical user, when using the product as designed, does not expect to be exposed to tricresyl phosphates, other chemicals or combustion products and to be potentially inflicted with permanent disability, life altering central and peripheral nervous system damage, chronic migraines, tremors, cognitive deficits, gastrointestinal distress, nausea, vison impairment, fatigue, significant and traumatic emotional and mental stress and depression or other related symptoms.

### "Fume" Events Are Common on Defendant's Aircrafts

53.    Plaintiff and the members of the Flight F91630 Class (defined below) are not the only consumers who have been subjected to fume events on Defendants'

aircrafts. Thousands of passengers (both before and after the "fume" event experienced by Plaintiff and the members of the F911630 Flight Class) have suffered in exactly the same manner from exactly the same defect:

54.     On or about May 20, 2018, Frontier airline flight 1839 departed Tulsa, Oklahoma with a destination of San Diego, California.  However, the plane, an Airbus A320 jet, was forced to make an emergency landing following a fume event that caused smoke to enter the plane's cabin[1].

55.     On or about Frontier flight 1676 traveling from Las Vegas to Orland, Florida made an emergency landing after crew reported a suspicious odor[2].

56.     On or about November 22, 2017, Frontier flight No 1686 from Nashville, Tennessee to Las Vegas, Nevada, was diverted to Albuquerque due to an odor in the cockpit[3].

57.     On or about June 21, 2010, Frontier Airlines flight 1903 from Milwaukee, Wisconsin made an emergency landing after smoke was reported in the cockpit[4].

58.     Indeed, while Defendants have utterly failed to warn consumers of the dangers of these events, consumers been forced to take matters into their own hands taking to online forums to complain of similar experiences.  For example,

**Marci of San Diego, CA Verified Reviewer** Original review: May 29, 2018

Two times in the last week Frontier Airlines had had emergency landing because of unknown chemical odors on the plane. I was on the first of these one week ago. Pilot announced emergency landing while gasping for breath in his oxygen mask. After landing in Albuquerque we were kept up all night in the airport in a line waiting to get rebooked to San Diego. Although medical people checked out Frontier staff on the plane not one mention was made for passengers to get checked out. I have

---

[1]     http://www.businessinsider.com/frontier-plane-makes-emergency-landing-after-odor-fills-cabin-2018-5 (last viewed May 31, 2018)
[2]     https://www.clickorlando.com/travel/odor-prompts-frontier-flight-to-make-emergency-landing-in-orlando (last viewed May 31, 2018)
[3]     http://www.wkrn.com/news/flight-from-vegas-to-nashville-diverted-to-albuquerque/1077006699 (last viewed May 31, 2018)
[4] http://www.kctv5.com/story/14786310/frontier-flight-makes-emergency-landing-at-kci-6-21-2010 (last viewed May 31, 2018)

been feeling sick all week and yesterday felt I might have some type of pneumonia.

I looked online to see if Frontier had released info about what the gas was we breathed in during the hours we were on the flight. Instead I saw another article explaining another emergency landing on Frontier happened yesterday- same route- San Diego-Tulsa- same problem. Fumes on plane. This time they emergency landed in Phoenix. Frontier said everyone was offered a medical exam yesterday (no one mentioned that option on my flight) and one 62-year-old man was admitted to the hospital.

I am very healthy- never get sick and have been feeling horrible for a week. Will Frontier have to explain what is going on? On the plane before the emergency landing a male flight attendant was lying on the floor by the bathroom. The entire experience was bizarre and I am wondering if others are sick. I contacted Frontier and they responded by saying we were all getting 200.00 vouchers to use on their flights.[5]

### **Defendants Have Known of The Dangers of Fume Events and Bleed Air for Years**

59. According to the FAA's Aerospace Medicine Technical Report No DOT/FAA/AM-15/20 report published in November of 2015, "[t]he quality of air distributed throughout the cockpit and cabin during air transportation in a pressurized aircraft is critically important to human health. For more than 30 years, the topic of cabin air quality has been of concern."

60. In 1994, the U.S. Congress mandated that the Federal Aviation Administration (FAA) establish an aircraft cabin air quality research program and to contract with the Centers for Disease Control and Prevention (CDC) to carry out studies specific to cabin air quality (Public Law 103-305, 1994).

61. In 2012, Congress directed the FAA to initiate a study of air quality in aircraft cabins to: 1) assess bleed air quality on the full range of commercial aircraft operating in the United States; 2) identify oil-based contaminants, hydraulic fluid

---

[5] https://www.consumeraffairs.com/travel/frontier.html (last viewed June 1, 2018.)

toxins, and other air toxins that appear in cabin air and measure the quantity and prevalence, or absence, of those toxins through a comprehensive sampling program; 3) determine the specific amount and duration of toxic fumes present in aircraft cabins that constitutes [sic] a health risk to passengers; 4) develop a systematic reporting standard for smoke and fume events in aircraft cabins; and 5) identify the potential health risks to individuals exposed to toxic fumes during flight.

62.     Since 2012, Airbus has been performing real-time monitoring of cabin air quality.

63.     Prior to the subject flight, Defendants received actual or constructive notice of the dangers posed by a loss of cabin pressure to the airworthiness of the aircraft and the safety of the passengers, including Plaintiffs, aboard an aircraft.

64.     Prior to the subject flight, Defendants received actual or constructive notice of the pressurization problems in its fleet and/or the subject aircraft.

65.     Prior to the subject flight, Defendants received actual or constructive notice of the contaminated bleed air problems in its fleet and/or the subject aircraft.

66.     Prior to the subject flight, Defendants received actual or constructive notice of the maintenance problems in its fleet and/or the subject aircraft.

67.     Prior to the subject flight, Defendants received actual or constructive notice of the dangers posed to the safety of its passengers and crew by allowing toxic fumes to enter the cabin of its aircraft through the aircraft's ventilation system.

68.     Prior to the subject flight, Defendants received actual or constructive notice of contaminated bleed air and toxic fumes entering the cabin while its passengers and crew were onboard.

69.     Despite such knowledge Defendants have not, to date, retrofitted their products with either sensors or recirculated air filtration systems designed to detect and/or eliminate and/or minimize vaporized and/or pyrolyzed engine oil and/or hydraulic fluid and its byproducts and/or other toxic substances under normal operations.

ER000125

70. There are, however, planes that have been so modified. For example, the Boeing 787 "Dreamliner" uses dedicated electrical compressors with air bearings, without risk of oil or hydraulic system contamination, to pressurize, refresh and heat the aircraft interior.

71. Frontier had a duty to provide its passengers with an aircraft that was in good mechanical condition and free of defects such as pressurization problems and toxic fumes.

72. After exposing its passengers to unidentified toxic fumes, Defendants had a duty to inform each and every passenger exactly which chemical or chemicals they had been exposed to, all possible consequences of such exposure, and information relevant to medical treatment for such exposure (including antidotes). Defendants also had a duty to measure the level of exposure each passenger sustained, as close in time to the fume event as practicable.

73. Frontier had a duty to use the highest degree of care consistent with the operation of its aircraft and its business as a common carrier.

74. Even though Frontier knew that the chemical contained in the "bleed air" can cause harm to humans, it is Frontier's policy not to inform passengers that they may be, are, or have been, exposed to compounds and chemicals that are known to be dangerous and/or toxic. This intentional concealment has prevented Plaintiff and the proposed class from making informed decisions on whether to fly on this airline or evaluate alternative means of transportation to minimize their exposure to chemicals.

**There Exists A Better Alternative Design for the Aircraft**

75. The bleed air system, while common, is not the only available system for the design and manufacture of the aircrafts.

76. Indeed, there is a non-bleed system that is preferable in many regards including the protection of the health and welfare of the passengers and increased fuel economy.

77. The no-bleed systems architecture replaces the traditional pneumatic

system and the bleed manifold with a high-power electrical system that, in addition to the traditional electrical system functions, supports a majority of the airplane functions that were traditionally performed via bleed air.

78.     In the no-bleed architecture, electrically driven compressors provide the cabin pressurization function, with fresh air brought onboard via dedicated cabin air inlets. This approach is significantly more efficient than the traditional bleed system because it avoids excessive energy extraction from engines with the associated energy waste by pre-coolers and modulating valves. There is no need to regulate down the supplied compressed air. Instead, the compressed air is produced by adjustable speed motor compressors at the required pressure without significant energy waste. That results in significant improvements in engine fuel consumption while also protecting the safety and quality of the air inside the cabin.



No Bleed System Architecture

79.     Eliminating the maintenance-intensive bleed system is also expected to

reduce airplane maintenance needs and improve airplane reliability because there are fewer components on the engine installation resulting in a simplified and more reliable APU.

80.    The no-bleed architecture also features modern power electronics and motors that will provide increased overall reliability, decreased costs, and improved performance.

81.    Finally, the architecture means reduced airplane weight, reduced part count, and simpler systems installation.

### CLASS ACTION ALLEGATIONS

82.    Plaintiff brings this action individually and on behalf of all other persons similarly situated.  The Classes which Plaintiff seeks to represent are defined as:

**Nationwide Class**
All persons in the United States who have flown in one of Defendants' aircraft that have experienced a bleed air event.  Specifically excluded from this Class are Defendants, the officers, directors, or employees of Defendants, any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir, or assign of Defendants.  Also excluded any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

**Flight 1630 Class**
All passengers in the United States who were on Frontier Airlines Flight 1630 on June 2, 2017.

83.    The Class is sufficiently numerous, as each includes hundreds of persons. Thus, joinder of such persons in a single action or bringing all members of the Classes before the Court is impracticable for purposes of Federal Rule of Civil Procedure, Rule 23.  The question is one of a general or common interest of many persons and it is impractical to bring them all before the Court.  The disposition of the claims of the members of the Classes in this class action will substantially benefit both the parties and the Court.

ER000128

84.     There are questions of law and fact common to each Class for purposes of Federal Rule of Civil Procedure, Rule 23, including:

a.      Whether or not the chemicals present in the "bleed air" introduced into Defendant's passenger cabins can cause harm to people exposed thereto;

b.      Whether Defendant had a duty to warn of the potential exposure to toxic chemicals that can result from "bleed" air;

c.      Whether Plaintiffs and the members of the Flight 91630 Class were falsely imprisoned; and

d.      Whether Defendants breached any express and/or implied warranties.

85.     Plaintiff asserts claims that are typical of the claims of each respective Class for purposes of Federal Rule of Civil Procedure, Rule 23.  Plaintiff and all members of each respective Class have been subjected to the same wrongful conduct because they have been exposed to chemicals as a result of the uniform defective design of Defendants' aircrafts.  Plaintiff and the members of the Classes paid a premium for the service, over similar alternatives.  Plaintiff and the members of each Class have thus all overpaid for the service.

86.     Plaintiff will fairly and adequately represent and protect the interests of the other members of each respective Class for purposes of Federal Rule of Civil Procedure, Rule 23.  Plaintiff has no interests antagonistic to those of other members of each respective Class.  Plaintiff is committed to the vigorous prosecution of this action and has retained counsel experienced in litigation of this nature to represent her.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.

87.     Additionally, class certification is appropriate because Defendant has acted or refused to act, on grounds generally applicable to the class, making monetary and injunctive relief appropriate as more specifically set forth below.  The common complaints of Plaintiff and the Proposed Class form common grounds for equitable and monetary relief, further making class certification appropriate.

88.     Proceeding as a class action provides substantial benefits to both the

parties and the Court because this is the most efficient method for the fair and efficient adjudication of the controversy. Members of each Class have suffered and will suffer irreparable harm and damages as a result of Defendants' wrongful conduct. Because of the nature of the individual claims of the members of each Class, few, if any, could or would otherwise afford to seek legal redress against Defendants for the wrongs complained of herein, and a representative class action is therefore the appropriate, superior method of proceeding and essential to the interests of justice insofar as the resolution of claims of the members of each Class is concerned. Absent a representative class action, members of each Class would continue to suffer losses for which they would have no remedy, and Defendants would unjustly retain the proceeds of its ill-gotten gains. Even if separate actions could be brought by individual members of each Class, the resulting multiplicity of lawsuits would cause undue hardship, burden, and expense for the Court and the litigants, as well as create a risk of inconsistent rulings, which might be dispositive of the interests of the other members of each Class who are not parties to the adjudications and/or may substantially impede their ability to protect their interests.

## COUNT I

### Strict Liability: Design Defect

**(By Plaintiff and the Members of the Classes Against All Defendants)**

89. Defendants manufactured, designed, promoted, marketed and sold the subject aircraft. At the time the subject aircraft left Defendants' custody and control, it was defective and unreasonably dangerous because:

a. Its design rendered the aircraft unreasonably dangerous.

b. The danger of this design was beyond that contemplated by the ordinary consumer with ordinary knowledge common to the community as to its characteristics as such consumer would not believe that they would be exposed to cabin air which was contaminated with toxic chemicals.

c. The benefits of this design are outweighed by the design's inherent risk of

danger

90.    Defendants'' design of the subject aircraft made such aircraft unreasonably dangerous in one of more of the following respects:

a.    The subject aircraft's ventilation system allows bleed air, which can become contaminated with dangerous toxins, to enter the breathing zone of the aircraft.

b.    The subject aircraft lacked adequate air quality monitors, sensors or alarms.

c.    The subject aircraft provides no safeguards or systems so the flight crew could identify the source of the contaminated air or mitigate or prevent contamination of the cabin air.

d.    The subject aircraft lacked adequate or appropriate filters which would have purified the cabin air and prevented or mitigated bleed air contamination.

91.    By reason of the foregoing, the subject aircraft was unreasonably dangerous and defective and Defendants are strictly liable for the damages sustained by the Plaintiff and the members of the Classes.

92.    Under the risk-benefits test, the risks of the design outweigh the benefits. Indeed, the design of the Boeing 787 "Dreamliner" uses dedicated electrical compressors with air bearings, without risk of oil or hydraulic system contamination, to pressurize, refresh and heat the aircraft interior.  Such design protects against fume events and is also more fuel efficient.

## COUNT II

### Breach of Warranties

### (Plaintiff and the members of the Classes Against All Defendants)

93.    Plaintiff incorporates by reference each prior allegation and fact, as if specifically restated herein, paragraph for paragraph and word for word.

94.    The Federal Aviation Administration (FAA) has issued a number of federal aviation regulations (FARs), airworthiness directives (ADs), and advisory circulars (ACs) regarding cabin air ventilation requirements and contaminant

concentration limits.

95.    For example, 14 C.F.R. provides § 23.831(b) provides in pertinent part: "[f]or pressurized airplanes, the ventilating air in the flight crew and passenger compartments must be free of harmful or hazardous concentrations of gases and vapors in normal operations and in the event of reasonably probable failures or malfunctioning of the ventilating, heating, pressurization, or other systems and equipment.

96.    14 C.F.R. §23.1109(a) provides, "[t]he cabin air system may not be subject to hazardous contamination following any probable failure of the turbocharger or its lubrication system."

97.    14 C.F.R. §23.1111 provides, "[h]azardous contamination of cabin air systems may not result from failures of the engine lubricating system."

98.    14 C.F.R. §25.831 provides in pertinent part:
[u]nder normal operating conditions and in the event of any probable failure conditions of any system which would adversely affect the ventilating air, the ventilation system must be designed to provide a sufficient amount of uncontaminated air to enable the crewmembers to perform their duties without undue discomfort or fatigue and to provide reasonable passenger comfort. For normal operating conditions, the ventilation system must be designed to provide each occupant with an airflow containing at least 0.55 pounds of fresh air per minute.

(b) Crew and passenger compartment air must be free from harmful or hazardous concentrations of gases or vapors. In meeting this requirement, the following apply:
    (1) Carbon monoxide concentrations in excess of 1 part in 20,000 parts of air are considered hazardous. For test purposes, any acceptable carbon monoxide detection method may be used.
    (2) Carbon dioxide concentration during flight must be shown not to exceed 0.5 percent by volume (sea level equivalent) in compartments normally occupied by passengers or crewmembers.

99.    These Defendants' knowing violation of these minimum federal aviation regulations was a causal factor in the fume event at issue.

100.    Defendants voluntarily warranted, expressly and impliedly, that they complied with minimum industry standards and federal regulations such as those above

during the design and manufacture of the subject aircraft such that it was not defective, in airworthy condition and reasonably fit for their intended and foreseeable uses and purposes on the subject engine.

101.   Plaintiff and the members of the Classes were injured by the defective design of the subject aircraft which were, at the time of the accident, in essentially the same condition as when they left the hands of the defendants. The breach of express and implied warranties was the proximate cause of injury for Plaintiff and the Class.

102.   Defendant Frontier contracted with Defendant Airbus so that Frontier could transport passengers in its aircraft. Defendant Airbus intended that consumers would be the end users of their aircrafts and that consumers would be the beneficiaries of its contracts with airlines such as Defendant Frontier.

## COUNT III

### Negligence

### (By Plaintiff and the members of the Classes Against All Defendants)

103.   Plaintiffs re-allege all previous paragraphs as if set forth verbatim herein.

104.   At all times relevant hereto, Defendants owed a duty to the Plaintiffs to use reasonable care in designing, manufacturing, assembling, testing, maintaining, servicing, selling, marketing, promoting and providing warnings or instructions about the subject aircraft.

105.   Such failure had the result that Plaintiff and the members of the Class could not weigh the risks and chose an alternative plane design or alternative method of transportation.  Thus, but for the failure to warn Plaintiff and the members of the Class would not have sustained such injuries.

106.   Defendants negligently breached its duty of care owed to the Plaintiff and the members of the Classes though one or more of the following negligent acts and omissions, when Defendants:

a.     negligently designed, manufactured, assembled and sold the subject aircraft such that its ventilation system allowed contaminated bleed air to enter the

ER000133

breathing zone of the aircraft;

  b. negligently designed, manufactured, assembled and sold the subject aircraft without an adequate or appropriate air quality monitor, sensor or alarm to detect bleed air contamination, allow the flight to identify the source of such contamination and / or permit the flight crew to mitigate or prevent fume events;

  c. negligently designed, manufactured, assembled and sold the subject aircraft without adequate or appropriate filters to protect cabin air from contamination;

  d. negligently designed, manufactured, assembled and sold the subject aircraft without proper warnings or instructions regarding the potential of the air supply system to become contaminated or the danger of exposure to such contaminated air;

  e. negligently designed, manufactured, assembled and sold the subject aircraft without knowing the actual chemical composition of the aviation jet engine lubricating oil, required for use on its aircraft;

  f. negligently designed, manufactured, assembled and sold the subject aircraft without knowing what chemicals or byproducts are created when aviation jet engine lubricating oil is heated to temperatures consistent with those experienced in the engines, required for use on its aircraft;

  g. negligently designed, manufactured, assembled and sold the subject aircraft without properly testing heated aviation jet engine lubricating oil;

  h. negligently designed, manufactured, assembled and sold the subject aircraft without knowing the quality of the bleed cabin air;

  i. negligently failed to incorporate a proper and effective environmental control system on the subject aircraft;

  j. negligently failed to incorporate a proper and effective air supply system on the subject aircraft;

  k. negligently failed to properly test the subject aircraft before distributing it;

l.      negligently failed to adequately maintain, service, retrofit and/or inspect the subject aircraft;

m.      negligently represented, promoted and marketed its aircraft as being safe and failed to provide adequate warnings and instructions about its aircraft; and

n.      were otherwise negligent and careless.

107.   Defendants owed a duty to adequately warn and instruct about the dangers of its aircraft of which it knew, or, in the exercise of ordinary care, should have known, at the time the product left Defendants' control.

108.   Defendants negligently failed to warn of the defective and unreasonably dangerous conditions of the subject aircraft.

109.   Defendants negligent and willfully misrepresented the safety of its aircraft and the dangers of air cabin contamination.

110.   As a direct and proximate result of one or more of the aforesaid negligent acts and omissions of Defendants, Defendants caused Plaintiff and the members of the Classes to suffer personal injuries and/or damages and to require medical monitoring.

## COUNT IV

### Negligent Infliction of Emotional Distress

### (Against Plaintiff and the Members of the Classes Against Defendant Frontier)

111.   Plaintiff repeats and realleges the above paragraphs as if fully stated herein.

112.   Defendants' conduct negligently caused emotional distress to Plaintiff and the Class Members.

113.   Defendants could reasonably foresee that his action would have caused emotional distress to Plaintiff and the Class Members.

114.   Plaintiff and the Class Members were in a specific zone of danger during and following the "fume event" and at risk of physical harm, causing their fear.

115.   Plaintiff and the Class Members, immediately or shortly after the "fume event" suffered distress and emotional harm.

116. The intentional and/or reckless conduct of Defendants and each of them was outrageous and was made with reckless disregard of the probability of causing injuries and emotional distress to Plaintiff and the members of the Classes, knowing that Plaintiff and the members of the Classes would be subjected to toxic exposure.

117. As a foreseeable result of Defendants' intentional and/or reckless conduct, as described above, Plaintiff and the members of the Classes suffered and continue to suffer from personal injuries and severe emotional distress from the reasonable fear of developing cancer amongst other serious health conditions.

118. As a direct and proximate result of Defendants' negligent acts and omissions, Plaintiff and the Classes have suffered and will suffer from great physical, mental and nervous pain and suffering, including but not limited to fear of cancer, and Plaintiff and the Classes are informed and believe and based thereon allege that they will be compelled to seek further treatment in the future for care of injuries sustained as a direct and proximate result of the Defendants negligence. Plaintiff and the Classes are further informed and believe and based thereon allege that they have incurred the costs of medical treatment and will continue to incur such costs into the future.

119. In engaging in the conduct as described herein, Defendants acted willfully, maliciously, oppressively, outrageously, and in conscious disregard and indifference to the safety and well-being of Plaintiff and the members of the Classes. By reason of Defendants conduct, as described above, punitive damages should be assessed against Defendants, in such an amount as may be determined at trial.

## COUNT V

### FALSE IMPRISONMENT

**(By Plaintiff and the Members of the Flight 1630 Class Against Defendant Frontier)**

120. Plaintiff repeats and realleges the above paragraphs as if fully stated herein.

121. California law defines the tort of false imprisonment as the "unlawful

violation of the personal liberty of another." *Fermino v. Fedco, Inc.*, 7 Cal. 4th 701, 715 (1994). The tort of false imprisonment consists of the "nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." Id.

122.   At all times relevant herein, in the absence of any privilege to do so, Defendant Frontier acted with the intention of confining Plaintiff and the members of the Flight 1630 Class within fixed boundaries. Defendant's acts directly or indirectly resulted in confinement, and the confinement was effectuated without Plaintiff and Class members' consent.

123.   Specifically, Plaintiff and members of the Flight 1630 Class were intentionally confined by Defendant Frontier for several hours in the terminal area of the airport.

124.   Such confinement was non-consensual.

125.   Defendant Frontier intentionally engaged in these acts of false imprisonment with oppression, fraud and malice, and with reckless disregard of the rights of Plaintiff and Flight 1630 Class members, entitling them to punitive damages.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## PRAYER FOR RELIEF

Plaintiff, on behalf of herself and on behalf of the members of the Class defined herein, prays for judgment and relief on all Causes of Action as follows:

1.    An order certifying that the action may be maintained as a class action as defined herein;

2.    An order awarding Plaintiff and the proposed Class members compensatory, general and special damages and punitive damages in an amount to be proven at trial;

3.    For medical monitoring;

4.    For a temporary, preliminary and/or permanent order for injunctive relief;

4.    Pre-judgment and post judgment interest;

5.    For Attorney fees, disbursements and litigation expenses; and

6.    Such other and further relief as the Court may deem necessary or appropriate.

DATED:  October 5, 2018      **BRADLEY/GROMBACHER, LLP**

By**:**  /s/  Kiley Lynn Grombacher
    Marcus J. Bradley, Esq.
    Kiley Lynn Grombacher, Esq.
    Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims so triable in this action.

DATED:  October 5, 2018      **BRADLEY/GROMBACHER, LLP**

By**:**  /s/  Kiley Lynn Grombacher
    Marcus J. Bradley, Esq.
    Kiley Lynn Grombacher, Esq.
    Attorneys for Plaintiff

ER000138

Kevin R. Sutherland (State Bar No. 163746)
Natasha N. Mikha (State Bar No. 270731)
CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone:   (213) 358-7600
Facsimile:   (213) 358-7699
Email:       kevin.sutherland@clydeco.us
             natasha.mikha@clydeco.us

Jeffrey J. Ellis (*pro hac vice* application to be submitted)
CLYDE & CO US LLP
405 Lexington Avenue, 16th Floor
New York, New York 10174
Telephone:   (212) 710-3900
Facsimile:   (212) 710-3950
Email:       jeff.ellis@clydeco.us

Attorneys for Defendant
FRONTIER AIRLINES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| ANDREA RIDGELL, on behalf of herself and others similarly situated, | ) ) ) | Case No.: 2:18-CV-04916 PA (AFMx) |
|---|---|---|
| Plaintiff, | ) ) ) | FRONTIER AIRLINES INC.'S NOTICE OF NON-OPPOSITION TO PLAINTIFF'S MOTION FOR RELIEF |
| v. | ) ) | FROM DEADLINE IMPOSED BY LOCAL RULE 23-3 |
| FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ, INC., a corporation doing business in the State of California, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | Complaint Filed: June 1, 2018 |

Frontier Airlines, Inc. ("Frontier") has reviewed plaintiff Andrea Ridgell's ("plaintiff") motion for relief from deadline imposed by Local Rule 23-3 and plaintiff's supporting papers.  Given the parties' agreement in their Joint Rule 26 Report that certain potentially dispositive issues should be determined in advance of

/ / /

ER000139

class certification, Frontier hereby provides notice that it does not oppose the relief requested in plaintiff's motion.

Dated: September 20, 2018         CLYDE & CO US LLP

By: */s/ Natasha N. Mikha*
       KEVIN R. SUTHERLAND
       NATASHA N. MIKHA
       Attorneys for Defendant
       FRONTIER AIRLINES, INC.

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

-2-
FRONTIER AIRLINES INC.'S NOTICE OF NON-OPPOSITION TO PLAINTIFF'S
MOTION FOR RELIEF FROM DEADLINE IMPOSED BY
LOCAL RULE 23-3

# PROOF OF SERVICE

## STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California, I am over the age of eighteen years, and not a party to the within action. My business address is 633 West 5th Street, 26th Floor, Los Angeles California 90071.

On September 20, 2018, I served the document(s) described as:

**FRONTIER AIRLINES INC.'S NOTICE OF NON-OPPOSITION TO PLAINTIFF'S MOTION FOR RELIEF FROM DEADLINE IMPOSED BY LOCAL RULE 23-3**

on the parties in this action addressed as follows:

SEE ATTACHED SERVICE LIST

in the following manner:

☐ **(BY FAX):** by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below, or as stated on the attached service list, on this date before 5:00 p.m.

☐ **(BY MAIL):** as follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

☐ **(BY OVERNIGHT DELIVERY):** I caused such envelope(s) to be delivered to an overnight delivery carrier with delivery fees provided for, addressed to the person(s) on whom it is to be served.

☐ **(BY PERSONAL SERVICE):** I caused such envelope(s) to be delivered by hand this date to the offices of the addressee(s).

☒ **(BY CM/ECF):** by electronic filing system with the clerk of the Court which will send a Notice of Electronic Filing to all parties with an e-mail address of record, who have filed a Notice of Consent to Electronic Service in this action:

I declare I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on September 20, 2018, at Los Angeles, California.

Kathy L. Rollins

CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

4444953

-3-
PROOF OF SERVICE

**SERVICE LIST**

Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
BRADLEY/GROMBACHER LLP
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Tel:  (805) 270-7100
Fax: (805) 270-7100
E-Mail: mbradley@bradleygrombacher.com
          kgrombacher@bradleygrombacher.com

Attorneys for Plaintiff

Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
ROTHSCHILD & ASSOCIATES, APC
27 W. Anapamu Street, Suite 289
Santa Barbara, California  93101
Tel:  (805) 845-1190
Fax: (805) 456-0132
E-Mail: krothschild@kdrlawgroup.com
          jalwill@kdrlawgroup.com

Attorneys for Plaintiff

CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

4444953

-4-
PROOF OF SERVICE

ER000142

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Telephone:(805) 270-7100
Facsimile: (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@ bradleygrombacher.com

**ROTHSCHILD & ASSOCIATES, APC**
Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
27 W. Anapamu Street, Suite 289
Santa Barbara, California  93101
Telephone:(805) 845-1190
Facsimile: (805) 456-0132
krothschild@kdrlawgroup.com
jalwill@kdrlawgroup.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA RIDGELL, on behalf of herself and others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California<br>Defendants. | **CASE NO. CV 18-4916 PA (AFMx)**<br><br>**JOINT REPORT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(f), LOCAL RULE 26-1, AND THE COURT'S SCHEDULING ORDER** |

ER000143

Pursuant to Federal Rule of Civil Procedure 26(f), Local Rule 26-1, and this Court's Order Scheduling Meeting of Counsel [ECF. No. 17], plaintiff Andrea Ridgell ("Plaintiff") and defendant Frontier Airlines, Inc. ("Frontier") (collectively the "Parties")[1] have met and conferred and hereby submit the following joint rule 26(f) report.

## I. NATURE AND BASIS OF THE CLAIMS AND DEFENSES (Rule 26(f))

Plaintiff brings this putative class action on the basis of alleged "fume" events, which occur when the air inside the passenger cabin of an aircraft becomes contaminated with pyrolised compounds such as engine oil, de-icing or hydraulic fluid. Plaintiff alleges that such events are the result of an allegedly defective design and manufacture of Frontier Airline's fleet of Airbus aircrafts. Specifically, Plaintiff alleges that Defendants have repeatedly experienced fume events yet have failed to eliminate the traditional pneumatic system and bleed manifold systems which cause such events and instead adopt a no-bleed system whereby electrically driven compressors provide the cabin pressurization function, with fresh air brought onboard via dedicated cabin air inlets. Moreover, Plaintiff challenges Frontier's policies and practices, alleging that Defendants have failed to warn consumers about the dangers of the "bleed" air system and have failed to implement proper protocols in the event of such incidents, thereby causing damage to Plaintiff and other passengers in the form of personal injury and lost money.

Plaintiff seeks to proceed in her own capacity and on behalf of two classes of other Frontier passengers defined as:

/ /

---

[1] Defendant Airbus S.A.S. ("Airbus") is a foreign corporation and thus service must be effectuated on this defendant through protocols established by the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention" or "Hague Convention"). Although Plaintiff began such process in July, service on Airbus has not yet been effectuated.

ER000144

**Nationwide Class**

All persons in the United States who have flown in one of Defendants' aircraft that have experienced a bleed air event. Specifically excluded from this Class are Defendants, the officers, directors, or employees of Defendants, any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir, or assign of Defendants. Also excluded any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

**Flight 1630 Class**

All passengers in the United States who were on Frontier Airlines Flight 1630 on June 2, 2017.

Plaintiff alleges the following causes of action on behalf of some or all of the members of the classes outlined above: (1) strict products liability; (2) breach of warranties; (3) negligence; (4) false imprisonment; (5) negligent infliction of emotional distress.

Frontier denies liability and maintains that class certification is not appropriate. It is Frontier's position that it cannot be sued for operating aircraft that are certified and deemed airworthy by the US Federal Aviation Administration ("FAA") and/or other duly authorized regulatory bodies, nor can it be held liable for said aircraft using a "bleed air" system which is widely used throughout the world and deemed safe by the FAA and all applicable regulatory bodies. Frontier further submits that there is no scientifically-accepted basis for finding that the fume events set forth in the complaint caused or contributed to the injuries allegedly sustained by Plaintiff as an individual or any other member of the purported class. Further, even if an injury was sustained for which Frontier could potentially be held liable, there is no basis under applicable law to render any such injury sufficiently similar and common to an injury suffered by any other person so as to warrant class certification.

## II.   STATUS OF SERVICE

### A. Status Regarding Defendant Frontier

Plaintiff served defendant Frontier on or about June 15, 2018.   Defendant Frontier timely filed an answer to the complaint on August 14, 2018. (ECF Dkt No. 15).

### B. Status Regarding Defendant Airbus Group HQ, Inc.

Plaintiff voluntarily dismissed defendant Airbus Group HQ, Inc., pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) on July 16, 2018.  (ECF Dkt No. 14)

### C. Status Regarding Defendant Airbus

Plaintiff promptly caused the initiating complaint and supporting documents to be translated into French and, promptly began the process of effectuating service on Defendant Airbus S.A.S. ("Airbus") through the processes required by Hague Convention.  The process request has been confirmed received by the Ministry de la Justice in Paris on July 16, 2018. At present, service upon Airbus has not been fully effectuated.

## III.   LAW AND MOTION MATTERS

The Parties anticipate the following dispositive motions: motion for summary judgment and/or summary adjudication (Plaintiff and Defendants); and motion for class certification (Plaintiff).

Given the status of service on Airbus, the Parties have conferred and propose staging the litigation such that certain potentially dispositive motions are heard in advance of the motion for class certification.  Specifically, Frontier intends to bring a motion for summary judgment and/or summary adjudication on the following issues: (1) Plaintiff's liability claims must be governed by federal law which, pursuant to federal statutes and numerous holdings of the district, appellate and Supreme Court of the United States, pre-empts and exclusively regulates the standards for the design, maintenance and operation of aircraft engaged in interstate and/or international air

transportation; (2) application of the foregoing standard requires dismissal because there is no basis to claim or establish that Frontier's aircraft breached the applicable federal standards; and (3) Plaintiff cannot establish that fume events set forth in the complaint caused or contributed to any of the class or individual injuries alleged in the complaint because there is no scientifically-accepted basis for such an assertion.

To the extent that it would not be in violation of the Transportation Security Administration's prohibition on disclosure of sensitive security information, the Parties will engage in limited discovery as to these issues and propose the following briefing schedule for Frontier's motion for summary judgment/adjudication:

| Event | Deadline |
|---|---|
| Filing of Frontier's Motion for Summary Judgment/Adjudication | February 11, 2019 |
| Filing of Opposition to Frontier's Motion for Summary Judgment/Adjudication | April 1, 2019 |
| Filing of Reply in Support of Frontier's Motion for Summary Judgment/Adjudication | May 6, 2019 |

The Parties propose that the Court vacate the present date for Plaintiff's motion for class certification and set a briefing schedule for such motion following the Court's disposition of Frontier's motion for summary judgment and service upon defendant Airbus. In the alternative, the Parties propose the following schedule for Plaintiff's motion for class certification:

| Event | Deadline |
|---|---|
| Filing of Plaintiff's Motion for Class Certification | August 26, 2019 |
| Filing of Opposition to Frontier's Motion for Summary Judgment/Adjudication | October 7, 2019 |
| Filing of Reply in Support of Frontier's Motion for Summary Judgment/Adjudication | November 4, 2019 |

The Parties submit that any dispositive motion cut-off should be set after Airbus has appeared in this action. Should the Court wish to set a date, the Parties propose a deadline of one hundred (100) days after issuance of the Court's Order on Plaintiff's motion for class certification.

**IV. DISCOVERY PLAN (RULE 26(F))**

    **A. Initial Disclosures Per Rule 26(a)**

The Parties will exchange Initial Disclosures in a timely manner in accordance with the applicable rules and/or court order.

    **B. Phasing of Discovery**

The Parties propose to stage discovery so that the initial rounds are focused upon issues related to Frontier's motion for summary judgment and/or summary adjudication. However, the Parties do not believe that it is appropriate to formally bifurcate discovery.

/ /

/ /

/ /

### C. Topics of Discovery

In general, the Parties anticipate engaging in written discovery (requests for production, interrogatories, requests for admission) and taking depositions of individuals and entities disclosed in initial disclosures, additional percipient witnesses identified through discovery, and expert witnesses disclosed pursuant to Rule 26(a)(2). The Parties provide a brief statement of topics they believe are relevant below.

#### 1. Plaintiff's Statement

Plaintiff intends to seek discovery regarding, among other things: (i) the number of fume events that occurred during the class period; (ii) the amount of revenue derived by Defendants from the sales of tickets; (iii) the design and manufacture of the subject aircrafts; (iv) Frontier's procedures and protocols regarding fume events; (v) the plane manifest for Plaintiff's flight; (vi) Frontier's policies and procedures regarding quarantining of passengers in airport terminals; (vii) customer complaints regarding fume events; and (viii) experts and evidence on which Defendants rely.

#### 2. Frontier's Statement:

Frontier intends to seek discovery regarding the incident(s) alleged in the complaint and the nature and extent of the injuries and damages allegedly sustained by Plaintiff and the proposed classes. It is Frontier's position that the proposed classes cannot be certified and that, even if the classes are certified, there is no scientifically-accepted basis for finding that an alleged fume event causes injury or illness. It is also Frontier's position that Plaintiff's claims, and those of the proposed classes, are pre-empted by federal law, which governs the design, maintenance and operation of aircraft.

With respect to Plaintiff's intent to seek the plane manifest for her flight, Frontier anticipates objecting on the grounds that it violates the right to privacy of

individuals who are not parties to this action. Additionally, any discovery sought by Plaintiff relating to operation of aircraft and/or airport operations may include sensitive security information, disclosure of which may be precluded by 49 CFR § 1520 *et seq.*.

### D.   Preservation of Discoverable Information

The Parties are aware of their duties regarding the preservation of discoverable information, and agree to take reasonable measures to comply with those duties as required by the Federal Rules of Civil Procedure and Local Rules.

The Parties further agree that they will conduct a reasonable search for and gather reasonably available active electronically stored information ("ESI") on subjects specified in any Rule 34 request, unless an objection to the Rule 34 request is made. The Parties agree to take reasonable measures to preserve reasonably available ESI. The Parties will not take measures permanently to erase or scrub hardware of already deleted files, unless such measures are a result of routine, good faith operation of an electronic information system or unless taken in good faith to maintain the party's information technology system. To the extent that ESI is produced it shall be produced in native format, except that documents consisting solely of text and/or still images may be produced in TIFF format with sequential Bates numbers on each page.

### E.   Confidentiality and Privilege Issues

The Parties recognize that a protective order will be required in order to safeguard confidential information and, should the action become at issue and discovery commence, will submit a proposed protective order for the Court's approval. To the extent a discovery request calls for privileged information, the parties will meet and confer regarding a mutually agreeable date to exchange privilege logs.

/ /

/ /

### F. Discovery Cut Off

The Parties propose that no discovery cut-off be set until defendant Airbus has been served in this action. Should the Court wish to set a date, the Parties propose a deadline of one hundred and eighty (180) days after issuance of the Court's Order on Plaintiff's motion for class certification. The parties agree to abide by the deadlines provided in Rule 26(a)(2) for expert disclosures.

### V. SETTLEMENT AND ADR

Presently, the Parties have not yet engaged in efforts to settle or resolve the case and believe such efforts are premature at this point in time. The Parties are open to exploring the possibility of settlement at a later time after some discovery has been conducted. Should the Parties decide to explore settlement, the Parties have agreed to participate in private dispute resolution pursuant to Settlement Procedure No. 3, set forth in L.R. 16-15.4.

### VI. TRIAL AND PRETRIAL DATES

Plaintiff has demanded a jury trial on all issues so triable. The scope and estimated length of the trial will principally depend on this Court's disposition of class certification and any dispositive motions that the Parties may file. At a minimum, the Parties anticipate bifurcating the trial as to Plaintiff's punitive damage claim. Thus, it is difficult for the parties to provide meaningful estimates regarding the length of any trial.

The Parties suggest that the court set another scheduling conference after ruling on Plaintiff's motion for class certification, to set a trial date. If the Court prefers to set a tentative trial date now, the parties propose that this matter be set for trial approximately August of 2020. Depending upon the scope of the class, if any, certified by the court and the rulings by the Court, if any, on dispositive motions filed prior to trial, the parties anticipate a trial of four to five weeks in length. If the matter

proceeds on an individual basis, the Parties anticipate a trial of approximately five to seven days.

## VII.   ADDITIONAL PARTIES TO BE ADDED

At present, the Parties do not anticipate the addition of any additional parties.

## VIII.  BIFURCATION, SEVERANCE OR OTHER ORDERING PROOF

At present, the Parties do not suggest bifurcation of the action; however, they reserve the right to revisit this issue as the scope of the action may change.

## IX.    SYNOPSIS OF THE PRINCIPAL LEGAL ISSUES

The Parties identify the following potential legal issues:

(a)   Whether Plaintiff's claims are amenable to class action treatment, and in particular, (1) whether the membership of the class is ascertainable; (2) whether the class is sufficiently numerous, (3) whether common issues of fact and/or law exist, (4) whether Plaintiff is typical of the members of the putative class; (5) whether Plaintiff and her counsel will adequately represent the putative  class; (6) whether common issues predominate over individual issues; and (7) whether class treatment is superior to other forms of adjudication;

(b)   Whether Plaintiff and the individual members of the proposed class have suffered a legal injury and damages and, if so, are entitled to relief and, if so, what type(s) of relief;

(c)   Whether Plaintiff's claims are barred, in whole or in part, by one or more of Defendant's affirmative defenses;

(d)   Whether there is any scientifically-accepted basis for finding that the types of injury and/or damages alleged by Plaintiff and/or the proposed classes are caused by alleged fume events; and

(e)   Whether federal law pre-empts the claims of Plaintiff and/or the proposed classes.

## X.  AMENDMENT OF PLEADINGS

Plaintiff is not presently contemplating amendment of her pleadings; however, she reserves the right to do so after conferring with Airbus.

## XI.  STATEMENT OF ISSUES TO BE DETERMINED BY MOTION

Plaintiff anticipates that some of the legal issues will be determined by Plaintiff's motion for class certification.  Presently, Plaintiff does not believe that other issues identified can be determined by motion practice.  Plaintiff reserves her right to bring a motion for summary judgment, depending on the outcome of discovery.

As stated above, Defendants believe that a motion for partial or total summary judgment may be appropriate as to the following issues: (1) Plaintiff's liability claims must be governed by federal law which, pursuant to federal statutes and numerous holdings of the district, appellate and Supreme Court of the United States, pre-empts and exclusively regulates the standards for the design, maintenance and operation of aircraft engaged in interstate and/or international air transportation; (2) application of the foregoing standard requires dismissal because there is no basis to claim or establish that Frontier's aircraft breached the applicable federal standards; and (3) Plaintiff cannot establish that fume events set forth in the complaint caused or contributed to any of the class or individual injuries alleged in the complaint because there is no scientifically-accepted basis for such an assertion.

## XII.  ISSUES AFFECTING THE STATUS OR MANAGEMENT OF
##       THE CASE

As noted above, Airbus has not yet been served.  Plaintiff submits that without discovery from Airbus she cannot properly prepare her motion for class certification as Airbus is the sole party in possession of critical information regarding the design and manufacture of the subject aircrafts.  Plaintiff submits that such information will

ER000153

be relevant to foundational certification factors such as commonality, typicality and predominance.

It is Frontier's position that, given the number of parties and legal questions involved, this case is complex and the Manual for Complex Litigation may serve as a useful procedural guide. Plaintiff's claims are pre-empted by federal law, which governs the design, maintenance and operation of aircraft in the United States. It is also Frontier's position that there is no scientifically-accepted basis for finding that an alleged fume event causes any alleged injury or illness. Accordingly, and pursuant to Section 21.11 of the Manual for Complex Litigation, it is Frontier's position that this litigation should initially be focused on issues of causation and federal pre-emption, as these are threshold dispositive issues.

DATED:  September 17, 2018          **BRADLEY/GROMBACHER, LLP**


By**:**   /s/Kiley Lynn Grombacher_____
  Marcus J. Bradley, Esq.
  Kiley Lynn Grombacher, Esq.
  Attorneys for Plaintiff

DATED:  September 17, 2018          **CLYDE & CO US, LLP**


By**:**   /s/ Natasha N. Mikha_____
  Kevin R. Sutherland, Esq.
  Natasha N. Mikha, Esq.
  Attorneys for Frontier Airlines, Inc.

1  **BRADLEY/GROMBACHER, LLP**
   Marcus J. Bradley, Esq. (SBN 174156)
2  Kiley L. Grombacher, Esq. (SBN 245960)
   Taylor L. Emerson, Esq. (SBN 225303)
3  2815 Townsgate Road, Suite 130
   Westlake Village, California 91361
4  Telephone:  (805) 270-7100
   Facsimile:   (805) 270-7589
5  mbradley@bradleygrombacher.com
   kgrombacher@ bradleygrombacher.com
6  temerson@bradleygrombacher.com

7  **ROTHSCHILD & ASSOCIATES, APC**
   Kristi D. Rothschild, Esq. (SBN 222727)
8  Julian Alwill, Esq. (SBN 259416)
   27 W. Anapamu Street, Suite 289
9  Santa Barbara, California   93101
   Telephone:  (805) 845-1190
10 Facsimile:   (805) 456-0132
   krothschild@kdrlawgroup.com
11 jalwill@kdrlawgroup.com

12
   Attorneys for Plaintiff
13

14            **UNITED STATES DISTRICT COURT**

15            **CENTRAL DISTRICT OF CALIFORNIA**

16 | ANDREA  RIDGELL,  on  behalf  of | **Case No.: 2:18-CV-04916 PA (AFMx)**
17 | herself and others similarly situated | **PLAINTIFF'S NOTICE OF MOTION**
                    Plaintiff,           | **AND MOTION FOR RELIEF FROM**
18 |                                     | **DEADLINE  IMPOSED  BY  LOCAL**
   | v.                                  | **RULE  23-3;  MEMORANDUM  OF**
19 |                                     | **POINTS  AND  AUTHORITIES  IN**
   | FRONTIER   AIRLINES,   INC.   a     | **SUPPORT THEREOF**
20 | Colorado corporation; AIRBUS S.A.S.,
   | a foreign corporation doing business in
21 | the   State   of   California;   AIRBUS
   | GROUP HQ INC., a corporation doing
22 | business in the State of California
                    Defendants.
23

24

25

26

27

28

─────────────────────────────────────
                    1
Notice of Motion And Motion For Relief From Deadline Imposed By Local Rule 23-3

ER000155

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

   PLEASE TAKE NOTICE that on October 15, 2018 at 1:30 p.m. before the Honorable Percy Anderson, in Courtroom  9A of the United States District Court located at  350 West 1st Street, Los Angeles, California, 90012, plaintiff, Andrea Ridgell ("Plaintiff") shall and does move this Court pursuant to Fed. R. Civ. P. 26(b)(1)-(2), as well as C.D. Cal. Local Rules 7 and 7-11 and this Court's Standing Order [ECF Dkt No. 8.]  for an order granting Relief from the 90-day deadline imposed by United States District Court, Central District of California Local Rule 23-3.

   The Motion is made on the grounds that a party to the action has not yet been served and the pleadings are not fully at issue, thus, discovery could not fully be conducted on issues critical to certification.  Defendant Airbus S.A.S. ("Airbus") is a foreign corporation and, as such, service must be effectuated through protocols established by the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention" or "Hague Convention").[1]  Although Plaintiff promptly initiated such protocols, the process is inherently slow and protracted and Airbus has not yet been served.  As such, discovery on this entity cannot yet be conducted.  It is anticipated that Airbus possess discovery relevant to Plaintiff's motion for class certification, including, information regarding the design and manufacture of the subject aircrafts.  Such information will be relevant to foundational certification factors such as commonality, typicality and predominance.

   The Motion is based on this Notice of Motion and Motion for Relief From Deadline Imposed By Local Rule 23-3, the accompanying Memorandum of Points and Authorities, the accompanying Request for Judicial Notice and supporting Exhibits, the Proposed Order, all other pleadings and papers on file in this action, and all further evidence and argument that may be adduced in connection herewith.

DATED:   September 6, 2018                    **BRADLEY/GROMBACHER, LLP**

                    By:  /s/   Kiley Lynn Grombacher
                         Kiley Lynn Grombacher, Esq.
                         Attorneys for Plaintiff

---

[1] Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361.

ER000156

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Plaintiff Andrea Ridgell ("Plaintiff") respectfully submits this Memorandum of Points and Authorities in support of her Motion for Relief from the 90-day deadline imposed by United States District Court, Central District of California Local Rule 23-3. Plaintiff proposes that the Court vacate the present deadline of September 13, 2018, until a date to be set at a time following service of all parties to the action.

Given that defendant Airbus S.A.S. ("Airbus") is a foreign corporation, service must be effectuated through protocols established by the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention" or "Hague Convention").[2]  Although Plaintiff promptly initiated such protocols, the process is inherently slow and protracted and Airbus has not yet been served.  As such, discovery on this entity cannot yet be conducted.  It is anticipated that Airbus possess discovery relevant to Plaintiff's motion for class certification, including, information regarding the design and manufacture of the subject aircrafts.  Such information will be relevant to foundational certification factors such as commonality, typicality and predominance.  Such continuance will not unduly delay the litigation as Plaintiff and Frontier have been meeting and conferring about staging the litigation so that potentially dispositive motions may be heard in advance of certification.

Simply, given the complexity of the claims alleged and procedural posture of this litigation, relief from the certification deadline imposed by Local Rule 23-3 is merited.

### II.   STATEMENT OF RELEVANT FACTS

Plaintiff filed this action on June 1, 2018.  (ECF Dkt . No. 1) Accordingly, pursuant to Local Rule 23-3, the deadline for the filing of Plaintiff's motion for class certification was set to fall on September 13, 2018. (Declaration of Kiley Lynn

---

[2] Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361.
(footnote continued)

ER000157

Grombacher ("Grombacher Decl.") at ¶ 6.)[3] Given the filing deadline, Plaintiff has been diligent in her prosecution of this action however, due to circumstances beyond her control all necessary parties have not yet been served and critical pre-certification discovery has not yet been completed.  (Id. at ¶¶ 10-14.)

### A. Status of Service Upon Defendant Entities

#### 1. Status Regarding Defendant Frontier

Plaintiff served defendant Frontier on or about June 15, 2018.  (Id. at ¶7.) As a professional courtesy to Frontier, Plaintiff stipulated to provide Frontier an additional thirty-nine (39) days in which to file an answer to the complaint. (Grombacher Decl. at ¶ 8; ECF Dkt No. 11.) Defendant Frontier timely filed an answer to the complaint on August 14, 2018. (Grombacher Decl. at ¶ 8; ECF Dkt No. 15).

#### 2. Status Regarding Defendant Airbus Group HQ, Inc.

Plaintiff voluntarily dismissed defendant Airbus Group HQ, Inc., pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) on July 16, 2018.  (ECF Dkt No. 14)

#### 3. Status Regarding Defendant Airbus

Moreover, Plaintiff promptly caused the initiating complaint and supporting documents to be translated into French and, promptly began the process of effectuating service on Defendant Airbus through the processes required by Hague Convention. (Grombacher Decl. at ¶¶ 10, 11.) The process request has been confirmed received by the Ministry de la Justice in Paris on July 16, 2018 (Grombacher Decl. ¶ 12.) Unfortunately, at present, service upon Airbus has not been fully effectuated.  (Id. at ¶ 13.)

### B. Other Scheduling In this Action

No scheduling conference has yet been held in this action.  Other than the certification deadline set by the Local Rule, at present there are no other dates set in this action.  No continuances of the certification deadline have yet been sought.

---

[3] Pursuant to Order of this Court, the deadline was briefly continued to permit Plaintiff to seek relief by this fully noticed motion [ECF Dkt No.; 20].  The current deadline for the filing of Plaintiff's motion for class certification is October , 2018.

ER000158

On August 16, 2018, this Court issued an order setting a conference for October 1, 2018. (ECF Dkt No. 17.) Given the Order and the current 23-3 certification filing deadline the parties participated in a telephonic Rule 26 conference of counsel on August 28, 2018. (Id.)

## C. Plaintiff and Frontier Have Met and Conferred Regarding the Relief Requested

Plaintiff and Frontier have met and conferred regarding the relief requested. (Grombacher Decl. ¶¶ 18-21.) On August 10, 2018, counsel spoke telephonically regarding the relief requested. (Id. at ¶ 18.)

## III. ANALYSIS

### A. The Court has Discretion to Modify the Certification Deadline

Central District Local Rule 23-3 provides in pertinent part: "Within 90 days after service of a pleading purporting to commence a class action … the proponent of the class shall file a motion for certification that the action is maintainable as a class action, unless otherwise ordered by the Court." The purpose of Local Rule 23-3 "is to give a clear definition to the parameters of the putative class, to outline the claims involved in the class action and to apprise the defendants of their potential liability *as soon as practicable*." *Molina v. Cafe Rio, Inc.*, No. ED CV 12-1858-JFW SP, 2013 WL 7174022, at *1 (C.D. Cal. July 12, 2013)(emphasis added) The Court however, has discretion to lift Local Rule 23-3's requirements where, as here, a Scheduling Order has not yet been issued by the Court.

Indeed, the Ninth Circuit has noted,
> the schedule contemplated by Central District of California Local Rule 23–3, when considered alongside federal rules regarding status conferences and the timing of discovery, is quite unrealistic in light of recent case law regarding the need to establish a sufficient factual record at the class certification stage. See *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011); see also Barbara J. Rothstein & Thomas E. Willging, Federal Judicial Center, Managing Class Action Litigation: A Pocket Guide for Judges 9 (3d ed. 2010) (noting that local rules calling for specific time limits on class certification should be

ER000159

ignored as inconsistent with federal rules and obsolete)[4].

Such sentiment echoes the Federal Judicial Center's own 2010 publication, "Managing Class Action Litigation: A Pocket Guide for Judges" (Exhibit A to Request for Judicial Notice filed concurrently with the Motion at page 9), which recognizes that, in light of the 2003 amendments to Rule 23(c)(1), local rules imposing specific time limits for filing class certification motions "appear to be inconsistent with the federal rules and, as such, obsolete."

The 2003 amendment to Federal Rule of Civil Procedure 23(c)(1)(A) changed the requirement that the Court determine whether to certify a class "as soon as practicable after commencement of an action" to "at an early practicable time." Moreover, the official annotations regarding the 2003 amendments to Rule 23(c)(1)(A) (Exhibit B to Request for Judicial Notice filed concurrently with the Motion) state that the former "as soon as practicable" language "neither reflects a prevailing practice nor captures the many valid reasons that may justify deferring the initial certification decision." The advisory committee went on to explain in relevant part:

> Time may be needed to gather information necessary to make the certification decision. Although an evaluation of the probable outcome on the merits is not properly part of the certification decision, discovery in aid of the certification decision often includes information required to identify the nature of the issues that actually will be presented at trial. In this sense it is appropriate to conduct controlled discovery into the "merits," limited to those aspects relevant to making the certification decision on an informed basis. Active judicial supervision may be required to achieve the most effective balance that expedites an informed certification determination without forcing an artificial and ultimately wasteful division between "certification discovery" and "merits discovery." A critical need is to determine how the case will be tried. An increasing number of courts require a party requesting class certification to present a "trial plan" that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof.

LR 23-3, which was predicated on the prior version of Rule 23(c)(1), has not been revised, in spite of the 2003 amendments to Rule 23(c)(1).

---

[4] *Balser v. Hain Celestial Grp., Inc.*, 640 F. App'x 694, 696 (9th Cir. 2016).

ER000160

## B. Upon a Showing of Good Cause, The Deadline For Plaintiff To Move For Class Certification Is Appropriately Continued

Rule 6 of the Federal Rules of Civil Procedure sets forth the foundational principal guiding courts' consideration of any request for additional time: "The district courts may extend many of the time periods set by the Rules." Fed. R. Civ. P. 6(b).[5] Extensions of time are governed by a "good cause" standard pursuant to Rule 6(b).

Courts "generally will find good cause and grant the extension unless the moving party has been negligent, lacked diligence, acted in bad faith, or abused prior extension." 1 Moore's Federal Practice, Section 6.06[2] (2015). The "good cause" standard focuses on the diligence of the party seeking amendment." *Tseng v. Nordstrom, Inc.,* No. CV 11-08471-CAS-MRWx 2012 WL 3019949 at *4 (C.D.Cal. July 23, 2012)(quoting *Coleman v. Quaker Oats Co.,* 232 F.2d 1271, 1294 (9th Cir. 2000).) Courts considering motions seeking extensions of time to file class certification motions have noted that "the fact that discovery is in the early stages" supports extensions. *Clark v. Sprint Spectrum L.P.,* No. CV 10-9702-CAS-SSx, 2011 WL 835487 at *2 (C.D.Cal. Mar. 7, 2011).

Here, Plaintiff seeks relief from the local rule mandating that class certification motions be filed and served within 90 days of any class action's commencement. Plaintiff has filed her Application before the original time or its extension expires and thus, the "good cause" standard applies.

Plaintiff's need to effectuate service on a foreign defendant and take discovery essential to substantiating the Class Certification Motion constitutes the good cause.

_____

[5] The Rules expressly authorize the district courts' promulgation of "local rules," which are "laws of the United States" and enforceable so long as they are consistent with the Rules. See Fed. R. Civ. P. 83. It is specifically contemplated that local rules (and, by implication, "local local" rules) will contribute specificity where the Rules are more general. Compare Rule 23 (mandating that certification motions be made "at an early practical time") with LR 23-3 ("Within 90 days after service of a pleading purporting to commence a class action other than an action subject to the Private Securities Litigation Reform Act of 1995, P.L. 104-67, 15 U.S.C. § 77z-1 et seq., the proponent of the class shall file a motion for certification that the action is maintainable as a class action, unless otherwise ordered by the Court."). Accordingly, the Court is empowered to alter the deadline for filing class certification papers to accommodate the specific needs of the case.

ER000161

While certain causes of action are amenable to motions for class certification without the need for discovery, where discovery is required, and particularly where that discovery must be conducted from a foreign entity, it is impossible to fit it within the 90-day period mandated by Local Rules 23-3.

### 1. The Requirement that Plaintiff Effectuate Service Upon Defendant Airbus Through The Hague Has Delayed the Litigation

Rule 4(h) of the Federal Rules of Civil Procedure provides three methods for service of process on foreign corporations. First, under Rule 4(h)(1)(A), a plaintiff may execute service in compliance with state law. Fed. R. Civ. P. 4(h)(1)(A)[6]. Second, under Rule 4(h)(1)(B), a plaintiff may serve a foreign corporation "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(h)(1)(B). Third, a plaintiff may serve a foreign corporation through the procedures authorized by the Hague Convention. Fed. R. Civ. P. 4(h)(2). "A federal court does not have jurisdiction over a defendant unless the defendant has been served properly under Fed. R. Civ. P. 4." *Direct Mail Specialists v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 688 (9th Cir. 1988).

Service on a foreign defendant is a cumbersome process. In this case, Plaintiff had to initiate service under the processes set forth in the Hague Convention). As a default rule, litigants serving in such fashion can expect service through the Central Authority to take at least six months[7].   In July 2008, the Permanent Bureau, the secretariat of the Hague Conference, distributed a questionnaire to Hague Service Convention States to evaluate how the Convention was functioning and to identify

---

[6] In California, service may be effectuated by personal delivery of process to, *inter alia*, "a general manager" of the corporation. Cal. Civ. Proc. Code § 416.10(b); Cal. Corp. Code § 2110.
[7] Charles Routh, Dispute Resolution--Representing the Foreign Client in Arbitration and Litigation, in Going International: Fundamentals of International Business Transactions 483, 491 (2004). (footnote continued)

ER000162

1   concerns[8].

2         Although two-thirds of service requests were completed within two months, the

3   Permanent Bureau uncovered an alarming trend, 18.3% of requests took 12 months or

4   more to be issued with a certificate.  Indeed, 120-day time limit for effecting service of

5   process under Fed.R.Civ.P. 4(m) does not apply to the service of process upon

6   defendants located in foreign countries. See Fed.R.Civ.P. 4(m) ("This subdivision (m)

7   does not apply to service in a foreign country...").

8         Simply, delays in service have frustrated Plaintiff's ability to comply with the

9   deadline set forth in Local Rule 23-3.

10               **2. Discovery Is Necessary to Prepare a Motion for Class**

11                              **Certification**

12         Across all circuits, the general rule is that both additional time to take discovery

13   necessary to support a class certification motion and additional time that does not work

14   a prejudice to the non-movant are permissible grounds for a late class certification

15   filing, without any prior request for more time. See, e.g., *Probe v. State Teachers'*

16   *Retirement Sys.*, 780 F.2d 776 (9th Cir. 1996) (where no prejudice to non-movant

17   shown, timing of class certification motion not appropriate basis for denial of

18   certification); *Gray v. Greyhound Lines, East, 545 F.2d 169, 172, n.11* (D.C. Cir. 1976)

19   (district court directed to reconsider on remand denial of class certification based solely

20   on delay in bringing certification motion); *Stolz v. United Broth. of Carpenters and*

21   *Joiners of Am.*, Local Union No. 971, 620 F. Supp. 396 (D. Nev. 1985) (delay alone in

22   filing class certification motion not proper basis for denial of class certification); *Griffin*

23   *v. Nat. Pub. Radio*, 1977 WL15507 (D. D.C. 1977) (violation of local rule prescribing

24   time within which class certification motion must be filed not a permissible ground for

25   dismissal of class allegations absent a showing of prejudice to defendant). F.2d 1362,

26   1366 (1st Cir. 1972) ("To pronounce finally, prior to allowing any discovery, the non-

27   ―――――――――――――――――

[8]  Permanent Bureau, Hague Conference on Private Int'l Law, Summary of Responses to the

28   Questionnaire of July 2008 Relating to the Service Convention, with Analytical Comments 10 (2009),
    http:// www.hcch.net/upload/wop/2008pd14e.pdf,

ER000163

existence of a class or set of subclasses, when their existence may depend on information wholly within defendants' ken, seems precipitate and contrary to the pragmatic spirit of Rule 23.").

Under Rule 26(f), "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order." Accordingly, Plaintiff is precluded from seeking any discovery from Airbus, yet such discovery will be critical to the preparation of her motion for class certification.  Plaintiff claims, *inter alia*, that the design of Airbus' aircrafts is defective.  Such claim requires discovery as to the aircrafts' design and manufacture in order to make a proper showing to meet Fed.R.Civ.P. 23's commonality and typicality requirements.

## IV.   CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests the Court issue an Order relieving Plaintiff of the 90-day deadline pursuant to LR 23-3 and extending the time for the filing of Plaintiff's motion for Certification until a date determined after service upon Airbus has been effectuated.

DATED:   September 6, 2018          **BRADLEY/GROMBACHER, LLP**


By **:**   /s/   Kiley Lynn Grombacher
        Kiley Lynn Grombacher, Esq.
        Attorneys for Plaintiff

---

Notice of Motion And Motion For Relief From Deadline Imposed By Local Rule 23-3

ER000164

1

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)

2
Kiley L. Grombacher, Esq. (SBN 245960)
2815 Townsgate Road, Suite 130

3
Westlake Village, California 91361
Telephone:    (805) 270-7100

4
Facsimile:    (805) 270-7589
mbradley@bradleygrombacher.com

5
kgrombacher@ bradleygrombacher.com

6

**ROTHSCHILD & ASSOCIATES, APC**

7
Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)

8
27 W. Anapamu Street, Suite 289
Santa Barbara, California   93101

9
Telephone:    (805) 845-1190
Facsimile:    (805) 456-0132

10
krothschild@kdrlawgroup.com
jalwill@kdrlawgroup.com

11

12
Attorneys for Plaintiff

13

14

**UNITED STATES DISTRICT COURT**

15
**CENTRAL DISTRICT OF CALIFORNIA**

16
ANDREA RIDGELL, on behalf of herself
and others similarly situated

17
                    Plaintiff,

18
v.

19
FRONTIER AIRLINES, INC. a Colorado
corporation; AIRBUS S.A.S., a foreign

20
corporation doing business in the State of
California; AIRBUS GROUP HQ INC., a

21
corporation doing business in the State of
California

22
                    Defendants.

23

24

| | |
|---|---|
| **Case No.: 2:18-CV-04916 PA (AFMx)** | |
| **DECLARATION OF KILEY LYNN GROMBACHER IN SUPPORT OF MOTION FOR RELIEF FROM DEADLINES IMPOSED BY LOCAL RULE 23-3** | |

25

26

27

28

1

---

ER000165

# DECLARATION OF KILEY LYNN GROMBACHER

I, Kiley Lynn Grombacher, declare as follows:

1.     I am an attorney duly admitted to practice law before this Court and I am a member in good standing of the State Bar of California, the State Bar of Tennessee, and in the Third and Ninth Circuits.

2.     I am a named partner at Bradley/Grombacher, LLP counsel for Andrea Ridgell ("Plaintiff").

3.     In my capacity as counsel, I have been actively involved with all aspects of this litigation. Accordingly, I have personal knowledge of all the matters set forth herein, and if called, I could and would competently testify to the following:

4.     I submit this declaration in support of Plaintiffs' Motion for Relief from the 90-day deadline imposed by United States District Court, Central District of California Local Rule ("L.R.") 23-3.

## RELEVANT PROCEDURAL HISTORY

5.     Plaintiff filed this action on June 1, 2018.

6.     Pursuant to Local Rule 23-3, the deadline for the filing of Plaintiff's motion for class certification was September 13, 2018. Currently, by Order of the Court the current deadline is October 22, 2018.

7.     Plaintiff served defendant Frontier on or about June 15, 2018.

8.     As a professional courtesy to Frontier, Plaintiff stipulated to provide Frontier an additional thirty-nine (39) days in which to file an answer to the complaint. Frontier filed an answer to the complaint on August 14, 2018.

9.     Plaintiff voluntarily dismissed defendant Airbus Group HQ, Inc., pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) on July 16, 2018.

10.     Given that defendant Airbus S.A.S. ("Airbus") is a foreign corporation, service must be effectuated through protocols established by the Hauge Convention.

11.     Shortly after filing, Plaintiff caused the complaint and all initiating documents to be translated into French.

12.     Promptly upon translation, Plaintiff began the process of effectuating service under the Hague Convention with the assistance of ABC Legal, a process serving company.

13.     In accordance with required procedures, the service request was sent to the Ministry de la Justice in Paris with confirmed receipt on July 16, 2018.

14.     At present, service has not yet been confirmed and may take several more weeks or months to be effectuated.

15.     No scheduling conference has yet been held in this action; however, a conference has recently been scheduled for October 1, 2018.

16.     The parties participated in a telephonic Rule 26 conference of counsel on August 28, 2018.  The parties are conferring regarding litigation of this action and are considering structuring the case such that certain potentially dispositive motions are heard in advance of certification.

17.     No prior requests for continuance of the certification date have been requested in this action.

**Plaintiff has Met and Conferred in Advance of Filing this Motion**

18.     On August 10, 2018, I spoke with counsel for defendant Frontier telephonically regarding the relief requested.  Counsel advised they would speak with their client regarding the relief sought.

19.     Plaintiff previously sought the relief requested by this motion via *ex parte* application [ECF Dkt. No 18].  Frontier filed a Non-Opposition to such application [ECF Dkt. No 19].

**Discovery From The Absent Defendant Is Necessary to Prepare a Motion for Class Certification**

20.     Although Plaintiff promptly initiated such protocols, the process, is inherently slow and protracted and Airbus has not yet been served.  As such, discovery on this entity

3

**Declaration of Kiley Lynn Grombacher In Support of Motion for Relief from Local Rule 23-3 Deadline**

1    cannot yet be conducted.

2        21.    It is anticipated that Airbus possesses discovery relevant to issues underlying

3    Plaintiff's motion for class certification, including, for example, information regarding the

4    design and manufacture of the subject aircrafts.   Such information will be relevant to

5    foundational certification factors such as commonality, typicality and predominance.

6        22.    Given the complexity of the claims alleged and procedural posture of this

7    litigation, relief from the certification deadline imposed by Local Rule 23-3 is merited.

8        I declare under penalty of perjury under the laws of the United States of America that

9    the foregoing is true and correct and is based upon my own personal knowledge.  Executed in

10   Westlake Village, California on September 6, 2018.

11                                    _/s/Kiley Lynn Grombacher_____

12                                    Kiley Lynn Grombacher

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                            4

ER000168

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Taylor L. Emerson, Esq. (SBN 225303)
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile: (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@ bradleygrombacher.com
temerson@bradleygrombacher.com

**ROTHSCHILD & ASSOCIATES, APC**
Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
27 W. Anapamu Street, Suite 289
Santa Barbara, California 93101
Telephone: (805) 845-1190
Facsimile: (805) 456-0132
krothschild@kdrlawgroup.com
jalwill@kdrlawgroup.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA RIDGELL, on behalf of herself and others similarly situated<br><br>        Plaintiff,<br><br>v.<br><br>FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California<br>        Defendants. | **Case No.: 2:18-CV-04916 PA (AFMx)**<br>**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE** |

ER000169

Plaintiff Andrea Ridgell ("Plaintiff") respectfully requests that this Court take judicial notice of the following documents, pursuant to Federal Rule of Evidence, Rule 201201(b)(2), which requires the Court to take judicial notice of facts "not subject to reasonable dispute" when they can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned":

1. Federal Judicial Center's 2005 publication, "Managing Class Action Litigation: A Pocket Guide for Judges." A true and correct copy is attached as Exhibit "A."

2. The official annotations regarding the 2003 Amendments to Federal Rule of Procedure 23(c)(l)(A). A true and correct copy is attached as Exhibit "B."

Exhibits "A" and "B" may be judicially noticed because they are either (a) reliable government documents from the Internet, *Eidson v. Medtronic, Inc*., 981 F. Supp. 2d 868, 879 (N.D. Cal. 2013); (b) documents and filings in other judicial proceedings, *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc*., 971 F.2d 244, 248 (9th Cir. 1992); and/or (c) otherwise "not subject to reasonable dispute because" they are either (1) "generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b).

DATED: September 6, 2018        **BRADLEY/GROMBACHER, LLP**

By**:**   /s/   Kiley Lynn Grombacher
         Marcus J. Bradley, Esq.
         Kiley Lynn Grombacher, Esq.
         Taylor L. Emerson, Esq.
         Attorneys for Plaintiff

# EXHIBIT A

# Managing Class Action Litigation:
# A Pocket Guide for Judges

*Third Edition*

Barbara J. Rothstein & Thomas E. Willging

Federal Judicial Center
2010

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to develop educational materials for the judicial branch. While the Center regards the content as responsible and valuable, it does not reflect policy or recommendations of the Board of the Federal Judicial Center.

ER000172

Case: 16-86170 A 11/23/2018 ID: 12098088 DktEntry: 14 Page 165 of 324

# Contents

Preface, v

Introduction, 1

I.   Determining Federal Jurisdiction, 3
    A. Burdens of proof, 4
    B. Amount in controversy, 4
    C. Home-state exception, 5
    D. Local-controversy exception, 5
    E. Discretionary jurisdiction, 6

II.  Selection of Counsel, 6
    A. Single-lawyer model, 7
    B. Private ordering, 7
    C. Selection by the judge, 8
    D. Empowered plaintiff model, 8
    E. Competitive bidding, 8

III. Timing and Significance of Class Certification, 9
    A. Timing, 9
    B. Class certification, 9
    C. Defining the class, 9
    D. Multiple class actions, 10
    E. Notice, 11

IV.  Settlement Review: Risks and Issues, 11
    A. Judge's role, 12
    B. Obtaining information about the settlement, 13
    C. Hot button indicators, 17
    D. Preliminary review of the proposed settlement, 23
    E. Warning about claims services, 25
    F. Notice issues, 26
    G. Claims processes and response handling, 30
    H. Fairness hearing, 31

V.   Attorney Fee Issues, 33
    A. Evaluating monetary and nonmonetary results achieved, 33
    B. Methods of calculating fees, 35
    C. "Mega" cases, 36
    D. Objectors, 36
    E. Role of government actors, 36

VI.  Coordination with State Judges, 38

VII. Use of Special Masters and Court-Appointed Experts, 39

Conclusion, 39

Bibliography, 40

Case Annotations by Topic, 42

iii

# Preface

This pocket guide is designed to help federal judges manage the increased number of class action cases filed in or removed to federal courts as a result of the Class Action Fairness Act of 2005 (CAFA). The 2005 legislation expresses congressional confidence in the abilities of federal judges to ensure "fair and prompt recoveries for class members with legitimate claims" and to provide appropriate "consideration of interstate cases of national importance under diversity jurisdiction." CAFA § 2(b). This third edition includes an expanded treatment of the notice and claims processes. Revisions are concentrated in parts III and IV.

CAFA also calls on the judiciary to develop and implement "best practices" for achieving the goals of ensuring that settlements are fair to class members and ensuring that class members are the primary beneficiaries of any settlement. This guide is part of the federal judiciary's continuing effort to achieve those goals. This edition also carries over from the second edition suggestions based on recent empirical research indicating that the administration of settlements has been less than transparent, especially regarding the disclosure of claims rates and actual payments to class members, to the detriment of litigants and policy makers.

A note of appreciation goes to Judge D. Brock Hornby (D. Me.) for his detailed suggestions and outline of topics, which served as a catalyst and road map for the original publication. Todd Hilsee, a class action notices expert with The Hilsee Group, supplied pro bono assistance in improving the sections on notices and on claims processes. We are also grateful to Jared Bataillon, who contributed valuable research assistance for this third edition.

I hope you find this guide useful in meeting the challenges Congress has entrusted to us in managing class action litigation.

Barbara Jacobs Rothstein
Director, Federal Judicial Center

ER000176

Case: 18-86170  A11/23/2018  ID: 12098088  DktEntry: 14  Page 169 of 324

# Introduction

Federal Judicial Center materials, particularly the *Manual for Complex Litigation, Fourth* (MCL 4th), have devoted considerable attention to class actions, perhaps yielding more information than busy judges can absorb. Hence, the need for a pocket guide. In enacting the Class Action Fairness Act of 2005 (CAFA) (Pub. L. No. 109-2, 119 Stat. 4 (2005)), Congress found both that class actions "are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties" and that "abuses in class actions undermine the National judicial system . . . in that State and local courts are . . . keeping cases of national importance out of Federal courts." 28 U.S.C. § 1711 note (2009). This guide can assist you in discharging the responsibilities those cases entail. The guide distills the elements of CAFA's federal jurisdictional changes and many of the most important practices for managing class actions found in the MCL 4th, and it provides citations to cases decided after publication of the MCL 4th to illustrate many points. For your convenience, cross-references to the MCL 4th are also provided in the guide. Cases and other references are presented in the Bibliography and Case Annotations by Topic at the end of the guide.

As Congress found, class action litigation allows for the resolution of many claims that might otherwise evade legal enforcement. Class actions may also help regulators control conduct that threatens to harm various markets. Securities and other consumer class actions serve to enforce regulatory standards designed to deter fraudulent marketplace conduct that might otherwise escape regulation. Members of Congress and others who assert class actions' general utility also point, however, to abuses that threaten to undermine their usefulness. Critics single out cases in which the benefits accruing to the class as a whole and to the public seem minimal.

Class actions demand that judges play a unique role. There is no such thing as a simple class action. Every class action has hidden hazards that can surface without warning. Your role includes anticipating the consequences of poorly equipped class represen-

1

ER000178

*Class Action Pocket Guide (3d ed.)*

tatives or attorneys, inadequate class settlement provisions, and overly generous fee stipulations. The high stakes of the litigation heighten your responsibility, and what's more, you cannot rely on the adversaries to shape the issues that you must resolve in the class context. Indeed, you have to decide first which individuals on the plaintiff side—class representatives and class counsel—can represent the class adequately and whom you should appoint to do so. And, once the adversaries agree on a settlement, you must decide—largely without any clash of views from class counsel, class representatives, or the defendant—whether that settlement is fair, reasonable, and adequate to satisfy the interests of the class as a whole. This guide attempts to clarify the class action standards that inform those decisions and to make the application of those standards more transparent and available to judges and to policy makers faced with the task of improving them. It is designed to help you determine when class representatives and counsel are "adequate" and whether a settlement's terms are "fair" to the class as a whole, "reasonable" in relation to the class's legitimate claims, and "adequate" to redress class members' actual losses.

Recent empirical research indicates that class action settlement administration has often not produced the transparent information that judges and policy makers need for reviewing class action settlements and setting clear standards for such reviews. Nicholas M. Pace & William B. Rubenstein, How Transparent Are Case Outcomes: Empirical Research on the Availability of Class Action Claims Data (RAND Corp. 2008). Not only are data about class member claims rates and actual recoveries not available to judges attempting to evaluate the benefits of a settlement to the class, but information needed to determine which claims rates are acceptable is not available to judges and policy makers concerned with setting standards for future cases. This guide discusses remedies for these deficiencies.

Now that CAFA is on the books and Federal Rule of Civil Procedure 23 has been amended, you can expect to encounter the following class action responsibilities:

- applying CAFA's federal jurisdiction and removal rules, such as its $5 million amount in controversy for the class

2

ER000179

as a whole, minimum diversity of citizenship between class members and defendants, and complex set of rules regarding federal jurisdiction when the "primary" or "significant" defendants are local citizens (discussed in part I);

· appointing counsel who have the professional skills, legal support staff, and financial resources needed to provide the class with adequate representation (discussed in part II);

· determining when and how to decide class certification motions (discussed in part III);

· establishing effective standards and procedures for evaluating the actual value to the class of proposed settlements and for determining whether the settlements are fair, reasonable, and adequate for class members (discussed in part IV);

· assessing reasonable attorney fees for class counsel by ensuring that fee awards are commensurate with the value of the results to the class as a whole (discussed in part V);

· coordinating with state judges the management of competing and overlapping class actions (discussed in part VI); and

· deciding when to use special masters and court-appointed experts to assist in managing class actions and reviewing settlements (discussed in part VII).

# I. Determining Federal Jurisdiction

CAFA provides expanded, but not unlimited, federal jurisdiction over class actions. *See* 28 U.S.C. § 1332(d). Before you invest time and energy in managing a class action, your first order of business is to determine whether you have jurisdiction. For a comprehensive show cause order form with a checklist of jurisdictional and removal issues, see *Tam v. Indymac Bank,* No. 2:8CV06458, 2008 WL 4793676 (C.D. Cal. Oct. 30, 2008).

Under CAFA, federal district courts have original jurisdiction over class actions in which the aggregate amount in controversy exceeds $5 million and in which there is "minimal diversity of citizenship," which means whenever "any member of a class of plaintiffs is a citizen of a State different from [that of] any defendant." 28 U.S.C. § 1332(d)(2). But federal jurisdiction is not available if

3

ER000180

*Class Action Pocket Guide (3d ed.)*

"the number of members of all proposed plaintiff classes in the aggregate is less than 100," 28 U.S.C. § 1332(d)(5)(B), or if "the primary defendants are states, state officials, or other government entities against whom the district court may be foreclosed from ordering relief," 28 U.S.C. § 1332(d)(5)(A), presumably because the sovereign immunity defense may preclude federal judicial remedies. Moreover, for cases that do meet CAFA's jurisdictional standards, exceptions may apply, as discussed below.

### A. Burdens of proof

Courts have generally ruled that even under CAFA, the proponent of federal jurisdiction—the plaintiff in original federal filings and the defendant in removed actions—bears the burden of demonstrating federal jurisdiction.

CAFA, which was a product of congressional compromise, sets out a number of exceptions to federal jurisdiction. Courts have been clear that the party opposing federal jurisdiction has the burden of establishing that the case falls within a statutory exception.

### B. Amount in controversy

In an original federal action, the plaintiff need only show the possibility that the amount in controversy, including statutory and punitive damages as well as statutory attorney fees, will exceed $5 million. Once the proponent of federal jurisdiction has established the possibility that the amount in controversy exceeds $5 million, only legal certainty that the judgment will be less precludes federal jurisdiction. So, unless there is a dispute regarding the amount in controversy or it is evident that the $5 million amount could not possibly be satisfied, you can accept well-pleaded allegations that $5 million or more is at stake.

In a case removed from a state court, courts continue to hold that the plaintiff is the master of the complaint and courts are compelled to accept a plaintiff's allegations that the amount in controversy is less than $5 million unless a defendant shows to a legal certainty that damages of more than that amount will be established. Moreover, the party challenging federal jurisdiction generally has to provide more than allegations; indeed, that party

4

ER000181

*Class Action Pocket Guide (3d ed.)*

must provide competent evidence of the facts supporting the challenge.

Where the plaintiff has not pleaded a cap on damages, costs, and attorney fees, the court may have to resolve disputes about the amount in controversy. A defendant who removes a case has the burden of showing not only the possible stakes of the litigation but also a reasonable probability that the stakes exceed the $5 million mark. Generally, information alleged in the notice of removal, perhaps supplemented by declarations or affidavits, will suffice.

## C. Home-state exception

Section 1332(d)(4)(B) of title 28 of the U.S. Code provides that a court must decline to exercise jurisdiction over a class action in which "two-thirds or more of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed." As discussed above, the objecting party, typically the plaintiff, has the burden of proving that this exception applies. Proof of an exception, however, requires more than an allegation and may require affidavits and evidence. For an example of an apparently efficient way of producing proof of citizenship for class members in the form of a questionnaire, see *Martin v. Lafon Nursing Facility of the Holy Family, Inc.,* 548 F. Supp. 2d 268, 273–78 (E.D. La. 2008). CAFA states that for the exception to apply, all primary defendants must be citizens of the home state, but does not define the term "primary defendant."

## D. Local-controversy exception

Section 1332(d)(4)(A) of title 28 of the U.S. Code creates what has been called the "local-controversy exception" to CAFA jurisdiction. CAFA spells out four elements that make up the exception:

1. two-thirds of the class members are citizens of the original forum state;
2. plaintiffs seek "significant relief" (another undefined term) from at least one defendant who is a citizen of the forum state;

5

*Class Action Pocket Guide (3d ed.)*

3. "principal injuries resulting from the alleged conduct . . . were incurred" in the forum state; and

4. no other class action asserting similar allegations against any of the defendants has been filed within three years preceding the filing.

Few appellate opinions apply or interpret the above terms, but the exception as a whole has been viewed narrowly. A defendant from whom "significant relief" is sought appears to be less central to the litigation than a "primary defendant" referred to in the home-state exception. Likewise, the term "principal injuries" calls for an interpretation that almost all of the injuries occurred within the state.

*E. Discretionary jurisdiction*

Under CAFA, a federal court may "in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction" over a class action in which more than one-third but less than two-thirds of the class members are citizens of the original forum state. 28 U.S.C. § 1332(d)(3). The Act lays out six factors for a court to consider before exercising its discretion, starting with "whether the claims asserted involve matters of national or interstate interest" and proceeding to factors related to the forum state's legal self-interest and nexus to the class members and harms alleged. Like the other exceptions, these provisions have been interpreted and applied by few appellate courts. One of the few cases to expand on the statutory language is *Preston v. Tenet Healthsystem Memorial Medical Center, Inc.,* 485 F.3d 804, 822–24 (5th Cir. 2007), which concluded that a class action lawsuit involving Hurricane Katrina-related injuries did not affect a "national interest."

# II. Selection of Counsel

Attorneys representing classes are in a position to control the litigation process far more than attorneys representing individual clients. The class action device enhances the role of such lawyers by virtue of the fact that even the approved class representatives do not have legal control over the litigation. Your power to appoint

6

ER000183

*Class Action Pocket Guide (3d ed.)*

counsel and approve or reject a class settlement may be the only checks and balances on the power of attorneys for the class.

There are at least five approaches to selection of counsel in class action litigation. Note that in multidistrict litigation (MDL), the transferee judge has the authority to appoint lead and liaison counsel regardless of whether class claims are involved. *See* MCL 4th § 10.22. Whatever approach you use, it is important to make clear to counsel at the outset the content and form of records you require to support applications for awards of fees and expenses or for a lodestar cross-check. *See* part V, "Attorney Fee Issues," below, and MCL 4th § 14.21. You may find it useful to instruct class counsel that all lawyers should submit fee and expense requests in a similar format—one that will be accessible to the court.

## A. Single-lawyer model

In the typical class action, the lawyer who filed the case will be the only logical choice for appointment as class counsel. That lawyer may have investigated the case independently or may have spoken with government regulators, investigative journalists, or other public information sources. In those cases, the task of selecting counsel consists of determining that the filing attorney satisfies Rule 23(g) standards, that is, has the requisite knowledge of the substantive law, class action legal experience, and financial and staff resources to represent the class adequately. That attorney, of course, must not have a conflict of interest with the class.

## B. Private ordering

In high-stakes, high-profile class action litigation, entrepreneurial plaintiff attorneys often compete to play the lead role. This competition may be heightened when the case piggybacks on a case investigated and perhaps litigated or prosecuted by a governmental entity. Nonetheless, substantial resources may be necessary to finance the expenses of the litigation. Most often, attorneys in such cases attempt to resolve the competition by "private ordering," that is, by agreeing to divide the labor, expenses, and fees. To safeguard the interests of the class and to prevent unnecessary litigation and overstaffing, you may want to review those agreements (which will

ER000184

*Class Action Pocket Guide (3d ed.)*

be subject to disclosure upon settlement in any event). MCL 4th
§ 21.272.

## C. Selection by the judge

In the absence of private ordering, you will have to select among
competing counsel by reviewing submissions based on the factors
identified in Federal Rule of Civil Procedure 23(g)(1)(C). That
section explicitly permits you to include in the order of appoint-
ment "provisions about the award of attorney fees or nontaxable
costs." Few judges have unilaterally imposed strict limits on fees
in the order of appointment. Consider, however, requesting that
counsel submit ex parte or under seal a proposed budget for fees
in the case. The budget would serve as an *ex ante* record of the pro-
jected time and expense the case might require; judicial review of a
proposed fee award at the end of the case would still be necessary,
but would most likely be easier.

## D. Empowered plaintiff model

As mentioned earlier, Rule 23(g) presents explicit criteria and a
procedure for appointing counsel to represent the class. For se-
curities class actions, the Private Securities Litigation Reform Act
(PSLRA) directs you to employ a special procedure for selecting
an "empowered" lead plaintiff (presumptively one with sizable
claims), who, in turn, has the right to select and retain class coun-
sel, subject to your approval.

## E. Competitive bidding

In a very narrow set of cases, a few courts have used competitive
bidding to select counsel. After an intensive study, a task force in
the Third Circuit concluded that competitive bidding "should be
an exception to the rule that qualified counsel can be selected ei-
ther by private ordering or by judicial selection of qualified coun-
sel . . . ." Third Circuit Task Force, *Report on Selection of Counsel,* 74
Temp. L. Rev. 689, 741 (2001).

ER000185

*Class Action Pocket Guide (3d ed.)*

# III. Timing and Significance of
# Class Certification

## A. Timing

The 2003 amendments to Rule 23(c)(1) give you flexibility by allowing you to consider class certification "at an early practicable time." Considering this rule, you should feel free to ignore local rules calling for specific time limits; such local rules appear to be inconsistent with the federal rules and, as such, obsolete. *See* MCL 4th § 21.133. The amended rule allows you to rule on motions to dismiss or for summary judgment before ruling on class certification.

## B. Class certification

Given the flexibility in the rules, the most efficient practice is to rule on motions to dismiss or for summary judgment before addressing class certification.

Determining whether a proposed class meets Rule 23 certification requirements demands a rigorous analysis. You have discretion to decide on both the extent of discovery and whether or not to hold a hearing to determine whether the requirements have been met. You need to make factual and legal determinations with respect to the requirements of Rule 23.

Ruling on class certification may prove to be unnecessary. The most important actions you can take to promote settlement are to rule on dispositive motions and then, if necessary, rule on class certification.

If the parties decide to talk about settlement before you make any ruling on class certification, they may urge you to certify a class for settlement purposes only—a *settlement class*—as opposed to certifying a *litigation class* for a possible trial. *See* section IV.C.8 below; *see also* MCL 4th § 21.131–.132.

## C. Defining the class

Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and

9

ER000186

*Class Action Pocket Guide (3d ed.)*

(3) entitled to notice in a Rule 23(b)(3) action. The definition must be precise, objective, and ascertainable. For example, the class may consist of those persons and companies that purchased specified products or securities from the defendants during a specified period, or it may consist of all persons who sought employment with, or who were employed by, the defendant during a fixed period. *See* MCL 4th § 21.222. Your certification order should specify those who are excluded from the class, such as residents of particular states, persons who have filed their own actions or are members of another class, and officers and directors of the defendants.

Consider also whether the class definition captures all individuals or entities necessary for the efficient and fair resolution of common questions of fact and law in a single proceeding. If the class definition fails to include a substantial number of persons with claims similar to those of the class members, it is questionable. A broader class definition or definition of a separate class might be more appropriate. Feel free to suggest broader or narrower definitions that would make a proposed class more manageable. If the class definition includes people with similar claims but divergent interests or positions, subclasses with separate class representatives and counsel might suffice. *See* MCL 4th § 21.23.

*Issues classes* are classes certified for particular issues or elements of claims or defenses. Though controversial and subject to conflicting rules in different circuits, issues classes "may enable a court to achieve economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action." MCL 4th § 21.24. The test is whether the resolution of common issues advances the litigation as a whole, as opposed to leaving a large number of issues for case-by-case adjudication.

### D. Multiple class actions

Finally, consider class certification in the context of duplicative or overlapping class action litigation pending in other federal and state courts. Be sure to "obtain complete information from the parties about other pending or terminated actions in federal or state courts relating to the claims presented." MCL 4th § 21.25. At

10

the outset of any class action, consider entering a standing order that requires counsel to inform the court promptly of any related class actions. Communication and administrative coordination with other judges will often be necessary. Other things being equal, federal judges should exercise federal jurisdiction over classes of nationwide scope; actions limited to single states can be carved out of any national certification.

### E. Notice

If you certify a class for litigation purposes, be prepared to decide on notice and allow members of Rule 23(b)(3) classes the opportunity to opt out before the trial. In fact, whether adequate notice *can* be given may be a significant factor in determining manageability as part of your class certification decision. *See In re* Vivendi Universal, S.A. Securities Litigation, 242 F.R.D. 76, 107–09 (2007). Class members, particularly unknown ones, must be able to understand that they are included. This could be a problem, for example, if the class member must recall making modest retail purchases in certain places, or know that a certain component is contained in a product. For a discussion of general notice and communication factors, see section IV.F, "Notice issues," below, as well as the "Notice Checklist and Plain Language Guide" available at the Class Action Notices Page at www.fjc.gov. The Federal Judicial Center provides examples of illustrative class certification notices on our website.

## IV. Settlement Review: Risks and Issues

Reviewing proposed settlements and awarding fees are usually the most important and challenging assignments judges face in the class action arena. Unlike settlements in other types of litigation, class action settlements are not an unequivocal blessing for judges. Rule changes, precedent, recent legislation, and elemental fairness to class members direct you not to rubber-stamp negotiated settlements on the basis of a cursory review. Current rules, particularly Federal Rule of Civil Procedure 23, unambiguously place you in the position of safeguarding the interests of absent class members by scrutinizing settlements approved by class counsel. Recognizing

ER000188

*Class Action Pocket Guide (3d ed.)*

the importance of this, the California panel dealing with complex litigation has drafted guidelines specifying content for motions for preliminary and final approval of proposed class settlements. *See* California Superior Court, Guidelines for Motions for Preliminary and Final Approval of Class Settlement (Draft May 3, 2010).

Be aware that adversarial clashes usually end with the settlement. Indeed, most settlements preclude the parties and attorneys from opposing the settlement's provisions, especially the stipulations about attorney fees. Thus, you need to take independent steps to get the information you will undoubtedly need to review a settlement agreement.

## A. Judge's role

The judge's assigned task of approving or disapproving a class settlement presents exceptional challenges. Some courts "have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class" and to impose "the high duty of care that the law requires of fiduciaries." Reynolds v. Beneficial National Bank, 288 F.3d 277, 280 (7th Cir. 2002).

Because the class itself typically lacks the motivation, knowledge, and resources to protect its own interests, and because settling counsel for both plaintiff and defendant have little or no incentive to offer information adverse to the settlement, you need to examine critically the class certification elements, the proposed settlement terms, the proposed notice plan, and the procedures set out for implementing the proposed settlement. *See* MCL 4th § 21.61. You need to identify possible sources of information about the settlement and use them to obtain, for example, agreements or understandings among counsel, the views and experiences of objectors, and the complete terms of the settlement. The next section (IV.B) discusses all of those informational sources.

Reviewing a proposed settlement calls for you to use your traditional judging skills. The central questions relate to the merits of the claims and defenses:

• What are the class claims?
• How strong are they?

12

ER000189

*Class Action Pocket Guide (3d ed.)*

- What is the range of values of a successful claim?
- How likely is the class to succeed on each claim in further litigation, including trial?

You may decide to avoid a definitive statement on the merits because the settlement may fail and the case may come to trial. Nonetheless, it seems absolutely necessary to obtain information and arguments from the parties about their assessment of the probabilities of success and their projection of a realistic range of possible recoveries. *Reynolds,* 288 F.3d at 284–85, discusses this approach further. While party submissions may influence your judgment about the merits, keep in mind that the parties have their own interests in supporting the settlement. You may need to search elsewhere for information that will allow you to take an independent and hard look at the merits of the claims and defenses.

## B. Obtaining information about the settlement

The key to reviewing a settlement is to obtain information about

- the settlement's terms;
- the merits of the class members' claims;
- the reasons for settling those claims;
- the settlement's benefits to the class;
- the number of claims actually filed by class members;
- the amount of the settlement that is likely to be distributed to class members;
- the reasons for any opposition to the settlement; and
- the effect of the settlement on other pending litigation.

This section presents a number of suggestions for gathering settlement information, starting with a provision from amended Rule 23.

### 1. Rule 23(e)(3) agreements and prior individual settlements

Federal Rule of Civil Procedure 23(e)(3) directs the parties to "file a statement identifying any agreement made in connection with the proposed settlement." Let the settling parties know that you expect them to provide the full settlement agreement as well as an informative summary of other agreements, such as settlement agreements for claims similar to those of class members; side un-

13

*Class Action Pocket Guide (3d ed.)*

derstandings about attorney fees; and agreements about filing fu-
ture cases, sealing of discovery, and the like. *See* MCL 4th § 21.631.
The idea is to identify documents that directly or implicitly suggest
the attorneys' perceptions of the value of the class claims and that
may point to funds that might otherwise be available to compen-
sate the class, including attorney fees and payments to objectors.

Consider directing the parties to provide additional informa-
tion to aid your assessment of the settlement. Often, information
about related parallel and overlapping cases, including amounts
paid to individual plaintiffs or claimants, will shed light on the
value of the class's claims. If prior settlements were confidential,
direct the parties to provide information for you to review in cam-
era. Pressing the parties to provide objective information about
the merits and value of the individual claims should advance your
effort to pin down the merits and value of the class claims. Make
sure the parties identify and justify any differences in treatment
of various types of class members. Expert evaluations of the costs
and present monetary value of all aspects of the settlement to the
class may be available. Ask counsel what information they used to
satisfy their professional obligation to advise their clients about
the value of the proposed settlement.

2. Preliminary review hearing

Holding a preliminary review hearing will afford you another op-
portunity to obtain information. If you are deciding whether to
certify a class at this stage, direct the parties to give you all the
information and arguments needed to apply the Rule 23(a) and
(b) criteria. How numerous is the class? What are the common
questions of law and fact, and do they predominate? Why is the
class action superior to other forms of adjudication?

At the preliminary hearing stage, determine whether the no-
tice to the class will reach a high percentage of the members (see
section IV.F below), and whether it should include claims forms
and instructions for completing the claims process before the final
hearing. Establishing a claims procedure at this stage can provide
you with valuable information about class members' rate of pre-
senting claims, information that is often essential in identifying

14

ER000191

the true size of the settlement fund, and in making your fairness determination. An early claims procedure might also simplify administrative costs, as discussed below in section IV.B.4. The benefits of any early claims procedure need to be weighed against the possibility that you will decide not to approve the settlement.

### 3. Subclasses

Information gleaned from reviewing class certification papers should also inform you about any need for subclasses to represent separate interests. *See* MCL 4th § 21.23. The preliminary review hearing is usually the last practical opportunity to create subclasses. Appointing counsel for subclasses will generally have the practical effect of sending the parties back to the negotiating table to deal with the interests of the new subclasses.

### 4. Prior action by government entities

When a government regulator has sought or obtained a monetary remedy for a class, examine the description of the intended beneficiaries of the government's action and decide whether you should define the class to be certified in the same way. Aligning the class definition with the description of the beneficiaries in the governmental action will most likely produce efficiencies in notifying the class, reviewing the settlement, distributing the proceeds, and evaluating requests for fees.

Typically, public enforcement actions result in a consent decree, but the government agency may have the statutory power to order rescission of agreements and restitution or disgorgement of profits from illegal activities, as the court recognized in *In re First Databank Antitrust Litigation,* 209 F. Supp. 2d 96, 98 (D.D.C. 2002). When an agency action or criminal prosecution against a business or its officers is successful, a private class action may well follow on its heels. In the context of an agency action, the class action can serve as the vehicle for distributing monetary relief to the class. In *In re First Databank,* for example, the Federal Trade Commission (FTC) got the defendant to agree to a $16–19 million figure for the disgorgement remedy. Private plaintiffs increased that amount by $8 million, and the final disgorgement figure was expressly

15

*Class Action Pocket Guide (3d ed.)*

declared to be for the purpose of settling the private class action lawsuits. As discussed in connection with attorney fees below in section V.E, asking the parties to be clear about which entity produced which portion of the award will simplify your decisions on attorney fees.

### 5. Appraisal of settlement

Your appraisal of the settlement should focus on the value actually distributed to the class—based on the number and percentage of class members who have filed a claim. As discussed below in section IV.C.4, strict eligibility requirements and cumbersome claims procedures often discourage class claims and might reduce the total amount paid to class members, making the stated value of the settlement fund illusory. Because there is no clear standard for predicting class response rates, consider calculating any attorney fee award as a percentage of the amount of the settlement fund that has already been distributed to the claimants—even if that means deferring final determination of all or part of the fee award until the claims process is complete.

At or after the preliminary review hearing and after reviewing the sources of information discussed above, consider whether you need an expert's appraisal of the value of nonmonetary or contingent monetary components of the settlement. If so, this is the time to appoint an expert, special master, magistrate judge, or other judicial adjunct, as discussed below in part VII. As a practical matter, waiting for objections or for the settling parties' presentations at the fairness hearing will be too late. *See* MCL 4th § 21.644.

### 6. Information from objectors

Before and during the fairness hearing, you might receive written objections and testimony from objectors. Objectors might contribute to your review in various ways. Attorneys who represent competing or overlapping classes, such as those in state actions, may have useful information on the value of the underlying claims. Similarly, attorneys representing individual claimants who seek a better recovery for their alleged injuries may help you identify the

ER000193

*Class Action Pocket Guide (3d ed.)*

strengths and weaknesses of the settlement and the trade-offs that led to the agreement. They may represent class members in state court actions with strong state law claims, which would be released by the settlement you are faced with.

Be sure to monitor any separate agreements to settle the claims of these objectors. If objectors settle for the same per capita amount as the class, that tends to validate the settlement (assuming that other factors are equal). If they settle for more than the class members, ask the settling parties to justify the differential. A higher settlement for objectors with similar damage claims might signify that the class members did not receive full value for their claims.

Institutional "public interest" objectors may bring a different perspective. Watch out, though, for canned objections from professional objectors who seek out class actions to extract a fee by lodging generic, unhelpful protests. Rule 23 gives you authority to scrutinize as part of the overall class settlement any side agreements to "buy out" such objectors.

Generally, government bodies such as the FTC and state attorneys general, as well as nonprofit entities, have the class-oriented goal of ensuring that class members receive fair, reasonable, and adequate compensation for any injuries suffered. They tend to pursue that objective by policing abuses in class action litigation. Consider allowing such entities to participate actively in the fairness hearing. *See* MCL 4th § 21.643.

## C. Hot button indicators

Some settlement terms show their potential unfairness on their face; we call them "hot button indicators." At the preliminary review stage, signaling your concerns about a proposal containing one or more of such indicators may allow you and the parties to create a notice and hearing process that will correct any deficiencies without the need for multiple hearings. Hot button indicators include any remedy to which you cannot confidently assign a cash value.

17

ER000194

*Class Action Pocket Guide (3d ed.)*

1. Coupons

CAFA calls for judicial scrutiny of coupon settlements and restricts the use of unredeemed coupons in calculating fees for class counsel. *See* 28 U.S.C. § 1712 (2008). It is important to discern whether attorney fees are being calculated using the face value of the coupons instead of the value of coupons actually redeemed. Determine whether the proposed coupons

- are transferable;
- have a secondary market in which they can be discounted and converted to cash;
- compare favorably with bargains generally available to a frugal shopper; and
- are likely to be redeemed by class members.

Coupon settlements were rare even before the passage of CAFA. Occasionally, you may find that transferable coupons have some value to a class of repeat users of a product or service, as they did in *In re Mexico Money Transfer Litigation,* 267 F.3d 743, 748 (7th Cir. 2001). Determining the precise value to the class of the rare beneficial coupon settlement, though, calls for hard data on class members' redemption of the coupons.

2. Negative options

Watch for a variant of the coupon settlement—the negative option, which is a gift or benefit that requires the recipient to take affirmative action to cancel it before a continuing obligation to pay arises. The FTC has aptly termed the negative option a "promotional gimmick." For example, in a California state class action, plaintiffs alleged fraud and deceptive and unfair business practices against a company selling DVD subscription services. The parties agreed to settle these claims for a one-month membership upgrade for current members and a "free" one-month membership for past members who had canceled. The catch was that both of these "benefits" would continue until the class member took affirmative steps to cancel the membership. In other words, the free service was converted automatically into an obligation to pay for future services. Apparently as a result of the FTC's amicus curiae participation, the parties renegotiated the settlement to remove

18

ER000195

*Class Action Pocket Guide (3d ed.)*

the automatic renewal feature and the court approved a revised settlement. Chavez v. Netflix, Inc., 75 Cal. Rptr. 3d 413, 418–21 (Cal. Ct. App. 2008). For a general definition of negative options and the FTC regulations governing them, see *Use of Prenotification Negative Option Plans,* 16 C.F.R. pt. 425 (2008).

### 3. *Cy pres* relief ("fluid recovery")

The term "*cy pres*" has migrated from the trust field into the sometimes less appropriate realm of class action litigation. Literally, *cy pres* means "as near as possible" to the original purpose. In the class action context, recovery for individual class members is sometimes not possible or practical. In these instances, the class is so large and the potential recovery per class member so small that the cost of administering a single claim would exceed the benefit to any individual. Individual reimbursement for taxi fare overcharges is a classic example.

    *Cy pres* relief must come as close as possible to the objective of the case and the interests of the class members. Question whether the class members might feasibly obtain a personal benefit. Look for evidence that proof of individual claims would be burdensome or that distribution of damages would be costly. If individual recoveries do not seem feasible, examine the proximity or distance between the *cy pres* recipient's interests or activities and the particular interests and claims of the class members. When *cy pres* relief consists of distributing products to charitable organizations or others, press for information about whether the products in question have retained their face value or might be out-of-date, duplicative, or of marginal value. In the end, *cy pres* awards may be an excellent way to avoid the restrictive claims processes and reversion clauses discussed in the next section.

### 4. Restrictions on claims/reversion of unclaimed funds to defendants

Limits on the amount of recovery per claimant, strict eligibility criteria for claimants, or other procedural or substantive obstacles to honoring claims from class members may dramatically reduce the apparent value of a settlement. Coupled with a provision that

ER000196

*Class Action Pocket Guide (3d ed.)*

any unclaimed funds revert to the defendant at the end of the claims period (a provision that is generally disfavored, as discussed in the next paragraph), restrictions on eligibility are likely to substantially diminish the overall value of a settlement to the class. The addition of a "clear sailing" agreement (i.e., a stipulation that attorney fees based on the inflated settlement figure will not be contested) to an agreement with a reversion clause adds decibels to the alarms set off by the reversion clause. Some courts treat the combination as creating a presumption of unfairness.

A reversion clause creates perverse incentives for a defendant to impose restrictive eligibility conditions and for class counsel and defendants to use the artificially inflated settlement amount as a basis for attorney fees. Instead of approving a settlement with a reversion clause, consider encouraging the parties to use an alternative approach, such as distributing the entire settlement fund to the class members who file claims. Prorating the fund in that way avoids the possibility of unclaimed funds and is a standard practice in securities class settlements. For a discussion of alternative ways of prorating a settlement fund, see Francis E. McGovern, *Distribution of Funds in Class Actions-Claims Administration*, 35 J. Corp. L. 123 (2009).

To align plaintiff counsel's interests with those of the class, to discourage the use of a reversion clause, and to negate the effect of a clear sailing agreement, consider linking the award of attorney fees to the value of the funds distributed to the class or the coupons redeemed by the class (see section V.B below).

### 5. Collusion: "Reverse auctions" and the like

An imbalance between the cash value of the settlement to the class as a whole and the agreed amount of attorney fees is a prime indicator of collusion by settling attorneys. For example, in a settlement with both monetary and nonmonetary relief, if the attorneys receive the lion's share of the cash and the class receives primarily nonmonetary relief, including future warrants, coupons, and the like, you should look for solid information to justify the imbalance. Likewise, you should scrutinize an agreement that provides that attorneys receive a noncontingent cash award and that class

20

ER000197

*Class Action Pocket Guide (3d ed.)*

benefits are contingent on settlement approval and claims made. *See* MCL 4th § 21.71.

"Reverse auction" is the label for a defendant's collusive selection of the weakest attorney among a number of plaintiff attorneys who have filed lawsuits dealing with the same subject matter; in other words, a reverse auction is the "sale" of a settlement to the *lowest* bidder among counsel for competing or overlapping classes. *See* MCL 4th § 21.61, text at n.952 and sources cited therein. For a recent example of a district court's thorough analysis of a proposed settlement with reverse auction principles at the forefront, see *Figueroa v. Sharper Image Corp.,* 517 F. Supp. 2d 1292, 1321 (S.D. Fla. 2007). In *Figueroa,* the court rejected a "Third Amended Settlement Agreement" in part because the defendant "selected counsel confronted with a most precarious position . . . and then proceeded to offer and convince Class Counsel to accept highly undesirable terms to settle the case." Determining whether a reverse auction might have occurred requires information about all litigation dealing with the subject of the dispute.

Another major indicator of a reverse auction is a difference between the apparent value of the class claims on the merits and the value of the settlement to class members. A typical element of a reverse auction is a promise to pay attorneys more than a reasonable value for the time they invested in negotiating the settlement. Generally, the overpayment of the attorneys originates in an underpayment of what the class should receive based on an objective assessment of the merits of the class claims.

Sometimes, the settlement will be with an attorney who has not been involved in litigating the class claims that other attorneys have been pursuing, an especially suspicious circumstance. Questionable settlements between class counsel and the same defendant in unrelated cases may suggest a continuing collusive relationship.

## 6. Injunctive relief

Question whether injunctive relief will truly benefit class members in the case at hand. In many cases, by putting an end to illegal practices, an injunction will benefit more class members than a small award. It will also avoid clogging the judicial system with

ER000198

*Class Action Pocket Guide (3d ed.)*

the administration of small awards to thousands of class members. But it is important to press the parties to identify such cases clearly and justify the remedy and fees. Ask yourself—and perhaps the parties—the following questions:

- How much is the injunction worth to the class as a practical matter?
- What is the dollar value the relief might yield?
- What is the real cost to the defendant?
- Does the injunctive relief do more than restate the obligation that the defendant already has under existing law or under a decree entered by a regulatory body?
- Are there viable damage claims that class counsel has not pursued?
- Might an emphasis on injunctive relief and proposed certification of a Rule 23(b)(2) class amount to a tactical move to avoid more stringent certification requirements and opt-out rights associated with a damages class under Rule 23(b)(3)?

Consider whether you need independent expert advice to place a value on the relief offered, as discussed below in part VII.

### 7. Release of liability without remedy

A natural impulse on the part of settling parties is to attempt to expand the class and release claims of those on the periphery of the class, such as the spouses and children of class members, without providing any direct benefit to those individuals. At times parties have attempted to release a damages remedy without making any correlative payment to class members, as the parties attempted to do in *Reynolds,* 288 F.3d at 283–84. Unpled claims against outside parties (e.g., medical malpractice claims in a class action against a pharmaceutical manufacturer) are sometimes swept into the settlement. The settlement should compensate class members or their families for the value of such claims. As a general rule, the release of claims by a subclass should be linked with specific remedies, such as payments to the subclass or increased payments to class members based, for example, on their family status.

22

ER000199

*Class Action Pocket Guide (3d ed.)*

8. Settlement class actions

Certification of class actions solely for the purpose of settlement at an early stage of the litigation generally makes meaningful judicial review more difficult and more important. MCL 4th § 21.612. Parties frequently agree to settle class actions before a judge has decided that a class can be certified under Rule 23. The parties then jointly seek certification in the context of the settlement. Often, the parties' agreement that a class can be certified is conditioned on judicial approval of the settlement. The Supreme Court has ruled that agreement of the parties does not lessen the need for a judge to determine whether all of Rule 23's certification standards other than manageability have been met. Amchem Products, Inc. v. Windsor, 521 U.S. 591, 620 (1997); MCL 4th § 21.132.

## D. Preliminary review of the proposed settlement

Judicial review of a proposed class settlement generally requires two hearings: one preliminary and one final. MCL 4th § 21.632. If you haven't already certified a class, you should determine during the preliminary fairness review whether the proposed class meets the standards of Rule 23(a) and (b). By doing this, you can avoid unnecessarily using scarce judicial and party resources to schedule a fairness hearing for a class that doesn't meet Rule 23 certification standards.

If you decide to certify the proposed class, be aware that courts, following the Supreme Court's lead in *Amchem,* have ruled that the settlement terms of a settlement class action need careful scrutiny. Often, such a settlement comes early in the litigation, so you may have to probe to uncover the strengths and weaknesses of the parties' claims and defenses as well as the character of their negotiations. There may be conflicts among groups within the proposed class. Question whether the claims of class members are homogeneous. If they are not, explore the possibility of creating subclasses and sending the parties back to renegotiate and take into account the differing interests of class members.

Preliminary review of the proposed settlement affords you an opportunity to express any concerns you may have about the "hot button indicators" discussed above in section IV.C. You don't have

23

*Class Action Pocket Guide (3d ed.)*

the power to decide what must be in a settlement agreement, but you do have the opportunity to state your concerns about provisions—or the absence of provisions—that would make a difference in your decision about whether to approve a proposed settlement. If you have such concerns, consider allowing the parties some time to respond to them by renegotiating the settlement so that the class notice can refer as closely as possible to a final settlement. If you hold back your concerns and reject a settlement at the final fairness hearing, the parties will most likely have to incur the considerable expense of sending new notices of any revised settlement to the class.

Consider seeking preliminary input into the fairness, reasonableness, and adequacy of the proposed settlement. For example, one judge permitted counsel pursuing independent state class actions against the same defendants to intervene as "an offsetting influence" to the loss of adversarial opposition from the parties. *In re* Lupron Marketing & Sales Practices Litigation, 345 F. Supp. 2d 135, 138 n.5 (D. Mass. 2004). Participation by such plaintiffs' counsel provided the judge with a unique opportunity to receive an informed assessment by nonsettling plaintiffs of the value of the case and the prospects for success at trial. Absent such an opportunity, consider asking the parties or others to provide preliminary information supporting the proposal.

Though not necessarily unfair, *conditional settlements* present a special problem to the class and the judge. Sometimes, a defendant resists settlement unless it can be assured that the number of class members opting out of the proposed settlement will not exceed a certain number that is specified but not widely disclosed. To avoid unduly delaying the settlement review, you may decide to press the parties to set a reasonable cutoff date for the defendant's decision about whether to proceed with the settlement, say thirty days after the end of the opt-out period. MCL 4th § 21.652. In any event, you should require the defendant to make an election before the fairness hearing.

Remember that any preliminary "approval" or other endorsement of the proposed settlement should not appear to be a commitment to approve the settlement in the end. Any preliminary

24

*Class Action Pocket Guide (3d ed.)*

finding should be that the proposed settlement is within the range of reasonableness; such a finding is not a final judgment that the proposal is fair, reasonable, and adequate as shown by evidence at the fairness hearing. Reserve that judgment and expect to be informed by counsel for the class and counsel for the defendants (maybe in response to your pointed questions), and by class members, objectors, lawyers from similar litigation, or, perhaps, your own expert or special master. Bring an inquiring mind to the preliminary review hearing and, as noted above, seek out the information you need to decide whether the settlement is fair, reasonable, and adequate.

Once you are satisfied that the proposed settlement warrants your preliminary approval, review the parties' proposed plan for notice and hearing. Generally, counsel will present the settlement proposal and a notice plan at the same time. The purpose of reviewing the notice plan at this stage is "to determine whether any defects in the proposed notice or other formal or substantive irregularities exist that warrant withholding notice." American Law Institute, Principles of Aggregate Litigation § 3.03(a) (2010) Before reviewing the proposed notice plan, consider whether you want to direct that class members' claims for monetary relief be filed in response to the notice and before the final review hearing (see section IV.B.2 above) The class's response to the settlement will help you analyze the settlement's value and evaluate its adequacy as seen through the eyes of class members deciding their own interests. Knowing the claims rate will also provide a basis for your assessment of requests for attorney fees. In any event, to remedy the current lack of knowledge about claims rates and class member recoveries, judges should routinely order the parties to report such information to the court and place it in the public record.

### E. Warning about claims services

Consider also whether you want to direct the parties to include in the notice and claims form some provisions that warn class members about the potential pitfalls in dealing with claims filing services, a cottage industry that offers to gather and file claims for

25

ER000202

*Class Action Pocket Guide (3d ed.)*

class members. Such services can increase the claims rate and provide a service to class members, but they do not generally add any value to a claim. The worst pitfall is that some claims services have absconded with funds. Protections in the form of requiring claims filing services to register with the court and maintain funds in a trust account may be in order.

## F. Notice issues

Opt-out notice binds class members by their silence, so you will want to focus on ensuring adequate notice. This pocket guide emphasizes notice issues because notices that fail to reach class members, or that confuse them, are all too common. They result in very low participation rates and discredit the class action procedure.

This section highlights some of the key notice issues. The "Notice Checklist and Plain Language Guide," available at the Class Action Notices Page at www.fjc.gov, details important considerations for notice to class members in several areas.

### 1. Notice to government regulators

CAFA requires that within ten days after a proposed settlement is filed in court, each participating defendant must serve notice of specified settlement-related papers on (1) the U.S. Attorney General or, in the case of a depository institution, the primary federal regulatory official *and* (2) the primary state regulatory official (or, if none, the attorney general) of each state in which a class member resides. 28 U.S.C. § 1715 (2008). The idea is to encourage government regulators to participate in reviewing settlements and lend their expertise (and perhaps an adversarial note) to the fairness hearing. You may want to consider extending an express invitation—to the preliminary approval hearing and to the fairness hearing—to any regulatory body you have found to be effective in dealing with the subject matter in question.

The Federal Trade Commission has extensive statutory authority and expertise in dealing with antitrust, unfair competition, and consumer protection matters. *See generally* FTC, Fulfilling the Original Vision: The FTC at 90 (Apr. 2004) (available at http://ftc.gov/os/2004/04/040402abafinal.pdf). CAFA does not

26

ER000203

*Class Action Pocket Guide (3d ed.)*

specify the FTC as an agency that must receive notice, but consider adding the FTC to the notice list in consumer and trade practice litigation, including antitrust actions. The FTC has created a "Class Action Fairness Project," which channels FTC resources into reviewing proposed settlements as well as class counsel requests for attorney fees. Since defendants have made copies of—or electronic links to—the required settlement documents for other agencies, it will be no burden on them to send notice to the FTC or other consumer protection entities in appropriate cases.

## 2. Notice to the class

Notices are usually the only way to communicate with unnamed class members and enable them to make informed decisions about whether to participate in a class action settlement, or to exercise their due process rights to be heard before final approval of the settlement. Your primary goals are that the notice reach as many class members as possible, preferably by individual notification (*see* Rules 23(c)(2) and 23(e)(1) and MCL 4th § 21.312), and that the recipients see it, recognize its connection to their lives and self-interests, read it, and act on it. *See* Todd B. Hilsee et al., *Do You Really Want Me To Know My Rights?* 18 Geo. J. Legal Ethics 1359 (2005).

The first challenge is to *reach* a high percentage of class members. Notice plans that appear reasonable may in fact reach only a small percentage of class members. Before approving a notice plan, consider asking for calculations to demonstrate the "reach"—i.e., the net percentage of class members who will receive or otherwise be exposed to a notice. You can use reach statistics to substantially improve the net reach to class members. The norm is in the 70–95% range. Consider asking whether the proposed notice plan was created by a vendor who will be paid to implement it if approved. If so, consider obtaining an independent analysis of the notice plan's adequacy before approving the plan. Competing vendors may cut corners to win the business, but you must find the "best notice that is practicable under the circumstances." Rule 23(c)(2)(B). To satisfy due process, the notice must reflect a "de-

ER000204

*Class Action Pocket Guide (3d ed.)*

sire to actually inform." *See* Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306 (1950).

Be certain the notice plan includes individual notice to all "reasonably identifiable" class members under Rule 23(c)(2). The plan should take steps to update addresses before mailing and provide for re-mailing notices to better addresses when returned as undeliverable. *See* Jones v. Flowers, 547 U.S. 220 (2006). The U.S. population is highly mobile today, so class lists compiled for business purposes may be out of date.

Next, it is important to give the class member a reason to *read* the notice. In a world in which junk mail and spam can easily drown out important messages, you may need to press the parties to look beyond the formal legal requirements and find a way to communicate the gist of a class action notice in an attention-getting and understandable format. Rule 23(c)(2)(B) commands that notices "clearly and concisely state in plain, easily understood language" the elements of class action notices. Boilerplate legal language almost never does the job. With help from linguists, communications specialists, a notice expert, and focus groups, the Federal Judicial Center prepared several illustrative notices. See the Class Action Notices Page at www.fjc.gov; there you can also see the "Notice Checklist and Plain Language Guide," which explains important features of the illustrative notices. For a handy booklet on notice principles, see Rust Consulting, Inc. & Kinsella Media, LLC, *Plain Language Primer for Class Action Notice* (undated) (available at http://www.kinsellamedia.com/Knowledge_Sharing.aspx).

The headline of a notice should tell potential class members at a glance why they should—or should not—bother to read the notice; what the notice is about; and what benefit the reader might gain from reading the notice. For example, a notice of an asbestos settlement might start with this headline: "If you have been exposed to an asbestos product, you may have a claim in a proposed class action settlement" and provide enough information to identify potential benefits and options as well as referral to a website or a toll-free telephone number for additional information. The goal is to get class members to read the notice and make an informed

28

*Class Action Pocket Guide (3d ed.)*

decision about exercising any of their rights before being bound by the court's judgment.

A picture of asbestos insulation in a notice may trigger an association in the reader's mind. Those who recognize their own circumstances are likely to read on, contact a website, or call a toll-free telephone number. Nonmembers of the class will have a good reason for adding the notice to the junk mail pile.

A short-form, single-page (or shorter) "summary" notice with headlines can communicate all the required elements of Rule 23 and can tell the reader how to get additional information. Formal case captions should not be used in the summary notice as they are a turn-off to lay people. Legal terms of the settlement tend to confuse lay readers and should be confined to the settlement agreement posted at the website. While "legalese" has been reduced in recent years, much improvement is still needed. *See* Shannon R. Wheatman & Terri R. LeClerq, Majority of Class Action Publication Notices Fail to Satisfy Rule 23 Requirements (2010).

"Plain English" notices may not be enough. Truly global settlements will include class members whose native language is not English and who may not be citizens of an English-speaking country. Note that the FJC's illustrative class action notices on its website include an example of a Spanish language notice. For a recent and colorful example of a global format for class settlements, which is translated into numerous languages and complete with flags for each country, see the settlement administration website for *In re Royal Ahold Securities and Erisa Litigation,* http://www.aholdsettlement.com.

Make sure the notice plan takes into account any cultural and language barriers to notifying class members. For example, the class actions involving assets of Holocaust victims demanded a far-reaching notice campaign to notify the many dispersed Jewish survivors as well as gays, Jehovah's Witnesses, and Romani ("gypsy") migrants. The judge approved a "multifaceted plan" that included "worldwide publication, public relations (i.e., 'earned media'), Internet, and grass roots community outreach." *In re* Holocaust Victims Assets Litigation, 105 F. Supp. 2d 139, 144–45 (E.D.N.Y. 2000). As the judge in the Holocaust victims' class actions was,

29

*Class Action Pocket Guide (3d ed.)*

be alert to cultural differences that might affect the attention re-
cipients will give to the proposed notices. A class of migrant farm
workers, for example, might rely on radio more often than urban
factory workers would. A class of people challenging searches and
seizures as unreasonable might respond differently to official court
notices than, say, people who have never been arrested.

## G. Claims processes and response handling

If the claims process deters class members from filing claims, the
settlement may have less value to the class than the parties assert.
Obtaining complete information about claims presented via an
unimpeded process will assist you in determining the full value of
the settlement and hence its reasonableness, fairness, and adequa-
cy to the class. Avoid imposing unnecessary hurdles on potential
claimants.

First, consider whether a claims process is necessary at all. The
defendant may already have the data it needs to automatically pay
the claims of at least a portion of class members who do not opt
out. Necessary claim forms should be as simple and clear as possi-
ble and should avoid redundancy. Be careful to avoid claim forms
that scare class members away with confusing questions and oner-
ous proof requirements.

If you anticipate or find evidence of a low claims rate, ask coun-
sel whether they have considered alternatives that might enhance
the reach of the claims process and tailor it to the characteristics
of class members, such as using surveys to determine reasons for
nonresponses, improving the clarity of the claims forms, and add-
ing outreach programs. *See* Francis E. McGovern, Distribution of
Funds in Class Actions-Claims Administration, 35 J. Corp. L. 123
(2009).

Class counsel should be available to answer class members'
questions. The parties commonly agree to seek the appointment
of a qualified claims administrator to receive and process claims
and handle a toll-free telephone number call center staffed by
trained agents. In less complex matters, settlement administrators
can place scripted answers to callers' frequently asked questions

30

*Class Action Pocket Guide (3d ed.)*

about the settlement on an automated phone system and on the Internet.

## H. Fairness hearing

### 1. Participation rates: opt-outs

The typical class action settlement notice will most likely yield an apathetic response, and few objectors or opt-outs. Two empirical studies found that about one in a thousand (0.1%) class members opted out of a proposed settlement. Theodore Eisenberg & Geoffrey P. Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues,* 57 Vand. L. Rev. 1529 (2004); Thomas E. Willging et al., Federal Judicial Center, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules (1996) [hereinafter Willging et al., Empirical Study of Class Actions (1996)].

Counsel may argue that a low percentage of opt-outs demonstrates class members' agreement with the settlement, but in some cases that argument seems misplaced. Opt-out rates vary according to the type of case and the amount of the individual recovery. Class members are considerably more likely to opt out of mass tort, employment, and commercial litigation, where individual recoveries are generally higher, and less likely to opt out of consumer cases, where individual recoveries are generally lower and individual litigation less viable.

### 2. Participation rates: objections

Do not expect class representatives or other class members to attend the fairness hearing or file written objections. A 1996 FJC study found that only about a quarter to a half of the class representatives attended the fairness hearing. Willging et al., Empirical Study of Class Actions (1996).

The FJC study also found that in about half of the class actions, not a single member filed a written objection. Written objections documented in the FJC study most frequently challenged the amount of the attorney fees requested. In second place was a related objection: that the settlement was inadequate to compensate class members for their losses, perhaps because the lawyers

31

*Class Action Pocket Guide (3d ed.)*

received more than their fair share. Next in line was the objection that the settlement favored some subclasses over others. These findings suggest that a substantial portion of the fairness hearing will focus on attorney fee issues.

### 3. Conducting the fairness hearing

It is essential to conduct a hearing even if no one other than the attorneys for the settling parties participates, because the hearing is your primary opportunity to focus on the terms of the settlement. You alone are charged with deciding whether the settlement is fair to the class members, reasonable in relation to the merits of their claims, and adequate to redress any injuries suffered. Rule 23 and the MCL 4th call for the judge to conduct an independent analysis of the settlement terms. Review the list of "hot button indicators" discussed in section IV.C above and be prepared to ask counsel hard questions about the value of the settlement to the class. In addition, the MCL 4th contains a checklist of fifteen more routine factors that might inform your decision about whether the settlement is superior to continued litigation of the class claims. MCL 4th § 21.62. The manual also discusses benchmarks for applying the fifteen factors.

If objectors and unrepresented class members appear at the fairness hearing, it is important to permit them to fully voice their concerns. For class members who feel strongly enough about their injuries to appear, the fairness hearing is their "day in court." Judges in settlements involving tort claims, such as the Agent Orange litigation and the silicone gel breast implant litigation, have held multiple days of hearings to accommodate the interests of class members.

You will, of course, want to eliminate unnecessary repetition. Setting time limits is a must. Be sure to notify participants in advance about how much time they will have. Note that having a group of class members gives you a chance to ask questions of all present, akin to conducting a voir dire of a jury venire. Such a group examination may be an efficient mechanism for getting a clear sense of the similarities and differences among class members' claims.

ER000209

*Class Action Pocket Guide (3d ed.)*

Finally, Rule 23 and good practice both require specific findings as to how the settlement meets or fails to meet the statutory requirements. In these times of heightened visibility of class action rulings, appellate review of settlements is not pro forma even when the court affirms the district court's findings and conclusions.

# V. Attorney Fee Issues

As discussed in part II above, Rule 23(g) requires you to appoint class counsel at an early stage of the litigation. When appointing counsel, consider entering an order with express provisions about the standards and procedures you expect to use in reviewing requests for attorney fees and costs. Rule 23(g)(1)(C). At the least, you should inform counsel about whether to keep time records to support using a lodestar cross-check, as discussed below. In addition, appointing counsel gives you a natural opportunity to discuss cost-saving measures, such as limiting travel expenses and discouraging the use of senior partners to do legal research. *See* MCL 4th § 14.21. Perhaps from the outset of the litigation, but at least at the fee determination stage, "the district judge must protect the class's interest by acting as a fiduciary for the class." *In re* Rite Aid Corp. Securities Litigation, 396 F.3d 294, 307 (3d Cir. 2005).

## A. Evaluating monetary and nonmonetary results achieved

The 2003 Committee Note to Rule 23(h) gives the following guidance for determining attorney fees based on the creation of a monetary fund for the common benefit of the class: the "fundamental focus is the result actually achieved for class members."

In cases involving monetary benefits, do not be misled by party valuations of the settlement that presume a 100% claims rate by class members. Insist on actual information on claims filed to determine the benefit to class members and use that information both to place a value on the settlement and to award attorney fees, as the district judge did in *Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 50–53 (D. Me. 2005). That value—plus the value of any nonmonetary relief—serves as the starting point for applying the

33

ER000210

*Class Action Pocket Guide (3d ed.)*

percentage-of-value method in determining appropriate attorney fees (discussed below).

Likewise, in cases in which the benefit to the class is nonmonetary (coupons, discounts, warrants, injunctions, and the like), determining the actual value to the class requires looking beyond the face value of nonmonetary or contingent benefits. Redemption data or other evidence of class use is essential. In some cases, particularly settlements involving injunctive or declaratory relief, you might use expert valuations based on reliable, objective standards. In other cases, perhaps a majority, the only reliable test of the benefit to the class will be evidence of class members' use or redemption of the coupons, warrants, or other nonmonetary scrip. *See* MCL 4th § 21.71; *see also* Class Action Fairness Act, 28 U.S.C. § 1712(a) (2008) (coupon settlements). In such cases, it is especially important to link the amount of any attorney fees with the actual benefit to the class.

A direct way to ensure that you have sufficient information to determine attorney fees in cases with nonmonetary benefits is simply to hold back the portion of any attorney fee awards that is linked with coupons, discounts, or other nonmonetary benefits until after the redemption period has ended and the value of the benefits can be established by calculating class members' actual use. For example, the court expressly reserved the determination of any attorney fees to be paid to plaintiffs' counsel until after the parties had provided the court with information concerning the distribution of benefits in *Strong v. BellSouth Telecommunications, Inc.*, 173 F.R.D. 167 (W.D. La. 1997), *aff'd,* 137 F.3d 844, 848 (5th Cir. 1998). Note that redemption of a coupon does not automatically mean the member received a benefit. If similar discounts are provided to consumers outside of the class, the benefit to the class might be less than the face amount of the coupon—or perhaps no benefit at all.

In some class actions involving injunctive relief, the injunctive relief can be assigned a monetary value on the basis of objective criteria. For example, an injunction against an overcharge may be valued at the amount of the overcharge multiplied by the number of people likely to be exposed to the overcharge in the near fu-

34

*Class Action Pocket Guide (3d ed.)*

ture. Or an injunction against a fraudulent sales practice might be valued by examining the amount of past sales attributable to the practice and projecting that value for a reasonable period of time, perhaps the life of the practice before the injunction. Other forms of injunctive relief, such as orders designed to end discrimination in public accommodations, may be more difficult to value. In such cases it may be necessary to calculate fees by using a lodestar approach.

The take-away line is this: Do not award fees until you know the true value of the settlement.

## B. Methods of calculating fees

Courts use two methods to calculate fees for cases in which the settlement is susceptible to an objective evaluation. The primary method is based on a percentage of the actual value to the class of any settlement fund plus the actual value of any nonmonetary relief. The second method is based on a lodestar calculation in which the court multiplies the reasonable number of attorney or paralegal hours actually expended by the hourly market rate for those services. For cases in which nonmonetary relief cannot be evaluated with confidence, the lodestar method may be the only reasonable alternative.

While most courts of appeals now permit district courts to use the percentage-of-value method (MCL 4th § 14.121), their decisions often direct district courts in their circuit to supplement the percentage method with a lodestar cross-check to see if the hourly rate is reasonable and to provide the appellate courts with a basis for reviewing the reasonableness of the fee award. The cross-check requires "neither mathematical precision nor bean-counting"; it allows you to "rely on summaries submitted by the attorneys and [you] need not review actual billing records." *In re* Rite Aid Corp. Securities Litigation, 396 F.3d 294, 306–07 (3d Cir. 2005).

Another type of cross-check involves examining the defendants' attorney fee records as a measure of what might be a reasonable number of hours or a total payment. In general, judges should avoid rigid adherence to a benchmark percentage and instead tailor their fee award to the realities of the class litigation before

35

ER000212

*Class Action Pocket Guide (3d ed.)*

them. Sometimes huge settlements do not warrant a standard percentage, as the next section discusses.

## C. "Mega" cases

In "mega" cases, be prepared to see attorney requests for truly huge amounts, up to hundreds of millions of dollars. In such cases, of course, the monetary recovery to the class typically is also in the hundreds of millions of dollars, even in the billions. *See, e.g., In re* Prudential Insurance Co. of America Sales Practices Litigation, 148 F.3d 283, 339–40 (3d Cir. 1998). In such cases, you should be looking at a percentage of recovery far less than the typical range and perhaps as low as 4%. MCL 4th § 14.121. Generally, as the total recovery increases the percentage allocated to fees should decrease. Consider using a sliding scale to advance the goal of awarding reasonable fees in relation to the hours expended. MCL 4th § 14.121, text at nn.497–99; *see also In re* Rite Aid Corp., 396 F.3d at 302–03 (discussing the pros and cons of sliding scales). As noted above in part II, asking attorneys at the outset of the litigation to maintain time records will be helpful in implementing a lodestar cross-check for cases of this magnitude.

## D. Objectors

Objectors may qualify for fees because of their contribution to the common fund available to the class. As occurred in *Bowling v. Pfizer,* 922 F. Supp. 1261, 1285 (S.D. Ohio 1996), by reducing attorney fees, objectors often increase funds available for the common settlement fund. The 2003 Committee Note to Rule 23(h) expressly recognizes the benefits that objectors may provide to the class. But be wary of self-interested professional objectors who often present rote objections to class counsel's fee requests and add little or nothing to the fee proceedings.

## E. Role of government actors

Often in consumer or commercial class action litigation, government regulators, such as the FTC, the Securities and Exchange Commission (SEC), or a state or the federal Attorney General's office, will lay the groundwork for class action litigation. In pursuing

36

*Class Action Pocket Guide (3d ed.)*

public goals of advancing fair competition, protecting consumers, and policing the marketplace against false and misleading information, such agencies may invest substantial resources in investigating a defendant's alleged malfeasance. For example, in *In re First Databank Antitrust Litigation,* 209 F. Supp. 2d 96, 97 (D.D.C. 2002), the FTC "expended over 25,000 hours of investigators' time, obtained production of and reviewed some 400 boxes of documents produced in response to approximately 40 subpoenas, and conducted 20 investigational hearings and over 60 interviews."

In quantifying the risk undertaken by plaintiffs' counsel in bringing a class action, scrutinize the activities of government actors that may have facilitated or enhanced the outcome (see section IV.B.4 above). Where a government body has obtained a guilty plea, criminal conviction, or civil judgment against a defendant, class counsel in a "piggyback" class action arising out of the same set of facts face a reduced risk of loss and a reduced burden of discovery and trial. A reasonable attorney fee in such cases may be a percentage of the value that the class counsel adds to the settlement that would not have been available to the class but for the counsel's work, as happened in *Swedish Hospital Corp. v. Shalala,* 1 F.3d 1261, 1272 (D.C. Cir. 1993). Likewise, in *In re First Databank,* 209 F. Supp. 2d at 98, the court limited the private plaintiff attorneys' fee to a percentage of the value the attorneys added to the FTC's proposed settlement.

In some cases, such as *In re First Databank,* the government actor might participate as an intervenor or as a friend of the court in addressing the attorney fee issues. If the agency does not intervene on its own initiative, consider inviting it to participate in the fee proceedings as an intervenor or friend of the court.

On the other hand, private class action litigation may pave the way for government enforcement or serve as a substantial deterrent in its own right. In such cases, take into account in awarding attorney fees any groundbreaking work of plaintiffs' counsel.

37

ER000214

*Class Action Pocket Guide (3d ed.)*

# VI. Coordination with State Judges

Most class actions of any size and scope will have federal jurisdiction based on minimal diversity and, if originally filed in state court, will most likely be removed to federal court. Coordination among federal courts will often, but not always, proceed through the MDL process, at least for major cases. Some overlapping class actions may be filed in state courts (for example, in cases filed on behalf of a class of primarily in-state plaintiffs against an in-state defendant), but federal courts lack jurisdiction only in cases in which a primary or significant defendant is a citizen of the forum state. The first step in determining jurisdiction is to ask the parties whether competing or overlapping proposed or certified class actions exist in other courts. A defendant should be aware of any other litigation against it and should inform the court about competing or overlapping state class actions.

Judges have developed various practices, with various levels of formality, for coordinating their efforts with their state judge counterparts. Informal practices include personal meetings, telephone calls, and e-mail communications to exchange information about scheduling and to coordinate discovery, rulings on class certification, and other procedural matters. In more formal contexts, judges may share a special master with state judges, sit jointly and hear evidence and argument on motions, or even hold a national conference or a set of meetings about the litigation.

Generally, state judges have responded to requests for coordination in a spirit of cooperation. The key is to identify the cases and judges and initiate communication. Coordination in areas like discovery should take into account the pressure a state judge might experience from state lawyers eager to present their cases at trial or, at a minimum, to share in any common fund that their efforts help create. Only in the rarest instance will you ever need to issue an injunction to protect federal jurisdiction, usually when you are seeking to insulate a national settlement from contrary rulings in competing or overlapping class actions in state court. *See* MCL 4th §§ 21.42 and 20.32.

38

ER000215

*Class Action Pocket Guide (3d ed.)*

# VII. Use of Special Masters and Court-Appointed Experts

Special masters, court-appointed experts, and other judicial adjuncts with special expertise may be useful in a variety of contexts in class action litigation. Specifically, judges have appointed special masters to oversee discovery and resolve disputes in cases in which the number and complexity of documents might generate a large number of disputes. *See* MCL 4th § 11.424. The emergence of electronic discovery and of a new industry of party experts on electronic discovery may increase the need for the court to appoint a discovery master. Judges have also used magistrate judges, special masters, court-appointed experts, technical advisors, and other adjuncts to assist them in evaluating class settlements (*see* MCL 4th § 21.644) and have appointed special masters or other adjuncts to administer settlements and participate in resolving claims via alternative dispute resolution (ADR) or other methods (*see* MCL 4th § 21.661).

Occasionally, judges have appointed special masters to devise trial plans. *See* MCL 4th § 21.141. In class actions involving disputed scientific evidence, you may want to appoint an expert to present a perspective on disputed issues that is less adversarial than what the parties' experts present. *See, e.g.,* MCL 4th § 22.87. Federal Rules of Civil Procedure 23(h)(4) and 53(a)(1)(C) expressly authorize using special masters to review attorney fee requests. *See* MCL 4th § 21.727. In many class actions, however, the trial judge may find that the information learned by participating in pretrial matters, such as resolving discovery disputes, will greatly enhance the judge's ability to make an informed assessment of a class settlement.

## Conclusion

If this guide has served its purpose, it has helped you analyze and manage the major aspects of class action litigation. By anticipating and paying serious attention to reviewing settlements and requests for attorney fees, you should be able to fulfill your role as a fidu-

ER000216

*Class Action Pocket Guide (3d ed.)*

ciary for a class whose counsel and representatives have decided to settle on a particular outcome.

## Bibliography

American Law Institute, Principles of Aggregate Litigation (2010)

California Superior Court, Guidelines for Motions for Preliminary and Final Approval of Class Settlement (Draft May 3, 2010)

Theodore Eisenberg & Geoffrey P. Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues,* 57 Vand. L. Rev. 1529 (2004)

Federal Judicial Center, Manual for Complex Litigation, Fourth (MCL 4th) (2004)

Federal Trade Commission, Fulfilling the Original Vision: The FTC at 90 (April 2004), http://ftc.gov/os/2004/04/040402abafinal.pdf

Deborah Hensler et al., Class Action Dilemmas: Pursuing Public Goals for Private Gain (RAND Corp. 2000)

Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do You Really Want Me To Know My Rights? The Ethics Behind Due Process in Class Action Notice Is More Than Just Plain Language: A Desire to Actually Inform*, 18 Geo. J. Legal Ethics 1359 (2005)

Alan Hirsch & Diane Sheehey, Federal Judicial Center, Awarding Attorneys' Fees and Managing Fee Litigation (2d ed. 2005)

Laural L. Hooper & Marie Leary, *Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study,* 209 F.R.D. 519 (Federal Judicial Center 2001)

Emery G. Lee III & Thomas E. Willging, *The Impact of the Class Action Fairness Act on the Federal Courts: An Empirical Analysis of Filings and Removals,* 156 U. Pa. L. Rev. 1723 (2008)

Emery G. Lee III & Thomas E. Willging, Federal Judicial Center, Impact of the Class Action Fairness Act on the Federal Courts: Preliminary Findings from Phase Two's Pre-CAFA Sample of Diversity Class Actions (2008)

40

*Class Action Pocket Guide (3d ed.)*

Francis E. McGovern, Distribution of Funds in Class Actions-Claims Administration, 35 J. Corp. L. 123 (2009)

Nicholas M. Pace & William B. Rubenstein, How Transparent Are Case Outcomes: Empirical Research on the Availability of Class Action Claims Data (RAND Corp. 2008)

Barbara J. Rothstein, John Beisner, Elizabeth J. Cabraser & Jay Tidmarsh, *The Class Action Fairness Act of 2005: An Overview of Legal and Case Management Issues* (Federal Judicial Center Broadcast, Apr. 1, 2005) (outline and videotape available from the FJC's Information Services Office)

Rust Consulting, Inc. & Kinsella Media, LLC, Plain Language Primer for Class Action Notice (undated), http://www.kinsella media.com/Knowledge_Sharing.aspx

Rust Consulting, Inc., Class Action Settlements: What You Should Know About Claim Filing Services (undated), http://www.rust consulting.com/pdfs/ClaimFilingServices.pdf

William W Schwarzer, Nancy E. Weiss & Alan Hirsch, *Judicial Federalism in Action: Coordination of Litigation in State and Federal Courts,* 78 Va. L. Rev. 1689 (1992)

Symposium, *Fairness to Whom? Perspectives on the Class Action Fairness Act of 2005,* 156 U. Pa. L. Rev. 1439 (2008)

Third Circuit Task Force, *Report on Selection of Class Counsel,* 74 Temp. L. Rev. 689 (2001)

Sarah S. Vance, *A Primer on the Class Action Fairness Act of 2005,* 80 Tul. L. Rev. 1617 (2006)

Shannon R. Wheatman & Terri R. LeClercq, Majority of Class Action Publication Notices Fail to Satisfy Rule 23 Requirements (2010) (unpublished manuscript on file with the Federal Judicial Center)

Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Federal Judicial Center, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules (1996); *see also* Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *An Empirical Analysis of Rule 23 to*

ER000218

*Class Action Pocket Guide (3d ed.)*

*Address the Rulemaking Challenges,* 71 N.Y.U. L. Rev. 74 (1996) (later version of same report with fewer tables and figures)

Thomas E. Willging & Shannon R. Wheatman, Federal Judicial Center, An Empirical Examination of Attorneys' Choice of Forum in Class Action Litigation (2005)

## Case Annotations by Topic

### *Determining federal jurisdiction*

Tam v. Indymac Bank, No. 2:8CV06458, 2008 WL 4793676 (C.D. Cal. Oct. 30, 2008) (comprehensive show cause order with a checklist of jurisdictional and removal issues)

### Burdens of proof

Blockbuster v. Galeno, 472 F.3d 53, 56–58 (2d Cir. 2006) (CAFA did not alter long-standing burden-of-proof rule)

Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc., 485 F.3d 804, 813 (5th Cir. 2007) ("'once federal jurisdiction has been established [under CAFA] the *objecting* party bears the burden of proof as to the applicability of any express statutory exception under §§ 1332(d)(4)(A) and (B) [the local controversy and home state exceptions]'") (quoting Serrano v. 180 Connect, Inc., 478 F.3d 1018, 1024 (9th Cir. 2007) (alterations in original))

Spivey v. Vertrue, Inc., 528 F.3d 982, 985–86 (7th Cir. 2008) (defendant satisfied its burden of proof by showing more than $5 million was at stake, or "in controversy")

### Amount in controversy

Brill v. Countrywide Home Loans, 427 F.3d 446, 448 (7th Cir. 2005) ("Once the proponent of jurisdiction has set out the amount in controversy, only a 'legal certainty' that the judgment will be less forecloses federal jurisdiction.")

Gene & Gene LLC v. Biopay LLC, 541 F.3d 318, 324 (5th Cir. 2008) ("Gene's complaint held open the possibility of treble damages, depending on the state of the proof.")

42

*Class Action Pocket Guide (3d ed.)*

> Hart v. FedEx Ground Package Sys., Inc., 457 F.3d 675, 682 (7th Cir. 2006) (party challenging federal jurisdiction must provide competent proof of the facts supporting the challenge)
>
> Lowdermilk v. United States Bank Nat'l Ass'n, 479 F.3d 994, 999–1000 (9th Cir. 2007) (plaintiff is the master of its complaint, and courts must accept damages allegations unless defendant can show a legal certainty of greater damages)

Home-state exception

> Martin v. Lafon Nursing Facility of the Holy Family, Inc., 548 F. Supp. 2d 268, 273–78 (E.D. La. 2008) (discussing use of a questionnaire to establish residence and intent)
>
> Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc., 485 F.3d 804, 813–18 (5th Cir. 2007) (discussing affidavits and evidence submitted to support proof of citizenship of class members in applying discretionary exception to CAFA)
>
> Summerhill v. Terminix, No. 4:08CV659, 2008 WL 4809448 (E.D. Ark. Oct. 30, 2008) (applying statutory requirement that all primary defendants must be citizens of the home state for the exception to apply)

Discretionary jurisdiction

> Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc., 485 F.3d 804, 822–24 (5th Cir. 2007) (class action involving Hurricane Katrina-related injuries did not affect national interests under CAFA)

## Timing and significance of class certification

Class certification

> General Telephone Co. v. Falcon, 457 U.S. 147, 161 (1982) ("[A] class action may only be certified if the trial judge is satisfied, after a vigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.")
>
> Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 594 (9th Cir. 2010) ("[D]istrict courts are not only at liberty to but must perform a rigorous analysis to ensure that the prerequisites of Rule 23 have been satisfied, and this analysis will often . . . require

43

*Class Action Pocket Guide (3d ed.)*

looking behind the pleadings to issues overlapping with the merits of the underlying claims.")

Notice

*In re* Vivendi Universal, S.A. Securities Litigation, 242 F.R.D. 76, 107–09 (2007)

Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 176 (1974)

## Settlement review: risks and issues

Judge's role

Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 280 (7th Cir. 2002)

Prior action by government entities

*In re* First Databank Antitrust Litig., 209 F. Supp. 2d 96 (D.D.C. 2002)

Appraisal of settlement

Acosta v. Trans Union, LLC, 243 F.R.D. 377, 391 (C.D. Cal. 2007) (reducing the number of claims rendered a portion of the settlement "illusory")

Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561, 574–75 (E.D. Pa. 2001) (settlement appraisal focused on the value actually distributed to the class based on the number of claims actually filed)

Information from objectors

O'Keefe v. Mercedes-Benz USA, LLC, 214 F.R.D. 266, 295 (E.D. Pa. 2003) (referring to "'canned objections filed by professional objectors who seek out class actions to simply extract a fee by lodging generic, unhelpful protests'" (quoting Shaw v. Toshiba Am. Info. Sys., 91 F. Supp. 2d 942, 973 (S.D. Tex. 2000))

ER000221

## Hot button indicators

Coupons

> *In re* Compact Disc Minimum Advertised Price Antitrust Litig., 292 F. Supp. 2d 184, 186–88 (D. Me. 2003) (comparing settlement discounts with discounts available to frugal shoppers)
>
> *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 809–10 (3d Cir. 1995) (rejecting coupon settlement based in part on absence of a secondary market in which coupons could be converted to cash)
>
> *In re* Mexico Money Transfer Litig., 267 F.3d 743, 748 (7th Cir. 2001) (coupons may be of value to repeat users of a product or service)

Negative options

> Chavez v. Netflix, Inc., 75 Cal. Rptr. 3d 413, 418–21 (Cal. Ct. App. 2008) (tying together a proposed "benefit" with an automatic paid renewal of that "benefit" is grounds for rejection of a proposed settlement)

*Cy pres* relief ("fluid recovery")

> Molski v. Gleich, 318 F.3d 937, 954 (9th Cir. 2003) (rejecting proposed *cy pres* award after examining proposed settlement for evidence that "proof of individual claims would be burdensome or that distribution of damages would be costly")
>
> Powell v. Georgia-Pac. Corp., 119 F.3d 703 (8th Cir. 1997) (examining the relationship between the class members' interests and those of the proposed *cy pres* recipient)

Restriction on claims/reversion of unclaimed funds to defendants

> Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 283 (7th Cir. 2002) (restrictions on eligibility may diminish the value of the settlement to the class)

Collusion: "Reverse auctions" and the like

> Acosta v. Trans Union, LLC, 243 F.R.D. 377, 399 (C.D. Cal. 2007) ("The Court is hesitant to classify the Settlement as the product of a 'reverse auction,' but cannot avoid the con-

45

*Class Action Pocket Guide (3d ed.)*

clusion that the process by which it was reached is strikingly similar.")

Figueroa v. Sharper Image Corp., 517 F. Supp. 2d 1292, 1321 (S.D. Fla. 2007) (class settlement rejected where defendants selected the most vulnerable plaintiff attorney and convinced that attorney to accept terms unfavorable to the class)

Injunctive relief

Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 615–23 (9th Cir. 2010) (discussing injunctive relief)

Release of liability without remedy

Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 283–84 (7th Cir. 2002) (releasing a damage remedy without payment to class members is not acceptable)

Settlement class actions

Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997) (Rule 23 standards, with the exception of manageability, apply to certification of settlement class actions)

## Preliminary review of proposed settlement

*In re* Lupron Mktg. & Sales Practices Litig., 345 F. Supp. 2d 135, 138 n.5 (D. Mass. 2004) (permitting plaintiff counsel in independent state class actions against same defendants to intervene and provide adversarial opposition to a proposed settlement)

Notice to the Class

Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974)

Mullane v. Central Hanover Bank and Trust Co. 339 U.S. 306 (1950)

Jones v. Flowers, 547 U.S. 220 (2006)

*In re* Holocaust Victims Assets Litig., 105 F. Supp. 2d 139, 144–45 (E.D.N.Y. 2000) (describing multifaceted notice plan)

46

ER000223

*Class Action Pocket Guide (3d ed.)*

## Conducting the fairness hearing

> *In re* Cendant Corp. Litig., 264 F.3d 201 (3d Cir. 2001) (appellate review of class settlement)

## Attorney fee issues

> *In re* Rite Aid Corp. Sec. Litig., 396 F.3d 294, 307 (3d Cir. 2005) (stating that "the district judge must protect the class's interest by acting as a fiduciary for the class")

Evaluating monetary and nonmonetary results achieved
> Bowling v. Pfizer, 132 F.3d 1147, 1151–52 (6th Cir. 1998) (reserving a portion of attorney fee decision until administration of the class settlement is complete)
>
> Fleury v. Richemont N. Am., Inc., No. 05-4525, 2008 WL 3287154, at *6 (N.D. Cal. Aug. 6, 2008) (reserving attorney fee decision)
>
> *In re* Auction Houses Antitrust Litig., No. 00-Civ.-0648, 2001 WL 170792, at *3–*5, *15–17 (S.D.N.Y. 2001) (awarding fees in part in the form of warrants)
>
> Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561 (E.D. Pa. 2001) (value distributed to the class based on the number of claims actually filed represents the starting point for calculation of attorney fee award)
>
> Strong v. BellSouth Telecomm., Inc., 173 F.R.D. 167 (W.D. La. 1997), *aff'd*, 137 F.3d 844, 848 (5th Cir. 1998) (reserving attorney fee decision until court receives information about actual distribution of settlement benefits to class members)
>
> Sylvester v. CIGNA Corp., 369 F. Supp. 2d 34, 50–53 (D. Me. 2005) (using information about actual claims by class members to evaluate settlement and award attorney fees)

Methods of calculating fees
> *In re* Rite Aid Corp. Sec. Litig., 396 F.3d 294, 306–07 (3d Cir. 2005) (lodestar cross-check does not require actual billing records)

47

ER000224

*Class Action Pocket Guide (3d ed.)*

"Mega" cases

> *In re* Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 339–40 (3d Cir. 1998) (describing large class settlements)
>
> *In re* Rite Aid Corp. Sec. Litig., 396 F.3d 294, 302–03 (3d Cir. 2005) (discussing pros and cons of sliding scales for fee awards)

Objectors

> Bowling v. Pfizer, 922 F. Supp. 1261, 1285 (S.D. Ohio 1996) (objectors to fees were awarded fees for adding to the common fund)

Role of government actors

> *In re* First Databank Antitrust Litig., 209 F. Supp. 2d 96, 97–98 (D.D.C. 2002) (documenting time and effort of government agency; participation in class litigation by government agency)
>
> Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1272 (D.C. Cir. 1993) (reasonable attorney fee is a percentage of the value added to the class settlement beyond the amount attributable to the government agency)

48

### The Federal Judicial Center

**Board**
The Chief Justice of the United States, Chair
Judge Susan H. Black, U.S. Court of Appeals for the Eleventh Circuit
Judge David O. Carter, U.S. District Court for the Central District of California
Magistrate Judge John Michael Facciola, U.S. District Court for the District of
    Columbia
Judge James B. Haines, Jr., U.S. Bankruptcy Court for the District of Maine
Judge Edward C. Prado, U.S. Court of Appeals for the Fifth Circuit
Judge Loretta A. Preska, U.S. District Court for the Southern District of New York
Judge Philip M. Pro, U.S. District Court for the District of Nevada
James C. Duff, Director of the Administrative Office of the U.S. Courts

**Director**
Judge Barbara J. Rothstein

**Deputy Director**
John S. Cooke

### About the Federal Judicial Center

The Federal Judicial Center is the research and education agency of the federal judicial system. It was established by Congress in 1967 (28 U.S.C. §§ 620–629), on the recommendation of the Judicial Conference of the United States.

By statute, the Chief Justice of the United States chairs the Center's Board, which also includes the director of the Administrative Office of the U.S. Courts and seven judges elected by the Judicial Conference.

The organization of the Center reflects its primary statutory mandates. The Education Division plans and produces education and training programs for judges and court staff, including satellite broadcasts, video programs, publications, curriculum packages for in-court training, and Web-based programs and resources. The Research Division examines and evaluates current and alternative federal court practices and policies. This research assists Judicial Conference committees, who request most Center research, in developing policy recommendations. The Center's research also contributes substantially to its educational programs. The two divisions work closely with two units of the Director's Office—the Systems Innovations & Development Office and Communications Policy & Design Office—in using print, broadcast, and online media to deliver education and training and to disseminate the results of Center research. The Federal Judicial History Office helps courts and others study and preserve federal judicial history. The International Judicial Relations Office provides information to judicial and legal officials from foreign countries and assesses how to inform federal judicial personnel of developments in international law and other court systems that may affect their work.

ER000226

Case: 18-80170   11/23/2018   ID: 11098088   DktEntry: 1-4   Page: 219 of 324

# EXHIBIT B

ER000227

**Notes of Advisory Committee on 2003 amendments.** *Note to Subdivision (c).* Subdivision (c) is amended in several respects. The requirement that the court determine whether to certify a class "as soon as practicable after commencement of an action" is replaced by requiring determination "at an early practicable time." The notice provisions are substantially revised.

Paragraph (1). Subdivision (c)(1)(A) is changed to require that the determination whether to certify a class be made "at an early practicable time." The "as soon as practicable" exaction neither reflects prevailing practice nor captures the many valid reasons that may justify deferring the initial certification decision. See Willging, Hooper & Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 26-36 (Federal Judicial Center 1996).

Time may be needed to gather information necessary to make the certification decision. Although an evaluation of the probable outcome on the merits is not properly part of the certification decision, discovery in aid of the certification decision often includes information required to identify the nature of the issues that actually will be presented at trial. In this sense it is appropriate to conduct controlled discovery into the "merits," limited to those aspects relevant to making the certification decision on an informed basis. Active judicial supervision may be required to achieve the most effective balance that expedites an informed certification determination without forcing an artificial and ultimately wasteful division between "certification discovery" and "merits discovery." A critical need is to determine how the case will be tried. An increasing number of courts require a party requesting class certification to present a "trial plan" that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof. See Manual For Complex Litigation Third, § 21.213, p. 44; § 30.11, p. 214; § 30.12, p. 215.

Other considerations may affect the timing of the certification decision. The party opposing the class may prefer to win dismissal or summary judgment as to the individual plaintiffs without certification and without binding the class that might have been certified. Time may be needed to explore designation of counsel under Rule 23(g), recognizing that in many cases the need to progress toward the certification determination may require designation of interim class counsel under Rule 23(g)(2)(A).

Although many circumstances may justify deferring the certification decision, active management may be necessary to ensure that the certification decision is not unjustifiably delayed.

Subdivision (c)(1)(C) reflects two amendments. The provision that a class certification "may be conditional" is deleted. A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met. The provision that permits alteration or amendment of an order granting or denying class certification is amended to set the cut-off point at final judgment rather than "the decision on the merits." This change avoids the possible ambiguity in referring to "the decision on the merits." Following a determination of liability, for example, proceedings to define the remedy may demonstrate the need to amend the class definition or subdivide the class. In this setting the final judgment concept is pragmatic. It is not the same as the concept used for appeal purposes, but it should be, particularly in protracted litigation.

The authority to amend an order under Rule 23(c)(1) before final judgment does not restore the practice of "one-way intervention" that was rejected by the 1966 revision of Rule 23. A determination of liability after certification, however, may show a need to amend the class definition. Decertification may be warranted after further proceedings.

If the definition of a class certified under Rule 23(b)(3) is altered to include members who have not

ER000228

been afforded notice and an opportunity to request exclusion, notice -- including an opportunity to request exclusion -- must be directed to the new class members under Rule 23(c)(2)(B).

Paragraph (2). The first change made in Rule 23(c)(2) is to call attention to the court's authority -- already established in part by Rule 23(d)(2) -- to direct notice of certification to a Rule 23(b)(1) or (b)(2) class. The present rule expressly requires notice only in actions certified under Rule 23(b)(3). Members of classes certified under Rules 23(b)(1) or (b)(2) have interests that may deserve protection by notice.

The authority to direct notice to class members in a (b)(1) or (b)(2) class action should be exercised with care. For several reasons, there may be less need for notice than in a (b)(3) class action. There is no right to request exclusion from a (b)(1) or (b)(2) class. The characteristics of the class may reduce the need for formal notice. The cost of providing notice, moreover, could easily cripple actions that do not seek damages. The court may decide not to direct notice after balancing the risk that notice costs may deter the pursuit of class relief against the benefits of notice.

When the court does direct certification notice in a (b)(1) or (b)(2) class action, the discretion and flexibility established by subdivision (c)(2)(A) extend to the method of giving notice. Notice facilitates the opportunity to participate. Notice calculated to reach a significant number of class members often will protect the interests of all. Informal methods may prove effective. A simple posting in a place visited by many class members, directing attention to a source of more detailed information, may suffice. The court should consider the costs of notice in relation to the probable reach of inexpensive methods.

If a Rule 23(b)(3) class is certified in conjunction with a (b)(2) class, the (c)(2)(B) notice requirements must be satisfied as to the (b)(3) class.

The direction that class-certification notice be couched in plain, easily understood language is a reminder of the need to work unremittingly at the difficult task of communicating with class members. It is difficult to provide information about most class actions that is both accurate and easily understood by class members who are not themselves lawyers. Factual uncertainty, legal complexity, and the complication of class-action procedure raise the barriers high. The Federal Judicial Center has created illustrative clear-notice forms that provide a helpful starting point for actions similar to those described in the forms.

*Note to Subdivision (e).* Subdivision (e) is amended to strengthen the process of reviewing proposed class-action settlements. Settlement may be a desirable means of resolving a class action. But court review and approval are essential to assure adequate representation of class members who have not participated in shaping the settlement.

Paragraph (1). Subdivision (e)(1)(A) expressly recognizes the power of a class representative to settle class claims, issues, or defenses.

Rule 23(e)(1)(A) resolves the ambiguity in former Rule 23(e)'s reference to dismissal or compromise of "a class action." That language could be -- and at times was -- read to require court approval of settlements with putative class representatives that resolved only individual claims. See Manual for Complex Litigation Third, § 30.41. The new rule requires approval only if the claims, issues, or defenses of a certified class are resolved by a settlement, voluntary dismissal, or compromise.

Subdivision (e)(1)(B) carries forward the notice requirement of present Rule 23(e) when the settlement binds the class through claim or issue preclusion; notice is not required when the settlement binds only the individual class representatives. Notice of a settlement binding on the class is required either when the settlement follows class certification or when the decisions on certification and settlement proceed

simultaneously.

Reasonable settlement notice may require individual notice in the manner required by Rule 23(c)(2)(B) for certification notice to a Rule 23(b)(3) class. Individual notice is appropriate, for example, if class members are required to take action -- such as filing claims -- to participate in the judgment, or if the court orders a settlement opt-out opportunity under Rule 23(e)(3).

Subdivision (e)(1)(C) confirms and mandates the already common practice of holding hearings as part of the process of approving settlement, voluntary dismissal, or compromise that would bind members of a class.

Subdivision (e)(1)(C) states the standard for approving a proposed settlement that would bind class members. The settlement must be fair, reasonable, and adequate. A helpful review of many factors that may deserve consideration is provided by *In re: Prudential Ins. Co. America Sales Practice Litigation Agent Actions, 148 F.3d 283, 316-324 (3d Cir. 1998).* Further guidance can be found in the Manual for Complex Litigation.

The court must make findings that support the conclusion that the settlement is fair, reasonable, and adequate. The findings must be set out in sufficient detail to explain to class members and the appellate court the factors that bear on applying the standard.

Settlement review also may provide an occasion to review the cogency of the initial class definition. The terms of the settlement themselves, or objections, may reveal divergent interests of class members and demonstrate the need to redefine the class or to designate subclasses.

Redefinition of a class certified under Rule 23(b)(3) may require notice to new class members under Rule 23(c)(2)(B). See Rule 23(c)(1)(C).

Paragraph (2). Subdivision (e)(2) requires parties seeking approval of a settlement, voluntary dismissal, or compromise under Rule 23(e)(1) to file a statement identifying any agreement made in connection with the settlement. This provision does not change the basic requirement that the parties disclose all terms of the settlement or compromise that the court must approve under Rule 23(e)(1). It aims instead at related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others. Doubts should be resolved in favor of identification.

Further inquiry into the agreements identified by the parties should not become the occasion for discovery by the parties or objectors. The court may direct the parties to provide to the court or other parties a summary or copy of the full terms of any agreement identified by the parties. The court also may direct the parties to provide a summary or copy of any agreement not identified by the parties that the court considers relevant to its review of a proposed settlement. In exercising discretion under this rule, the court may act in steps, calling first for a summary of any agreement that may have affected the settlement and then for a complete version if the summary does not provide an adequate basis for review. A direction to disclose a summary or copy of an agreement may raise concerns of confidentiality. Some agreements may include information that merits protection against general disclosure. And the court must provide an opportunity to claim work-product or other protections.

Paragraph (3). Subdivision (e)(3) authorizes the court to refuse to approve a settlement unless the settlement affords class members a new opportunity to request exclusion from a class certified under Rule 23(b)(3) after settlement terms are known. An agreement by the parties themselves to permit class members to elect exclusion at this point by the settlement agreement may be one factor supporting

approval of the settlement. Often there is an opportunity to opt out at this point because the class is certified and settlement is reached in circumstances that lead to simultaneous notice of certification and notice of settlement. In these cases, the basic opportunity to elect exclusion applies without further complication. In some cases, particularly if settlement appears imminent at the time of certification, it may be possible to achieve equivalent protection by deferring notice and the opportunity to elect exclusion until actual settlement terms are known. This approach avoids the cost and potential confusion of providing two notices and makes the single notice more meaningful. But notice should not be delayed unduly after certification in the hope of settlement.

Rule 23 (e)(3) authorizes the court to refuse to approve a settlement unless the settlement affords a new opportunity to elect exclusion in a case that settles after a certification decision if the earlier opportunity to elect exclusion provided with the certification notice has expired by the time of the settlement notice. A decision to remain in the class is likely to be more carefully considered and is better informed when settlement terms are known.

The opportunity to request exclusion from a proposed settlement is limited to members of a (b)(3) class. Exclusion may be requested only by individual class members; no class member may purport to opt out other class members by way of another class action.

The decision whether to approve a settlement that does not allow a new opportunity to elect exclusion is confided to the court's discretion. The court may make this decision before directing notice to the class under Rule 23(e)(1)(B) or after the Rule 23(e)(1)(C) hearing. Many factors may influence the court's decision. Among these are changes in the information available to class members since expiration of the first opportunity to request exclusion, and the nature of the individual class members' claims.

The terms set for permitting a new opportunity to elect exclusion from the proposed settlement of a Rule 23(b)(3) class action may address concerns of potential misuse. The court might direct, for example, that class members who elect exclusion are bound by rulings on the merits made before the settlement was proposed for approval. Still other terms or conditions may be appropriate.

Paragraph (4). Subdivision (e)(4) confirms the right of class members to object to a proposed settlement, voluntary dismissal, or compromise. The right is defined in relation to a disposition that, because it would bind the class, requires court approval under subdivision (e)(1)(C).

Subdivision (e)(4)(B) requires court approval for withdrawal of objections made under subdivision (e)(4)(A). Review follows automatically if the objections are withdrawn on terms that lead to modification of the settlement with the class. Review also is required if the objector formally withdraws the objections. If the objector simply abandons pursuit of the objection, the court may inquire into the circumstances.

Approval under paragraph (4)(B) may be given or denied with little need for further inquiry if the objection and the disposition go only to a protest that the individual treatment afforded the objector under the proposed settlement is unfair because of factors that distinguish the objector from other class members. Different considerations may apply if the objector has protested that the proposed settlement is not fair, reasonable, or adequate on grounds that apply generally to a class or subclass. Such objections, which purport to represent class-wide interests, may augment the opportunity for obstruction or delay. If such objections are surrendered on terms that do not affect the class settlement or the objector's participation in the class settlement, the court often can approve withdrawal of the

ER000231

objections without elaborate inquiry.

Once an objector appeals, control of the proceeding lies in the court of appeals. The court of appeals may undertake review and approval of a settlement with the objector, perhaps as part of appeal settlement procedures, or may remand to the district court to take advantage of the district court's familiarity with the action and settlement.

*Note to Subdivision (g).* Subdivision (g) is new. It responds to the reality that the selection and activity of class counsel are often critically important to the successful handling of a class action. Until now, courts have scrutinized proposed class counsel as well as the class representative under Rule 23(a)(4). This experience has recognized the importance of judicial evaluation of the proposed lawyer for the class, and this new subdivision builds on that experience rather than introducing an entirely new element into the class certification process. Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in assessing proposed class counsel as part of the certification decision. This subdivision recognizes the importance of class counsel, states the obligation to represent the interests of the class, and provides a framework for selection of class counsel. The procedure and standards for appointment vary depending on whether there are multiple applicants to be class counsel. The new subdivision also provides a method by which the court may make directions from the outset about the potential fee award to class counsel in the event the action is successful.

Paragraph (1) sets out the basic requirement that class counsel be appointed if a class is certified and articulates the obligation of class counsel to represent the interests of the class, as opposed to the potentially conflicting interests of individual class members. It also sets out the factors the court should consider in assessing proposed class counsel.

Paragraph (1)(A) requires that the court appoint class counsel to represent the class. Class counsel must be appointed for all classes, including each subclass that the court certifies to represent divergent interests.

Paragraph (1)(A) does not apply if "a statute provides otherwise." This recognizes that provisions of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified in various sections of 15 U.S.C.), contain directives that bear on selection of a lead plaintiff and the retention of counsel. This subdivision does not purport to supersede or to affect the interpretation of those provisions, or any similar provisions of other legislation.

Paragraph 1(B) recognizes that the primary responsibility of class counsel, resulting from appointment as class counsel, is to represent the best interests of the class. The rule thus establishes the obligation of class counsel, an obligation that may be different from the customary obligations of counsel to individual clients.

Appointment as class counsel means that the primary obligation of counsel is to the class rather than to any individual members of it. The class representatives do not have an unfettered right to "fire" class counsel.In the same vein, the class representatives cannot command class counsel to accept or reject a settlement proposal. To the contrary, class counsel must determine whether seeking the court's approval of a settlement would be in the best interests of the class as a whole.

Paragraph (1)(C) articulates the basic responsibility of the court to appoint class counsel who will provide the adequate representation called for by paragraph (1)(B). It identifies criteria that must be considered and invites the court to consider any other pertinent matters. Although couched in terms of

the court's duty, the listing also informs counsel seeking appointment about the topics that should be addressed in an application for appointment or in the motion for class certification.

The court may direct potential class counsel to provide additional information about the topics mentioned in paragraph (1)(C) or about any other relevant topic. For example, the court may direct applicants to inform the court concerning any agreements about a prospective award of attorney fees or nontaxable costs, as such agreements may sometimes be significant in the selection of class counsel. The court might also direct that potential class counsel indicate how parallel litigation might be coordinated or consolidated with the action before the court.

The court may also direct counsel to propose terms for a potential award of attorney fees and nontaxable costs. Attorney fee awards are an important feature of class action practice, and attention to this subject from the outset may often be a productive technique. Paragraph (2)(C) therefore authorizes the court to provide directions about attorney fees and costs when appointing class counsel. Because there will be numerous class actions in which this information is not likely to be useful, the court need not consider it in all class actions.

Some information relevant to class counsel appointment may involve matters that include adversary preparation in a way that should be shielded from disclosure to other parties. An appropriate protective order may be necessary to preserve confidentiality.

In evaluating prospective class counsel, the court should weigh all pertinent factors. No single factor should necessarily be determinative in a given case. For example, the resources counsel will commit to the case must be appropriate to its needs, but the court should be careful not to limit consideration to lawyers with the greatest resources.

If, after review of all applicants, the court concludes that none would be satisfactory class counsel, it may deny class certification, reject all applications, recommend that an application be modified, invite new applications, or make any other appropriate order regarding selection and appointment of class counsel.

Paragraph (2). This paragraph sets out the procedure that should be followed in appointing class counsel. Although it affords substantial flexibility, it provides the framework for appointment of class counsel in all class actions. For counsel who filed the action, the materials submitted in support of the motion for class certification may suffice to justify appointment so long as the information described in paragraph (g)(1)(C) is included. If there are other applicants, they ordinarily would file a formal application detailing their suitability for the position.

In a plaintiff class action the court usually would appoint as class counsel only an attorney or attorneys who have sought appointment. Different considerations may apply in defendant class actions.

The rule states that the court should appoint "class counsel." In many instances, the applicant will be an individual attorney. In other cases, however, an entire firm, or perhaps of numerous attorneys who are not otherwise affiliated but are collaborating on the action will apply. No rule of thumb exists to determine when such arrangements are appropriate; the court should be alert to the need for adequate staffing of the case, but also to the risk of overstaffing or an ungainly counsel structure.

Paragraph (2)(A) authorizes the court to designate interim counsel during the pre-certification period if necessary to protect the interests of the putative class. Rule 23(c)(1)(B) directs that the order certifying the class include appointment of class counsel. Before class certification, however, it will usually be important for an attorney to take action to prepare for the certification decision. The amendment to

Rule 23(c)(1) recognizes that some discovery is often necessary for that determination. It also may be important to make or respond to motions before certification. Settlement may be discussed before certification. Ordinarily, such work is handled by the lawyer who filed the action. In some cases, however, there may be rivalry or uncertainty that makes formal designation of interim counsel appropriate. Rule 23(g)(2)(A) authorizes the court to designate interim counsel to act on behalf of the putative class before the certification decision is made. Failure to make the formal designation does not prevent the attorney who filed the action from proceeding in it. Whether or not formally designated interim counsel, an attorney who acts on behalf of the class before certification must act in the best interests of the class as a whole. For example, an attorney who negotiates a pre-certification settlement must seek a settlement that is fair, reasonable, and adequate for the class.

Rule 23(c)(1) provides that the court should decide whether to certify the class "at an early practicable time," and directs that class counsel should be appointed in the order certifying the class. In some cases, it may be appropriate for the court to allow a reasonable period after commencement of the action for filing applications to serve as class counsel. The primary ground for deferring appointment would be that there is reason to anticipate competing applications to serve as class counsel. Examples might include instances in which more than one class action has been filed, or in which other attorneys have filed individual actions on behalf of putative class members. The purpose of facilitating competing applications in such a case is to afford the best possible representation for the class. Another possible reason for deferring appointment would be that the initial applicant was found inadequate, but it seems appropriate to permit additional applications rather than deny class certification.

Paragraph (2)(B) states the basic standard the court should use in deciding whether to certify the class and appoint class counsel in the single applicant situation -- that the applicant be able to provide the representation called for by paragraph (1)(B) in light of the factors identified in paragraph (1)(C).

If there are multiple adequate applicants, paragraph (2)(B) directs the court to select the class counsel best able to represent the interests of the class. This decision should also be made using the factors outlined in paragraph (1)(C), but in the multiple applicant situation the court is to go beyond scrutinizing the adequacy of counsel and make a comparison of the strengths of the various applicants. As with the decision whether to appoint the sole applicant for the position, no single factor should be dispositive in selecting class counsel in cases in which there are multiple applicants. The fact that a given attorney filed the instant action, for example, might not weigh heavily in the decision if that lawyer had not done significant work identifying or investigating claims. Depending on the nature of the case, one important consideration might be the applicant's existing attorney-client relationship with the proposed class representative.

Paragraph (2)(C) builds on the appointment process by authorizing the court to include provisions regarding attorney fees in the order appointing class counsel. Courts may find it desirable to adopt guidelines for fees or nontaxable costs, or to direct class counsel to report to the court at regular intervals on the efforts undertaken in the action, to facilitate the court's later determination of a reasonable attorney fee.

*Note to Subdivision (h).* Subdivision (h) is new. Fee awards are a powerful influence on the way attorneys initiate, develop, and conclude class actions. Class action attorney fee awards have heretofore been handled, along with all other attorney fee awards, under Rule 54(d)(2), but that rule is not addressed to the particular concerns of class actions. This subdivision is designed to work in tandem

with new subdivision (g) on appointment of class counsel, which may afford an opportunity for the court to provide an early framework for an eventual fee award, or for monitoring the work of class counsel during the pendency of the action.

Subdivision (h) applies to "an action certified as a class action." This includes cases in which there is a simultaneous proposal for class certification and settlement even though technically the class may not be certified unless the court approves the settlement pursuant to review under Rule 23(e). When a settlement is proposed for Rule 23(e) approval, either after certification or with a request for certification, notice to class members about class counsel's fee motion would ordinarily accompany the notice to the class about the settlement proposal itself.

This subdivision does not undertake to create new grounds for an award of attorney fees or nontaxable costs. Instead, it applies when such awards are authorized by law or by agreement of the parties. Against that background, it provides a format for all awards of attorney fees and nontaxable costs in connection with a class action, not only the award to class counsel. In some situations, there may be a basis for making an award to other counsel whose work produced a beneficial result for the class, such as attorneys who acted for the class before certification but were not appointed class counsel, or attorneys who represented objectors to a proposed settlement under Rule 23(e) or to the fee motion of class counsel. Other situations in which fee awards are authorized by law or by agreement of the parties may exist.

This subdivision authorizes an award of "reasonable" attorney fees and nontaxable costs. This is the customary term for measurement of fee awards in cases in which counsel may obtain an award of fees under the "common fund" theory that applies in many class actions, and is used in many fee-shifting statutes. Depending on the circumstances, courts have approached the determination of what is reasonable in different ways. In particular, there is some variation among courts about whether in "common fund" cases the court should use the lodestar or a percentage method of determining what fee is reasonable. The rule does not attempt to resolve the question whether the lodestar or percentage approach should be viewed as preferable.

Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process. Continued reliance on caselaw development of fee-award measures does not diminish the court's responsibility. In a class action, the district court must ensure that the amount and mode of payment of attorney fees are fair and proper whether the fees come from a common fund or are otherwise paid. Even in the absence of objections, the court bears this responsibility.

Courts discharging this responsibility have looked to a variety of factors. One fundamental focus is the result actually achieved for class members, a basic consideration in any case in which fees are sought on the basis of a benefit achieved for class members. The Private Securities Litigation Reform Act of 1995 explicitly makes this factor a cap for a fee award in actions to which it applies. See 15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class"). For a percentage approach to fee measurement, results achieved is the basic starting point.

In many instances, the court may need to proceed with care in assessing the value conferred on class members. Settlement regimes that provide for future payments, for example, may not result in significant actual payments to class members. In this connection, the court may need to scrutinize the manner and operation of any applicable claims procedure. In some cases, it may be appropriate to defer

ER000235

some portion of the fee award until actual payouts to class members are known. Settlements involving nonmonetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class. On occasion the court's Rule 23(e) review will provide a solid basis for this sort of evaluation, but in any event it is also important to assessing the fee award for the class.

At the same time, it is important to recognize that in some class actions the monetary relief obtained is not the sole determinant of an appropriate attorney fees award. Cf. Blanchard v. Bergeron, 489 U.S. 87, 95 [103 L. Ed. 2d 67, 76] (1989) (cautioning in an individual case against an "undesirable emphasis" on "the importance of the recovery of damages in civil rights litigation" that might "shortchange efforts to seek effective injunctive or declaratory relief").

Any directions or orders made by the court in connection with appointing class counsel under Rule 23(g) should weigh heavily in making a fee award under this subdivision.

Courts have also given weight to agreements among the parties regarding the fee motion, and to agreements between class counsel and others about the fees claimed by the motion. Rule 54(d)(2)(B) provides: "If directed by the court, the motion shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made." The agreement by a settling party not to oppose a fee application up to a certain amount, for example, is worthy of consideration, but the court remains responsible to determine a reasonable fee. "Side agreements" regarding fees provide at least perspective pertinent to an appropriate fee award.

In addition, courts may take account of the fees charged by class counsel or other attorneys for representing individual claimants or objectors in the case. In determining a fee for class counsel, the court's objective is to ensure an overall fee that is fair for counsel and equitable within the class. In some circumstances individual fee agreements between class counsel and class members might have provisions inconsistent with those goals, and the court might determine that adjustments in the class fee award were necessary as a result.

Finally, it is important to scrutinize separately the application for an award covering nontaxable costs. If costs were addressed in the order appointing class counsel, those directives should be a presumptive starting point in determining what is an appropriate award.

Paragraph (1). Any claim for an award of attorney fees must be sought by motion under Rule 54(d)(2), which invokes the provisions for timing of appeal in Rule 58 and Appellate Rule 4. Owing to the distinctive features of class action fee motions, however, the provisions of this subdivision control disposition of fee motions in class actions, while Rule 54(d)(2) applies to matters not addressed in this subdivision.

The court should direct when the fee motion must be filed. For motions by class counsel in cases subject to court review of a proposed settlement under Rule 23(e), it would be important to require the filing of at least the initial motion in time for inclusion of information about the motion in the notice to the class about the proposed settlement that is required by Rule 23(e). In cases litigated to judgment, the court might also order class counsel's motion to be filed promptly so that notice to the class under this subdivision (h) can be given.

Besides service of the motion on all parties, notice of class counsel's motion for attorney fees must be "directed to the class in a reasonable manner." Because members of the class have an interest in the arrangements for payment of class counsel whether that payment comes from the class fund or is made directly by another party, notice is required in all instances. In cases in which settlement approval is

ER000236

contemplated under Rule 23(e), notice of class counsel's fee motion should be combined with notice of the proposed settlement, and the provision regarding notice to the class is parallel to the requirements for notice under Rule 23(e). In adjudicated class actions, the court may calibrate the notice to avoid undue expense.

Paragraph (2). A class member and any party from whom payment is sought may object to the fee motion. Other parties -- for example, nonsettling defendants -- may not object because they lack a sufficient interest in the amount the court awards. The rule does not specify a time limit for making an objection. In setting the date objections are due, the court should provide sufficient time after the full fee motion is on file to enable potential objectors to examine the motion.

The court may allow an objector discovery relevant to the objections. In determining whether to allow discovery, the court should weigh the need for the information against the cost and delay that would attend discovery. See Rule 26(b)(2). One factor in determining whether to authorize discovery is the completeness of the material submitted in support of the fee motion, which depends in part on the fee measurement standard applicable to the case. If the motion provides thorough information, the burden should be on the objector to justify discovery to obtain further information.

Paragraph (3). Whether or not there are formal objections, the court must determine whether a fee award is justified and, if so, set a reasonable fee. The rule does not require a formal hearing in all cases. The form and extent of a hearing depend on the circumstances of the case. The rule does require findings and conclusions under Rule 52(a).

Paragraph (4). By incorporating Rule 54(d)(2), this provision gives the court broad authority to obtain assistance in determining the appropriate amount to award. In deciding whether to direct submission of such questions to a special master or magistrate judge, the court should give appropriate consideration to the cost and delay that such a process might entail.

1   Kevin R. Sutherland (State Bar No. 163746)
    Natasha N. Mikha (State Bar No. 270731)
2   CLYDE & CO US LLP
    633 West 5th Street, 26th Floor
3   Los Angeles, California 90071
    Telephone: (213) 358-7600
4   Facsimile:  (213) 358-7699
    Email:     kevin.sutherland@clydeco.us
5                natasha.mikha@clydeco.us

6   Jeffrey J. Ellis (*pro hac vice* application to be submitted)
    CLYDE & CO US LLP
7   405 Lexington Avenue, 16th Floor
    New York, New York 10174
8   Telephone:  (212) 710-3900
    Facsimile:  (212) 710-3950
9   Email:     jeff.ellis@clydeco.us

10   Attorneys for Defendant
    FRONTIER AIRLINES, INC.

11

12          UNITED STATES DISTRICT COURT

13        CENTRAL DISTRICT OF CALIFORNIA

14   ANDREA RIDGELL, on behalf of   )  Case No.: 2:18-CV-04916 PA (AFMx)
    herself and others similarly situated,  )
15                        )  FRONTIER AIRLINES INC.'S
                       )  NOTICE OF NON-OPPOSITION TO
16          Plaintiff,         )  PLAINTIFF'S *EX PARTE*
                       )  APPLICATION FOR RELIEF FROM
      v.                )  DEADLINE IMPOSED BY LOCAL
17                        )  RULE 23-3
    FRONTIER AIRLINES, INC. a     )
18   Colorado corporation; AIRBUS    )
    S.A.S., a foreign corporation doing  )  Complaint Filed: June 1, 2018
19   business in the State of California;   )
    AIRBUS GROUP HQ, INC., a     )
20   corporation doing business in the State )
    of California,                 )
21                        )
         Defendants.       )
22   _____)

23         Frontier Airlines, Inc. ("Frontier") has reviewed plaintiff Andrea Ridgell's

24   ("plaintiff") *ex parte* application for relief from deadline imposed by Local Rule 23-3

25   and plaintiff's supporting papers.  Given the parties' ongoing discussions concerning

26   potentially dispositive issues which should be heard in advance of certification,

27   Frontier hereby provides notice that it does not oppose the relief requested in

28

FRONTIER AIRLINES INC.'S NOTICE OF NON-OPPOSITION TO PLAINTIFF'S
*EX PARTE* APPLICATION FOR RELIEF FROM DEADLINE IMPOSED BY
LOCAL RULE 23-3

ER000238

plaintiff's *ex parte* application.

Dated: August 29, 2018                    CLYDE & CO US LLP

By: */s/ Natasha N. Mikha*
  KEVIN R. SUTHERLAND
  NATASHA N. MIKHA
  Attorneys for Defendant
  FRONTIER AIRLINES, INC.

CLYDE & CO US LLP
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

-2-
FRONTIER AIRLINES INC.'S NOTICE OF NON-OPPOSITION TO PLAINTIFF'S
*EX PARTE* APPLICATION FOR RELIEF FROM DEADLINE IMPOSED BY
LOCAL RULE 23-3

ER000239

# PROOF OF SERVICE

## STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California, I am over the age of eighteen years, and not a party to the within action. My business address is 633 West 5th Street, 26th Floor, Los Angeles California 90071.

On August 29, 2018, I served the document(s) described as:

**FRONTIER AIRLINES INC.'S NOTICE OF NON-OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR RELIEF FROM DEADLINE IMPOSED BY LOCAL RULE 23-3**

on the parties in this action addressed as follows:

SEE ATTACHED SERVICE LIST

in the following manner:

☐ **(BY FAX):** by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below, or as stated on the attached service list, on this date before 5:00 p.m.

☐ **(BY MAIL):** as follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

☐ **(BY OVERNIGHT DELIVERY):** I caused such envelope(s) to be delivered to an overnight delivery carrier with delivery fees provided for, addressed to the person(s) on whom it is to be served.

☐ **(BY PERSONAL SERVICE):** I caused such envelope(s) to be delivered by hand this date to the offices of the addressee(s).

☒ **(BY CM/ECF):** by electronic filing system with the clerk of the Court which will send a Notice of Electronic Filing to all parties with an e-mail address of record, who have filed a Notice of Consent to Electronic Service in this action:

I declare I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on August 29, 2018, at Los Angeles, California.

Kathy L. Rollins

CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

ER000240

1

**SERVICE LIST**

2

3  Marcus J. Bradley, Esq. (SBN 174156)
   Kiley L. Grombacher, Esq. (SBN 245960)

4  BRADLEY/GROMBACHER LLP
   2815 Townsgate Road, Suite 130

5  Westlake Village, California 91361
   Tel:  (805) 270-7100

6  Fax: (805) 270-7100
   E-Mail: mbradley@bradleygrombacher.com

7           kgrombacher@bradleygrombacher.com

8  Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLYDE & CO US LLP
633 West 5th Street, 26th Floor
Los Angeles, California 90071
Telephone: (213) 358-7600

4404695

-4-
PROOF OF SERVICE

ER000241

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Taylor L. Emerson, Esq. (SBN 225303)
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Telephone:   (805) 270-7100
Facsimile:    (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@ bradleygrombacher.com
temerson@bradleygrombacher.com

**ROTHSCHILD & ASSOCIATES, APC**
Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
27 W. Anapamu Street, Suite 289
Santa Barbara, California   93101
Telephone:   (805) 845-1190
Facsimile:    (805) 456-0132
krothschild@kdrlawgroup.com
jalwill@kdrlawgroup.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA RIDGELL, on behalf of herself and others similarly situated<br><br>        Plaintiff,<br><br>v.<br><br>FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California<br>        Defendants. | **Case No.: 2:18-CV-04916 PA (AFMx)**<br><br>**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE *EX PARTE* APPLICATION FOR RELIEF FROM DEADLINE IMPOSED BY LOCAL RULE 23-3** |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Andrea Ridgell ("Plaintiff") hereby applies *ex parte*, pursuant to Fed. R. Civ. P. 26(b)(1)-(2), as well as C.D. Cal. Local Rules 7-19 and 7-11, for an order granting Relief from the 90-day deadline imposed by United States District Court, Central District of California Local Rule 23-3. District courts have broad discretion in interpreting and applying their local rules. *Miranda v. Southern Pacific Transp. Co.* 710 F.2d 516, 521 (9th Cir. 1983). Courts have generally applied Local Rule 23-3 or similar rules in other districts flexibly and realistically. See e.g., *Probe v. State Teachers' Retirement System* 780 F.2d 776, 780 (9th Cir. 1986) (certification motion filed 18 months after case filing not untimely); *Buttino v. FBI* 1992 U.S.Dist.LEXIS 21919, at *15-16 (N.D.Cal. Sep. 24, 1992, No. C-90-1639 SBA) (certification motion filed two months past local rules deadline not untimely and leniency is reasonable in light policy reasons underlying class actions and no prejudice to the defendant).)

The motion could not have been made sooner as not all parties to the action have yet been served, a process which Plaintiff had hoped to complete before seeking relief. Given that defendant Airbus S.A.S. ("Airbus") is a foreign corporation, service must be effectuated through protocols established by the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention" or "Hague Convention").[1] Although Plaintiff promptly initiated such protocols, the process is inherently slow and protracted and Airbus has not yet been served. As such, discovery on this entity cannot yet be conducted. It is anticipated that Airbus possess discovery relevant to Plaintiff's motion for class certification, including, information regarding the design and manufacture of the subject aircrafts. Such information will be relevant to foundational certification factors such as commonality, typicality and predominance.

The names and contact information for counsel for defendant Frontier Airlines Inc. ("Frontier") are as follows:[2]

| | |
|---|---|
| CLYDE & CO US LLP | CLYDE & CO US LLP |
| Jeff Ellis | Kevin Sutherland |
| 405 Lexington Avenue | Natasha Mikha |
| 16th Floor | 633 W 5th Street |

[1] Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361.
[2] Counsel for Airbus is not yet known.

ER000243

New York, NY 10174
Phone: (212) 710-3900
Fax: (212) 710- 3950
Jeff.Ellis@clydeco.us

28th Floor
Los Angeles, CA 90071
Phone: (415) 365-9800
Fax: (415) 365-9801
Kevin.Sutherland@clydeco.us
Natasha.Mikha@clydeco.us

      Pursuant to Local Rule 7-19.1, Plaintiff's counsel spoke with Frontier's counsel by telephone to discuss the substance of this *ex parte* application. Plaintiff's counsel also sent an email on August 28, 2018, giving further notice of this application.  In such email, Plaintiff's counsel also informed Frontier's counsel that any opposition to this application should be filed and served within twenty-four (24) hours of the electronic filing of this application. Frontier may oppose this motion.

      This *ex parte* application is based on this notice, the accompanying memorandum of points and authorities, and the records and files on the docket in this action.

DATED:  August 28, 2018        **BRADLEY/GROMBACHER, LLP**

        By**:**  /s/   Kiley Lynn Grombacher
           Kiley Lynn Grombacher, Esq.
           Attorneys for Plaintiff

### MEMORANDUM OF POINTS AND AUTHORITIES

**I.  INTRODUCTION**

Plaintiff Andrea Ridgell ("Plaintiff") respectfully submits this Memorandum of Points and Authorities in support of her *Ex Parte* Application for Relief from the 90-day deadline imposed by United States District Court, Central District of California Local Rule 23-3.  Plaintiff proposes that the Court vacate the present deadline of September 13, 2018, until a date to be set at a time following service of all parties to the action.

Given that defendant Airbus S.A.S. ("Airbus") is a foreign corporation, service must be effectuated through protocols established by the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention" or "Hague Convention").[3]  Although Plaintiff promptly initiated such protocols, the process is inherently slow and protracted and Airbus has not yet been served.  As such, discovery on this entity cannot yet be conducted.  It is anticipated that Airbus possess discovery relevant to Plaintiff's motion for class certification, including, information regarding the design and manufacture of the subject aircrafts.  Such information will be relevant to foundational certification factors such as commonality, typicality and predominance.  Such continuance may not unduly delay the litigation as Plaintiff and Frontier have been meeting and conferring about staging the litigation so that some potentially dispositive motions may be heard in advance of certification.

Simply, given the complexity of the claims alleged and procedural posture of this litigation, relief from the certification deadline imposed by Local Rule 23-3 is merited.

**II.  STATEMENT OF RELEVANT FACTS**

Plaintiff filed this action on June 1, 2018.  (ECF Dkt . No. 1) Accordingly, pursuant to Local Rule 23-3, the deadline for the filing of Plaintiff's motion for class certification will fall on September 13, 2018. (Declaration of Kiley Lynn Grombacher ("Grombacher Decl.") at ¶ 6.) Given the filing deadline, Plaintiff has been diligent in her prosecution of this action.  (Id. at ¶¶ 7-12)

/ / /

---

[3] Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361.

### A.   Status of Service Upon Defendant Entities

#### 1.   Status Regarding Defendant Frontier

Plaintiff served defendant Frontier on or about June 15, 2018.  (Id. at ¶7.) As a professional courtesy to Frontier, Plaintiff stipulated to provide Frontier an additional thirty-nine (39) days in which to file an answer to the complaint. (Grombacher Decl. at ¶ 8; ECF Dkt No. 11.) Defendant Frontier timely filed an answer to the complaint on August 14, 2018. (Grombacher Decl. at ¶ 8; ECF Dkt No. 15).

#### 2.   Status Regarding Defendant Airbus Group HQ, Inc.

Plaintiff voluntarily dismissed defendant Airbus Group HQ, Inc., pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) on July 16, 2018.  (ECF Dkt No. 14)

#### 3.   Status Regarding Defendant Airbus

Moreover, Plaintiff promptly caused the initiating complaint and supporting documents to be translated into French and, promptly began the process of effectuating service on Defendant Airbus through the processes required by Hague Convention.  (Grombacher Decl. at ¶¶ 10, 11.) The process request has been confirmed received by the Ministry de la Justice in Paris on July 16, 2018 (Grombacher Decl. ¶ 12.) Unfortunately, at present, service upon Airbus has not been fully effectuated.  (Id. at ¶ 13.)

### B.   Other Scheduling In this Action

No scheduling conference has yet been held in this action.  Other than the certification deadline set by the Local Rule, at present there are no other dates set in this action.  No continuances of the certification deadline have yet been sought.

On August 16, 2018, this Court issued an order setting a conference for October 1, 2018.  (ECF Dkt No. 17.)  Given the Order and the fact that Frontier may oppose this application, Plaintiff has requested a telephonic Rule 26 conference of counsel.  (Grombacher Decl. ¶ 12.) The parties have agreed to hold such conference on August 28, 2018.  (Id.) Plaintiff intends to propound discovery upon Frontier following the conference.  (Grombacher Decl. ¶ 16.)

/ / /

/ / /

C.      **Plaintiff and Frontier Have Met and Conferred Regarding the Relief Requested**

Plaintiff and Frontier have met and conferred regarding the relief requested.  (Grombacher Decl. ¶¶ 18-21.) On August 10, 2018, counsel spoke telephonically regarding the relief requested.  (Id. at ¶ 18.) On August 24, 2018, Frontier clarified that it may oppose the relief sought.  (Id at ¶ 19.)

III.    **ANALYSIS**

A.      *Ex Parte* **Relief is Proper**

*Ex parte* relief is warranted where (1) "the moving party is without fault in creating the crisis that requires *ex parte* relief," and (2) "the moving party's cause will be irreparably prejudiced if the underlying motion is heard according to regular noticed motion procedures[.]" *Mission Power Eng'g Co. v. Continental Cas. Co*., 883 F. Supp. 488, 492 (C.D. Cal. 1995). Both of those requirements are met here.

If Plaintiff's motion were to be heard according to regular noticed motion procedures, Plaintiff would not be permitted to have her motion for relief heard until after the deadline for the filing of Plaintiff's motion for class certification. Thus, the hearing would not provide the Parties with sufficient time to address the Court's ruling on the matter.

B.      **The Court has Discretion to Modify the Certification Deadline**

Central District Local Rule 23-3 provides in pertinent part: "Within 90 days after service of a pleading purporting to commence a class action … the proponent of the class shall file a motion for certification that the action is maintainable as a class action, unless otherwise ordered by the Court." The purpose of Local Rule 23-3 "is to give a clear definition to the parameters of the putative class, to outline the claims involved in the class action and to apprise the defendants of their potential liability *as soon as practicable*."  *Molina v. Cafe Rio, Inc*., No. ED CV 12-1858-JFW SP, 2013 WL 7174022, at *1 (C.D. Cal. July 12, 2013)(emphasis added)  The Court however, has discretion to lift Local Rule 23-3's requirements where, as here, a Scheduling Order has not yet been issued by the Court.

> Indeed, the Ninth Circuit has noted,
> the schedule contemplated by Central District of California Local Rule 23–3, when considered alongside federal rules regarding status conferences and the timing of discovery, is quite unrealistic in light of recent case law regarding the need to establish a sufficient factual record at the class certification stage. See

ER000247

*Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011); see also Barbara J. Rothstein & Thomas E. Willging, Federal Judicial Center, Managing Class Action Litigation: A Pocket Guide for Judges 9 (3d ed. 2010) (noting that local rules calling for specific time limits on class certification should be ignored as inconsistent with federal rules and obsolete)[4].

Such sentiment echoes the Federal Judicial Center's own 2010 publication, "Managing Class Action Litigation: A Pocket Guide for Judges" (Exhibit A to Request for Judicial Notice filed concurrently with the Motion at page 9), which recognizes that, in light of the 2003 amendments to Rule 23(c)(1), local rules imposing specific time limits for filing class certification motions "appear to be inconsistent with the federal rules and, as such, obsolete."

The 2003 amendment to Federal Rule of Civil Procedure 23(c)(1)(A) changed the requirement that the Court determine whether to certify a class "as soon as practicable after commencement of an action" to "at an early practicable time." Moreover, the official annotations regarding the 2003 amendments to Rule 23(c)(1)(A) (Exhibit B to Request for Judicial Notice filed concurrently with the Motion) state that the former "as soon as practicable" language "neither reflects a prevailing practice nor captures the many valid reasons that may justify deferring the initial certification decision." The advisory committee went on to explain in relevant part:

> Time may be needed to gather information necessary to make the certification decision. Although an evaluation of the probable outcome on the merits is not properly part of the certification decision, discovery in aid of the certification decision often includes information required to identify the nature of the issues that actually will be presented at trial. In this sense it is appropriate to conduct controlled discovery into the "merits," limited to those aspects relevant to making the certification decision on an informed basis. Active judicial supervision may be required to achieve the most effective balance that expedites an informed certification determination without forcing an artificial and ultimately wasteful division between "certification discovery" and "merits discovery." A critical need is to determine how the case will be tried. An increasing number of courts require a party requesting class certification to present a "trial plan" that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof.

LR 23-3, which was predicated on the prior version of Rule 23(c)(1), has not been revised, in spite of the 2003 amendments to Rule 23(c)(1).

/ / /

---

[4] *Balser v. Hain Celestial Grp., Inc.*, 640 F. App'x 694, 696 (9th Cir. 2016).

### C.  Upon a Showing of Good Cause, The Deadline For Plaintiff To Move For Class Certification Is Appropriately Continued

Rule 6 of the Federal Rules of Civil Procedure sets forth the foundational principal guiding courts' consideration of any request for additional time: "The district courts may extend many of the time periods set by the Rules." Fed. R. Civ. P. 6(b).[5]  Extensions of time are governed by a "good cause" standard pursuant to Rule 6(b).

Courts "generally will find good cause and grant the extension unless the moving party has been negligent, lacked diligence, acted in bad faith, or abused prior extension." 1 Moore's Federal Practice, Section 6.06[2] (2015).  The "good cause" standard focuses on the diligence of the party seeking amendment." *Tseng v. Nordstrom, Inc.,* No. CV 11-08471-CAS-MRWx 2012 WL 3019949 at *4 (C.D.Cal. July 23, 2012)(quoting *Coleman v. Quaker Oats Co.,* 232 F.2d 1271, 1294 (9th Cir. 2000).) Courts considering motions seeking extensions of time to file class certification motions have noted that "the fact that discovery is in the early stages" supports extensions. *Clark v. Sprint Spectrum L.P.,* No. CV 10-9702-CAS-SSx, 2011 WL 835487 at *2 (C.D.Cal. Mar. 7, 2011).

Here, Plaintiff seeks relief from the local rule mandating that class certification motions be filed and served within 90 days of any class action's commencement. Plaintiff has filed her Application before the original time or its extension expires and thus, the "good cause" standard applies.

Plaintiff's need to effectuate service on a foreign defendant and take discovery essential to substantiating the Class Certification Motion constitutes the good cause. While certain causes of action are amenable to motions for class certification without the need for discovery, where discovery is

---

[5] The Rules expressly authorize the district courts' promulgation of "local rules," which are "laws of the United States" and enforceable so long as they are consistent with the Rules. See Fed. R. Civ. P. 83. It is specifically contemplated that local rules (and, by implication, "local local" rules) will contribute specificity where the Rules are more general. Compare Rule 23 (mandating that certification motions be made "at an early practical time") with LR 23-3 ("Within 90 days after service of a pleading purporting to commence a class action other than an action subject to the Private Securities Litigation Reform Act of 1995, P.L. 104-67, 15 U.S.C. § 77z-1 et seq., the proponent of the class shall file a motion for certification that the action is maintainable as a class action, unless otherwise ordered by the Court."). Accordingly, the Court is empowered to alter the deadline for filing class certification papers to accommodate the specific needs of the case.

ER000249

required, and particularly where that discovery must be conducted from a foreign entity, it is impossible to fit it within the 90-day period mandated by Local Rules 23-3.

### 1. The Requirement that Plaintiff Effectuate Service Upon Defendant Airbus Through The Hague Has Delayed the Litigation

Rule 4(h) of the Federal Rules of Civil Procedure provides three methods for service of process on foreign corporations. First, under Rule 4(h)(1)(A), a plaintiff may execute service in compliance with state law. Fed. R. Civ. P. 4(h)(1)(A)[6]. Second, under Rule 4(h)(1)(B), a plaintiff may serve a foreign corporation "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(h)(1)(B). Third, a plaintiff may serve a foreign corporation through the procedures authorized by the Hague Convention. Fed. R. Civ. P. 4(h)(2). "A federal court does not have jurisdiction over a defendant unless the defendant has been served properly under Fed. R. Civ. P. 4." *Direct Mail Specialists v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 688 (9th Cir. 1988).

Service on a foreign defendant is a cumbersome process. In this case, Plaintiff had to initiate service under the processes set forth in the Hague Convention). As a default rule, litigants serving in such fashion can expect service through the Central Authority to take at least six months[7]. In July 2008, the Permanent Bureau, the secretariat of the Hague Conference, distributed a questionnaire to Hague Service Convention States to evaluate how the Convention was functioning and to identify concerns[8].

Although two-thirds of service requests were completed within two months, the Permanent Bureau uncovered an alarming trend, 18.3% of requests took 12 months or more to be issued with a certificate. Indeed, 120-day time limit for effecting service of process under Fed.R.Civ.P. 4(m) does not apply to the service of process upon defendants located in foreign countries. See Fed.R.Civ.P. 4(m) ("This subdivision (m) does not apply to service in a foreign country...").

---

[6] In California, service may be effectuated by personal delivery of process to, *inter alia*, "a general manager" of the corporation. Cal. Civ. Proc. Code § 416.10(b); Cal. Corp. Code § 2110.
[7] Charles Routh, Dispute Resolution--Representing the Foreign Client in Arbitration and Litigation, in Going International: Fundamentals of International Business Transactions 483, 491 (2004).
[8] Permanent Bureau, Hague Conference on Private Int'l Law, Summary of Responses to the Questionnaire of July 2008 Relating to the Service Convention, with Analytical Comments 10 (2009), http:// www.hcch.net/upload/wop/2008pd14e.pdf,

Simply, delays in service have frustrated Plaintiff's ability to comply with the deadline set forth in Local Rule 23-3.

### 2. Discovery Is Necessary to Prepare a Motion for Class Certification

Across all circuits, the general rule is that both additional time to take discovery necessary to support a class certification motion and additional time that does not work a prejudice to the non-movant are permissible grounds for a late class certification filing, without any prior request for more time. See, e.g., *Probe v. State Teachers' Retirement Sys.*, 780 F.2d 776 (9th Cir. 1996) (where no prejudice to non-movant shown, timing of class certification motion not appropriate basis for denial of certification); *Gray v. Greyhound Lines, East, 545 F.2d 169, 172, n.11* (D.C. Cir. 1976) (district court directed to reconsider on remand denial of class certification based solely on delay in bringing certification motion); *Stolz v. United Broth. of Carpenters and Joiners of Am.*, Local Union No. 971, 620 F. Supp. 396 (D. Nev. 1985) (delay alone in filing class certification motion not proper basis for denial of class certification); *Griffin v. Nat. Pub. Radio*, 1977 WL15507 (D. D.C. 1977) (violation of local rule prescribing time within which class certification motion must be filed not a permissible ground for dismissal of class allegations absent a showing of prejudice to defendant). F.2d 1362, 1366 (1st Cir. 1972) ("To pronounce finally, prior to allowing any discovery, the non-existence of a class or set of subclasses, when their existence may depend on information wholly within defendants' ken, seems precipitate and contrary to the pragmatic spirit of Rule 23.").

Under Rule 26(f), "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except in a proceeding exempted from initial disclosure under Rule 26(a)(1)(B), or when authorized by these rules, by stipulation, or by court order." Accordingly, Plaintiff is precluded from seeking any discovery from Airbus, yet such discovery will be critical to the preparation of her motion for class certification. Plaintiff claims, *inter alia*, that the design of Airbus' aircrafts is defective. Such claim requires discovery as to the aircrafts' design and manufacture in order to make a proper showing to meet Fed.R.Civ.P. 23's commonality and typicality requirements.

/ / /

/ / /

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests the Court issue an Order relieving Plaintiff of the 90-day deadline pursuant to LR 23-3 and extending the time for the filing of Plaintiff's motion for Certification until a date determined after service upon Airbus has been effectuated.


DATED:   August 28, 2018                   **BRADLEY/GROMBACHER, LLP**


                                    By**:**  /s/   Kiley Lynn Grombacher
                                         Kiley Lynn Grombacher, Esq.
                                         Attorneys for Plaintiff

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Taylor L. Emerson, Esq. (SBN 225303)
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Telephone:   (805) 270-7100
Facsimile:   (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@ bradleygrombacher.com
temerson@bradleygrombacher.com

**ROTHSCHILD & ASSOCIATES, APC**
Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
27 W. Anapamu Street, Suite 289
Santa Barbara, California  93101
Telephone:  (805) 845-1190
Facsimile:    (805) 456-0132
krothschild@kdrlawgroup.com
jalwill@kdrlawgroup.com

Attorneys for Plaintiff

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA RIDGELL, on behalf of herself and others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California<br>Defendants. | Case No.: 2:18-CV-04916 PA (AFMx)<br><br>**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE** |

ER000253

Plaintiff Andrea Ridgell ("Plaintiff") respectfully requests that this Court take judicial notice of the following documents, pursuant to Federal Rule of Evidence, Rule 201201(b)(2), which requires the Court to take judicial notice of facts "not subject to reasonable dispute" when they can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned":

1. Federal Judicial Center's 2005 publication, "Managing Class Action Litigation: A Pocket Guide for Judges." A true and correct copy is attached as Exhibit "A."

2. The official annotations regarding the 2003 Amendments to Federal Rule of Procedure 23(c)(l)(A). A true and correct copy is attached as Exhibit "B."

Exhibits "A" and "B" may be judicially noticed because they are either (a) reliable government documents from the Internet, *Eidson v. Medtronic, Inc.*, 981 F. Supp. 2d 868, 879 (N.D. Cal. 2013); (b) documents and filings in other judicial proceedings, *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992); and/or (c) otherwise "not subject to reasonable dispute because" they are either (1) "generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b).

DATED:  August 28, 2018                **BRADLEY/GROMBACHER, LLP**

                                       By**:**  /s/   Kiley Lynn Grombacher
                                            Marcus J. Bradley, Esq.
                                            Kiley Lynn Grombacher, Esq.
                                            Taylor L. Emerson, Esq.
                                            Attorneys for Plaintiff

# EXHIBIT A

Case: 18-80170, 11/23/2018, ID: 11098088, DktEntry: 1-4, Page 248 of 324

# Managing Class Action Litigation:
# A Pocket Guide for Judges

*Third Edition*

Barbara J. Rothstein & Thomas E. Willging

Federal Judicial Center
2010

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to develop educational materials for the judicial branch. While the Center regards the content as responsible and valuable, it does not reflect policy or recommendations of the Board of the Federal Judicial Center.

ER000256

Case 18-80170, 11/23/2018, ID: 11098088, DktEntry: 14, Page 249 of 324

# Contents

Preface,  v

Introduction,  1

I.   Determining Federal Jurisdiction,  3
   A.  Burdens of proof,  4
   B.  Amount in controversy,  4
   C.  Home-state exception,  5
   D.  Local-controversy exception,  5
   E.  Discretionary jurisdiction,  6

II.   Selection of Counsel,  6
   A.  Single-lawyer model,  7
   B.  Private ordering,  7
   C.  Selection by the judge,  8
   D.  Empowered plaintiff model,  8
   E.  Competitive bidding,  8

III.   Timing and Significance of Class Certification,  9
   A.  Timing,  9
   B.  Class certification,  9
   C.  Defining the class,  9
   D.  Multiple class actions,  10
   E.  Notice,  11

IV.   Settlement Review: Risks and Issues,  11
   A.  Judge's role,  12
   B.  Obtaining information about the settlement,  13
   C.  Hot button indicators,  17
   D.  Preliminary review of the proposed settlement,  23
   E.  Warning about claims services,  25
   F.  Notice issues,  26
   G.  Claims processes and response handling,  30
   H.  Fairness hearing,  31

V.   Attorney Fee Issues,  33
   A.  Evaluating monetary and nonmonetary results achieved,  33
   B.  Methods of calculating fees,  35
   C.  "Mega" cases,  36
   D.  Objectors,  36
   E.  Role of government actors,  36

VI.   Coordination with State Judges,  38

VII.  Use of Special Masters and Court-Appointed Experts,  39

Conclusion,  39

Bibliography,  40

Case Annotations by Topic,  42

iii

ER000258

ER000259

# Preface

This pocket guide is designed to help federal judges manage the increased number of class action cases filed in or removed to federal courts as a result of the Class Action Fairness Act of 2005 (CAFA). The 2005 legislation expresses congressional confidence in the abilities of federal judges to ensure "fair and prompt recoveries for class members with legitimate claims" and to provide appropriate "consideration of interstate cases of national importance under diversity jurisdiction." CAFA § 2(b). This third edition includes an expanded treatment of the notice and claims processes. Revisions are concentrated in parts III and IV.

CAFA also calls on the judiciary to develop and implement "best practices" for achieving the goals of ensuring that settlements are fair to class members and ensuring that class members are the primary beneficiaries of any settlement. This guide is part of the federal judiciary's continuing effort to achieve those goals. This edition also carries over from the second edition suggestions based on recent empirical research indicating that the administration of settlements has been less than transparent, especially regarding the disclosure of claims rates and actual payments to class members, to the detriment of litigants and policy makers.

A note of appreciation goes to Judge D. Brock Hornby (D. Me.) for his detailed suggestions and outline of topics, which served as a catalyst and road map for the original publication. Todd Hilsee, a class action notices expert with The Hilsee Group, supplied pro bono assistance in improving the sections on notices and on claims processes. We are also grateful to Jared Bataillon, who contributed valuable research assistance for this third edition.

I hope you find this guide useful in meeting the challenges Congress has entrusted to us in managing class action litigation.

Barbara Jacobs Rothstein
Director, Federal Judicial Center

ER000260

Case: 18-80470, 11/23/2018, ID: 11098088, DktEntry: 1-4, Page 253 of 324

# Introduction

Federal Judicial Center materials, particularly the *Manual for Complex Litigation, Fourth* (MCL 4th), have devoted considerable attention to class actions, perhaps yielding more information than busy judges can absorb. Hence, the need for a pocket guide. In enacting the Class Action Fairness Act of 2005 (CAFA) (Pub. L. No. 109-2, 119 Stat. 4 (2005)), Congress found both that class actions "are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties" and that "abuses in class actions undermine the National judicial system . . . in that State and local courts are . . . keeping cases of national importance out of Federal courts." 28 U.S.C. § 1711 note (2009). This guide can assist you in discharging the responsibilities those cases entail. The guide distills the elements of CAFA's federal jurisdictional changes and many of the most important practices for managing class actions found in the MCL 4th, and it provides citations to cases decided after publication of the MCL 4th to illustrate many points. For your convenience, cross-references to the MCL 4th are also provided in the guide. Cases and other references are presented in the Bibliography and Case Annotations by Topic at the end of the guide.

As Congress found, class action litigation allows for the resolution of many claims that might otherwise evade legal enforcement. Class actions may also help regulators control conduct that threatens to harm various markets. Securities and other consumer class actions serve to enforce regulatory standards designed to deter fraudulent marketplace conduct that might otherwise escape regulation. Members of Congress and others who assert class actions' general utility also point, however, to abuses that threaten to undermine their usefulness. Critics single out cases in which the benefits accruing to the class as a whole and to the public seem minimal.

Class actions demand that judges play a unique role. There is no such thing as a simple class action. Every class action has hidden hazards that can surface without warning. Your role includes anticipating the consequences of poorly equipped class represen-

1

*Class Action Pocket Guide (3d ed.)*

tatives or attorneys, inadequate class settlement provisions, and overly generous fee stipulations. The high stakes of the litigation heighten your responsibility, and what's more, you cannot rely on the adversaries to shape the issues that you must resolve in the class context. Indeed, you have to decide first which individuals on the plaintiff side—class representatives and class counsel—can represent the class adequately and whom you should appoint to do so. And, once the adversaries agree on a settlement, you must decide—largely without any clash of views from class counsel, class representatives, or the defendant—whether that settlement is fair, reasonable, and adequate to satisfy the interests of the class as a whole. This guide attempts to clarify the class action standards that inform those decisions and to make the application of those standards more transparent and available to judges and to policy makers faced with the task of improving them. It is designed to help you determine when class representatives and counsel are "adequate" and whether a settlement's terms are "fair" to the class as a whole, "reasonable" in relation to the class's legitimate claims, and "adequate" to redress class members' actual losses.

Recent empirical research indicates that class action settlement administration has often not produced the transparent information that judges and policy makers need for reviewing class action settlements and setting clear standards for such reviews. Nicholas M. Pace & William B. Rubenstein, How Transparent Are Case Outcomes: Empirical Research on the Availability of Class Action Claims Data (RAND Corp. 2008). Not only are data about class member claims rates and actual recoveries not available to judges attempting to evaluate the benefits of a settlement to the class, but information needed to determine which claims rates are acceptable is not available to judges and policy makers concerned with setting standards for future cases. This guide discusses remedies for these deficiencies.

Now that CAFA is on the books and Federal Rule of Civil Procedure 23 has been amended, you can expect to encounter the following class action responsibilities:

- applying CAFA's federal jurisdiction and removal rules, such as its $5 million amount in controversy for the class

2

ER000263

as a whole, minimum diversity of citizenship between class members and defendants, and complex set of rules regarding federal jurisdiction when the "primary" or "significant" defendants are local citizens (discussed in part I);

- appointing counsel who have the professional skills, legal support staff, and financial resources needed to provide the class with adequate representation (discussed in part II);
- determining when and how to decide class certification motions (discussed in part III);
- establishing effective standards and procedures for evaluating the actual value to the class of proposed settlements and for determining whether the settlements are fair, reasonable, and adequate for class members (discussed in part IV);
- assessing reasonable attorney fees for class counsel by ensuring that fee awards are commensurate with the value of the results to the class as a whole (discussed in part V);
- coordinating with state judges the management of competing and overlapping class actions (discussed in part VI); and
- deciding when to use special masters and court-appointed experts to assist in managing class actions and reviewing settlements (discussed in part VII).

## I. Determining Federal Jurisdiction

CAFA provides expanded, but not unlimited, federal jurisdiction over class actions. *See* 28 U.S.C. § 1332(d). Before you invest time and energy in managing a class action, your first order of business is to determine whether you have jurisdiction. For a comprehensive show cause order form with a checklist of jurisdictional and removal issues, see *Tam v. Indymac Bank,* No. 2:8CV06458, 2008 WL 4793676 (C.D. Cal. Oct. 30, 2008).

Under CAFA, federal district courts have original jurisdiction over class actions in which the aggregate amount in controversy exceeds $5 million and in which there is "minimal diversity of citizenship," which means whenever "any member of a class of plaintiffs is a citizen of a State different from [that of] any defendant." 28 U.S.C. § 1332(d)(2). But federal jurisdiction is not available if

3

ER000264

*Class Action Pocket Guide (3d ed.)*

"the number of members of all proposed plaintiff classes in the aggregate is less than 100," 28 U.S.C. § 1332(d)(5)(B), or if "the primary defendants are states, state officials, or other government entities against whom the district court may be foreclosed from ordering relief," 28 U.S.C. § 1332(d)(5)(A), presumably because the sovereign immunity defense may preclude federal judicial remedies. Moreover, for cases that do meet CAFA's jurisdictional standards, exceptions may apply, as discussed below.

### A. Burdens of proof

Courts have generally ruled that even under CAFA, the proponent of federal jurisdiction—the plaintiff in original federal filings and the defendant in removed actions—bears the burden of demonstrating federal jurisdiction.

CAFA, which was a product of congressional compromise, sets out a number of exceptions to federal jurisdiction. Courts have been clear that the party opposing federal jurisdiction has the burden of establishing that the case falls within a statutory exception.

### B. Amount in controversy

In an original federal action, the plaintiff need only show the possibility that the amount in controversy, including statutory and punitive damages as well as statutory attorney fees, will exceed $5 million. Once the proponent of federal jurisdiction has established the possibility that the amount in controversy exceeds $5 million, only legal certainty that the judgment will be less precludes federal jurisdiction. So, unless there is a dispute regarding the amount in controversy or it is evident that the $5 million amount could not possibly be satisfied, you can accept well-pleaded allegations that $5 million or more is at stake.

In a case removed from a state court, courts continue to hold that the plaintiff is the master of the complaint and courts are compelled to accept a plaintiff's allegations that the amount in controversy is less than $5 million unless a defendant shows to a legal certainty that damages of more than that amount will be established. Moreover, the party challenging federal jurisdiction generally has to provide more than allegations; indeed, that party

4

ER000265

*Class Action Pocket Guide (3d ed.)*

must provide competent evidence of the facts supporting the challenge.

Where the plaintiff has not pleaded a cap on damages, costs, and attorney fees, the court may have to resolve disputes about the amount in controversy. A defendant who removes a case has the burden of showing not only the possible stakes of the litigation but also a reasonable probability that the stakes exceed the $5 million mark. Generally, information alleged in the notice of removal, perhaps supplemented by declarations or affidavits, will suffice.

## C. Home-state exception

Section 1332(d)(4)(B) of title 28 of the U.S. Code provides that a court must decline to exercise jurisdiction over a class action in which "two-thirds or more of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed." As discussed above, the objecting party, typically the plaintiff, has the burden of proving that this exception applies. Proof of an exception, however, requires more than an allegation and may require affidavits and evidence. For an example of an apparently efficient way of producing proof of citizenship for class members in the form of a questionnaire, see *Martin v. Lafon Nursing Facility of the Holy Family, Inc.,* 548 F. Supp. 2d 268, 273–78 (E.D. La. 2008). CAFA states that for the exception to apply, all primary defendants must be citizens of the home state, but does not define the term "primary defendant."

## D. Local-controversy exception

Section 1332(d)(4)(A) of title 28 of the U.S. Code creates what has been called the "local-controversy exception" to CAFA jurisdiction. CAFA spells out four elements that make up the exception:

1. two-thirds of the class members are citizens of the original forum state;
2. plaintiffs seek "significant relief" (another undefined term) from at least one defendant who is a citizen of the forum state;

5

ER000266

3.  "principal injuries resulting from the alleged conduct . . . were incurred" in the forum state; and
4.  no other class action asserting similar allegations against any of the defendants has been filed within three years preceding the filing.

Few appellate opinions apply or interpret the above terms, but the exception as a whole has been viewed narrowly. A defendant from whom "significant relief" is sought appears to be less central to the litigation than a "primary defendant" referred to in the home-state exception. Likewise, the term "principal injuries" calls for an interpretation that almost all of the injuries occurred within the state.

### E. Discretionary jurisdiction

Under CAFA, a federal court may "in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction" over a class action in which more than one-third but less than two-thirds of the class members are citizens of the original forum state. 28 U.S.C. § 1332(d)(3). The Act lays out six factors for a court to consider before exercising its discretion, starting with "whether the claims asserted involve matters of national or interstate interest" and proceeding to factors related to the forum state's legal self-interest and nexus to the class members and harms alleged. Like the other exceptions, these provisions have been interpreted and applied by few appellate courts. One of the few cases to expand on the statutory language is *Preston v. Tenet Healthsystem Memorial Medical Center, Inc.,* 485 F.3d 804, 822–24 (5th Cir. 2007), which concluded that a class action lawsuit involving Hurricane Katrina-related injuries did not affect a "national interest."

# II. Selection of Counsel

Attorneys representing classes are in a position to control the litigation process far more than attorneys representing individual clients. The class action device enhances the role of such lawyers by virtue of the fact that even the approved class representatives do not have legal control over the litigation. Your power to appoint

ER000267

*Class Action Pocket Guide (3d ed.)*

counsel and approve or reject a class settlement may be the only checks and balances on the power of attorneys for the class.

There are at least five approaches to selection of counsel in class action litigation. Note that in multidistrict litigation (MDL), the transferee judge has the authority to appoint lead and liaison counsel regardless of whether class claims are involved. *See* MCL 4th § 10.22. Whatever approach you use, it is important to make clear to counsel at the outset the content and form of records you require to support applications for awards of fees and expenses or for a lodestar cross-check. *See* part V, "Attorney Fee Issues," below, and MCL 4th § 14.21. You may find it useful to instruct class counsel that all lawyers should submit fee and expense requests in a similar format—one that will be accessible to the court.

### A. Single-lawyer model

In the typical class action, the lawyer who filed the case will be the only logical choice for appointment as class counsel. That lawyer may have investigated the case independently or may have spoken with government regulators, investigative journalists, or other public information sources. In those cases, the task of selecting counsel consists of determining that the filing attorney satisfies Rule 23(g) standards, that is, has the requisite knowledge of the substantive law, class action legal experience, and financial and staff resources to represent the class adequately. That attorney, of course, must not have a conflict of interest with the class.

### B. Private ordering

In high-stakes, high-profile class action litigation, entrepreneurial plaintiff attorneys often compete to play the lead role. This competition may be heightened when the case piggybacks on a case investigated and perhaps litigated or prosecuted by a governmental entity. Nonetheless, substantial resources may be necessary to finance the expenses of the litigation. Most often, attorneys in such cases attempt to resolve the competition by "private ordering," that is, by agreeing to divide the labor, expenses, and fees. To safeguard the interests of the class and to prevent unnecessary litigation and overstaffing, you may want to review those agreements (which will

7

*Class Action Pocket Guide (3d ed.)*

be subject to disclosure upon settlement in any event). MCL 4th § 21.272.

### C. Selection by the judge

In the absence of private ordering, you will have to select among competing counsel by reviewing submissions based on the factors identified in Federal Rule of Civil Procedure 23(g)(1)(C). That section explicitly permits you to include in the order of appointment "provisions about the award of attorney fees or nontaxable costs." Few judges have unilaterally imposed strict limits on fees in the order of appointment. Consider, however, requesting that counsel submit ex parte or under seal a proposed budget for fees in the case. The budget would serve as an *ex ante* record of the projected time and expense the case might require; judicial review of a proposed fee award at the end of the case would still be necessary, but would most likely be easier.

### D. Empowered plaintiff model

As mentioned earlier, Rule 23(g) presents explicit criteria and a procedure for appointing counsel to represent the class. For securities class actions, the Private Securities Litigation Reform Act (PSLRA) directs you to employ a special procedure for selecting an "empowered" lead plaintiff (presumptively one with sizable claims), who, in turn, has the right to select and retain class counsel, subject to your approval.

### E. Competitive bidding

In a very narrow set of cases, a few courts have used competitive bidding to select counsel. After an intensive study, a task force in the Third Circuit concluded that competitive bidding "should be an exception to the rule that qualified counsel can be selected either by private ordering or by judicial selection of qualified counsel . . . ." Third Circuit Task Force, *Report on Selection of Counsel,* 74 Temp. L. Rev. 689, 741 (2001).

ER000269

*Class Action Pocket Guide (3d ed.)*

# III. Timing and Significance of Class Certification

## A. Timing

The 2003 amendments to Rule 23(c)(1) give you flexibility by allowing you to consider class certification "at an early practicable time." Considering this rule, you should feel free to ignore local rules calling for specific time limits; such local rules appear to be inconsistent with the federal rules and, as such, obsolete. *See* MCL 4th § 21.133. The amended rule allows you to rule on motions to dismiss or for summary judgment before ruling on class certification.

## B. Class certification

Given the flexibility in the rules, the most efficient practice is to rule on motions to dismiss or for summary judgment before addressing class certification.

Determining whether a proposed class meets Rule 23 certification requirements demands a rigorous analysis. You have discretion to decide on both the extent of discovery and whether or not to hold a hearing to determine whether the requirements have been met. You need to make factual and legal determinations with respect to the requirements of Rule 23.

Ruling on class certification may prove to be unnecessary. The most important actions you can take to promote settlement are to rule on dispositive motions and then, if necessary, rule on class certification.

If the parties decide to talk about settlement before you make any ruling on class certification, they may urge you to certify a class for settlement purposes only—a *settlement class*—as opposed to certifying a *litigation class* for a possible trial. *See* section IV.C.8 below; *see also* MCL 4th § 21.131–.132.

## C. Defining the class

Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and

9

ER000270

*Class Action Pocket Guide (3d ed.)*

(3) entitled to notice in a Rule 23(b)(3) action. The definition must be precise, objective, and ascertainable. For example, the class may consist of those persons and companies that purchased specified products or securities from the defendants during a specified period, or it may consist of all persons who sought employment with, or who were employed by, the defendant during a fixed period. *See* MCL 4th § 21.222. Your certification order should specify those who are excluded from the class, such as residents of particular states, persons who have filed their own actions or are members of another class, and officers and directors of the defendants.

Consider also whether the class definition captures all individuals or entities necessary for the efficient and fair resolution of common questions of fact and law in a single proceeding. If the class definition fails to include a substantial number of persons with claims similar to those of the class members, it is questionable. A broader class definition or definition of a separate class might be more appropriate. Feel free to suggest broader or narrower definitions that would make a proposed class more manageable. If the class definition includes people with similar claims but divergent interests or positions, subclasses with separate class representatives and counsel might suffice. *See* MCL 4th § 21.23.

*Issues classes* are classes certified for particular issues or elements of claims or defenses. Though controversial and subject to conflicting rules in different circuits, issues classes "may enable a court to achieve economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action." MCL 4th § 21.24. The test is whether the resolution of common issues advances the litigation as a whole, as opposed to leaving a large number of issues for case-by-case adjudication.

### D. Multiple class actions

Finally, consider class certification in the context of duplicative or overlapping class action litigation pending in other federal and state courts. Be sure to "obtain complete information from the parties about other pending or terminated actions in federal or state courts relating to the claims presented." MCL 4th § 21.25. At

10

*Class Action Pocket Guide (3d ed.)*

the outset of any class action, consider entering a standing order that requires counsel to inform the court promptly of any related class actions. Communication and administrative coordination with other judges will often be necessary. Other things being equal, federal judges should exercise federal jurisdiction over classes of nationwide scope; actions limited to single states can be carved out of any national certification.

### E. Notice

If you certify a class for litigation purposes, be prepared to decide on notice and allow members of Rule 23(b)(3) classes the opportunity to opt out before the trial. In fact, whether adequate notice *can* be given may be a significant factor in determining manageability as part of your class certification decision. *See In re* Vivendi Universal, S.A. Securities Litigation, 242 F.R.D. 76, 107–09 (2007). Class members, particularly unknown ones, must be able to understand that they are included. This could be a problem, for example, if the class member must recall making modest retail purchases in certain places, or know that a certain component is contained in a product. For a discussion of general notice and communication factors, see section IV.F, "Notice issues," below, as well as the "Notice Checklist and Plain Language Guide" available at the Class Action Notices Page at www.fjc.gov. The Federal Judicial Center provides examples of illustrative class certification notices on our website.

## IV. Settlement Review: Risks and Issues

Reviewing proposed settlements and awarding fees are usually the most important and challenging assignments judges face in the class action arena. Unlike settlements in other types of litigation, class action settlements are not an unequivocal blessing for judges. Rule changes, precedent, recent legislation, and elemental fairness to class members direct you not to rubber-stamp negotiated settlements on the basis of a cursory review. Current rules, particularly Federal Rule of Civil Procedure 23, unambiguously place you in the position of safeguarding the interests of absent class members by scrutinizing settlements approved by class counsel. Recognizing

11

ER000272

Case 18-80172 11/29/2018 ID: 11098028 DktEntry: 1-4 Page 265 of 324

*Class Action Pocket Guide (3d ed.)*

the importance of this, the California panel dealing with complex litigation has drafted guidelines specifying content for motions for preliminary and final approval of proposed class settlements. *See* California Superior Court, Guidelines for Motions for Preliminary and Final Approval of Class Settlement (Draft May 3, 2010).

Be aware that adversarial clashes usually end with the settlement. Indeed, most settlements preclude the parties and attorneys from opposing the settlement's provisions, especially the stipulations about attorney fees. Thus, you need to take independent steps to get the information you will undoubtedly need to review a settlement agreement.

## A. Judge's role

The judge's assigned task of approving or disapproving a class settlement presents exceptional challenges. Some courts "have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class" and to impose "the high duty of care that the law requires of fiduciaries." Reynolds v. Beneficial National Bank, 288 F.3d 277, 280 (7th Cir. 2002).

Because the class itself typically lacks the motivation, knowledge, and resources to protect its own interests, and because settling counsel for both plaintiff and defendant have little or no incentive to offer information adverse to the settlement, you need to examine critically the class certification elements, the proposed settlement terms, the proposed notice plan, and the procedures set out for implementing the proposed settlement. *See* MCL 4th § 21.61. You need to identify possible sources of information about the settlement and use them to obtain, for example, agreements or understandings among counsel, the views and experiences of objectors, and the complete terms of the settlement. The next section (IV.B) discusses all of those informational sources.

Reviewing a proposed settlement calls for you to use your traditional judging skills. The central questions relate to the merits of the claims and defenses:

- What are the class claims?
- How strong are they?

12

ER000273

- What is the range of values of a successful claim?
- How likely is the class to succeed on each claim in further litigation, including trial?

You may decide to avoid a definitive statement on the merits because the settlement may fail and the case may come to trial. Nonetheless, it seems absolutely necessary to obtain information and arguments from the parties about their assessment of the probabilities of success and their projection of a realistic range of possible recoveries. *Reynolds,* 288 F.3d at 284–85, discusses this approach further. While party submissions may influence your judgment about the merits, keep in mind that the parties have their own interests in supporting the settlement. You may need to search elsewhere for information that will allow you to take an independent and hard look at the merits of the claims and defenses.

## B. Obtaining information about the settlement

The key to reviewing a settlement is to obtain information about

- the settlement's terms;
- the merits of the class members' claims;
- the reasons for settling those claims;
- the settlement's benefits to the class;
- the number of claims actually filed by class members;
- the amount of the settlement that is likely to be distributed to class members;
- the reasons for any opposition to the settlement; and
- the effect of the settlement on other pending litigation.

This section presents a number of suggestions for gathering settlement information, starting with a provision from amended Rule 23.

### 1. Rule 23(e)(3) agreements and prior individual settlements

Federal Rule of Civil Procedure 23(e)(3) directs the parties to "file a statement identifying any agreement made in connection with the proposed settlement." Let the settling parties know that you expect them to provide the full settlement agreement as well as an informative summary of other agreements, such as settlement agreements for claims similar to those of class members; side un-

13

ER000274

*Class Action Pocket Guide (3d ed.)*

derstandings about attorney fees; and agreements about filing future cases, sealing of discovery, and the like. *See* MCL 4th § 21.631. The idea is to identify documents that directly or implicitly suggest the attorneys' perceptions of the value of the class claims and that may point to funds that might otherwise be available to compensate the class, including attorney fees and payments to objectors.

Consider directing the parties to provide additional information to aid your assessment of the settlement. Often, information about related parallel and overlapping cases, including amounts paid to individual plaintiffs or claimants, will shed light on the value of the class's claims. If prior settlements were confidential, direct the parties to provide information for you to review in camera. Pressing the parties to provide objective information about the merits and value of the individual claims should advance your effort to pin down the merits and value of the class claims. Make sure the parties identify and justify any differences in treatment of various types of class members. Expert evaluations of the costs and present monetary value of all aspects of the settlement to the class may be available. Ask counsel what information they used to satisfy their professional obligation to advise their clients about the value of the proposed settlement.

### 2. Preliminary review hearing

Holding a preliminary review hearing will afford you another opportunity to obtain information. If you are deciding whether to certify a class at this stage, direct the parties to give you all the information and arguments needed to apply the Rule 23(a) and (b) criteria. How numerous is the class? What are the common questions of law and fact, and do they predominate? Why is the class action superior to other forms of adjudication?

At the preliminary hearing stage, determine whether the notice to the class will reach a high percentage of the members (see section IV.F below), and whether it should include claims forms and instructions for completing the claims process before the final hearing. Establishing a claims procedure at this stage can provide you with valuable information about class members' rate of presenting claims, information that is often essential in identifying

ER000275

*Class Action Pocket Guide (3d ed.)*

the true size of the settlement fund, and in making your fairness determination. An early claims procedure might also simplify administrative costs, as discussed below in section IV.B.4. The benefits of any early claims procedure need to be weighed against the possibility that you will decide not to approve the settlement.

## 3. Subclasses

Information gleaned from reviewing class certification papers should also inform you about any need for subclasses to represent separate interests. *See* MCL 4th § 21.23. The preliminary review hearing is usually the last practical opportunity to create subclasses. Appointing counsel for subclasses will generally have the practical effect of sending the parties back to the negotiating table to deal with the interests of the new subclasses.

## 4. Prior action by government entities

When a government regulator has sought or obtained a monetary remedy for a class, examine the description of the intended beneficiaries of the government's action and decide whether you should define the class to be certified in the same way. Aligning the class definition with the description of the beneficiaries in the governmental action will most likely produce efficiencies in notifying the class, reviewing the settlement, distributing the proceeds, and evaluating requests for fees.

Typically, public enforcement actions result in a consent decree, but the government agency may have the statutory power to order rescission of agreements and restitution or disgorgement of profits from illegal activities, as the court recognized in *In re First Databank Antitrust Litigation,* 209 F. Supp. 2d 96, 98 (D.D.C. 2002). When an agency action or criminal prosecution against a business or its officers is successful, a private class action may well follow on its heels. In the context of an agency action, the class action can serve as the vehicle for distributing monetary relief to the class. In *In re First Databank,* for example, the Federal Trade Commission (FTC) got the defendant to agree to a $16–19 million figure for the disgorgement remedy. Private plaintiffs increased that amount by $8 million, and the final disgorgement figure was expressly

15

ER000276

*Class Action Pocket Guide (3d ed.)*

declared to be for the purpose of settling the private class action lawsuits. As discussed in connection with attorney fees below in section V.E, asking the parties to be clear about which entity produced which portion of the award will simplify your decisions on attorney fees.

### 5. Appraisal of settlement

Your appraisal of the settlement should focus on the value actually distributed to the class—based on the number and percentage of class members who have filed a claim. As discussed below in section IV.C.4, strict eligibility requirements and cumbersome claims procedures often discourage class claims and might reduce the total amount paid to class members, making the stated value of the settlement fund illusory. Because there is no clear standard for predicting class response rates, consider calculating any attorney fee award as a percentage of the amount of the settlement fund that has already been distributed to the claimants—even if that means deferring final determination of all or part of the fee award until the claims process is complete.

At or after the preliminary review hearing and after reviewing the sources of information discussed above, consider whether you need an expert's appraisal of the value of nonmonetary or contingent monetary components of the settlement. If so, this is the time to appoint an expert, special master, magistrate judge, or other judicial adjunct, as discussed below in part VII. As a practical matter, waiting for objections or for the settling parties' presentations at the fairness hearing will be too late. *See* MCL 4th § 21.644.

### 6. Information from objectors

Before and during the fairness hearing, you might receive written objections and testimony from objectors. Objectors might contribute to your review in various ways. Attorneys who represent competing or overlapping classes, such as those in state actions, may have useful information on the value of the underlying claims. Similarly, attorneys representing individual claimants who seek a better recovery for their alleged injuries may help you identify the

ER000277

*Class Action Pocket Guide (3d ed.)*

strengths and weaknesses of the settlement and the trade-offs that led to the agreement. They may represent class members in state court actions with strong state law claims, which would be released by the settlement you are faced with.

Be sure to monitor any separate agreements to settle the claims of these objectors. If objectors settle for the same per capita amount as the class, that tends to validate the settlement (assuming that other factors are equal). If they settle for more than the class members, ask the settling parties to justify the differential. A higher settlement for objectors with similar damage claims might signify that the class members did not receive full value for their claims.

Institutional "public interest" objectors may bring a different perspective. Watch out, though, for canned objections from professional objectors who seek out class actions to extract a fee by lodging generic, unhelpful protests. Rule 23 gives you authority to scrutinize as part of the overall class settlement any side agreements to "buy out" such objectors.

Generally, government bodies such as the FTC and state attorneys general, as well as nonprofit entities, have the class-oriented goal of ensuring that class members receive fair, reasonable, and adequate compensation for any injuries suffered. They tend to pursue that objective by policing abuses in class action litigation. Consider allowing such entities to participate actively in the fairness hearing. *See* MCL 4th § 21.643.

## C. Hot button indicators

Some settlement terms show their potential unfairness on their face; we call them "hot button indicators." At the preliminary review stage, signaling your concerns about a proposal containing one or more of such indicators may allow you and the parties to create a notice and hearing process that will correct any deficiencies without the need for multiple hearings. Hot button indicators include any remedy to which you cannot confidently assign a cash value.

ER000278

*Class Action Pocket Guide (3d ed.)*

### 1. Coupons

CAFA calls for judicial scrutiny of coupon settlements and restricts the use of unredeemed coupons in calculating fees for class counsel. *See* 28 U.S.C. § 1712 (2008). It is important to discern whether attorney fees are being calculated using the face value of the coupons instead of the value of coupons actually redeemed. Determine whether the proposed coupons

- are transferable;
- have a secondary market in which they can be discounted and converted to cash;
- compare favorably with bargains generally available to a frugal shopper; and
- are likely to be redeemed by class members.

Coupon settlements were rare even before the passage of CAFA. Occasionally, you may find that transferable coupons have some value to a class of repeat users of a product or service, as they did in *In re Mexico Money Transfer Litigation,* 267 F.3d 743, 748 (7th Cir. 2001). Determining the precise value to the class of the rare beneficial coupon settlement, though, calls for hard data on class members' redemption of the coupons.

### 2. Negative options

Watch for a variant of the coupon settlement—the negative option, which is a gift or benefit that requires the recipient to take affirmative action to cancel it before a continuing obligation to pay arises. The FTC has aptly termed the negative option a "promotional gimmick." For example, in a California state class action, plaintiffs alleged fraud and deceptive and unfair business practices against a company selling DVD subscription services. The parties agreed to settle these claims for a one-month membership upgrade for current members and a "free" one-month membership for past members who had canceled. The catch was that both of these "benefits" would continue until the class member took affirmative steps to cancel the membership. In other words, the free service was converted automatically into an obligation to pay for future services. Apparently as a result of the FTC's amicus curiae participation, the parties renegotiated the settlement to remove

18

ER000279

*Class Action Pocket Guide (3d ed.)*

the automatic renewal feature and the court approved a revised settlement. Chavez v. Netflix, Inc., 75 Cal. Rptr. 3d 413, 418–21 (Cal. Ct. App. 2008). For a general definition of negative options and the FTC regulations governing them, see *Use of Prenotification Negative Option Plans,* 16 C.F.R. pt. 425 (2008).

3. *Cy pres* relief ("fluid recovery")

The term "*cy pres*" has migrated from the trust field into the sometimes less appropriate realm of class action litigation. Literally, *cy pres* means "as near as possible" to the original purpose. In the class action context, recovery for individual class members is sometimes not possible or practical. In these instances, the class is so large and the potential recovery per class member so small that the cost of administering a single claim would exceed the benefit to any individual. Individual reimbursement for taxi fare overcharges is a classic example.

   *Cy pres* relief must come as close as possible to the objective of the case and the interests of the class members. Question whether the class members might feasibly obtain a personal benefit. Look for evidence that proof of individual claims would be burdensome or that distribution of damages would be costly. If individual recoveries do not seem feasible, examine the proximity or distance between the *cy pres* recipient's interests or activities and the particular interests and claims of the class members. When *cy pres* relief consists of distributing products to charitable organizations or others, press for information about whether the products in question have retained their face value or might be out-of-date, duplicative, or of marginal value. In the end, *cy pres* awards may be an excellent way to avoid the restrictive claims processes and reversion clauses discussed in the next section.

4. Restrictions on claims/reversion of unclaimed funds to defendants

Limits on the amount of recovery per claimant, strict eligibility criteria for claimants, or other procedural or substantive obstacles to honoring claims from class members may dramatically reduce the apparent value of a settlement. Coupled with a provision that

19

ER000280

*Class Action Pocket Guide (3d ed.)*

any unclaimed funds revert to the defendant at the end of the claims period (a provision that is generally disfavored, as discussed in the next paragraph), restrictions on eligibility are likely to substantially diminish the overall value of a settlement to the class. The addition of a "clear sailing" agreement (i.e., a stipulation that attorney fees based on the inflated settlement figure will not be contested) to an agreement with a reversion clause adds decibels to the alarms set off by the reversion clause. Some courts treat the combination as creating a presumption of unfairness.

A reversion clause creates perverse incentives for a defendant to impose restrictive eligibility conditions and for class counsel and defendants to use the artificially inflated settlement amount as a basis for attorney fees. Instead of approving a settlement with a reversion clause, consider encouraging the parties to use an alternative approach, such as distributing the entire settlement fund to the class members who file claims. Prorating the fund in that way avoids the possibility of unclaimed funds and is a standard practice in securities class settlements. For a discussion of alternative ways of prorating a settlement fund, see Francis E. McGovern, *Distribution of Funds in Class Actions-Claims Administration*, 35 J. Corp. L. 123 (2009).

To align plaintiff counsel's interests with those of the class, to discourage the use of a reversion clause, and to negate the effect of a clear sailing agreement, consider linking the award of attorney fees to the value of the funds distributed to the class or the coupons redeemed by the class (see section V.B below).

### 5. Collusion: "Reverse auctions" and the like

An imbalance between the cash value of the settlement to the class as a whole and the agreed amount of attorney fees is a prime indicator of collusion by settling attorneys. For example, in a settlement with both monetary and nonmonetary relief, if the attorneys receive the lion's share of the cash and the class receives primarily nonmonetary relief, including future warrants, coupons, and the like, you should look for solid information to justify the imbalance. Likewise, you should scrutinize an agreement that provides that attorneys receive a noncontingent cash award and that class

ER000281

*Class Action Pocket Guide (3d ed.)*

benefits are contingent on settlement approval and claims made. *See* MCL 4th § 21.71.

"Reverse auction" is the label for a defendant's collusive selection of the weakest attorney among a number of plaintiff attorneys who have filed lawsuits dealing with the same subject matter; in other words, a reverse auction is the "sale" of a settlement to the *lowest* bidder among counsel for competing or overlapping classes. *See* MCL 4th § 21.61, text at n.952 and sources cited therein. For a recent example of a district court's thorough analysis of a proposed settlement with reverse auction principles at the forefront, see *Figueroa v. Sharper Image Corp.,* 517 F. Supp. 2d 1292, 1321 (S.D. Fla. 2007). In *Figueroa,* the court rejected a "Third Amended Settlement Agreement" in part because the defendant "selected counsel confronted with a most precarious position . . . and then proceeded to offer and convince Class Counsel to accept highly undesirable terms to settle the case." Determining whether a reverse auction might have occurred requires information about all litigation dealing with the subject of the dispute.

Another major indicator of a reverse auction is a difference between the apparent value of the class claims on the merits and the value of the settlement to class members. A typical element of a reverse auction is a promise to pay attorneys more than a reasonable value for the time they invested in negotiating the settlement. Generally, the overpayment of the attorneys originates in an underpayment of what the class should receive based on an objective assessment of the merits of the class claims.

Sometimes, the settlement will be with an attorney who has not been involved in litigating the class claims that other attorneys have been pursuing, an especially suspicious circumstance. Questionable settlements between class counsel and the same defendant in unrelated cases may suggest a continuing collusive relationship.

6. Injunctive relief

Question whether injunctive relief will truly benefit class members in the case at hand. In many cases, by putting an end to illegal practices, an injunction will benefit more class members than a small award. It will also avoid clogging the judicial system with

21

*Class Action Pocket Guide (3d ed.)*

the administration of small awards to thousands of class members. But it is important to press the parties to identify such cases clearly and justify the remedy and fees. Ask yourself—and perhaps the parties—the following questions:

- How much is the injunction worth to the class as a practical matter?
- What is the dollar value the relief might yield?
- What is the real cost to the defendant?
- Does the injunctive relief do more than restate the obligation that the defendant already has under existing law or under a decree entered by a regulatory body?
- Are there viable damage claims that class counsel has not pursued?
- Might an emphasis on injunctive relief and proposed certification of a Rule 23(b)(2) class amount to a tactical move to avoid more stringent certification requirements and opt-out rights associated with a damages class under Rule 23(b)(3)?

Consider whether you need independent expert advice to place a value on the relief offered, as discussed below in part VII.

### 7. Release of liability without remedy

A natural impulse on the part of settling parties is to attempt to expand the class and release claims of those on the periphery of the class, such as the spouses and children of class members, without providing any direct benefit to those individuals. At times parties have attempted to release a damages remedy without making any correlative payment to class members, as the parties attempted to do in *Reynolds,* 288 F.3d at 283–84. Unpled claims against outside parties (e.g., medical malpractice claims in a class action against a pharmaceutical manufacturer) are sometimes swept into the settlement. The settlement should compensate class members or their families for the value of such claims. As a general rule, the release of claims by a subclass should be linked with specific remedies, such as payments to the subclass or increased payments to class members based, for example, on their family status.

ER000283

*Class Action Pocket Guide (3d ed.)*

8. Settlement class actions

Certification of class actions solely for the purpose of settlement at an early stage of the litigation generally makes meaningful judicial review more difficult and more important. MCL 4th § 21.612. Parties frequently agree to settle class actions before a judge has decided that a class can be certified under Rule 23. The parties then jointly seek certification in the context of the settlement. Often, the parties' agreement that a class can be certified is conditioned on judicial approval of the settlement. The Supreme Court has ruled that agreement of the parties does not lessen the need for a judge to determine whether all of Rule 23's certification standards other than manageability have been met. Amchem Products, Inc. v. Windsor, 521 U.S. 591, 620 (1997); MCL 4th § 21.132.

*D. Preliminary review of the proposed settlement*

Judicial review of a proposed class settlement generally requires two hearings: one preliminary and one final. MCL 4th § 21.632. If you haven't already certified a class, you should determine during the preliminary fairness review whether the proposed class meets the standards of Rule 23(a) and (b). By doing this, you can avoid unnecessarily using scarce judicial and party resources to schedule a fairness hearing for a class that doesn't meet Rule 23 certification standards.

If you decide to certify the proposed class, be aware that courts, following the Supreme Court's lead in *Amchem,* have ruled that the settlement terms of a settlement class action need careful scrutiny. Often, such a settlement comes early in the litigation, so you may have to probe to uncover the strengths and weaknesses of the parties' claims and defenses as well as the character of their negotiations. There may be conflicts among groups within the proposed class. Question whether the claims of class members are homogeneous. If they are not, explore the possibility of creating subclasses and sending the parties back to renegotiate and take into account the differing interests of class members.

Preliminary review of the proposed settlement affords you an opportunity to express any concerns you may have about the "hot button indicators" discussed above in section IV.C. You don't have

ER000284

*Class Action Pocket Guide (3d ed.)*

the power to decide what must be in a settlement agreement, but you do have the opportunity to state your concerns about provisions—or the absence of provisions—that would make a difference in your decision about whether to approve a proposed settlement. If you have such concerns, consider allowing the parties some time to respond to them by renegotiating the settlement so that the class notice can refer as closely as possible to a final settlement. If you hold back your concerns and reject a settlement at the final fairness hearing, the parties will most likely have to incur the considerable expense of sending new notices of any revised settlement to the class.

Consider seeking preliminary input into the fairness, reasonableness, and adequacy of the proposed settlement. For example, one judge permitted counsel pursuing independent state class actions against the same defendants to intervene as "an offsetting influence" to the loss of adversarial opposition from the parties. *In re* Lupron Marketing & Sales Practices Litigation, 345 F. Supp. 2d 135, 138 n.5 (D. Mass. 2004). Participation by such plaintiffs' counsel provided the judge with a unique opportunity to receive an informed assessment by nonsettling plaintiffs of the value of the case and the prospects for success at trial. Absent such an opportunity, consider asking the parties or others to provide preliminary information supporting the proposal.

Though not necessarily unfair, *conditional settlements* present a special problem to the class and the judge. Sometimes, a defendant resists settlement unless it can be assured that the number of class members opting out of the proposed settlement will not exceed a certain number that is specified but not widely disclosed. To avoid unduly delaying the settlement review, you may decide to press the parties to set a reasonable cutoff date for the defendant's decision about whether to proceed with the settlement, say thirty days after the end of the opt-out period. MCL 4th § 21.652. In any event, you should require the defendant to make an election before the fairness hearing.

Remember that any preliminary "approval" or other endorsement of the proposed settlement should not appear to be a commitment to approve the settlement in the end. Any preliminary

24

ER000285

*Class Action Pocket Guide (3d ed.)*

finding should be that the proposed settlement is within the range of reasonableness; such a finding is not a final judgment that the proposal is fair, reasonable, and adequate as shown by evidence at the fairness hearing. Reserve that judgment and expect to be informed by counsel for the class and counsel for the defendants (maybe in response to your pointed questions), and by class members, objectors, lawyers from similar litigation, or, perhaps, your own expert or special master. Bring an inquiring mind to the preliminary review hearing and, as noted above, seek out the information you need to decide whether the settlement is fair, reasonable, and adequate.

Once you are satisfied that the proposed settlement warrants your preliminary approval, review the parties' proposed plan for notice and hearing. Generally, counsel will present the settlement proposal and a notice plan at the same time. The purpose of reviewing the notice plan at this stage is "to determine whether any defects in the proposed notice or other formal or substantive irregularities exist that warrant withholding notice." American Law Institute, Principles of Aggregate Litigation § 3.03(a) (2010) Before reviewing the proposed notice plan, consider whether you want to direct that class members' claims for monetary relief be filed in response to the notice and before the final review hearing (see section IV.B.2 above) The class's response to the settlement will help you analyze the settlement's value and evaluate its adequacy as seen through the eyes of class members deciding their own interests. Knowing the claims rate will also provide a basis for your assessment of requests for attorney fees. In any event, to remedy the current lack of knowledge about claims rates and class member recoveries, judges should routinely order the parties to report such information to the court and place it in the public record.

*E. Warning about claims services*

Consider also whether you want to direct the parties to include in the notice and claims form some provisions that warn class members about the potential pitfalls in dealing with claims filing services, a cottage industry that offers to gather and file claims for

ER000286

*Class Action Pocket Guide (3d ed.)*

class members. Such services can increase the claims rate and provide a service to class members, but they do not generally add any value to a claim. The worst pitfall is that some claims services have absconded with funds. Protections in the form of requiring claims filing services to register with the court and maintain funds in a trust account may be in order.

## F. Notice issues

Opt-out notice binds class members by their silence, so you will want to focus on ensuring adequate notice. This pocket guide emphasizes notice issues because notices that fail to reach class members, or that confuse them, are all too common. They result in very low participation rates and discredit the class action procedure.

This section highlights some of the key notice issues. The "Notice Checklist and Plain Language Guide," available at the Class Action Notices Page at www.fjc.gov, details important considerations for notice to class members in several areas.

### 1. Notice to government regulators

CAFA requires that within ten days after a proposed settlement is filed in court, each participating defendant must serve notice of specified settlement-related papers on (1) the U.S. Attorney General or, in the case of a depository institution, the primary federal regulatory official *and* (2) the primary state regulatory official (or, if none, the attorney general) of each state in which a class member resides. 28 U.S.C. § 1715 (2008). The idea is to encourage government regulators to participate in reviewing settlements and lend their expertise (and perhaps an adversarial note) to the fairness hearing. You may want to consider extending an express invitation—to the preliminary approval hearing and to the fairness hearing—to any regulatory body you have found to be effective in dealing with the subject matter in question.

The Federal Trade Commission has extensive statutory authority and expertise in dealing with antitrust, unfair competition, and consumer protection matters. *See generally* FTC, Fulfilling the Original Vision: The FTC at 90 (Apr. 2004) (available at http://ftc.gov/os/2004/04/040402abafinal.pdf). CAFA does not

26

ER000287

*Class Action Pocket Guide (3d ed.)*

specify the FTC as an agency that must receive notice, but consider adding the FTC to the notice list in consumer and trade practice litigation, including antitrust actions. The FTC has created a "Class Action Fairness Project," which channels FTC resources into reviewing proposed settlements as well as class counsel requests for attorney fees. Since defendants have made copies of—or electronic links to—the required settlement documents for other agencies, it will be no burden on them to send notice to the FTC or other consumer protection entities in appropriate cases.

## 2. Notice to the class

Notices are usually the only way to communicate with unnamed class members and enable them to make informed decisions about whether to participate in a class action settlement, or to exercise their due process rights to be heard before final approval of the settlement. Your primary goals are that the notice reach as many class members as possible, preferably by individual notification (*see* Rules 23(c)(2) and 23(e)(1) and MCL 4th § 21.312), and that the recipients see it, recognize its connection to their lives and self-interests, read it, and act on it. *See* Todd B. Hilsee et al., *Do You Really Want Me To Know My Rights?* 18 Geo. J. Legal Ethics 1359 (2005).

The first challenge is to *reach* a high percentage of class members. Notice plans that appear reasonable may in fact reach only a small percentage of class members. Before approving a notice plan, consider asking for calculations to demonstrate the "reach"—i.e., the net percentage of class members who will receive or otherwise be exposed to a notice. You can use reach statistics to substantially improve the net reach to class members. The norm is in the 70–95% range. Consider asking whether the proposed notice plan was created by a vendor who will be paid to implement it if approved. If so, consider obtaining an independent analysis of the notice plan's adequacy before approving the plan. Competing vendors may cut corners to win the business, but you must find the "best notice that is practicable under the circumstances." Rule 23(c)(2)(B). To satisfy due process, the notice must reflect a "de-

27

ER000288

*Class Action Pocket Guide (3d ed.)*

sire to actually inform." *See* Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306 (1950).

Be certain the notice plan includes individual notice to all "reasonably identifiable" class members under Rule 23(c)(2). The plan should take steps to update addresses before mailing and provide for re-mailing notices to better addresses when returned as undeliverable. *See* Jones v. Flowers, 547 U.S. 220 (2006).  The U.S. population is highly mobile today, so class lists compiled for business purposes may be out of date.

Next, it is important to give the class member a reason to *read* the notice. In a world in which junk mail and spam can easily drown out important messages, you may need to press the parties to look beyond the formal legal requirements and find a way to communicate the gist of a class action notice in an attention-getting and understandable format. Rule 23(c)(2)(B) commands that notices "clearly and concisely state in plain, easily understood language" the elements of class action notices. Boilerplate legal language almost never does the job. With help from linguists, communications specialists, a notice expert, and focus groups, the Federal Judicial Center prepared several illustrative notices. See the Class Action Notices Page at www.fjc.gov; there you can also see the "Notice Checklist and Plain Language Guide," which explains important features of the illustrative notices. For a handy booklet on notice principles, see Rust Consulting, Inc. & Kinsella Media, LLC, *Plain Language Primer for Class Action Notice* (undated) (available at http://www.kinsellamedia.com/Knowledge_Sharing.aspx).

The headline of a notice should tell potential class members at a glance why they should—or should not—bother to read the notice; what the notice is about; and what benefit the reader might gain from reading the notice.  For example, a notice of an asbestos settlement might start with this headline: "If you have been exposed to an asbestos product, you may have a claim in a proposed class action settlement" and provide enough information to identify potential benefits and options as well as referral to a website or a toll-free telephone number for additional information. The goal is to get class members to read the notice and make an informed

28

ER000289

*Class Action Pocket Guide (3d ed.)*

decision about exercising any of their rights before being bound by the court's judgment.

A picture of asbestos insulation in a notice may trigger an association in the reader's mind. Those who recognize their own circumstances are likely to read on, contact a website, or call a toll-free telephone number. Nonmembers of the class will have a good reason for adding the notice to the junk mail pile.

A short-form, single-page (or shorter) "summary" notice with headlines can communicate all the required elements of Rule 23 and can tell the reader how to get additional information. Formal case captions should not be used in the summary notice as they are a turn-off to lay people. Legal terms of the settlement tend to confuse lay readers and should be confined to the settlement agreement posted at the website. While "legalese" has been reduced in recent years, much improvement is still needed. *See* Shannon R. Wheatman & Terri R. LeClerq, Majority of Class Action Publication Notices Fail to Satisfy Rule 23 Requirements (2010).

"Plain English" notices may not be enough. Truly global settlements will include class members whose native language is not English and who may not be citizens of an English-speaking country. Note that the FJC's illustrative class action notices on its website include an example of a Spanish language notice. For a recent and colorful example of a global format for class settlements, which is translated into numerous languages and complete with flags for each country, see the settlement administration website for *In re Royal Ahold Securities and Erisa Litigation,* http://www.aholdsettlement.com.

Make sure the notice plan takes into account any cultural and language barriers to notifying class members. For example, the class actions involving assets of Holocaust victims demanded a far-reaching notice campaign to notify the many dispersed Jewish survivors as well as gays, Jehovah's Witnesses, and Romani ("gypsy") migrants. The judge approved a "multifaceted plan" that included "worldwide publication, public relations (i.e., 'earned media'), Internet, and grass roots community outreach." *In re* Holocaust Victims Assets Litigation, 105 F. Supp. 2d 139, 144–45 (E.D.N.Y. 2000). As the judge in the Holocaust victims' class actions was,

29

ER000290

*Class Action Pocket Guide (3d ed.)*

be alert to cultural differences that might affect the attention recipients will give to the proposed notices. A class of migrant farm workers, for example, might rely on radio more often than urban factory workers would. A class of people challenging searches and seizures as unreasonable might respond differently to official court notices than, say, people who have never been arrested.

## G. Claims processes and response handling

If the claims process deters class members from filing claims, the settlement may have less value to the class than the parties assert. Obtaining complete information about claims presented via an unimpeded process will assist you in determining the full value of the settlement and hence its reasonableness, fairness, and adequacy to the class. Avoid imposing unnecessary hurdles on potential claimants.

First, consider whether a claims process is necessary at all. The defendant may already have the data it needs to automatically pay the claims of at least a portion of class members who do not opt out. Necessary claim forms should be as simple and clear as possible and should avoid redundancy. Be careful to avoid claim forms that scare class members away with confusing questions and onerous proof requirements.

If you anticipate or find evidence of a low claims rate, ask counsel whether they have considered alternatives that might enhance the reach of the claims process and tailor it to the characteristics of class members, such as using surveys to determine reasons for nonresponses, improving the clarity of the claims forms, and adding outreach programs. *See* Francis E. McGovern, Distribution of Funds in Class Actions-Claims Administration, 35 J. Corp. L. 123 (2009).

Class counsel should be available to answer class members' questions. The parties commonly agree to seek the appointment of a qualified claims administrator to receive and process claims and handle a toll-free telephone number call center staffed by trained agents. In less complex matters, settlement administrators can place scripted answers to callers' frequently asked questions

30

*Class Action Pocket Guide (3d ed.)*

about the settlement on an automated phone system and on the Internet.

## H. Fairness hearing

### 1. Participation rates: opt-outs

The typical class action settlement notice will most likely yield an apathetic response, and few objectors or opt-outs. Two empirical studies found that about one in a thousand (0.1%) class members opted out of a proposed settlement. Theodore Eisenberg & Geoffrey P. Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues,* 57 Vand. L. Rev. 1529 (2004); Thomas E. Willging et al., Federal Judicial Center, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules (1996) [hereinafter Willging et al., Empirical Study of Class Actions (1996)].

Counsel may argue that a low percentage of opt-outs demonstrates class members' agreement with the settlement, but in some cases that argument seems misplaced. Opt-out rates vary according to the type of case and the amount of the individual recovery. Class members are considerably more likely to opt out of mass tort, employment, and commercial litigation, where individual recoveries are generally higher, and less likely to opt out of consumer cases, where individual recoveries are generally lower and individual litigation less viable.

### 2. Participation rates: objections

Do not expect class representatives or other class members to attend the fairness hearing or file written objections. A 1996 FJC study found that only about a quarter to a half of the class representatives attended the fairness hearing. Willging et al., Empirical Study of Class Actions (1996).

The FJC study also found that in about half of the class actions, not a single member filed a written objection. Written objections documented in the FJC study most frequently challenged the amount of the attorney fees requested. In second place was a related objection: that the settlement was inadequate to compensate class members for their losses, perhaps because the lawyers

31

received more than their fair share. Next in line was the objection that the settlement favored some subclasses over others. These findings suggest that a substantial portion of the fairness hearing will focus on attorney fee issues.

### 3. Conducting the fairness hearing

It is essential to conduct a hearing even if no one other than the attorneys for the settling parties participates, because the hearing is your primary opportunity to focus on the terms of the settlement. You alone are charged with deciding whether the settlement is fair to the class members, reasonable in relation to the merits of their claims, and adequate to redress any injuries suffered. Rule 23 and the MCL 4th call for the judge to conduct an independent analysis of the settlement terms. Review the list of "hot button indicators" discussed in section IV.C above and be prepared to ask counsel hard questions about the value of the settlement to the class. In addition, the MCL 4th contains a checklist of fifteen more routine factors that might inform your decision about whether the settlement is superior to continued litigation of the class claims. MCL 4th § 21.62. The manual also discusses benchmarks for applying the fifteen factors.

If objectors and unrepresented class members appear at the fairness hearing, it is important to permit them to fully voice their concerns. For class members who feel strongly enough about their injuries to appear, the fairness hearing is their "day in court." Judges in settlements involving tort claims, such as the Agent Orange litigation and the silicone gel breast implant litigation, have held multiple days of hearings to accommodate the interests of class members.

You will, of course, want to eliminate unnecessary repetition. Setting time limits is a must. Be sure to notify participants in advance about how much time they will have. Note that having a group of class members gives you a chance to ask questions of all present, akin to conducting a voir dire of a jury venire. Such a group examination may be an efficient mechanism for getting a clear sense of the similarities and differences among class members' claims.

ER000293

*Class Action Pocket Guide (3d ed.)*

Finally, Rule 23 and good practice both require specific findings as to how the settlement meets or fails to meet the statutory requirements. In these times of heightened visibility of class action rulings, appellate review of settlements is not pro forma even when the court affirms the district court's findings and conclusions.

# V. Attorney Fee Issues

As discussed in part II above, Rule 23(g) requires you to appoint class counsel at an early stage of the litigation. When appointing counsel, consider entering an order with express provisions about the standards and procedures you expect to use in reviewing requests for attorney fees and costs. Rule 23(g)(1)(C). At the least, you should inform counsel about whether to keep time records to support using a lodestar cross-check, as discussed below. In addition, appointing counsel gives you a natural opportunity to discuss cost-saving measures, such as limiting travel expenses and discouraging the use of senior partners to do legal research. *See* MCL 4th § 14.21. Perhaps from the outset of the litigation, but at least at the fee determination stage, "the district judge must protect the class's interest by acting as a fiduciary for the class." *In re* Rite Aid Corp. Securities Litigation, 396 F.3d 294, 307 (3d Cir. 2005).

## A. Evaluating monetary and nonmonetary results achieved

The 2003 Committee Note to Rule 23(h) gives the following guidance for determining attorney fees based on the creation of a monetary fund for the common benefit of the class: the "fundamental focus is the result actually achieved for class members."

In cases involving monetary benefits, do not be misled by party valuations of the settlement that presume a 100% claims rate by class members. Insist on actual information on claims filed to determine the benefit to class members and use that information both to place a value on the settlement and to award attorney fees, as the district judge did in *Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 50–53 (D. Me. 2005). That value—plus the value of any nonmonetary relief—serves as the starting point for applying the

ER000294

*Class Action Pocket Guide (3d ed.)*

percentage-of-value method in determining appropriate attorney fees (discussed below).

Likewise, in cases in which the benefit to the class is nonmonetary (coupons, discounts, warrants, injunctions, and the like), determining the actual value to the class requires looking beyond the face value of nonmonetary or contingent benefits. Redemption data or other evidence of class use is essential. In some cases, particularly settlements involving injunctive or declaratory relief, you might use expert valuations based on reliable, objective standards. In other cases, perhaps a majority, the only reliable test of the benefit to the class will be evidence of class members' use or redemption of the coupons, warrants, or other nonmonetary scrip. *See* MCL 4th § 21.71; *see also* Class Action Fairness Act, 28 U.S.C. § 1712(a) (2008) (coupon settlements). In such cases, it is especially important to link the amount of any attorney fees with the actual benefit to the class.

A direct way to ensure that you have sufficient information to determine attorney fees in cases with nonmonetary benefits is simply to hold back the portion of any attorney fee awards that is linked with coupons, discounts, or other nonmonetary benefits until after the redemption period has ended and the value of the benefits can be established by calculating class members' actual use. For example, the court expressly reserved the determination of any attorney fees to be paid to plaintiffs' counsel until after the parties had provided the court with information concerning the distribution of benefits in *Strong v. BellSouth Telecommunications, Inc.*, 173 F.R.D. 167 (W.D. La. 1997), *aff'd,* 137 F.3d 844, 848 (5th Cir. 1998). Note that redemption of a coupon does not automatically mean the member received a benefit. If similar discounts are provided to consumers outside of the class, the benefit to the class might be less than the face amount of the coupon—or perhaps no benefit at all.

In some class actions involving injunctive relief, the injunctive relief can be assigned a monetary value on the basis of objective criteria. For example, an injunction against an overcharge may be valued at the amount of the overcharge multiplied by the number of people likely to be exposed to the overcharge in the near fu-

ER000295

*Class Action Pocket Guide (3d ed.)*

ture. Or an injunction against a fraudulent sales practice might be valued by examining the amount of past sales attributable to the practice and projecting that value for a reasonable period of time, perhaps the life of the practice before the injunction. Other forms of injunctive relief, such as orders designed to end discrimination in public accommodations, may be more difficult to value. In such cases it may be necessary to calculate fees by using a lodestar approach.

The take-away line is this: Do not award fees until you know the true value of the settlement.

## B. Methods of calculating fees

Courts use two methods to calculate fees for cases in which the settlement is susceptible to an objective evaluation. The primary method is based on a percentage of the actual value to the class of any settlement fund plus the actual value of any nonmonetary relief. The second method is based on a lodestar calculation in which the court multiplies the reasonable number of attorney or paralegal hours actually expended by the hourly market rate for those services. For cases in which nonmonetary relief cannot be evaluated with confidence, the lodestar method may be the only reasonable alternative.

While most courts of appeals now permit district courts to use the percentage-of-value method (MCL 4th § 14.121), their decisions often direct district courts in their circuit to supplement the percentage method with a lodestar cross-check to see if the hourly rate is reasonable and to provide the appellate courts with a basis for reviewing the reasonableness of the fee award. The cross-check requires "neither mathematical precision nor bean-counting"; it allows you to "rely on summaries submitted by the attorneys and [you] need not review actual billing records." *In re* Rite Aid Corp. Securities Litigation, 396 F.3d 294, 306–07 (3d Cir. 2005).

Another type of cross-check involves examining the defendants' attorney fee records as a measure of what might be a reasonable number of hours or a total payment. In general, judges should avoid rigid adherence to a benchmark percentage and instead tailor their fee award to the realities of the class litigation before

35

ER000296

*Class Action Pocket Guide (3d ed.)*

them. Sometimes huge settlements do not warrant a standard percentage, as the next section discusses.

## C. "Mega" cases

In "mega" cases, be prepared to see attorney requests for truly huge amounts, up to hundreds of millions of dollars. In such cases, of course, the monetary recovery to the class typically is also in the hundreds of millions of dollars, even in the billions. *See, e.g., In re* Prudential Insurance Co. of America Sales Practices Litigation, 148 F.3d 283, 339–40 (3d Cir. 1998). In such cases, you should be looking at a percentage of recovery far less than the typical range and perhaps as low as 4%. MCL 4th § 14.121. Generally, as the total recovery increases the percentage allocated to fees should decrease. Consider using a sliding scale to advance the goal of awarding reasonable fees in relation to the hours expended. MCL 4th § 14.121, text at nn.497–99; *see also In re* Rite Aid Corp., 396 F.3d at 302–03 (discussing the pros and cons of sliding scales). As noted above in part II, asking attorneys at the outset of the litigation to maintain time records will be helpful in implementing a lodestar cross-check for cases of this magnitude.

## D. Objectors

Objectors may qualify for fees because of their contribution to the common fund available to the class. As occurred in *Bowling v. Pfizer,* 922 F. Supp. 1261, 1285 (S.D. Ohio 1996), by reducing attorney fees, objectors often increase funds available for the common settlement fund. The 2003 Committee Note to Rule 23(h) expressly recognizes the benefits that objectors may provide to the class. But be wary of self-interested professional objectors who often present rote objections to class counsel's fee requests and add little or nothing to the fee proceedings.

## E. Role of government actors

Often in consumer or commercial class action litigation, government regulators, such as the FTC, the Securities and Exchange Commission (SEC), or a state or the federal Attorney General's office, will lay the groundwork for class action litigation. In pursuing

36

ER000297

*Class Action Pocket Guide (3d ed.)*

public goals of advancing fair competition, protecting consumers, and policing the marketplace against false and misleading information, such agencies may invest substantial resources in investigating a defendant's alleged malfeasance. For example, in *In re First Databank Antitrust Litigation,* 209 F. Supp. 2d 96, 97 (D.D.C. 2002), the FTC "expended over 25,000 hours of investigators' time, obtained production of and reviewed some 400 boxes of documents produced in response to approximately 40 subpoenas, and conducted 20 investigational hearings and over 60 interviews."

In quantifying the risk undertaken by plaintiffs' counsel in bringing a class action, scrutinize the activities of government actors that may have facilitated or enhanced the outcome (see section IV.B.4 above). Where a government body has obtained a guilty plea, criminal conviction, or civil judgment against a defendant, class counsel in a "piggyback" class action arising out of the same set of facts face a reduced risk of loss and a reduced burden of discovery and trial. A reasonable attorney fee in such cases may be a percentage of the value that the class counsel adds to the settlement that would not have been available to the class but for the counsel's work, as happened in *Swedish Hospital Corp. v. Shalala,* 1 F.3d 1261, 1272 (D.C. Cir. 1993). Likewise, in *In re First Databank,* 209 F. Supp. 2d at 98, the court limited the private plaintiff attorneys' fee to a percentage of the value the attorneys added to the FTC's proposed settlement.

In some cases, such as *In re First Databank,* the government actor might participate as an intervenor or as a friend of the court in addressing the attorney fee issues. If the agency does not intervene on its own initiative, consider inviting it to participate in the fee proceedings as an intervenor or friend of the court.

On the other hand, private class action litigation may pave the way for government enforcement or serve as a substantial deterrent in its own right. In such cases, take into account in awarding attorney fees any groundbreaking work of plaintiffs' counsel.

37

ER000298

*Class Action Pocket Guide (3d ed.)*

# VI. Coordination with State Judges

Most class actions of any size and scope will have federal jurisdiction based on minimal diversity and, if originally filed in state court, will most likely be removed to federal court. Coordination among federal courts will often, but not always, proceed through the MDL process, at least for major cases. Some overlapping class actions may be filed in state courts (for example, in cases filed on behalf of a class of primarily in-state plaintiffs against an in-state defendant), but federal courts lack jurisdiction only in cases in which a primary or significant defendant is a citizen of the forum state. The first step in determining jurisdiction is to ask the parties whether competing or overlapping proposed or certified class actions exist in other courts. A defendant should be aware of any other litigation against it and should inform the court about competing or overlapping state class actions.

Judges have developed various practices, with various levels of formality, for coordinating their efforts with their state judge counterparts. Informal practices include personal meetings, telephone calls, and e-mail communications to exchange information about scheduling and to coordinate discovery, rulings on class certification, and other procedural matters. In more formal contexts, judges may share a special master with state judges, sit jointly and hear evidence and argument on motions, or even hold a national conference or a set of meetings about the litigation.

Generally, state judges have responded to requests for coordination in a spirit of cooperation. The key is to identify the cases and judges and initiate communication. Coordination in areas like discovery should take into account the pressure a state judge might experience from state lawyers eager to present their cases at trial or, at a minimum, to share in any common fund that their efforts help create. Only in the rarest instance will you ever need to issue an injunction to protect federal jurisdiction, usually when you are seeking to insulate a national settlement from contrary rulings in competing or overlapping class actions in state court. *See* MCL 4th §§ 21.42 and 20.32.

38

ER000299

*Class Action Pocket Guide (3d ed.)*

# VII. Use of Special Masters and Court-Appointed Experts

Special masters, court-appointed experts, and other judicial adjuncts with special expertise may be useful in a variety of contexts in class action litigation. Specifically, judges have appointed special masters to oversee discovery and resolve disputes in cases in which the number and complexity of documents might generate a large number of disputes. *See* MCL 4th § 11.424. The emergence of electronic discovery and of a new industry of party experts on electronic discovery may increase the need for the court to appoint a discovery master. Judges have also used magistrate judges, special masters, court-appointed experts, technical advisors, and other adjuncts to assist them in evaluating class settlements (*see* MCL 4th § 21.644) and have appointed special masters or other adjuncts to administer settlements and participate in resolving claims via alternative dispute resolution (ADR) or other methods (*see* MCL 4th § 21.661).

Occasionally, judges have appointed special masters to devise trial plans. *See* MCL 4th § 21.141. In class actions involving disputed scientific evidence, you may want to appoint an expert to present a perspective on disputed issues that is less adversarial than what the parties' experts present. *See, e.g.,* MCL 4th § 22.87. Federal Rules of Civil Procedure 23(h)(4) and 53(a)(1)(C) expressly authorize using special masters to review attorney fee requests. *See* MCL 4th § 21.727. In many class actions, however, the trial judge may find that the information learned by participating in pretrial matters, such as resolving discovery disputes, will greatly enhance the judge's ability to make an informed assessment of a class settlement.

# Conclusion

If this guide has served its purpose, it has helped you analyze and manage the major aspects of class action litigation. By anticipating and paying serious attention to reviewing settlements and requests for attorney fees, you should be able to fulfill your role as a fidu-

ER000300

*Class Action Pocket Guide (3d ed.)*

ciary for a class whose counsel and representatives have decided to settle on a particular outcome.

# Bibliography

American Law Institute, Principles of Aggregate Litigation (2010)

California Superior Court, Guidelines for Motions for Preliminary and Final Approval of Class Settlement (Draft May 3, 2010)

Theodore Eisenberg & Geoffrey P. Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues,* 57 Vand. L. Rev. 1529 (2004)

Federal Judicial Center, Manual for Complex Litigation, Fourth (MCL 4th) (2004)

Federal Trade Commission, Fulfilling the Original Vision: The FTC at 90 (April 2004), http://ftc.gov/os/2004/04/040402abafinal.pdf

Deborah Hensler et al., Class Action Dilemmas: Pursuing Public Goals for Private Gain (RAND Corp. 2000)

Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do You Really Want Me To Know My Rights? The Ethics Behind Due Process in Class Action Notice Is More Than Just Plain Language: A Desire to Actually Inform*, 18 Geo. J. Legal Ethics 1359 (2005)

Alan Hirsch & Diane Sheehey, Federal Judicial Center, Awarding Attorneys' Fees and Managing Fee Litigation (2d ed. 2005)

Laural L. Hooper & Marie Leary, *Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study,* 209 F.R.D. 519 (Federal Judicial Center 2001)

Emery G. Lee III & Thomas E. Willging, *The Impact of the Class Action Fairness Act on the Federal Courts: An Empirical Analysis of Filings and Removals,* 156 U. Pa. L. Rev. 1723 (2008)

Emery G. Lee III & Thomas E. Willging, Federal Judicial Center, Impact of the Class Action Fairness Act on the Federal Courts: Preliminary Findings from Phase Two's Pre-CAFA Sample of Diversity Class Actions (2008)

ER000301

*Class Action Pocket Guide (3d ed.)*

Francis E. McGovern, Distribution of Funds in Class Actions-Claims Administration, 35 J. Corp. L. 123 (2009)

Nicholas M. Pace & William B. Rubenstein, How Transparent Are Case Outcomes: Empirical Research on the Availability of Class Action Claims Data (RAND Corp. 2008)

Barbara J. Rothstein, John Beisner, Elizabeth J. Cabraser & Jay Tidmarsh, *The Class Action Fairness Act of 2005: An Overview of Legal and Case Management Issues* (Federal Judicial Center Broadcast, Apr. 1, 2005) (outline and videotape available from the FJC's Information Services Office)

Rust Consulting, Inc. & Kinsella Media, LLC, Plain Language Primer for Class Action Notice (undated), http://www.kinsella media.com/Knowledge_Sharing.aspx

Rust Consulting, Inc., Class Action Settlements: What You Should Know About Claim Filing Services (undated), http://www.rust consulting.com/pdfs/ClaimFilingServices.pdf

William W Schwarzer, Nancy E. Weiss & Alan Hirsch, *Judicial Federalism in Action: Coordination of Litigation in State and Federal Courts,* 78 Va. L. Rev. 1689 (1992)

Symposium, *Fairness to Whom? Perspectives on the Class Action Fairness Act of 2005,* 156 U. Pa. L. Rev. 1439 (2008)

Third Circuit Task Force, *Report on Selection of Class Counsel,* 74 Temp. L. Rev. 689 (2001)

Sarah S. Vance, *A Primer on the Class Action Fairness Act of 2005,* 80 Tul. L. Rev. 1617 (2006)

Shannon R. Wheatman & Terri R. LeClercq, Majority of Class Action Publication Notices Fail to Satisfy Rule 23 Requirements (2010) (unpublished manuscript on file with the Federal Judicial Center)

Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Federal Judicial Center, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules (1996); *see also* Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *An Empirical Analysis of Rule 23 to*

41

ER000302

*Class Action Pocket Guide (3d ed.)*

*Address the Rulemaking Challenges,* 71 N.Y.U. L. Rev. 74 (1996) (later version of same report with fewer tables and figures)

Thomas E. Willging & Shannon R. Wheatman, Federal Judicial Center, An Empirical Examination of Attorneys' Choice of Forum in Class Action Litigation (2005)

## Case Annotations by Topic

### Determining federal jurisdiction

Tam v. Indymac Bank, No. 2:8CV06458, 2008 WL 4793676 (C.D. Cal. Oct. 30, 2008) (comprehensive show cause order with a checklist of jurisdictional and removal issues)

### Burdens of proof

Blockbuster v. Galeno, 472 F.3d 53, 56–58 (2d Cir. 2006) (CAFA did not alter long-standing burden-of-proof rule)

Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc., 485 F.3d 804, 813 (5th Cir. 2007) ("'once federal jurisdiction has been established [under CAFA] the *objecting* party bears the burden of proof as to the applicability of any express statutory exception under §§ 1332(d)(4)(A) and (B) [the local controversy and home state exceptions]'") (quoting Serrano v. 180 Connect, Inc., 478 F.3d 1018, 1024 (9th Cir. 2007) (alterations in original))

Spivey v. Vertrue, Inc., 528 F.3d 982, 985–86 (7th Cir. 2008) (defendant satisfied its burden of proof by showing more than $5 million was at stake, or "in controversy")

### Amount in controversy

Brill v. Countrywide Home Loans, 427 F.3d 446, 448 (7th Cir. 2005) ("Once the proponent of jurisdiction has set out the amount in controversy, only a 'legal certainty' that the judgment will be less forecloses federal jurisdiction.")

Gene & Gene LLC v. Biopay LLC, 541 F.3d 318, 324 (5th Cir. 2008) ("Gene's complaint held open the possibility of treble damages, depending on the state of the proof.")

42

ER000303

*Class Action Pocket Guide (3d ed.)*

Hart v. FedEx Ground Package Sys., Inc., 457 F.3d 675, 682 (7th Cir. 2006) (party challenging federal jurisdiction must provide competent proof of the facts supporting the challenge)

Lowdermilk v. United States Bank Nat'l Ass'n, 479 F.3d 994, 999–1000 (9th Cir. 2007) (plaintiff is the master of its complaint, and courts must accept damages allegations unless defendant can show a legal certainty of greater damages)

### Home-state exception

Martin v. Lafon Nursing Facility of the Holy Family, Inc., 548 F. Supp. 2d 268, 273–78 (E.D. La. 2008) (discussing use of a questionnaire to establish residence and intent)

Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc., 485 F.3d 804, 813–18 (5th Cir. 2007) (discussing affidavits and evidence submitted to support proof of citizenship of class members in applying discretionary exception to CAFA)

Summerhill v. Terminix, No. 4:08CV659, 2008 WL 4809448 (E.D. Ark. Oct. 30, 2008) (applying statutory requirement that all primary defendants must be citizens of the home state for the exception to apply)

### Discretionary jurisdiction

Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc., 485 F.3d 804, 822–24 (5th Cir. 2007) (class action involving Hurricane Katrina-related injuries did not affect national interests under CAFA)

## Timing and significance of class certification

### Class certification

General Telephone Co. v. Falcon, 457 U.S. 147, 161 (1982) ("[A] class action may only be certified if the trial judge is satisfied, after a vigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.")

Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 594 (9th Cir. 2010) ("[D]istrict courts are not only at liberty to but must perform a rigorous analysis to ensure that the prerequisites of Rule 23 have been satisfied, and this analysis will often . . . require

43

*Class Action Pocket Guide (3d ed.)*

looking behind the pleadings to issues overlapping with the
merits of the underlying claims.")

Notice

> *In re* Vivendi Universal, S.A. Securities Litigation, 242 F.R.D. 76,
> 107–09 (2007)
>
> Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 176 (1974)

## Settlement review: risks and issues

Judge's role

> Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 280 (7th Cir.
> 2002)

Prior action by government entities

> *In re* First Databank Antitrust Litig., 209 F. Supp. 2d 96 (D.D.C.
> 2002)

Appraisal of settlement

> Acosta v. Trans Union, LLC, 243 F.R.D. 377, 391 (C.D. Cal.
> 2007) (reducing the number of claims rendered a portion of
> the settlement "illusory")
>
> Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp.
> 2d 561, 574–75 (E.D. Pa. 2001) (settlement appraisal focused
> on the value actually distributed to the class based on the
> number of claims actually filed)

Information from objectors

> O'Keefe v. Mercedes-Benz USA, LLC, 214 F.R.D. 266, 295 (E.D.
> Pa. 2003) (referring to "'canned objections filed by profes-
> sional objectors who seek out class actions to simply extract
> a fee by lodging generic, unhelpful protests'" (quoting Shaw
> v. Toshiba Am. Info. Sys., 91 F. Supp. 2d 942, 973 (S.D. Tex.
> 2000))

ER000305

*Class Action Pocket Guide (3d ed.)*

## Hot button indicators

Coupons

> *In re* Compact Disc Minimum Advertised Price Antitrust Litig.,
> 292 F. Supp. 2d 184, 186–88 (D. Me. 2003) (comparing settle-
> ment discounts with discounts available to frugal shoppers)
>
> *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods.
> Liab. Litig., 55 F.3d 768, 809–10 (3d Cir. 1995) (rejecting
> coupon settlement based in part on absence of a secondary
> market in which coupons could be converted to cash)
>
> *In re* Mexico Money Transfer Litig., 267 F.3d 743, 748 (7th Cir.
> 2001) (coupons may be of value to repeat users of a product
> or service)

Negative options

> Chavez v. Netflix, Inc., 75 Cal. Rptr. 3d 413, 418–21 (Cal. Ct.
> App. 2008) (tying together a proposed "benefit" with an au-
> tomatic paid renewal of that "benefit" is grounds for rejec-
> tion of a proposed settlement)

*Cy pres* relief ("fluid recovery")

> Molski v. Gleich, 318 F.3d 937, 954 (9th Cir. 2003) (rejecting
> proposed *cy pres* award after examining proposed settlement
> for evidence that "proof of individual claims would be bur-
> densome or that distribution of damages would be costly")
>
> Powell v. Georgia-Pac. Corp., 119 F.3d 703 (8th Cir. 1997) (ex-
> amining the relationship between the class members' inter-
> ests and those of the proposed *cy pres* recipient)

Restriction on claims/reversion of unclaimed funds to
defendants

> Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 283 (7th Cir.
> 2002) (restrictions on eligibility may diminish the value of
> the settlement to the class)

Collusion: "Reverse auctions" and the like

> Acosta v. Trans Union, LLC, 243 F.R.D. 377, 399 (C.D. Cal.
> 2007) ("The Court is hesitant to classify the Settlement as
> the product of a 'reverse auction,' but cannot avoid the con-

ER000306

*Class Action Pocket Guide (3d ed.)*

clusion that the process by which it was reached is strikingly similar.")

Figueroa v. Sharper Image Corp., 517 F. Supp. 2d 1292, 1321 (S.D. Fla. 2007) (class settlement rejected where defendants selected the most vulnerable plaintiff attorney and convinced that attorney to accept terms unfavorable to the class)

Injunctive relief

Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 615–23 (9th Cir. 2010) (discussing injunctive relief)

Release of liability without remedy

Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 283–84 (7th Cir. 2002) (releasing a damage remedy without payment to class members is not acceptable)

Settlement class actions

Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997) (Rule 23 standards, with the exception of manageability, apply to certification of settlement class actions)

## Preliminary review of proposed settlement

*In re* Lupron Mktg. & Sales Practices Litig., 345 F. Supp. 2d 135, 138 n.5 (D. Mass. 2004) (permitting plaintiff counsel in independent state class actions against same defendants to intervene and provide adversarial opposition to a proposed settlement)

Notice to the Class

Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974)

Mullane v. Central Hanover Bank and Trust Co. 339 U.S. 306 (1950)

Jones v. Flowers, 547 U.S. 220 (2006)

*In re* Holocaust Victims Assets Litig., 105 F. Supp. 2d 139, 144–45 (E.D.N.Y. 2000) (describing multifaceted notice plan)

ER000307

*Class Action Pocket Guide (3d ed.)*

## Conducting the fairness hearing

> *In re* Cendant Corp. Litig., 264 F.3d 201 (3d Cir. 2001) (appellate review of class settlement)

## Attorney fee issues

> *In re* Rite Aid Corp. Sec. Litig., 396 F.3d 294, 307 (3d Cir. 2005) (stating that "the district judge must protect the class's interest by acting as a fiduciary for the class")

Evaluating monetary and nonmonetary results achieved

> Bowling v. Pfizer, 132 F.3d 1147, 1151–52 (6th Cir. 1998) (reserving a portion of attorney fee decision until administration of the class settlement is complete)
>
> Fleury v. Richemont N. Am., Inc., No. 05-4525, 2008 WL 3287154, at *6 (N.D. Cal. Aug. 6, 2008) (reserving attorney fee decision)
>
> *In re* Auction Houses Antitrust Litig., No. 00-Civ.-0648, 2001 WL 170792, at *3–*5, *15–17 (S.D.N.Y. 2001) (awarding fees in part in the form of warrants)
>
> Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561 (E.D. Pa. 2001) (value distributed to the class based on the number of claims actually filed represents the starting point for calculation of attorney fee award)
>
> Strong v. BellSouth Telecomm., Inc., 173 F.R.D. 167 (W.D. La. 1997), *aff'd*, 137 F.3d 844, 848 (5th Cir. 1998) (reserving attorney fee decision until court receives information about actual distribution of settlement benefits to class members)
>
> Sylvester v. CIGNA Corp., 369 F. Supp. 2d 34, 50–53 (D. Me. 2005) (using information about actual claims by class members to evaluate settlement and award attorney fees)

Methods of calculating fees

> *In re* Rite Aid Corp. Sec. Litig., 396 F.3d 294, 306–07 (3d Cir. 2005) (lodestar cross-check does not require actual billing records)

ER000308

*Class Action Pocket Guide (3d ed.)*

"Mega" cases

*In re* Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 339–40 (3d Cir. 1998) (describing large class settlements)

*In re* Rite Aid Corp. Sec. Litig., 396 F.3d 294, 302–03 (3d Cir. 2005) (discussing pros and cons of sliding scales for fee awards)

Objectors

Bowling v. Pfizer, 922 F. Supp. 1261, 1285 (S.D. Ohio 1996) (objectors to fees were awarded fees for adding to the common fund)

Role of government actors

*In re* First Databank Antitrust Litig., 209 F. Supp. 2d 96, 97–98 (D.D.C. 2002) (documenting time and effort of government agency; participation in class litigation by government agency)

Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1272 (D.C. Cir. 1993) (reasonable attorney fee is a percentage of the value added to the class settlement beyond the amount attributable to the government agency)

ER000309

**The Federal Judicial Center**

**Board**
The Chief Justice of the United States, Chair
Judge Susan H. Black, U.S. Court of Appeals for the Eleventh Circuit
Judge David O. Carter, U.S. District Court for the Central District of California
Magistrate Judge John Michael Facciola, U.S. District Court for the District of
    Columbia
Judge James B. Haines, Jr., U.S. Bankruptcy Court for the District of Maine
Judge Edward C. Prado, U.S. Court of Appeals for the Fifth Circuit
Judge Loretta A. Preska, U.S. District Court for the Southern District of New York
Judge Philip M. Pro, U.S. District Court for the District of Nevada
James C. Duff, Director of the Administrative Office of the U.S. Courts

**Director**
Judge Barbara J. Rothstein

**Deputy Director**
John S. Cooke

**About the Federal Judicial Center**
The Federal Judicial Center is the research and education agency of the federal
judicial system. It was established by Congress in 1967 (28 U.S.C. §§ 620–629), on
the recommendation of the Judicial Conference of the United States.

By statute, the Chief Justice of the United States chairs the Center's Board,
which also includes the director of the Administrative Office of the U.S. Courts
and seven judges elected by the Judicial Conference.

The organization of the Center reflects its primary statutory mandates. The
Education Division plans and produces education and training programs for
judges and court staff, including satellite broadcasts, video programs, publica-
tions, curriculum packages for in-court training, and Web-based programs and
resources. The Research Division examines and evaluates current and alterna-
tive federal court practices and policies. This research assists Judicial Conference
committees, who request most Center research, in developing policy recommen-
dations. The Center's research also contributes substantially to its educational
programs. The two divisions work closely with two units of the Director's Of-
fice—the Systems Innovations & Development Office and Communications
Policy & Design Office—in using print, broadcast, and online media to deliver
education and training and to disseminate the results of Center research. The
Federal Judicial History Office helps courts and others study and preserve federal
judicial history. The International Judicial Relations Office provides information
to judicial and legal officials from foreign countries and assesses how to inform
federal judicial personnel of developments in international law and other court
systems that may affect their work.

# EXHIBIT B

**Notes of Advisory Committee on 2003 amendments.** *Note to Subdivision (c).* Subdivision (c) is amended in several respects. The requirement that the court determine whether to certify a class "as soon as practicable after commencement of an action" is replaced by requiring determination "at an early practicable time." The notice provisions are substantially revised.

Paragraph (1). Subdivision (c)(1)(A) is changed to require that the determination whether to certify a class be made "at an early practicable time." The "as soon as practicable" exaction neither reflects prevailing practice nor captures the many valid reasons that may justify deferring the initial certification decision. See Willging, Hooper & Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 26-36 (Federal Judicial Center 1996).

Time may be needed to gather information necessary to make the certification decision. Although an evaluation of the probable outcome on the merits is not properly part of the certification decision, discovery in aid of the certification decision often includes information required to identify the nature of the issues that actually will be presented at trial. In this sense it is appropriate to conduct controlled discovery into the "merits," limited to those aspects relevant to making the certification decision on an informed basis. Active judicial supervision may be required to achieve the most effective balance that expedites an informed certification determination without forcing an artificial and ultimately wasteful division between "certification discovery" and "merits discovery." A critical need is to determine how the case will be tried. An increasing number of courts require a party requesting class certification to present a "trial plan" that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof. See Manual For Complex Litigation Third, § 21.213, p. 44; § 30.11, p. 214; § 30.12, p. 215.

Other considerations may affect the timing of the certification decision. The party opposing the class may prefer to win dismissal or summary judgment as to the individual plaintiffs without certification and without binding the class that might have been certified. Time may be needed to explore designation of counsel under Rule 23(g), recognizing that in many cases the need to progress toward the certification determination may require designation of interim class counsel under Rule 23(g)(2)(A).

Although many circumstances may justify deferring the certification decision, active management may be necessary to ensure that the certification decision is not unjustifiably delayed.

Subdivision (c)(1)(C) reflects two amendments. The provision that a class certification "may be conditional" is deleted. A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met. The provision that permits alteration or amendment of an order granting or denying class certification is amended to set the cut-off point at final judgment rather than "the decision on the merits." This change avoids the possible ambiguity in referring to "the decision on the merits." Following a determination of liability, for example, proceedings to define the remedy may demonstrate the need to amend the class definition or subdivide the class. In this setting the final judgment concept is pragmatic. It is not the same as the concept used for appeal purposes, but it should be, particularly in protracted litigation.

The authority to amend an order under Rule 23(c)(1) before final judgment does not restore the practice of "one-way intervention" that was rejected by the 1966 revision of Rule 23. A determination of liability after certification, however, may show a need to amend the class definition. Decertification may be warranted after further proceedings.

If the definition of a class certified under Rule 23(b)(3) is altered to include members who have not

been afforded notice and an opportunity to request exclusion, notice -- including an opportunity to request exclusion -- must be directed to the new class members under Rule 23(c)(2)(B).

Paragraph (2). The first change made in Rule 23(c)(2) is to call attention to the court's authority -- already established in part by Rule 23(d)(2) -- to direct notice of certification to a Rule 23(b)(1) or (b)(2) class. The present rule expressly requires notice only in actions certified under Rule 23(b)(3). Members of classes certified under Rules 23(b)(1) or (b)(2) have interests that may deserve protection by notice.

The authority to direct notice to class members in a (b)(1) or (b)(2) class action should be exercised with care. For several reasons, there may be less need for notice than in a (b)(3) class action. There is no right to request exclusion from a (b)(1) or (b)(2) class. The characteristics of the class may reduce the need for formal notice. The cost of providing notice, moreover, could easily cripple actions that do not seek damages. The court may decide not to direct notice after balancing the risk that notice costs may deter the pursuit of class relief against the benefits of notice.

When the court does direct certification notice in a (b)(1) or (b)(2) class action, the discretion and flexibility established by subdivision (c)(2)(A) extend to the method of giving notice. Notice facilitates the opportunity to participate. Notice calculated to reach a significant number of class members often will protect the interests of all. Informal methods may prove effective. A simple posting in a place visited by many class members, directing attention to a source of more detailed information, may suffice. The court should consider the costs of notice in relation to the probable reach of inexpensive methods.

If a Rule 23(b)(3) class is certified in conjunction with a (b)(2) class, the (c)(2)(B) notice requirements must be satisfied as to the (b)(3) class.

The direction that class-certification notice be couched in plain, easily understood language is a reminder of the need to work unremittingly at the difficult task of communicating with class members. It is difficult to provide information about most class actions that is both accurate and easily understood by class members who are not themselves lawyers. Factual uncertainty, legal complexity, and the complication of class-action procedure raise the barriers high. The Federal Judicial Center has created illustrative clear-notice forms that provide a helpful starting point for actions similar to those described in the forms.

*Note to Subdivision (e).* Subdivision (e) is amended to strengthen the process of reviewing proposed class-action settlements. Settlement may be a desirable means of resolving a class action. But court review and approval are essential to assure adequate representation of class members who have not participated in shaping the settlement.

Paragraph (1). Subdivision (e)(1)(A) expressly recognizes the power of a class representative to settle class claims, issues, or defenses.

Rule 23(e)(1)(A) resolves the ambiguity in former Rule 23(e)'s reference to dismissal or compromise of "a class action." That language could be -- and at times was -- read to require court approval of settlements with putative class representatives that resolved only individual claims. See Manual for Complex Litigation Third, § 30.41. The new rule requires approval only if the claims, issues, or defenses of a certified class are resolved by a settlement, voluntary dismissal, or compromise.

Subdivision (e)(1)(B) carries forward the notice requirement of present Rule 23(e) when the settlement binds the class through claim or issue preclusion; notice is not required when the settlement binds only the individual class representatives. Notice of a settlement binding on the class is required either when the settlement follows class certification or when the decisions on certification and settlement proceed

simultaneously.

Reasonable settlement notice may require individual notice in the manner required by Rule 23(c)(2)(B) for certification notice to a Rule 23(b)(3) class. Individual notice is appropriate, for example, if class members are required to take action -- such as filing claims -- to participate in the judgment, or if the court orders a settlement opt-out opportunity under Rule 23(e)(3).

Subdivision (e)(1)(C) confirms and mandates the already common practice of holding hearings as part of the process of approving settlement, voluntary dismissal, or compromise that would bind members of a class.

Subdivision (e)(1)(C) states the standard for approving a proposed settlement that would bind class members. The settlement must be fair, reasonable, and adequate. A helpful review of many factors that may deserve consideration is provided by *In re: Prudential Ins. Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283, 316-324 (3d Cir. 1998). Further guidance can be found in the Manual for Complex Litigation.

The court must make findings that support the conclusion that the settlement is fair, reasonable, and adequate. The findings must be set out in sufficient detail to explain to class members and the appellate court the factors that bear on applying the standard.

Settlement review also may provide an occasion to review the cogency of the initial class definition. The terms of the settlement themselves, or objections, may reveal divergent interests of class members and demonstrate the need to redefine the class or to designate subclasses.

Redefinition of a class certified under Rule 23(b)(3) may require notice to new class members under Rule 23(c)(2)(B). See Rule 23(c)(1)(C).

Paragraph (2). Subdivision (e)(2) requires parties seeking approval of a settlement, voluntary dismissal, or compromise under Rule 23(e)(1) to file a statement identifying any agreement made in connection with the settlement. This provision does not change the basic requirement that the parties disclose all terms of the settlement or compromise that the court must approve under Rule 23(e)(1). It aims instead at related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others. Doubts should be resolved in favor of identification.

Further inquiry into the agreements identified by the parties should not become the occasion for discovery by the parties or objectors. The court may direct the parties to provide to the court or other parties a summary or copy of the full terms of any agreement identified by the parties. The court also may direct the parties to provide a summary or copy of any agreement not identified by the parties that the court considers relevant to its review of a proposed settlement. In exercising discretion under this rule, the court may act in steps, calling first for a summary of any agreement that may have affected the settlement and then for a complete version if the summary does not provide an adequate basis for review. A direction to disclose a summary or copy of an agreement may raise concerns of confidentiality. Some agreements may include information that merits protection against general disclosure. And the court must provide an opportunity to claim work-product or other protections.

Paragraph (3). Subdivision (e)(3) authorizes the court to refuse to approve a settlement unless the settlement affords class members a new opportunity to request exclusion from a class certified under Rule 23(b)(3) after settlement terms are known. An agreement by the parties themselves to permit class members to elect exclusion at this point by the settlement agreement may be one factor supporting

approval of the settlement. Often there is an opportunity to opt out at this point because the class is certified and settlement is reached in circumstances that lead to simultaneous notice of certification and notice of settlement. In these cases, the basic opportunity to elect exclusion applies without further complication. In some cases, particularly if settlement appears imminent at the time of certification, it may be possible to achieve equivalent protection by deferring notice and the opportunity to elect exclusion until actual settlement terms are known. This approach avoids the cost and potential confusion of providing two notices and makes the single notice more meaningful. But notice should not be delayed unduly after certification in the hope of settlement.

Rule 23 (e)(3) authorizes the court to refuse to approve a settlement unless the settlement affords a new opportunity to elect exclusion in a case that settles after a certification decision if the earlier opportunity to elect exclusion provided with the certification notice has expired by the time of the settlement notice. A decision to remain in the class is likely to be more carefully considered and is better informed when settlement terms are known.

The opportunity to request exclusion from a proposed settlement is limited to members of a (b)(3) class. Exclusion may be requested only by individual class members; no class member may purport to opt out other class members by way of another class action.

The decision whether to approve a settlement that does not allow a new opportunity to elect exclusion is confided to the court's discretion. The court may make this decision before directing notice to the class under Rule 23(e)(1)(B) or after the Rule 23(e)(1)(C) hearing. Many factors may influence the court's decision. Among these are changes in the information available to class members since expiration of the first opportunity to request exclusion, and the nature of the individual class members' claims.

The terms set for permitting a new opportunity to elect exclusion from the proposed settlement of a Rule 23(b)(3) class action may address concerns of potential misuse. The court might direct, for example, that class members who elect exclusion are bound by rulings on the merits made before the settlement was proposed for approval. Still other terms or conditions may be appropriate.

Paragraph (4). Subdivision (e)(4) confirms the right of class members to object to a proposed settlement, voluntary dismissal, or compromise. The right is defined in relation to a disposition that, because it would bind the class, requires court approval under subdivision (e)(1)(C).

Subdivision (e)(4)(B) requires court approval for withdrawal of objections made under subdivision (e)(4)(A). Review follows automatically if the objections are withdrawn on terms that lead to modification of the settlement with the class. Review also is required if the objector formally withdraws the objections. If the objector simply abandons pursuit of the objection, the court may inquire into the circumstances.

Approval under paragraph (4)(B) may be given or denied with little need for further inquiry if the objection and the disposition go only to a protest that the individual treatment afforded the objector under the proposed settlement is unfair because of factors that distinguish the objector from other class members. Different considerations may apply if the objector has protested that the proposed settlement is not fair, reasonable, or adequate on grounds that apply generally to a class or subclass. Such objections, which purport to represent class-wide interests, may augment the opportunity for obstruction or delay. If such objections are surrendered on terms that do not affect the class settlement or the objector's participation in the class settlement, the court often can approve withdrawal of the

objections without elaborate inquiry.

Once an objector appeals, control of the proceeding lies in the court of appeals. The court of appeals may undertake review and approval of a settlement with the objector, perhaps as part of appeal settlement procedures, or may remand to the district court to take advantage of the district court's familiarity with the action and settlement.

*Note to Subdivision (g).* Subdivision (g) is new. It responds to the reality that the selection and activity of class counsel are often critically important to the successful handling of a class action. Until now, courts have scrutinized proposed class counsel as well as the class representative under Rule 23(a)(4). This experience has recognized the importance of judicial evaluation of the proposed lawyer for the class, and this new subdivision builds on that experience rather than introducing an entirely new element into the class certification process. Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in assessing proposed class counsel as part of the certification decision. This subdivision recognizes the importance of class counsel, states the obligation to represent the interests of the class, and provides a framework for selection of class counsel. The procedure and standards for appointment vary depending on whether there are multiple applicants to be class counsel. The new subdivision also provides a method by which the court may make directions from the outset about the potential fee award to class counsel in the event the action is successful.

Paragraph (1) sets out the basic requirement that class counsel be appointed if a class is certified and articulates the obligation of class counsel to represent the interests of the class, as opposed to the potentially conflicting interests of individual class members. It also sets out the factors the court should consider in assessing proposed class counsel.

Paragraph (1)(A) requires that the court appoint class counsel to represent the class. Class counsel must be appointed for all classes, including each subclass that the court certifies to represent divergent interests.

Paragraph (1)(A) does not apply if "a statute provides otherwise." This recognizes that provisions of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified in various sections of 15 U.S.C.), contain directives that bear on selection of a lead plaintiff and the retention of counsel. This subdivision does not purport to supersede or to affect the interpretation of those provisions, or any similar provisions of other legislation.

Paragraph 1(B) recognizes that the primary responsibility of class counsel, resulting from appointment as class counsel, is to represent the best interests of the class. The rule thus establishes the obligation of class counsel, an obligation that may be different from the customary obligations of counsel to individual clients.

Appointment as class counsel means that the primary obligation of counsel is to the class rather than to any individual members of it. The class representatives do not have an unfettered right to "fire" class counsel.In the same vein, the class representatives cannot command class counsel to accept or reject a settlement proposal. To the contrary, class counsel must determine whether seeking the court's approval of a settlement would be in the best interests of the class as a whole.

Paragraph (1)(C) articulates the basic responsibility of the court to appoint class counsel who will provide the adequate representation called for by paragraph (1)(B). It identifies criteria that must be considered and invites the court to consider any other pertinent matters. Although couched in terms of

ER000316

the court's duty, the listing also informs counsel seeking appointment about the topics that should be addressed in an application for appointment or in the motion for class certification.

The court may direct potential class counsel to provide additional information about the topics mentioned in paragraph (1)(C) or about any other relevant topic. For example, the court may direct applicants to inform the court concerning any agreements about a prospective award of attorney fees or nontaxable costs, as such agreements may sometimes be significant in the selection of class counsel. The court might also direct that potential class counsel indicate how parallel litigation might be coordinated or consolidated with the action before the court.

The court may also direct counsel to propose terms for a potential award of attorney fees and nontaxable costs. Attorney fee awards are an important feature of class action practice, and attention to this subject from the outset may often be a productive technique. Paragraph (2)(C) therefore authorizes the court to provide directions about attorney fees and costs when appointing class counsel. Because there will be numerous class actions in which this information is not likely to be useful, the court need not consider it in all class actions.

Some information relevant to class counsel appointment may involve matters that include adversary preparation in a way that should be shielded from disclosure to other parties. An appropriate protective order may be necessary to preserve confidentiality.

In evaluating prospective class counsel, the court should weigh all pertinent factors. No single factor should necessarily be determinative in a given case. For example, the resources counsel will commit to the case must be appropriate to its needs, but the court should be careful not to limit consideration to lawyers with the greatest resources.

If, after review of all applicants, the court concludes that none would be satisfactory class counsel, it may deny class certification, reject all applications, recommend that an application be modified, invite new applications, or make any other appropriate order regarding selection and appointment of class counsel.

Paragraph (2). This paragraph sets out the procedure that should be followed in appointing class counsel. Although it affords substantial flexibility, it provides the framework for appointment of class counsel in all class actions. For counsel who filed the action, the materials submitted in support of the motion for class certification may suffice to justify appointment so long as the information described in paragraph (g)(1)(C) is included. If there are other applicants, they ordinarily would file a formal application detailing their suitability for the position.

In a plaintiff class action the court usually would appoint as class counsel only an attorney or attorneys who have sought appointment. Different considerations may apply in defendant class actions.

The rule states that the court should appoint "class counsel." In many instances, the applicant will be an individual attorney. In other cases, however, an entire firm, or perhaps of numerous attorneys who are not otherwise affiliated but are collaborating on the action will apply. No rule of thumb exists to determine when such arrangements are appropriate; the court should be alert to the need for adequate staffing of the case, but also to the risk of overstaffing or an ungainly counsel structure.

Paragraph (2)(A) authorizes the court to designate interim counsel during the pre-certification period if necessary to protect the interests of the putative class. Rule 23(c)(1)(B) directs that the order certifying the class include appointment of class counsel. Before class certification, however, it will usually be important for an attorney to take action to prepare for the certification decision. The amendment to

Rule 23(c)(1) recognizes that some discovery is often necessary for that determination. It also may be important to make or respond to motions before certification. Settlement may be discussed before certification. Ordinarily, such work is handled by the lawyer who filed the action. In some cases, however, there may be rivalry or uncertainty that makes formal designation of interim counsel appropriate. Rule 23(g)(2)(A) authorizes the court to designate interim counsel to act on behalf of the putative class before the certification decision is made. Failure to make the formal designation does not prevent the attorney who filed the action from proceeding in it. Whether or not formally designated interim counsel, an attorney who acts on behalf of the class before certification must act in the best interests of the class as a whole. For example, an attorney who negotiates a pre-certification settlement must seek a settlement that is fair, reasonable, and adequate for the class.

Rule 23(c)(1) provides that the court should decide whether to certify the class "at an early practicable time," and directs that class counsel should be appointed in the order certifying the class. In some cases, it may be appropriate for the court to allow a reasonable period after commencement of the action for filing applications to serve as class counsel. The primary ground for deferring appointment would be that there is reason to anticipate competing applications to serve as class counsel. Examples might include instances in which more than one class action has been filed, or in which other attorneys have filed individual actions on behalf of putative class members. The purpose of facilitating competing applications in such a case is to afford the best possible representation for the class. Another possible reason for deferring appointment would be that the initial applicant was found inadequate, but it seems appropriate to permit additional applications rather than deny class certification.

Paragraph (2)(B) states the basic standard the court should use in deciding whether to certify the class and appoint class counsel in the single applicant situation -- that the applicant be able to provide the representation called for by paragraph (1)(B) in light of the factors identified in paragraph (1)(C).

If there are multiple adequate applicants, paragraph (2)(B) directs the court to select the class counsel best able to represent the interests of the class. This decision should also be made using the factors outlined in paragraph (1)(C), but in the multiple applicant situation the court is to go beyond scrutinizing the adequacy of counsel and make a comparison of the strengths of the various applicants. As with the decision whether to appoint the sole applicant for the position, no single factor should be dispositive in selecting class counsel in cases in which there are multiple applicants. The fact that a given attorney filed the instant action, for example, might not weigh heavily in the decision if that lawyer had not done significant work identifying or investigating claims. Depending on the nature of the case, one important consideration might be the applicant's existing attorney-client relationship with the proposed class representative.

Paragraph (2)(C) builds on the appointment process by authorizing the court to include provisions regarding attorney fees in the order appointing class counsel. Courts may find it desirable to adopt guidelines for fees or nontaxable costs, or to direct class counsel to report to the court at regular intervals on the efforts undertaken in the action, to facilitate the court's later determination of a reasonable attorney fee.

*Note to Subdivision (h).* Subdivision (h) is new. Fee awards are a powerful influence on the way attorneys initiate, develop, and conclude class actions. Class action attorney fee awards have heretofore been handled, along with all other attorney fee awards, under Rule 54(d)(2), but that rule is not addressed to the particular concerns of class actions. This subdivision is designed to work in tandem

ER000318

with new subdivision (g) on appointment of class counsel, which may afford an opportunity for the court to provide an early framework for an eventual fee award, or for monitoring the work of class counsel during the pendency of the action.

Subdivision (h) applies to "an action certified as a class action." This includes cases in which there is a simultaneous proposal for class certification and settlement even though technically the class may not be certified unless the court approves the settlement pursuant to review under Rule 23(e). When a settlement is proposed for Rule 23(e) approval, either after certification or with a request for certification, notice to class members about class counsel's fee motion would ordinarily accompany the notice to the class about the settlement proposal itself.

This subdivision does not undertake to create new grounds for an award of attorney fees or nontaxable costs. Instead, it applies when such awards are authorized by law or by agreement of the parties. Against that background, it provides a format for all awards of attorney fees and nontaxable costs in connection with a class action, not only the award to class counsel. In some situations, there may be a basis for making an award to other counsel whose work produced a beneficial result for the class, such as attorneys who acted for the class before certification but were not appointed class counsel, or attorneys who represented objectors to a proposed settlement under Rule 23(e) or to the fee motion of class counsel. Other situations in which fee awards are authorized by law or by agreement of the parties may exist.

This subdivision authorizes an award of "reasonable" attorney fees and nontaxable costs. This is the customary term for measurement of fee awards in cases in which counsel may obtain an award of fees under the "common fund" theory that applies in many class actions, and is used in many fee-shifting statutes. Depending on the circumstances, courts have approached the determination of what is reasonable in different ways. In particular, there is some variation among courts about whether in "common fund" cases the court should use the lodestar or a percentage method of determining what fee is reasonable. The rule does not attempt to resolve the question whether the lodestar or percentage approach should be viewed as preferable.

Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process. Continued reliance on caselaw development of fee-award measures does not diminish the court's responsibility. In a class action, the district court must ensure that the amount and mode of payment of attorney fees are fair and proper whether the fees come from a common fund or are otherwise paid. Even in the absence of objections, the court bears this responsibility.

Courts discharging this responsibility have looked to a variety of factors. One fundamental focus is the result actually achieved for class members, a basic consideration in any case in which fees are sought on the basis of a benefit achieved for class members. The Private Securities Litigation Reform Act of 1995 explicitly makes this factor a cap for a fee award in actions to which it applies. See 15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class"). For a percentage approach to fee measurement, results achieved is the basic starting point.

In many instances, the court may need to proceed with care in assessing the value conferred on class members. Settlement regimes that provide for future payments, for example, may not result in significant actual payments to class members. In this connection, the court may need to scrutinize the manner and operation of any applicable claims procedure. In some cases, it may be appropriate to defer

ER000319

some portion of the fee award until actual payouts to class members are known. Settlements involving nonmonetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class. On occasion the court's Rule 23(e) review will provide a solid basis for this sort of evaluation, but in any event it is also important to assessing the fee award for the class.

At the same time, it is important to recognize that in some class actions the monetary relief obtained is not the sole determinant of an appropriate attorney fees award. Cf. Blanchard v. Bergeron, 489 U.S. 87, 95 [103 L. Ed. 2d 67, 76] (1989) (cautioning in an individual case against an "undesirable emphasis" on "the importance of the recovery of damages in civil rights litigation" that might "shortchange efforts to seek effective injunctive or declaratory relief").

Any directions or orders made by the court in connection with appointing class counsel under Rule 23(g) should weigh heavily in making a fee award under this subdivision.

Courts have also given weight to agreements among the parties regarding the fee motion, and to agreements between class counsel and others about the fees claimed by the motion. Rule 54(d)(2)(B) provides: "If directed by the court, the motion shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made." The agreement by a settling party not to oppose a fee application up to a certain amount, for example, is worthy of consideration, but the court remains responsible to determine a reasonable fee. "Side agreements" regarding fees provide at least perspective pertinent to an appropriate fee award.

In addition, courts may take account of the fees charged by class counsel or other attorneys for representing individual claimants or objectors in the case. In determining a fee for class counsel, the court's objective is to ensure an overall fee that is fair for counsel and equitable within the class. In some circumstances individual fee agreements between class counsel and class members might have provisions inconsistent with those goals, and the court might determine that adjustments in the class fee award were necessary as a result.

Finally, it is important to scrutinize separately the application for an award covering nontaxable costs. If costs were addressed in the order appointing class counsel, those directives should be a presumptive starting point in determining what is an appropriate award.

Paragraph (1). Any claim for an award of attorney fees must be sought by motion under Rule 54(d)(2), which invokes the provisions for timing of appeal in Rule 58 and Appellate Rule 4. Owing to the distinctive features of class action fee motions, however, the provisions of this subdivision control disposition of fee motions in class actions, while Rule 54(d)(2) applies to matters not addressed in this subdivision.

The court should direct when the fee motion must be filed. For motions by class counsel in cases subject to court review of a proposed settlement under Rule 23(e), it would be important to require the filing of at least the initial motion in time for inclusion of information about the motion in the notice to the class about the proposed settlement that is required by Rule 23(e). In cases litigated to judgment, the court might also order class counsel's motion to be filed promptly so that notice to the class under this subdivision (h) can be given.

Besides service of the motion on all parties, notice of class counsel's motion for attorney fees must be "directed to the class in a reasonable manner." Because members of the class have an interest in the arrangements for payment of class counsel whether that payment comes from the class fund or is made directly by another party, notice is required in all instances. In cases in which settlement approval is

ER000320

contemplated under Rule 23(e), notice of class counsel's fee motion should be combined with notice of the proposed settlement, and the provision regarding notice to the class is parallel to the requirements for notice under Rule 23(e). In adjudicated class actions, the court may calibrate the notice to avoid undue expense.

Paragraph (2). A class member and any party from whom payment is sought may object to the fee motion. Other parties -- for example, nonsettling defendants -- may not object because they lack a sufficient interest in the amount the court awards. The rule does not specify a time limit for making an objection. In setting the date objections are due, the court should provide sufficient time after the full fee motion is on file to enable potential objectors to examine the motion.

The court may allow an objector discovery relevant to the objections. In determining whether to allow discovery, the court should weigh the need for the information against the cost and delay that would attend discovery. See Rule 26(b)(2). One factor in determining whether to authorize discovery is the completeness of the material submitted in support of the fee motion, which depends in part on the fee measurement standard applicable to the case. If the motion provides thorough information, the burden should be on the objector to justify discovery to obtain further information.

Paragraph (3). Whether or not there are formal objections, the court must determine whether a fee award is justified and, if so, set a reasonable fee. The rule does not require a formal hearing in all cases. The form and extent of a hearing depend on the circumstances of the case. The rule does require findings and conclusions under Rule 52(a).

Paragraph (4). By incorporating Rule 54(d)(2), this provision gives the court broad authority to obtain assistance in determining the appropriate amount to award. In deciding whether to direct submission of such questions to a special master or magistrate judge, the court should give appropriate consideration to the cost and delay that such a process might entail.

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
2815 Townsgate Road, Suite 130
Westlake Village, California 91361
Telephone:  (805) 270-7100
Facsimile:   (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@ bradleygrombacher.com

**ROTHSCHILD & ASSOCIATES, APC**
Kristi D. Rothschild, Esq. (SBN 222727)
Julian Alwill, Esq. (SBN 259416)
27 W. Anapamu Street, Suite 289
Santa Barbara, California  93101
Telephone:  (805) 845-1190
Facsimile:   (805) 456-0132
krothschild@kdrlawgroup.com
jalwill@kdrlawgroup.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA RIDGELL, on behalf of herself and others similarly situated<br>Plaintiff,<br><br>v.<br><br>FRONTIER AIRLINES, INC. a Colorado corporation; AIRBUS S.A.S., a foreign corporation doing business in the State of California; AIRBUS GROUP HQ INC., a corporation doing business in the State of California<br>Defendants. | **Case No.: 2:18-CV-04916 PA (AFMx)**<br><br>**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICEDECLARATION OF KILEY LYNN GROMBACHER IN SUPPORT OF *EX PARTE* APPLICATION FOR RELIEF FROM DEADLINES IMPOSED BY LOCAL RULE 23-3** |

ER000322

## DECLARATION OF KILEY LYNN GROMBACHER

I, Kiley Lynn Grombacher, declare as follows:

     1.    I am an attorney duly admitted to practice law before this Court and I am a member in good standing of the State Bar of California, the State Bar of Tennessee, and in the Third and Ninth Circuits.

     2.    I am a named partner at Bradley/Grombacher, LLP counsel for Andrea Ridgell ("Plaintiff").

     3.    In my capacity as counsel, I have been actively involved with all aspects of this litigation. Accordingly, I have personal knowledge of all the matters set forth herein, and if called, I could and would competently testify to the following:

     4.    I submit this declaration in support of Plaintiffs' Administrative Motion for Relief from the 90-day deadline imposed by United States District Court, Central District of California Local Rule ("L.R.") 23-3.

### RELEVANT PROCEDURAL HISTORY

     5.    Plaintiff filed this action on June 1, 2018.

     6.    Pursuant to Local Rule 23-3, the deadline for the filing of Plaintiff's motion for class certification is currently September 13, 2018.

     7.    Plaintiff served defendant Frontier on or about June 15, 2018.

     8.    As a professional courtesy to Frontier, Plaintiff stipulated to provide Frontier an additional thirty-nine (39) days in which to file an answer to the complaint.  Frontier filed an answer to the complaint on August 14, 2018.

     9.    Plaintiff voluntarily dismissed defendant Airbus Group HQ, Inc., pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) on July 16, 2018.

     10.    Given that defendant Airbus S.A.S. ("Airbus") is a foreign corporation, service must be effectuated through protocols established by the Hauge Convention.

     11.    Shortly after filing, Plaintiff caused the complaint and all initiating documents to be translated into French.

12. Promptly upon translation, Plaintiff began the process of effectuating service under the Hague Convention with the assistance of ABC Legal, a process serving company.

13. In accordance with required procedures, the service request was sent to the Ministry de la Justice in Paris with confirmed receipt on July 16, 2018.

14. At present, service has not yet been confirmed and may take several more weeks or months to be effectuated.

15. No scheduling conference has yet been held in this action; however, a conference has recently been scheduled for October 1, 2018.

16. Given the Order and the fact that Frontier may oppose this application, Plaintiff has requested a telephonic Rule 26 conference of counsel. The parties have agreed to hold such conference on August 28, 2018.

17. No prior requests for continuance of the certification date have been requested in this action.

**Plaintiff has Met and Conferred in Advance of Filing this Motion**

18. On August 10, 2018, I spoke with counsel for defendant Frontier telephonically regarding the relief requested. Counsel advised they would speak with their client regarding the relief sought.

19. On August 24, 2018, Frontier clarified that it may oppose the relief sought.

20. On August 25, 2018, I sent an email to defense counsel providing notice of this *ex parte* and advising that any opposition would be due within 24 hours.

**Discovery From The Absent Defendant Is Necessary To Prepare a Motion for Class Certification**

21. Although Plaintiff promptly initiated such protocols, the process, is inherently slow and protracted and Airbus has not yet been served. As such, discovery on this entity cannot yet be conducted.

22. It is anticipated that Airbus possesses discovery relevant to issues underlying Plaintiff's motion for class certification, including, for example, information regarding the design and

ER000324

manufacture of the subject aircrafts. Such information will be relevant to foundational certification factors such as commonality, typicality and predominance.

23. Given the complexity of the claims alleged and procedural posture of this litigation, relief from the certification deadline imposed by Local Rule 23-3 is merited.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and is based upon my own personal knowledge. Executed in Westlake Village, California on August 28, 2018.

_/s/Kiley Lynn Grombacher_
Kiley Lynn Grombacher

ACCO,NORTHERN,(AFMx),DISCOVERY,MANADR,PROTORD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
### CIVIL DOCKET FOR CASE #: 2:18-cv-04916-PA-AFM

Andrea Ridgell v. Frontier Airlines, Inc. et al          Date Filed: 06/01/2018
Assigned to: Judge Percy Anderson                        Jury Demand: Plaintiff
Referred to: Magistrate Judge Alexander F. MacKinnon     Nature of Suit: 310 Airplane
Cause: 28:1332 Diversity-Product Liability               Jurisdiction: Diversity

**Plaintiff**

**Andrea Ridgell**                          represented by   **Kristi D Rothschild**
*, on behalf of herself and others*                         Rothschild and Alwill APC
*similarly situated*                                        27 West Anapamu Street Suite 289
                                                            Santa Barbara, CA 93101
                                                            805-845-1190
                                                            Fax: 805-456-0132
                                                            Email: krothschild@kdrlawgroup.com
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Marcus J Bradley**
                                                            Bradley Grombacher LLP
                                                            2815 Townsgate Road Suite 130
                                                            Westlake Village, CA 91361
                                                            805-270-7100
                                                            Fax: 805-270-7589
                                                            Email:
                                                            mbradley@bradleygrombacher.com
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Kiley Lynn Grombacher**
                                                            Bradley Grombacher LLP
                                                            2815 Townsgate Road Suite 130
                                                            Westlake Village, CA 91361
                                                            805-270-7100
                                                            Fax: 805-270-7589
                                                            Email:
                                                            kgrombacher@bradleygrombacher.com
                                                            *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Frontier Airlines, Inc.**                 represented by   **Kevin R Sutherland**
*, a Colorado corporation*                                  Clyde and Co US LLP
                                                            633 West 5th Street 26th Floor

Los Angeles, CA 90071
213-358-7600
Fax: 213-358-7950
Email: kevin.sutherland@clydeco.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey J Ellis**
Clyde and Co US LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
212-710-3900
Fax: 212-710-3950
Email: jeff.ellis@clydeco.us
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Natasha N Mikha**
Clyde and Co US LLP
633 West 5th Street 26th Floor
Los Angeles, CA 90071
213-358-7600
Fax: 213-358-7699
Email: natasha.mikha@clydeco.us
*ATTORNEY TO BE NOTICED*

**Defendant**

**Airbus S.A.S.**
*a foreign corporation doing business in
the State of California*

**Defendant**

**Airbus Group HQ, Inc.**
*a corporation doing business in the
State of California*
*TERMINATED: 07/16/2018*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 06/01/2018 | 1 | COMPLAINT Receipt No: 0973-21858905 - Fee: $400, filed by Plaintiff Andrea Ridgell. (Attorney Kiley Lynn Grombacher added to party Andrea Ridgell(pty:pla))(Grombacher, Kiley) (Entered: 06/01/2018) |
| 06/01/2018 | 2 | CIVIL COVER SHEET filed by Plaintiff Andrea Ridgell. (Grombacher, Kiley) (Entered: 06/01/2018) |
| 06/01/2018 | 3 | |

| | | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff Andrea Ridgell. (Grombacher, Kiley) (Entered: 06/01/2018) |
|---|---|---|
| 06/01/2018 | 4 | CERTIFICATE of Interested Parties filed by Plaintiff Andrea Ridgell, identifying Plaintiff, Andrea Ridgell, Defendant Frontier Airlines, Inc., Defendant Airbus S.A.S., Defendant Airbus Group HQ, Inc.. (Grombacher, Kiley) (Entered: 06/01/2018) |
| 06/04/2018 | 5 | NOTICE OF ASSIGNMENT to District Judge Percy Anderson and Magistrate Judge Alexander F. MacKinnon. (jp) (Entered: 06/04/2018) |
| 06/04/2018 | 6 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (jp) (Entered: 06/04/2018) |
| 06/04/2018 | 7 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendants Airbus Group HQ, Inc., Airbus S.A.S., Frontier Airlines, Inc. (jp) (Entered: 06/04/2018) |
| 06/05/2018 | 8 | STANDING ORDER REGARDING NEWLY ASSIGNED CASES upon filing of the complaint by Judge Percy Anderson. (rfi) (Entered: 06/05/2018) |
| 07/03/2018 | 9 | PROOF OF SERVICE Executed by Plaintiff Andrea Ridgell, upon Defendant Airbus Group HQ, Inc. served on 6/14/2018, answer due 7/5/2018. Service of the Summons and Complaint were executed upon Carlos Paz, Process Specialist, Person Authorized to Accept in compliance with statute not specified by service on a domestic corporation, unincorporated association, or public entity.Original Summons NOT returned. (Grombacher, Kiley) (Entered: 07/03/2018) |
| 07/03/2018 | 10 | PROOF OF SERVICE Executed by Plaintiff Andrea Ridgell, upon Defendant Frontier Airlines, Inc. served on 6/15/2018, answer due 7/6/2018. Service of the Summons and Complaint were executed upon Briana Gonzalez, Person Authorized to Accept in compliance with statute not specified by service on a domestic corporation, unincorporated association, or public entity.Original Summons NOT returned. (Grombacher, Kiley) (Entered: 07/03/2018) |
| 07/05/2018 | 11 | STIPULATION for Extension of Time to File Answer to August 14, 2018 re Complaint (Attorney Civil Case Opening) 1 filed by defendant Frontier Airlines, Inc.. (Attachments: # 1 Proposed Order Extending Time to Respond to Complaint)(Attorney Kevin R Sutherland added to party Frontier Airlines, Inc. (pty:dft))(Sutherland, Kevin) (Entered: 07/05/2018) |
| 07/06/2018 | 12 | ORDER EXTENDING TIME FOR FRONTIER AIRLINES TO FILE AND SERVE ITS ANSWER OR MOTION IN RESPONSE TO COMPLAINT BY 39 DAYS 11 by Judge Percy Anderson. IT IS HEREBY ORDERED THAT the time within which Frontier Airlines has to file and serve an answer or a motion in response to plaintiff's complaint is extended from July 6, 2018, up to, and including, August 14, 2018. (lom) (Entered: 07/06/2018) |
| 07/06/2018 | 13 | MINUTE ORDER IN CHAMBERS - ORDER TO SHOW CAUSE RE: DISMISSAL FOR LACK OF PROSECUTION by Judge Percy Anderson. (Show Cause Response due by 7/16/2018.) (mrgo) (Entered: 07/09/2018) |
| 07/16/2018 | 14 | |

ER000328

| | | |
|---|---|---|
| | | NOTICE OF DISMISSAL filed by Plaintiff Andrea Ridgell pursuant to FRCP 41a(1) as to Airbus Group HQ, Inc.. (Grombacher, Kiley) (Entered: 07/16/2018) |
| 08/14/2018 | 15 | ANSWER to Complaint (Attorney Civil Case Opening) 1 filed by Defendant Frontier Airlines, Inc..(Sutherland, Kevin) (Entered: 08/14/2018) |
| 08/14/2018 | 16 | NOTICE of Interested Parties filed by Defendant Frontier Airlines, Inc., identifying Frontier Airlines Holdings, Inc.; Frontier Group Holdings, Inc.; and Indigo Partners, LLC. (Sutherland, Kevin) (Entered: 08/14/2018) |
| 08/16/2018 | 17 | SCHEDULING MEETING OF COUNSEL [FRCP 16, 26(f)] ORDER by Judge Percy Anderson. (Scheduling Conference set for 10/1/2018 at 10:30 AM before Judge Percy Anderson.) (mrgo) (Entered: 08/16/2018) |
| 08/28/2018 | 18 | EX PARTE APPLICATION for Relief from DEADLINE IMPOSED BY LOCAL RULE 23-3 filed by Andrea Ridgell Andrea Ridgell. (Attachments: # 1 Unredacted Document Request for Judicial Notice, # 2 Declaration of Kiley Grombacher In Support of Motin for Relief, # 3 Proposed Order Granting Relief) (Grombacher, Kiley) (Entered: 08/28/2018) |
| 08/28/2018 | 20 | MINUTES (IN CHAMBERS) - COURT ORDER by Judge Percy Anderson re: 18 EX PARTE APPLICATION for Relief. Before the Court is an Ex Parte Application for Relief from Deadline Imposed by Local Rule 23-3 filed by plaintiff Andrea Ridgell ("Plaintiff") (Docket No. 18). Plaintiff seeks relief from Local Rule 23-3's timing requirement for the filing of a Motion for Class Certification. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument. Neither this Court nor Frontier should have to rush to consider Plaintiff's Ex Parte Application merely because Plaintiff did not seek such relief sooner. Nevertheless, and so that both Frontier and the Court have the time contemplated for opposing and considering such a Motion, the Court will continue the Local Rule 23-3 deadline to October 22, 2018, so that Plaintiff may file a regularly-noticed Motion for Relief from Local Rule 23-3. Plaintiff shall file such a Motion, pursuant to Local Rule 6-1 and the Court's Standing Order, by no later than September 6, 2018, and set the Motion for a hearing on October 15, 2018. (See document for full details) (mrgo) (Entered: 08/29/2018) |
| 08/29/2018 | 19 | NOTICE OF NON-OPPOSITION to EX PARTE APPLICATION for Relief from DEADLINE IMPOSED BY LOCAL RULE 23-3 18 *Frontier Airlines, Inc.'s Notice of Non-Opposition to Plaintiff's Ex Parte Application for Relief from Deadline Imposed by Local Rule 23-3* filed by Defendant Frontier Airlines, Inc.. (Mikha, Natasha) (Entered: 08/29/2018) |
| 09/06/2018 | 21 | NOTICE OF MOTION AND MOTION for Relief from DEADLINE IMPOSED BY LOCAL RULE 23-3 filed by Andrea Ridgell Andrea Ridgell. Motion set for hearing on 10/15/2018 at 01:30 PM before Judge Percy Anderson. (Attachments: # 1 Declaration Kiley L. Grombacher, # 2 Proposed Order) (Grombacher, Kiley) (Entered: 09/06/2018) |
| 09/06/2018 | 22 | REQUEST FOR JUDICIAL NOTICE re NOTICE OF MOTION AND MOTION for Relief from DEADLINE IMPOSED BY LOCAL RULE 23-3 21 filed by Plaintiff Andrea Ridgell. (Grombacher, Kiley) (Entered: 09/06/2018) |

ER000329

| 09/17/2018 | 23 | JOINT RULE 26 REPORT filed by Plaintiff Andrea Ridgell. (Grombacher, Kiley) (Entered: 09/17/2018) |
|---|---|---|
| 09/20/2018 | 24 | NOTICE OF NON-OPPOSITION to NOTICE OF MOTION AND MOTION for Relief from DEADLINE IMPOSED BY LOCAL RULE 23-3 21 *Frontier Airlines Inc.'s Notice of Non-Opposition to Plaintiff's Motion for Relief from Deadline Imposed by Local Rule 23-3* filed by Defendant Frontier Airlines, Inc.. (Mikha, Natasha) (Entered: 09/20/2018) |
| 09/21/2018 | 25 | STIPULATION to Continue Scheduling Conference from October 1, 2018 to October 15, 2018 Re: Order, Set/Reset Hearing 17 filed by Defendant Frontier Airlines, Inc.. (Attachments: # 1 Proposed Order)(Mikha, Natasha) (Entered: 09/21/2018) |
| 09/21/2018 | 26 | ORDER DENYING STIPULATION TO CONTINUE SCHEDULING CONFERENCE by Judge Percy Anderson, re Stipulation to Continue 25 . (mrgo) (Entered: 09/24/2018) |
| 09/26/2018 | 27 | APPLICATION of Non-Resident Attorney Jeffrey J. Ellis to Appear Pro Hac Vice on behalf of Defendant Frontier Airlines, Inc (Pro Hac Vice Fee - $400 Fee Paid, Receipt No. 0973-22483778) filed by Defendant Frontier Airlines, Inc.. (Attachments: # 1 Proposed Order) (Mikha, Natasha) (Entered: 09/26/2018) |
| 09/26/2018 | 28 | ORDER by Judge Percy Anderson: granting 27 Non-Resident Attorney Jeffrey J. Ellis APPLICATION to Appear Pro Hac Vice on behalf of defendant Frontier Airlines Inc, designating Kevin R. Sutherland as local counsel. (mrgo) (Entered: 09/27/2018) |
| 10/01/2018 | 29 | PROTECTIVE ORDER CONCERNING CONFIDENTIAL INFORMATION by Judge Percy Anderson. (See document for details) (mrgo) (Entered: 10/02/2018) |
| 10/01/2018 | 30 | MINUTES OF SCHEDULING CONFERENCE MOTION for Relief from Deadline Imposed by Local Rule 23-3 21 Hearing held before Judge Percy Anderson. For the reasons stated on the record the motion is denied. Schedule of Trial and Pretrial Dates: Amended Pleadings due by 12/27/2018. Discovery cut-off 6/10/2019. Motions in Limine to be filed by 7/19/2019. Motions due by 6/17/2019. Proposed Pretrial Order due by 7/5/2019. Final Pretrial Conference set for 7/19/2019 at 01:30 PM before Judge Percy Anderson. Jury Trial set for 8/20/2019 at 09:00 AM before Judge Percy Anderson. Exhibit List due by 7/5/2019. Witness List due by 7/5/2019. Last date to conduct settlement conference is 6/24/2019. Court Reporter: Phyllis Preston. (mrgo) (Entered: 10/02/2018) |
| 10/01/2018 | 31 | MINUTE ORDER IN CHAMBERS - COURT ORDER by Judge Percy Anderson. Before the Court is a Class Action Complaint filed by plaintiff Andrea Ridgell ("Plaintiff") on behalf of herself and on behalf of two putative classes against defendants Frontier Airlines, Inc. ("Frontier") and Airbus S.A.S. ("Airbus"). At the scheduling conference, the Court inquired about the basis for the Court's subject matter jurisdiction. Plaintiff's counsel stated that the Court possessed diversity jurisdiction under both 28 U.S.C. § 1332(a) and under the |

| | | |
|---|---|---|
| | | Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Accordingly, the Court dismisses Plaintiffs Complaint for lack of subject matter jurisdiction. A district court may, and should, grant leave to amend when it appears that subject matter jurisdiction may exist, even though the complaint inadequately alleges jurisdiction. Therefore, the Court grants Plaintiff leave to amend to attempt to establish federal subject matter jurisdiction. Plaintiff's First Amended Complaint, if any, is to be filed and served no later than October 15, 2018. (mrgo) (Entered: 10/02/2018) |
| 10/02/2018 | 32 | CIVIL TRIAL SCHEDULING ORDER [FED. R. CIV. P. 16(b)] by Judge Percy Anderson. (Discovery cut-off 6/10/2019. Motions due by 6/17/2019. Final Pretrial Conference set for 7/19/2019 at 01:30 PM before Judge Percy Anderson., Jury Trial set for 8/20/2019 at 09:00 AM before Judge Percy Anderson.) (mrgo) (Entered: 10/02/2018) |
| 10/05/2018 | 33 | FIRST AMENDED COMPLAINT against Defendants All Defendants amending Complaint (Attorney Civil Case Opening) 1 , filed by Andrea Ridgell Andrea Ridgell(Grombacher, Kiley) (Entered: 10/05/2018) |
| 10/08/2018 | 34 | TRANSCRIPT ORDER as to Andrea Ridgell Andrea Ridgell for Court Reporter. Court will contact Tina Amoke at tamoke@bradleygrombacher.com with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Grombacher, Kiley) (Entered: 10/08/2018) |
| 10/08/2018 | 35 | TRANSCRIPT ORDER as to defendant Frontier Airlines, Inc. for Court Reporter. Court will contact Patricia Inabnet at patricia.inabnet@clydeco.us with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the court reporter. (Sutherland, Kevin) (Entered: 10/08/2018) |
| 10/15/2018 | 36 | NOTICE OF SELECTION OF MEDIATOR filed by defendant Frontier Airlines, Inc.. (Mikha, Natasha) (Entered: 10/15/2018) |
| 10/19/2018 | 37 | ANSWER to Amended Complaint/Petition 33 filed by Defendant Frontier Airlines, Inc..(Sutherland, Kevin) (Entered: 10/19/2018) |
| 10/22/2018 | 38 | NOTICE OF MOTION AND MOTION to Certify Class filed by Plaintiff Andrea Ridgell. Motion set for hearing on 11/19/2018 at 01:30 PM before Judge Percy Anderson. (Attachments: # 1 Declaration of Marcus J. Bradley, # 2 Declaration of Kiley L. Grombacher, # 3 Declaration of Plaintiff, Andrea Ridgell, # 4 Proposed Order) (Bradley, Marcus) (Entered: 10/22/2018) |
| 10/23/2018 | 39 | DECLARATION of Andrea Ridgell In Support of NOTICE OF MOTION AND MOTION to Certify Class 38 (EXECUTED) filed by Plaintiff Andrea Ridgell. (Bradley, Marcus) (Entered: 10/23/2018) |
| 10/29/2018 | 40 | OPPOSITION in opposition re: NOTICE OF MOTION AND MOTION to Certify Class 38 Frontier Airlines Inc.'s Opposition to Plaintiff's Motion for Class Certification filed by Defendant Frontier Airlines, Inc.. (Attachments: # 1 Declaration Valerie W. Tyler, # 2 Exhibit A to Tyler Declaration, # 3 Declaration Jeffrey J. Ellis)(Mikha, Natasha) (Entered: 10/29/2018) |
| | | |

ER000331

| 11/05/2018 | 41 | REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION filed by Plaintiff Andrea Ridgell. (Grombacher, Kiley) (Entered: 11/05/2018) |
|---|---|---|
| 11/09/2018 | 42 | MINUTES (IN CHAMBERS) - COURT ORDER by Judge Percy Anderson re: 38 MOTION to Certify Class Action. For the foregoing reasons, the Court concludes that Plaintiff has not satisfied Rule 23's requirements for either the Nationwide or Flight 1630 classes she seeks the certify. The Court therefore denies Plaintiff's Motion for Class Certification. (See document for details) (mrgo) (Entered: 11/09/2018) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/21/2018 10:13:06 | | |
| **PACER Login:** BradGrom2815:5622879:0 | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 2:18-cv-04916-PA-AFM End date: 11/21/2018 |
| **Billable Pages:** 6 | **Cost:** | 0.60 |